Ryan J. Schriever (Bar No. 10816)
SCHRIEVER LAW FIRM
51 East 800 North
Spanish Fork, UT 84660
Telephone: (801) 574-0883
Fax: (801) 515-8686
ryan@schrieverlaw.com
*Attorneys for Martin Crowson*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **MARTIN CROWSON**, <br><br> Plaintiff, <br><br> vs. <br><br> **JUDD LAROWE**, et al., <br><br> Defendants. | **MEMORANDUM IN OPPOSITION TO WASHINGTON COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 2:15-CV-880-RJS <br><br> Judge Tena Campbell <br><br> (Oral Arguments Requested) |

Plaintiff, Martin Crowson, by and through counsel, submits this Memorandum in Opposition to Motion for Summary Judgment.

## <u>INTRODUCTORY STATEMENT</u>

The issue before the Court is whether an inmate who was left in a medical observation cell for seven days in Purgatory Jail without any meaningful diagnosis or evaluation of his serious medical need is entitled to have his Eighth Amendment case heard by a jury.  Martin Crowson entered Purgatory Jail on June 11, 2014.  He was placed in solitary confinement from June 17, 2014 to June 25, 2014.   When the deputies

1

encountered Crowson early that morning, they realized there was something wrong with him and they took him to the medical staff.  From June 25, 2014 to July 1, 2014, Crowson sat in a medical observation cell unable to verbalize intelligent answers or follow simple instructions.  Despite the seriousness of his medical condition, Crowson was never seen by a doctor or a mental health professional.  Until Nurse Ryan Borrowman made the decision on July 1 to send Crowson to the emergency room, Crowson remained in the medical observation cell with no diagnosis and no real treatment plan.

The Court should deny the Washington County Defendants' Motion for Summary Judgment because there are disputed issues of fact and the defendants are not entitled to judgment as a matter of law.

### <u>RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS</u>

<u>**NO DISPUTE:**</u>  The plaintiff does not dispute statements of fact one through two, five to eight, 10-11, 15-16, 18-22, 24, 26, 29-32, 34-39, 41-48.

<u>**STATEMENT OF FACT NO. 3:**</u>  It is not uncommon for prisoners to illegally take medications or drugs from other inmates which sometimes causes intoxication. In addition, some inmates make, contrary to Jail rules, homemade alcohol and become intoxicated or poisoned by it. Both of these situations may cause an inmate to suffer withdrawals while in the Jail, especially if they had a drug or alcohol problem before entering the Jail. (See Exhibit 2, Excerpts from the Deposition of Bret Lyman 46:9-47:2).

<u>**DISPUTE**</u>:  Martin Crowson did not take illegal drugs or alcohol when he was in prison.  (Crowson Decl. ¶8.)  Crowson was in lockdown from June 17, 2014 until he went into medical observation on June 25, 2014.  For eight days prior to being transferred to medical observation, Crowson only had access to prison guards.  (Lyman Dep at 34-36.)

The defendants may have assumed Crowson had access to alcohol or illicit drugs, but they did nothing to test their assumptions.  They did not draw his blood, take a urine sample, or do any other form of toxicology testing.  (*See* Bates No. 501.)  Dr. Larowe ordered a complete blood count and a comprehensive metabolic panel ("CBC") because "it's quite valuable in assessment."  (Larowe Dep at 16.)  The CBC, if taken, would have indicated whether Crowson was acidotic or septic.  It would also have given Dr. Larowe an idea about Crowson's kidney function, liver function, electrolytes and blood sugar.  *Id.*

**STATEMENT OF FACT NO. 9.**:  Plaintiff was moved from the general population of the Jail to 'A block' on about June 17, 2014, due to a disciplinary charge.  He does not remember anything that happened after being moved to A block.

**DISPUTE**:  The plaintiff does not dispute that he was transferred to A Block, but it is important to understand that A Block is Purgatory Jail's solitary confinement area. Inmates in A Block are isolated and only allowed out of their cell for one hour, every other day.  (Lyman Dep at 28.)  During that time, Crowson had no contact with anyone except correctional officers who checked on him and served him food on Styrofoam trays slid through a slot in the door.  (Lyman Dep at 34-36.)  The records provided by the Washington County Defendants show that Crowson was allowed out of his cell for one hour on June 20, 2014, and for one hour on June 22, 2014.  (Bates Nos. 524, 525.)  Other than that, he was in his cell.

Further, no one from medical checked on Crowson during that entire time. Crowson does not remember his time in A Block which means he was having mental and cognitive issues, but had no access to medical care.  (*See* Bates 484.)

**STATEMENT OF FACT NO. 12**:  As a jail nurse, Johnson administers medications to inmates, checks vital signs, and reports his assessments to doctors and mental health professionals. However, by law he cannot prescribe medications for an inmate patient or diagnose any medical condition.  Generally, any diagnosis or prescription would have to come from a doctor. (Johnson Decl. ¶3.)

**DISPUTE**:  There is a genuine issue of material fact as to Johnson's assertion that those factors constitute the totality of his responsibilities or duties owed to inmates. From June 25, 2014 through June 30, 2014, Johnson was the only medical professional who saw Crowson.   Johnson's assessment and diagnosis as a nurse were crucial to Crowson's care and the actual facts of this case show that Johnson's deliberate indifference to Crowson's serious medical condition resulted in an unacceptable delay of Crowson receiving appropriate medical care.

As set forth in more detail in the Plaintiff's Statement of Additional Material Facts, Crowson was deliberately indifferent in the exercise of his gatekeeper role.  Further, he was deliberately indifferent in implementing the medical plan prescribed by Dr. Larowe.

According to Ryan Borrowman, nurses use the ADPIE protocol to perform nursing assessments where A stands for "assessment," D stands for "diagnosis," P stands for "planning," I stands for "implementation," and E stands for "evaluation."  (*See* Borrowman Dep at 23-24; *accord* https://www.nursetheory.com/adpie/ (last visited Oct. 2, 2018).) Johnson not only fell short in all of the categories, but the ways in which he fell short manifested deliberate indifference.

**STATEMENT OF FACT NO. 13.**:  Johnson also reviewed the notes he recorded about Plaintiff in the jail's electronic medical record (CorERM) system. These notes

include observations he recorded about Plaintiff in June 2014. Johnson has a general recollection about Plaintiff since he was at the Jail on numerous occasions. (Johnson Decl. ¶6.)

**DISPUTE**:   There is a genuine dispute regarding this assertion of fact. The defendants assert that Johnson reviewed his own notes, but they fail to acknowledge that there are many other important facts that Johnson ignored. On June 25, 2014, Johnson recorded in CorEMR "pt noted to be dazed and confused while serving breakfast, pt has been incarcerated x2 wks . . ." (Bates No. 501.) No one from medical saw Crowson on June 26 or 27, 2014. *See id.* Johnson came back on shift on June 28, 2014, but did not see Crowson until 2:07 PM. *Id.* At that time, Johnson noted "pt continues to appear confused, disoriented, one word answers to questions, bp elevated @ this time, reported to md." *Id.*

Dr. Larowe testified that when he learned of Crowson's condition on June 28, 2014, Johnson did not make him aware that Crowson had already been in medical observation for four days. (Larowe Dep at 44.) In addition, Dr. Larowe also did not know that Crowson had been incarcerated for over two weeks. *See id.* Dr. Larowe thought the first time Crowson was in medical observation was when he received the call from Johnson. *Id.*

Johnson did not review Crowson's intake history or get any history of Crowson's medical condition. (Johnson Dep at 73;22-23.) When Johnson returned to shift on June 28, 2014, he did not find out any information about Crowson's condition on June 26 or June 27 to convey to Dr. Larowe. (*See* Johnson Dep at 90.) Johnson testified, "For the time I'm there that's the only time I can speak for. For the other days or whatever when he was there, I can't talk for that." (Johnson Dep at 90.)

**STATEMENT OF FACT NO. 14:**  Johnson knows that the information on these notes is accurate because it is his practice to accurately document pertinent patient assessments in the CorEMR system after a significant interaction with a patient inmate. (Johnson Decl. ¶6.)

**DISPUTE:**  This statement of fact is disputed.  Johnson's note of June 29, 2014 noted "dts", or delirium tremens, yet he did not document any symptoms of delirium tremens.  (*See* Bates No. 501.) When asked if Johnson would have documented whether Crowson was sweating, a significant sign of delirium tremens, Johnson answered, "Perhaps, perhaps not."  (Johnson Dep at 101.)  Contary to Johnson's bald assertion of accuracy, there are multiple deficiencies in his patient assessments in CorEMR.

Furthermore, this statement of fact is an irrelevant conclusory assertion.  The implication is that Johnson was not deliberately indifferent because he kept medical notes.  However, Johnson repeatedly failed to pass on important and accurate information to Jon Worlton and Dr. Larowe.

It makes no difference how accurate or inaccurate Crowson's notes were because they never made it to Dr. Larowe. Dr. Larowe did not have remote access to CorEMR. (Larowe Dep at 10, 12-13.)  Dr. Larowe could have accessed the CorEMR records if he had come to Purgatory Jail at some point during the week as he was contractually obligated to do, but he did not.  (Larowe Dep at 25-26.)  That meant Dr. Larowe had no access to the CorEMR records.  His only source of information was Michael Johnson.

 Johnson, however, was deliberately indifferent about providing accurate and complete information to Dr. Larowe.  He did not relay any of Crowson's prior history from June 11, 2014 to June 28, 2014.  (Johnson Dep at 90.)

In addition, Johnson was deliberately indifferent about providing any kind of useful assessment or nursing diagnosis of Crowson.  Johnson was asked, "Was it within your ability to make a direct recommendation to Dr. Larowe that he send an inmate to the emergency room?"  (Johnson Dep at 91.)  He responded, "That would mean I would diagnose the patient and I wouldn't diagnose the patient. I would just give [Dr. Larowe] what I was observing and what information I had and let him determine that."  (Johnson Dep at 91.)

That is in direct contrast to what Dr. Larowe needed and what he expected:

> Q:      As far as evaluating patients, it's true you rely on nurses in large part when you're not there, right?
> A:      I do.
> Q:      In fact, there's no other way to do it, is there?
> A:      There is not.
> Q:      They've got to be your eyes and ears?
> A:      They are.

(Larowe Dep at 14-15.)

> Q:      And if Mr. Johnson, on June 25th, 2014, would have recommended that, you would have had no objection to that either, correct?
> A:      They are my eyes and ears.

(Larowe Dep at 45.)

**STATEMENT OF FACT NO. 17**:  On the morning of June 25, 2014, jail deputies reported to Michael Johnson that Plaintiff was acting different than normal.  Johnson interviewed Plaintiff at about 7:00 a.m. and observed that Plaintiff seemed quiet and reserved, which was different from how he normally acted.  (Johnson Decl. ¶9.)

**DISPUTE**:  This statement of fact is incomplete and understates what was observed on June 25, 2014. On June 25, 2014, Deputy Brett Lyman noted:

> Inmate Crowson did not show up to the line for breakfast this morning. I stepped in to the section and called for him. When he did come out of the

7

lower tier he appeared to me to be lethargic or slow. I asked him to get a food tray. He turned around and went back to the lower tier. Depputy Dolgner carne to F-Block and escorted him to booking. Medical checked Crowson and found nothing wrong with his vitals. He was later moved to the detox cell for observation.

(Bates No. 529.)

That same day, Deputy Fred Keil observed:

Prior to being placed in the Booking detox cell for medical observation, in the privacy of the Booking Dress-out room, I performed a visual body cavity search on Inmate Crowson. Inmate Crowson appeared to be in an unusual state of confusion and was slow to respond to my commands. When Inmate Crowson was instructed to dress, he put his underwear on after he had his pants on. I instructed Inmate Crowson to redress himself by putting the underwear on and then his pants over them. He seemed to be confused and removed the underwear but did not put them on.

(Bates No. 521.)

At 7:13 AM that same morning, Johnson noted "pt able to verbalize name, spell last name, unable to remember what kind of work he did prior to being arrested . . ." (Bates No. 501.)  At that time, Johnson referred Crowson to "J. Worlton for further eval." *Id.*  At 3:22 PM that same day, Johnson checked Crowson's blood pressure, measured his oxygen saturation and noted that his "pupils were dilated but reactive to light."  (Bates No. 501, 503.)  Johnson did not make any observations about Crowson's mental status. Johnson then went off shift and Crowson was not seen by anyone from medical for the next two days.  *See id.*

The plaintiff does not dispute statement of fact 18.

**STATEMENT OF FACT NO. 19:**   After Johnson interviewed Plaintiff, he was concerned Plaintiff may be suffering from some medical problem. Therefore, Johnson instructed jail deputies to move Plaintiff to a medical housing cell in the booking area so

8

that his health and safety could be better monitored by staff. Medical housing cells are in the booking area of the Jail where they are observed on a more frequent basis than the rest of the Jail. Johnson also requested further evaluation for Plaintiff for mental health. (Johnson Decl. ¶ 11).

**DISPUTE:**  The defendants have asserted that Crowson's presence in the medical cell meant that Crowson was observed more frequently, but that is not what happened. According to the medical personnel from Purgatory Jail, an inmate in the medical observation cell should have been checked on twice per day by medical staff.  (Johnson Dep at 109;6-9.)  Although it is not a "written policy," the practice of Purgatory Jail is that a nurse should check on an inmate in medical observation at least one time per shift, i.e. at least one time every twelve hours.  (Worlton Dep at 45.)

The facts show that Johnson checked on Crowson two times on June 25, 2014. (Bates No. 501.)  However, no one checked on Crowson on June 26, 2014 or on June 27, 2014.  *See id.*  Johnson returned to work on June 28, 2014, but did not see Crowson until 2:07 PM that afternoon.  *Id.*  Johnson entered three notes, timestamped at 2:07 PM, 4:22 PM and 4:24 PM, but there were no other checks done until the following morning. *Id.* On June 29, 2014, Johnson checked on Crowson at 7:48 AM, 9:43 AM and 3:36 PM. *Id.*  No one checked on Crowson on June 30, 2014 except to administer Ativan at 6:34 AM.  *Id.*  After 4:24 PM on June 29, 2014, there are no other indications about Crowson's status until 2:50 PM on July 1, 2014 when Ryan Borrowman called Dr. Larowe to recommend that Crowson be transported to the ER.  *Id.*

There is also a dispute about the mental health evaluation that Johnson allegedly ordered.  The medical records indicate that Johnson "referred to J.Worlton for further

9

eval." (Bates No. 501.) Purgatory Jail did not have a specific procedure for notifying Worlton that his services had been requested. (*See* Worlton Dep at 26-27.) It is possible Johnson told Worlton verbally about the request for evaluation, but Worlton does not remember any specifics. (Worlton Dep at 26.) Prior to his deposition, Worlton reviewed the tasks associated with Crowson's case, but he did not see a task for him to evaluate Crowson. (Worlton Dep at 27.) Worlton conceded, "If it wasn't communicated verbally or if it wasn't included in the task, I wouldn't have necessarily known." (Worlton Dep at 28.) When asked if he knew why the referral for mental evaluation "fell through the cracks," Worlton stated "I don't remember. I can tell you what I think but I don't remember for sure." (Worlton Dep at 47.) Worlton then went on to speculate that "Mike was believing there was some detox or that he got into some drugs or something. From a mental health standpoint there's not a lot that I can do for somebody in that condition . . . so I would have prioritized that differently." (Worlton Dep at 47.)

In contrast to Worlton's questionable memory that Johnson told him Crowson was experiencing detoxification, Johnson testified that he recommended an evaluation with Worlton because Crowson was "acting a little bit different toward the deputies. . . [Crowson] was more outgoing, not quiet, reserved." (Johnson Dep at 46.) In addition, Johnson testified that the reason he put Crowson in medical observation on June 25, 2014 was for "mental health observation," not "detox observation." (Johnson Dep at 48.)

The reasonable inference to be drawn from these disputed facts is that Johnson noted Crowson should be referred to Worlton for a mental health evaluation, but that message either never made it to Worlton or Worlton was deliberately indifferent when he "prioritized it differently."

**STATEMENT OF FACT NO. 20**:  That same day, at approximately 3 p.m. Johnson checked on Plaintiff again. Johnson observed that Plaintiffs pupils were dilated but were reactive to light. Johnson observed that Plaintiff was alert and oriented. Because of this Johnson thought Plaintiff was not in need of any other care at that time and left the Jail after his shift ended. (Johnson Decl. ¶ 12).

**DISPUTE:**  This statement of fact is incomplete, and the complete set of facts show that Johnson was deliberately indifferent.  First, it should be noted that Johnson did not contact or call Dr. Larowe at any time on June 25, 2014.  (Johnson Dep at 112;16-18.)

While it is undisputed that Johnson checked Crowson's pupils at 3:23 PM, Johnson failed to perform a neurological assessment to determine Crowson's mental status. Johnson testified that to identify a brain injury, he would perform a neurological assessment, including: "check their eyes, their movement, their speech, their cognitive, whether they're processing, either slow or fast . . . check their grips. . . [h]ave them stick their tongue out, wiggle it back and forth, check their eyes, see if they're dilated, pinpoints, if they can move their eyes, track with their eyes, if they can answer questions, if they can speak clearly enough."  (Johnson Dep at 32-33.)  However, the only thing Johnson did was check to see if Crowson's pupils were reactive to light.

Having done that, Johnson unilaterally decided Crowson "was not in need of any other care at that time and left the Jail" without consulting Dr. Larowe.  It is significant that that Johnson's last evaluation of Crowson that day took place toward the end of his shift. (*See* Johnson Dep at 82 (referring to 4:24 PM on June 28, 2014 as being "just before the end of [his] shift.")  Facing the prospect of ending his shift to have the next two days off,

Johnson decided not to contact Dr. Larowe before unilaterally deciding that Crowson needed no additional care.

That stands in stark contrast to the reasons Johnson gave for his actions on June 28, 2014 after Crowson had been languishing in a dazed and confused state for four days. Johnson's post-hoc justification was that only Dr. Larowe could decide what to do with Crowson.  (*See e.g.*, Johnson Dep at 91.)  But Johnson's actions on June 25, 2014 belie that assertion.   Johnson had no problem deciding that Crowson did not need any additional medical care; he only had a problem deciding whether Crowson needed more care.

Johnson's actions are telling.  On June 25, 2014, Johnson decided Crowson did not need additional care.  He made that decision again on June 28 and June 29. Johnson's actions had nothing to do with Dr. Larowe's oversight.  Dr. Larowe testified that he would have absolutely transported Crowson to the ER earlier if Johnson had recommended it.  "[I]f there's an – if there's a thought that we need to transfer them, we always err on the side of transporting."  (Larowe Dep at 76.)

Johnson simply did not tell Dr. Larowe anything that would indicate Crowson should be transported because Johnson was deliberately indifferent to Crowson's serious medical condition.

**STATEMENT OF FACT NO. 21**:  Johnson did not work at the jail on June 26 or 27, 2014, but observed Plaintiff again on June 28, 2014 at approximately 2:00 p.m. At that time, Plaintiff was confused and disoriented and had elevated blood pressure. However, he seemed to be making a little more sense than when Johnson had observed him on June 25. After meeting with Plaintiff, Johnson reported his observations to Dr.

Judd LaRowe, who asked that Plaintiff be given a chest x-ray to rule out any lung issues and have blood drawn for testing. However, Johnson was not able to draw Plaintiff's blood due to vein scarring and his uncooperative nature. Johnson reported this to Dr. LaRowe. (Johnson Decl. ¶ 13).

**DISPUTE:** It is undisputed that Johnson did not work at the jail on June 26 or June 27. It is also undisputed that not a single person from medical checked on Crowson on June 26 of June 27. (Bates No. 501.)

The defendants also asserted as fact that Crowson "was confused and disoriented and had elevated blood pressure. However, he seemed to be making a little more sense than when Johnson had observed him on June 25." That assertion is not consistent with the medical records noted at the time. The CorEMR records state that "pt continues appear confused, disoriented, one word answers to questions, bp elevated." (Bates No. 501.) At 4:24 PM, the note states "when directed to breathe deeply pt states 'ok' but non-compliant with taking any deep breaths." (Bates No. 501.)

The defendants have asserted Crowson was "doing a little better," but the medical records indicate he could not even follow a simple instruction to take a deep breath. When Johnson saw Crowson on June 25, Crowson could at least spell his last name. By June 28, Crowson was giving one-word answers and could not even follow the most basic of all instructions.

The issue of a blood draw is also an area rife with dispute. It is undisputed that Dr. Larowe ordered blood work "to get a better feel for what was going on, because his case was not clear-cut." (Larowe Dep at 13-14.) Dr. Larowe testified that the blood work would have been a significant diagnostic tool. (Larowe Dep at 34-35.)

Johnson testified that "I wasn't able to get any vein penetration because of the scarring on his veins."  (Johnson Dep at 116;13-14.)  The CorEMR record states that the "cbc/cmp attempted without success, severe scarring and pt not willing to hold still." (Bates 501.)  There is a dispute about whether any scarring prevented Johnson from drawing blood.  First, Crowson does not have scarring on his arms, and second, Crowson has had blood drawn from his arms multiple times at the Draper prison since his incarceration at Purgatory Jail.  (Crowson Declaration ¶¶ 2, 4; *accord* Crowson Dep at 80-81.)

More importantly, even if Crowson's condition made it difficult to draw blood, Johnson and Dr. Larowe could have sent Crowson to the hospital.  Borrowman testified that when he was unable to draw blood from an inmate he "would always send them to the hospital because they've got Doppler ultrasound that they can find veins.  So even there I wouldn't say that we were limited because we have an ER that was always available to us."  (Borrowman Dep at 31.)

When asked why Johnson "didn't . . . recommend that Dr. Larowe send [Crowson] to the emergency room at that point," Crowson responded, "it was the end of the shift, it was close to the end of the shift."  (Johnson Dep at 82;18-25.)

**STATEMENT OF FACT NO. 23**:  The next day, June 29, 2014, at approximately 7:45 a.m. Johnson visited Plaintiff again. Johnson took his vitals and noted an elevated heart rate. Johnson also observed that Plaintiff was still acting dazed and confused. Johnson reported his observations to Dr. LaRowe who prescribed medication and instructed Johnson to administer 2 milligrams of Ativan to Plaintiff. (Johnson Decl. ¶ 15).

14

**DISPUTE**:  The defendants have misstated what the CorEMR records show.  The entry from June 29, 2014 at 7:48 AM states,

> pt hr elevated @140, noted dt's occurring, staffed pt status with MD, to:Ativan 2mt IM now then start on labium protocol, cont to monitor pt closely, pt tolerated IM injection well

(Bates No. 501.)  Once again, this is evidence of Johnson making diagnoses without input from Dr. Larowe.  When asked, "As you reviewed these notes, did you see anything in there that you thought would be specific, as it relates to a delirium tremens?"  Dr. Larowe responded, "No I did not."  (Larowe Dep at 31.)

Johnson's declaration itself presents a dispute of fact.  The declaration states that Crowson "was still acting dazed and confused," but the CorEMR record states Johnson "noted dt's occurring."  DT's stands for delirium tremens, which can be a serious condition associated with alcohol withdrawal.  Dr. Larowe explained that "typical symptoms" of delirium tremens include "[v]isual hallucinations, auditory hallucinations . . . odd tactile sensation, confusion, agitation."  (Larowe Dep at 31.)  Dr. Larowe further testified that "when their symptoms become such that you think they're on the verge of DTs or even if they go into delirium tremens, that can be a life-threatening event."  (Larowe Dep at 67.)  Dr. Larowe even explained that the emergency room will sometimes send patients suffering from alcohol withdrawals to Purgatory Jail because "it's the one we see most commonly," but if those patients begin to go into delirium tremens "that's when we send them back."  (Larowe Dep at 67.)

Fast forward to June 29, 2014 when Johnson noted that Crowson was dazed and confused and he diagnosed Crowson with DTs.  Taking Johnson's June 29th diagnosis

at face value, that means Crowson would have been experiencing DTs for five days, or approximately 120 hours.

People experiencing alcohol withdrawal usually begin experiencing symptoms no later than 72 hours after cessation of alcohol.  (Larowe Dep at 30.)   Crowson was experiencing those symptoms on June 25, meaning his alleged DTs had begun at least by June 25.

Symptoms of alcohol withdrawal typically peak within 24 to 36 hours meaning his symptoms should have been waning by June 26 or possibly June 27.  (*See* Johnson  Dep at 42.)  It is possible Crowson was dazed prior to June 25, but no medical staff had checked on him while he was in lockdown.  (Bates No. 501.)   That means by the time Johnson diagnosed Crowson with DTs, Crowson was at least 86 hours past the longest time when alcohol withdrawal symptoms typically peak.

If Johnson believed that was a correct diagnosis, then Johnson was deliberately indifferent to Crowson's serious medical needs.  Ryan Borrowman testified that

> . . . [a]lcohol withdrawal, that one is a lot more dangerous [than opioid withdrawal]. Where no one really dies from opioid withdrawal, you can die from alcohol withdrawal. So normally, in my setting, if I suspected that someone was going through opioid withdrawal, I would expect eight to nine days.
> For alcohol, depends on how quickly you get the medication in. If you get the medication quickly, you can take them out of withdrawal pretty quick.

(Borrowman Dep at 35.)   Dr. Larowe testified that patients experiencing alcohol withdrawal typically have a positive response to drugs like Ativan or Librium within 30 minutes to an hour, and even in patients who respond more slowly he "would hope there would be some improvement" within a day.  (Larowe Dep at 43.)

**STATEMENT OF FACT NO. 25**:  Johnson checked on Plaintiff again at 3:30 p.m. on June 29, 2014. Plaintiff was better able to verbalize his thoughts and his vital signs remained stable. Plaintiff related to Johnson that he couldn't remember the last five days. Johnson informed Plaintiff he was in a medical cell and that the jail doctor had prescribed him medications that he would start receiving on a regular basis to help his condition. Plaintiff agreed to take the medications as they were disbursed and prescribed. (Johnson Decl. ¶ 17).

**DISPUTE**:  There is a genuine dispute as to this statement of fact.  Crowson does not recall any portion of his time in the medical observation cell and there is a genuine dispute as to whether he was mentally competent to contract to take oral medications. (Crowson Declaration ¶¶7, 9.)

**STATEMENT OF FACT NO. 27**:  During the interactions Johnson had with Plaintiff during this time, he attempted to give Plaintiff the best medical care possible for his situation. That care included moving Plaintiff to a medical cell for his health and safety, regularly checking his vital signs, reporting his observations of Plaintiff to the doctor, and administering prescribed medications to Plaintiff. Johnson deferred to Dr. LaRowe's diagnosis and treatment plan and always believed Plaintiff was receiving appropriate medical care. (Johnson Decl. ¶ 19).

**DISPUTE**:  The plaintiff disputes this conclusory statement as non-factual and inaccurate.  As set forth above, Johnson did not provide the best medical care possible. He was deliberately indifferent to the diagnosis of DTs. He was deliberately indifferent to assessing Crowson for a brain injury. He failed to perform proper neurological assessments.  He conveyed inaccurate and incomplete information to Dr. Larowe.  He

17

failed to provide proper notification to Jon Worlton as to the need for a mental health evaluation.

He failed to take a proper medical history.  He did not request Crowson's prior medical records to learn about his health history.  Purgatory Jail could have requested Crowson's past medical records at any time as evidenced by the fact that they requested and received medical records within two days from Dixie Regional Medical Center after Crowson had been transported.  (*See* Johnson Dep at 107;1-13.)

Most importantly, Johnson did not implement the medical plan provided by Dr. Larowe because he did not draw blood for blood work.  He did not send Crowson to the emergency room to have blood drawn because it was too close to the end of his shift.

In this statement of fact, Johnson asserts that he "deferred to Dr. Larowe's diagnosis," but the facts show the exact opposite.  On the morning of June 25, Johnson diagnosed Crowson as needing a mental health evaluation but he failed to procure one. On the afternoon of June 25, Johnson diagnosed Crowson as not needing any additional medical care without consulting Dr. Larowe.   On June 28, Johnson deviated from Dr. Larowe's prescription by not ensuring that blood work was completed.   On June 29, Johnson diagnosed Crowson with DTs even though Dr. Larowe's later review of the records indicated no evidence of DTs.  Johnson's post-hoc justification that he could not act without a direct order from Dr. Larowe is untrue and inconsistent with the facts of the case.

By way of contrast, Ryan Borrowman saw Crowson in medical observation for the first time at 2:50 PM on July 1, 2014.  He noted that Crowson could "verbalize multi-word answers but physical movement is delayed. Pt still struggles with focusing on interviewer

and will lose his train of thought. Discussed pt with MD, will send to ER for more in depth eval." (Bates No. 501.) Objectively speaking, Crowson was doing better on July 1, 2014 than at any time prior to that, but Borrowman made the near instantaneous decision to recommend Crowson be taken to the hospital. Borrowman viewed a change in mental status lasting two days as a basis to send Crowson to the hospital. (Borrowman Dep at 41-42.) He immediately called Dr. Larowe and obtained permission to send Crowson for a second opinion. (Borrowman Dep at 41.)

During the beginning of his deposition, Johnson thought if an inmate is dazed and confused for more than 24 hours, it is necessary to call the doctor about the inmate's condition. (Johnson Dep at 69;1-8.) However, Johnson became argumentative and defensive when questioned whether such a period of time would be appropriate for someone who was not an inmate.

Q:      Okay. If that was your kid who has been dazed and confused for three days, you would send him to the hospital, wouldn't you?
MR. MYLAR: Objection.   No   foundation.   Calls   for   speculation   and incomplete hypothetical.
A:      I don't know if I would. I don't know.
Q:      If that was your wife who had been dazed and confused for three days –
A:      If it was the same situation and he was under medical and in jail, I would trust them to take care of him.
Q:      I'm not asking in jail. I'm asking about real people outside of jail. If that was your wife –
A:      This is a different situation than outside of jail.

(Johnson Dep at 83-84.)

Johnson was not concerned about the patients, he was there to pass the time on his shift and then go home.  When asked whether it should raise red flags that an inmate had been dazed and confused for three days, Johnson answered, ". . . you're trying to lump that into a whole three days that I wasn't there that whole three days.  I was only there for my shifts."  (Johnson Dep at 85-86.)

**STATEMENT OF FACT NO. 28**:  Johnson was never instructed to send Plaintiff to the hospital and at no time did he feel there was an urgency to Plaintiff's medical condition. Johnson believed it was possible Plaintiff was experiencing withdrawals from drugs and this just required medical observation. (Johnson Decl. ¶ 20).

**DISPUTE**:  Johnson's belief that Crowson's condition "just required medical observation" was the result of his deliberate indifference.  A nurse's role is to assess, diagnose, plan, implement and evaluate patients.  (*See* Borrowman Dep at 23-24; *accord* https://www.nursetheory.com/adpie/ (last visited Oct. 2, 2018).)

**STATEMENT OF FACT NO. 33**: During the interactions Borrowman had with Plaintiff during this time, he gave appropriate medical care for Plaintiff's situation and had no reason to doubt that Plaintiff received appropriate care from other medical providers at the Jail. (Borrowman Decl. ¶ 12).

**DISPUTE**:  The plaintiff does not dispute that Borrowman gave appropriate medical care on July 1, 2014.  However, the remaining statement of fact is not actually a statement of fact, but an ultimate opinion about a legal issue.

**STATEMENT OF FACT NO. 40**:  The vast majority of the policies in place during the time Martin Crowson was incarcerated in the Washington County Jail in June-July 2014 were originally approved and signed by prior sheriff administrations. Pulsipher had

20

no knowledge of any defect in the policies that related in any way to the delivery of medical care and treatment to Jail inmates. To the contrary, it was his understanding that the Jail appropriately treated the medical needs of inmates at all times and that the Jail had passed all relevant Jail inspections. (Pulsipher Decl. ¶ 4).

**DISPUTE**:  The defendant's statement that the "vast majority of the policies" were approved by prior administrations is too vague to be material or to be disputed.  It is not a statement of fact that is material to this motion.

What is relevant to this motion is that Purgatory Jail had no relevant policies in place.  Purgatory Jail does not have any policy or criteria for determining whether an inmate has a brain injury.  (Johnson Dep at 38;15-21.)  Purgatory Jail has policy manual, but it does not include information about how to assess a brain injury.  (Johnson Dep at 62;8-16.)  Dr. Larowe has not provided training to Purgatory Jail medical staff about how to determine whether there has been a brain injury.  (Johnson Dep at 62;19-24.) Ryan Borrowman confirmed that he has never received training in relation to recognition of brain injuries at Purgatory Jail.  (Borrowman Dep at 10.)  Purgatory Jail also does not have a written policy as to when an inmate with changed mental status should be referred for a mental health evaluation.  (*See* Worlton Dep at 24.)

Likewise, Purgatory Jail has no policy for the recognition and treatment of alcohol withdrawal symptoms.  Johnson was not familiar with the CIWA-AA standards, or any other standards for assessment of alcohol withdrawal symptoms. (Johnson Dep at 52;11-13.)  Johnson testified that he follows the alcohol withdrawal standards as taught by Dr. Larowe, but he did not know what those standards are.  (Johnson Dep at 53;2-4.)  Borrowman testified he was trained in the CIWA-AA standards at another job, but he did

not commit it to memory for his job at Purgatory Jail.  (Borrowman Dep at 15.)  Worlton testified that Purgatory Jail does not have a policy or procedure to follow when putting an inmate into detox observation.  (Worlton Dep at 43-44.)

Purgatory Jail also has no formal policy for determining when it is necessary to transport an inmate to the hospital.  (Dr. Larowe Dep at 77.)  Dr. Larowe testified that "[o]ur unwritten policy, you know, is to protect the patient, protect our license."  (Dr. Larowe Dep at 77.)

**STATEMENT OF FACT NO. 49**: Plaintiff did not avail himself of the grievance procedure regarding the alleged incidents during his time of incarceration. In addition, Pulsipher never received any notification in any form regarding any concerns about the medical care inmates received during the relevant time. (Pulsipher Decl. ¶ 12).

**DISPUTE**:  The plaintiff disputes that he had access to the grievance procedure. As noted above, Crowson was not mentally competent during any of the relevant time periods.  Further, Crowson was in lockdown from June 11, 2014 through June 25, 2014 and in medical observation from June 25, 2014 until he was transported to the hospital on July 1, 2014.  He was neither competent nor did he have physical access to the grievance mechanisms; whatever they were.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

**The Need for an Alcohol Withdrawal Policy**

1.        Worlton spends about 70% of his clinical time with inmates suffering from alcohol or drug withdrawal symptoms.  (Worlton Dep at 13;5-12.)

2.        Purgatory Jail treats so many people with withdrawal symptoms that the hospital sends detox patients to the jail for treatment.  (Larowe Dep at 67.)

3.      Purgatory jail has had "ongoing issues with staffing."  (Johnson Dep at 15.)

## Dr. Larowe Did Not See Crowson

4.      Dr. LaRowe did not visit Purgatory Jail at any time that Crowson was incarcerated in the medical cell.  (Larowe Dep at 25-26.)

5.      Dr. Larowe had a nurse practitioner that he could have sent in his place. (Johnson Dep at 15;9-11.)

6.      Aside from answering a telephone call from Johnson, Dr. Larowe did nothing to follow up on Crowson's condition except to expect that the nurses would be checking on him one time per shift.  (*See* Larowe Dep at 38-39.)  In a hospital situation, by contrast, a doctor will "round on them daily. That's a minimum."  (Larowe Dep at 40.)

7.      Dr. Larowe, however, readily conceded that inmates in Purgatory Jail do not receive the same standard of care as a patient in a hospital.  (Larowe Dep at 40.)

## Crowson Had a Serious Medical Condition

8.      Upon reviewing Crowson's medical records, and with the benefit of hindsight, Dr. Larowe opined that Crowson was suffering from metabolic encephalopathy, not alcohol withdrawal. (Larowe Dep at 34.)

9.      The treatment for metabolic encephalopathy is to treat the patient's agitation and to administer neomycin or lactulose to reduce ammonia levels.  (Larowe Dep at 34.)

10.     Treatment for metabolic encephalopathy should begin as soon as the symptoms appear.  (Larowe Dep at 35.)

11.     Brain injuries are serious medical conditions.  (Johnson Dep. at 40;3.)

## ARGUMENT

The right secured for prisoners under the Eighth Amendment is access to medical care.  In the Supreme Court's words,

> elementary principles establish the government's obligation to provide medical care to those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical torture or a lingering death, the evils of most immediate concern to the drafters of the [Eighth] Amendment.

*Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (citation omitted).

## I.    STANDARD FOR SUMMARY JUDGMENT

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The rule requires the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of

materials in the record" or by "showing that the materials cited do not establish the absence... of a genuine dispute[.]" Fed.R.Civ.P. 56(c)(1).

A prison official's burden on summary judgment is to show that there are not disputed issues of material facts and that the office did not demonstrate deliberate indifference to the "inmate's serious medical needs" in "violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "The test for constitutional liability of prison officials involves both an objective and a subjective component." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).

The subjective prong of the deliberate indifference test requires the plaintiff to present evidence of the prison official's culpable state of mind. *Mata v. Saiz*, 427 F.3d 745, (Cir. 2005). The subjective component is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Id*. A prison medical professional who serves "solely . . . as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper role." *Id*. (*quoting Sealock*, 218 F.3d at 1211; *see also Estelle*, 429 U.S. at 104-105 (deliberate indifference is manifested by prison personnel "in intentionally denying or delaying access to medical care"). "Deliberate indifference does not require a finding of express intent to harm." *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 2012). The deliberate indifference standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer*, 511

U.S. at 836.  "An official 'would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'"  *Mata*, 427 F.3d 745 (*quoting Farmer*, 511 U.S. at 843 n.8.)

It is difficult for a prison official to prevail on the question of whether there was a substantial risk because "substantial risk is a question subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Mata*, 427 F.3d 745. "[I]f a risk obvious so that a reasonable man would realize it, we might well infer that the defendant did in fact realize it."  *Id.*

## II.   CROWSON HAD A SERIOUS MEDICAL NEED

The Court should reject the defendants' argument that Crowson did not have a serious medical need.  A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999).

The defendants knew Crowson had a serious medical need. Johnson acknowledged that brain injuries are serious medical conditions.  (Johnson Dep. at 40;3.) Although the defendants never formally diagnosed Crowson with any particular condition, their working hypotheses included alcohol withdrawal, drug withdrawal, and/or brain injury.  All of those are serious medical needs, and even the deputies who brought Crowson to medical recognized he had a serious medical need.

Upon reviewing Crowson's medical records, and with the benefit of hindsight, Dr. Larowe opined that Crowson was suffering from metabolic encephalopathy. (Larowe Dep at 34.)   That is a condition that mandates treatment.   The treatment for metabolic encephalopathy is to treat the patient's agitation and to administer neomycin or lactulose to reduce ammonia levels.  (Larowe Dep at 34.)   According to Dr. Larowe, treatment for metabolic encephalopathy should begin as soon as the symptoms appear.  (Larowe Dep at 35.)

The other serious medical condition considered by Purgatory Jail was alcohol withdrawal with delirium tremens. That would have also been a serious medical condition. Dr. Larowe testified that "when their symptoms become such that you think they're on the verge of DTs or even if they go into delirium tremens, that can be a life-threatening event." (Larowe Dep at 67.)  Johnson was obviously aware of the dangers of delirium tremens because he was monitoring Crowson for symptoms of delirium tremens.  Johnson testified that "most of the time with alcohol, DTs or delirium tremens, that's the main thing we worry about is a seizure."  (Johnson Dep at 41.)

The evidence shows that Crowson had a serious medical condition, and that even though the defendants were deliberately indifferent about assessing and diagnosing what that condition was, they recognized it as a serious medical need.

### III.   MICHAEL JOHNSON WAS DELIBERATELY INDIFFERENT

The Court should deny Johnson's assertions that he was not deliberately indifferent and that he is entitled to qualified immunity.  The defendants have essentially argued that Crowson received treatment from Johnson and that this lawsuit is merely a disagreement over whether that treatment was appropriate.  The defendants in *Oxendine*

*v. Kaplan & Negron*, 241 F.3d 1272, (10th Cir. 2001) made a similar argument, but the court rejected that argument.   The court stated that "[t]he government seems to find dispositive the fact that Oxendine received at least some treatment from Dr. Kaplan during the time period when he alleged that he received inadequate and delayed medical care." However, the court rejected that argument stating," we do not believe this case involves mere disagreement between the parties."  *Id.*  The *Oxendine* court cited *Hunt,* 199 F.3d at 1223-24 for the proposition that "holding that a prisoner's claim that he was denied adequate and timely medical assistance did not reflect 'mere disagreement with his medical treatment,' and that 'the fact that he has seen numerous doctors does not necessarily mean that he received treatment for serious medical needs, i.e., that treatment was prescribed at all or that prescribed treatment was provided".  *Id.*

Crowson's right, as an inmate, was to have access to adequate health care is firmly established in the Tenth Circuit and across the country.   Johnson asserts that he is entitled misapprehend Crowson's medical condition, but he is not entitled to treat Crowson with deliberate indifference.

Crowson was in the medical observation cell for seven days and he never saw a doctor or received a diagnosis because Johnson failed to perform his gatekeeper role. "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of harm."  *Gonzales v. Martinez*, 403 F.3d 1179, 1183 (10th Cir. 2005).   Johnson failed to act despite his actual knowledge of the substantial risk of harm. Johnson entered a note in CorEMR that Crowson needed to be seen by Jon Worlton for a mental health evaluation, but he never entered a task to

28

make sure that happened.  Johnson was ordered by Dr. Larowe to draw blood for a blood panel, but Johnson did not complete that task and did not send Crowson to the emergency room to have the blood drawn because it was close to the end of shift.

There were three days that Crowson was not checked on by medical staff while Johnson was off-duty.  Johnson made no effort to find out what had happened to Crowson during that time because Johnson was more concerned about fulfilling his shift than he was providing competent care to Crowson.  Johnson did not contact Dr. Larowe until Crowson had been in the medical observation cell for nearly four days.

Johnson never recommended to Dr. Larowe that Crowson be transported to an emergency room where he could have received adequate medical care because Johnson did not feel competent to diagnose Crowson and he believed Crowson was probably just detoxing from some unknown substance.

On the fifth day of Crowson's stay in the medical observation cell, Johnson diagnosed Crowson with DTs despite the fact that, if Crowson had been detoxing from alcohol, Crowson's alleged DTs would have peaked on day two or maybe three.  If Johnson had actually believed Crowson was suffering withdrawal symptoms, he was deliberatey indifferent to them because he should have requested Dr. Larowe prescribe Librium as soon as he suspected alcohol withdrawal.  In many patients, Ativan or Librium will stop withdrawal symptoms within 30 minutes, sometimes up to a day.

In *Finn v. Warren County*, 1:10-cv-00016-JHM (W.D. Kentucky, July 27, 2012) (unpublished opinion), an inmate died after experiencing delirium tremens in the county jail.  The jail personnel, including a nurse by the name of Leah Price, moved for summary judgment.   Nurse Price contended that "there [was] no evidence she acted with

29

knowledge or deliberate ignorance of a substantial risk to [the plaintiff's] health.  Like Johnson, Nurse Price monitored the plaintiff's vital signs and placed him in a medical observation cell.  Nurse Price noted the plaintiff "was weak, restless, sweating, shaking, anxious, and unsteady," but she indicated his vital signs were normal.

The *Finn* court was critical of Nurse Price, stating that Nurse Price "disregarded" a serious risk. "Nurse Price was aware that Finn was exhibiting characteristics of a life-threatening nature, yet she did nothing more than allow Finn to be placed in an isolation cell to be checked on by deputy jailers every 15-20 minutes."  *Id.*  "On these facts, a reasonable jury could find that Nurse Price was aware of a serious risk to Finn's health and safety and disregarded that risk."  *Id.*

Johnson's failure to complete the blood draw ordered by Dr. Larowe was deliberate indifference.  In *Purkey v. Green*, 28 Fed.Appx. 736 (10th Cir. 2001), the plaintiff asserted that one or more nurses . . . refused to comply with Dr. Green's orders for treatment of infected blisters on his feet, and that, as a result, he experienced pain and suffering."  *Id.*  The court held that those allegations, "if true, would clearly demonstrate more than an 'inadvertent failure to provide adequate medical care.'"  *Id.* (*quoting Estelle*, 429 U.S. at 105.)

At the very least, the Court should find that there is genuine issue of fact to be decided by a jury as to Johnson's deliberate indifference.  In the alternative, the Court could find that the defendants have not satisfied their burden of proving as a matter of law that Johnson was not deliberately indifferent.

## IV. SHERIFF PULSIPHER AND WASHINGTON COUNTY WERE DELIBERATELY INDIFFERENT

The Court should deny the defendants' Motion for Summary in regard to Washington County and Sheriff Pulsipher because there are sufficient facts upon which a jury could conclude that they were deliberately indifferent. There are three requirements for municipal liability under 42 U.S.C. § 1983: "(1) the existence of an official policy or custom; (2) a direct causal link between the policy or custom and the constitutional injury; and (3) that the defendant established the policy with deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769-70 (10th Cir. 2013). "In the municipal liability context, " [t]he deliberate indifference standard may be satisfied when the [County] has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Layton v. The Board of County Commissioners of Oklahoma County*, 512 Fed. Appx. 861, (10th Cir. 2013).

The defendants have argued that Sheriff Pulsipher and Washington County can not be held liable for deliberate indifference without having had personal knowledge of Crowson, however, the defendants are wrong. "Deliberate indifference . . . is defined differently for Eighth Amendment and municipal liability purposes." *Layton v. The Board of County Commissioners of Oklahoma County*, 512 Fed.Appx. 861, (10th Cir. 2013) (*quoting Barney v. Pulsipher*, 143 F.3d 1299, 1307 n.5 (10th Cir. 1998). "In the prison conditions context, deliberate indifference is a subjective standard requiring actual knowledge of a risk by the official." *Id.* In contrast, municipal liability "deliberate

indifference is an objective standard which is satisfied if the risk is so obvious that the official should have known of it." *Id.; see generally Farmer v. Brennan*, 511 U.S. 825, 840-42 (1994).

Sheriff Pulsipher and Washington were deliberately indifferent to the risk of having nurses who were not trained and did not have policies to follow.  The risk was so obvious that Sheriff Pulsipher should have known about.  "The County may also 'be liable on the basis that [the Sheriff] is a final policymaker with regard to its jail, such that his actions 'may fairly be said to be those of the municipality.'" *Layton*, 512 Fed.Appx. 872, (*quoting Lopez*, 172 F.3d at 763; *Brown*, 520 U.S. at 404; *see also Winton v. Bd. of Comm'rs of Tulsa Cnty.*, 88 F.Supp.2d 1247, 1270 (N.D. Okla. 2000) ("The Sheriff's actions or inactions, as the final policy maker for the Jail, are attributable to the County.").

The Sixth Circuit relied on *City of Canton,* in part when it held that a prison's lack of training and written policies were sufficient evidence of deliberate indifference to preclude summary judgment.  In *Shadrick v. Hopkins County*, 805 F.3d 724, (6th Cir. 2015), the court explained that a prison's "failure to train and supervise its LPN nurses adequately 'about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983 . . . " (citing *Connick v. Thompson*, 563 U.S. 51 (2011).)  The plaintiff's burden is to prove that the defendants' failure to train and supervise its employees amounted "to deliberate indifference to the rights of persons with whom the [nurses] come into contact." *Id.* (*citing City of Canton v. Harris*, 489 U.S. 379, 388 (1989).  The plaintiff in that case was able to establish deliberate indifference through "'a single violation of federal rights, accompanied by a showing that [the prison]

has failed to train its employees to handle recurring situations presenting an obvious potential' for a constitutional violation." *Id.* (citing *Bryan Cnty.*, 520 U.S. at 409.

In that case, the nurses "professed ignorance of the written medical treatment protocols and policies" of the jail. *Id.* at 740. "The nurses denied receiving ongoing training about their medical responsibilities within the jail setting, and they disclosed that their superiors did not give feedback or regular evaluations to let them know whether they performed appropriately." *Id.* In addition, the administrators denied that they offered any type of training program to "insure that the nurses were trained to carry out their responsibilities." *Id.* at 741. Ultimately, the *Shaddick* court concluded that "a reasonable jury could find that SHP was deliberately indifferent to the need to train and supervise its LPN nurses to provide adequate medical care to inmates, especially in view of the obvious risk that the Constitution could be violated without such training and supervision." *Id.*

Comparing the case to *Canton City*, the *Shaddick* court explained,

> The obvious need to train police officers who lack knowledge of the constitutional constraints on the use of deadly force parallels the obvious need to train LPN nurses who lack knowledge about the constitutional dimensions of providing adequate medical care to inmates in the jail setting. Unlike licensed prosecutors who completed law school, routinely attend ongoing continuing legal education classes, receive on-the-job legal mentoring, and labor under rules of professional responsibility to master their Brady obligations, *Connick*, 131 S.Ct. at 1361-62, LPN nurses employed within the prison environment may be required to make professional judgments outside their area of medical expertise. Unless the employer provides necessary training, the LPN nurses lack knowledge about the constitutional consequences of their actions or inaction in providing medical care to inmates. Because it is so highly predictable that a poorly trained LPN nurse working in the jail setting 'utter[ly] lack[s] an ability to cope with constitutional situations,' *id*. at 1363, a jury reasonably could find that SHP's failure to train reflects 'deliberate indifference to the `highly predictable consequence,' namely, violations of constitutional rights,' *id*. at 1361 (*quoting Bryan Cnty*., 520 U.S. at 409, 117 S.Ct. 1382). Unlike *Connick* and *D'Ambrosio*, this case falls squarely within 'the narrow

range of *Canton's* hypothesized single-incident liability." *Connick*, 131 S.Ct. at 1361.

*Id.* at 742; *see also See Lawson v. Whitley Cnty.,* 2012 WL 300617, at *4 (E.D. Ky. Jan. 13, 2012) (the jail's failure to train medical personnel how to deal with medical emergencies relating to diabetes was deliberate indifference); *Finn v. Warren County*, 1:10-CV-00016-JHM (W.D. Kentucky, July 27, 2012).

In the instant case, the question of whether Sheriff Pulsipher and Washington County were deliberately indifferent is an issue that should go to the jury. Not only did Johnson and Borrowman testify they never received training on the issues important to this case, but Worlton and Larowe also testified that they did not provide training and that there were no written policies. That is inexcusable, particularly in relation to the guidelines for diagnosing alcohol withdrawal, because Purgatory Jail has to routinely deal with these types of medical issues.

The fact that prisoners will need medical attention is obvious. And the fact that Purgatory Jail employs nurses as its primary medical personnel makes the need for written policies and training even more important. They are not qualified or trained to provide the diagnoses and prescriptions that a doctor provides.

Dr. Larowe only comes to Purgatory Jail one time per week, for about two hours each time (although he did not go to Purgatory Jail at all the week Crowson was in need). Jon Worlton has so many people to see that he prioritizes inmates like Crowson differently (i.e. he does not see them). That leaves the undertrained nurses like Michael Johnson as the first-level medical providers and it forces them to encounter situations they are neither prepared or qualified to deal with.

34

This is evidenced by the fact that Johnson would never recommend to Dr. Larowe that an inmate like Crowson should be transported to the hospital despite many days of changed mental status.  The lack of policies and training resulted in Crowson receiving no medical attention on three out of the seven days he was in medical observation.  It also resulted in a lack of testing and assessment on the part of Johnson, the only nurse who saw Crowson from June 25, 2014 to June 30, 2014.  Crowson may have had many working theories as to what was causing Crowson's injuries, but his lack of training and the lack of written policies meant he never gave Dr. Larowe sufficient information to get Crowson the medical treatment he needed.

Based on this record, it would not be proper to grant summary judgment to Sheriff Pulsipher or Washington County because there are sufficient facts upon which a jury could reasonably conclude that the final policymaker for Washington County was deliberately indifferent to the constitutional rights of inmates at Purgatory Jail, including Martin Crowson.

### A.      Sheriff Pulispher and Washington County Were Also Deliberately Indifferent When They Failed to Provide Crowson Access to Medical Care in A-Block

As stated above, the touchstone of the Eighth Amendment right to medical care is access.  When Crowson was in A-Block from June 17, 2014 to June 25, 2014 he did not have access to medical care.  The Utah Department of Corrections, which "operates infirmaries at both the Utah State Prison and the Central Utah Correctional Facility," follows the standards set forth by the National Commission on Correctional Health Care

("NCCCHC").[1]   The United States Supreme Court has held, in the context of a prison conditions case, "correctional standards issued by organizations like ACA and NCCHC, and even by the Department of Justice, may be instructive in certain cases. . ." *Bell v. Wolfish*, 441 U.S. 520 (1979).

The NCCHC, recognizing that inmates in solitary confinement are isolated from medical professionals, has issued a position statement advising that "[h]ealth care staff should evaluate individuals in solitary confinement upon placement and thereafter, on at least a daily basis. They should provide them with prompt medical assistance and treatment as required."   ((available at https://www.ncchc.org/solitary-confinement-position-statement) (last visited October 5, 2018).)  While not binding on this Court, this statement is instructive because reinforces the importance of providing access to medical care even when a patient is in solitary confinement.

In this case, Crowson exited solitary confinement in A-Block and immediately demonstrated significant changes in mental status.  Deputy Keil observed that Crowson could not follow instructions.  Crowson put his underwear on over his pants, and was unable to personally dress himself correctly.  Deputies Lyman and Dolgier found that Crowson was dazed and confused and had delayed physical movement.  No one can say for certain when Crowson began exhibiting those symptoms, but the record clearly establishes that no one from medical visited Crowson or checked on him while he was in solitary confinement.

---

[1] available at https://corrections.utah.gov/index.php?option=com_content&view=article&id=1054&Itemid=182 (last visited October 1, 2018)

The lack of a policy requiring medical to check on inmates in solitary confinement shows deliberate indifference toward the obvious medical needs of inmates at Purgatory Jail.  Had Sheriff Pulsipher, Washington County and the Purgatory Jail administration fulfilled its constitutional obligation to provide Crowson access to medical care, Crowson's condition would likely have been discovered earlier and his treatment might not have been delayed.

## VI.    THE PRISON LIABILITY REFORM ACT DOES NOT REQUIRE DISMISSAL OF CROWSON'S CASE

The Court need not dismiss the plaintiff's case under the Prisoner Litigation Reform Act ("PLRA").  42 U.S.C. 1997e.  The defendants have failed to meet their burden of proof to show that there are sufficient facts upon which the Court could rule as a matter of law. *See Jones v. Bock*, 549 U.S. 199, 216, (2007) (holding that failure to exhaust under the PLRA is an affirmative defense). The defendants have made the bald assertion that Purgatory Jail had "comprehensive grievance system.  (Statement of Fact No. 47.) However, the defendants have failed to set forth any facts regarding how an inmate would lodge a grievance and how Purgatory Jail would receive the grievance.  The defendants' failure to provide such rudimentary information about the grievance process has rendered it impossible for the plaintiff to respond in any meaningful manner.  *See e.g., Cantwell v. Sterling*, 788 F.3d 507 (5th Cir. 2015) (ordering further proceedings because the defendant did not provide enough information about the applicable grievance procedures to know whether the plaintiff exhausted them.)

**A.    The Grievance Procedures Were Not Available to Crowson**

The PLRA does not bar Crowson's lawsuit because the grievance procedures were not available to him while he was mentally incompetent and locked in a cell 23 hours per day without access to the common area.   The PLRA states, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   42 U.S.C. 1997e.   As the Tenth Circuit has noted, "the PLRA only requires the exhaustion of 'available' administrative remedies."   *Little v. Jones*, 607 F.3d 1245, 1250 (Cir. 2010).   This issue typically arises when prison officials take affirmative acts to prevent the inmate from pursuing a grievance.   *Id.*   "Although the PLRA does not provide a definition, the plain meaning of the term 'available' is 'capable of use for the accomplishment of a purpose: immediately utilizable . . . accessible.'"   *Miller v. Nelson*, 247 F.3d 736, 740 (8th Cir. 2001) (quoting Webster's Third New International Dictionary 150 (1986)).

The defendants have not set forth sufficient facts to show that the grievance procedures were available to a person in Crowson's condition or locations.   As such, the Court should deny the defendants' motion.

**B.    A Dismissal Under the PLRA Must Be Without Prejudice**

In the event the Court deems dismissal under the PLRA appropriate, the dismissal must be without prejudice.   *See Kikumura v. Osagie*, 461 F.3d 1269, (Cir. 2006).   This is particularly true where the plaintiff's claim can be revived under Utah's Savings Statute which states that "[i]f any action is timely filed and the . . . plaintiff fails in the action or upon a cause of action otherwise than upon the merits, and the time limited either by law

or contract for commencing the action has expired, the plaintiff . . . may commence a new action within one year after the reversal or failure."  Utah Code Ann. §78B-2-111; *accord Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001) (holding that the plaintiff's case could be refiled under Arkansas' savings statute).

<u>**CONCLUSION**</u>

The Court should deny the Washington County Defendant's Motion for Summary Jugdment because there are triable issues of material fact on: (1) whether Michael Johnson's conduct demonstrated deliberate indifference; (2) whether Crowson suffered a serious medical need; (3) whether Johnson is entitled to qualified immunity; and (4) whether Sheriff Pulsipher and Washington County were deliberately indifferent to the serious need to provide inmates with medical care. And finally, the defendants have not satisfied their burden to prove that Crowson failed to exhaust his administrative remedies.

DATED this 5th day of October 2018.

SCHRIEVER LAW FIRM

/s/ Ryan J. Schriever
_____
Ryan J. Schriever
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 5th day of October, 2018 she/he filed the foregoing MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT using the Court's electronic filing system that automatically generated notice to the following:

Kipp & Christian
Gary Wight
10 Exchange Place, 4th Floor
Salt Lake City, UT 84111
gwight@kippandchristian.com

Frank D. Mylar
2494 Bengal Boulevard
Salt Lake City, UT 84121
mylar_law@me.com

/s/ Ryan J. Schriever
_____

40