# Exhibit 1

1          IN THE UNITED STATES DISTRICT COURT

2                    CENTRAL DIVISION

3

4

5   MARTIN CROWSON,                    )
                                       )      **COPY**
6        Plaintiff,                    )
                                       )
7        vs.                           )Case No.
                                       )2:15-CV-880-RJS
8   JUDD LAROWE, BRET LYMAN, et al.,)
                                       )Judge Tena
9        Defendant.                    )Campbell
                                       )
10   _____)

11

12

13              DEPOSITION OF DR. JUDD LAROWE

14           Taken at the Courtyard Marriott
                   185 South 1470 East
15                 St. George, Utah

16             On Wednesday, June 6, 2018
                     At 9:03 A.M.
17

18

19

20

21

22

23

24

25   Reported by:  J. Elizabeth Robison, RPR, CCR

1  private contractor. I provide medical care for the
2  inmates in coordination with the medical department
3  at Purgatory. So I'm not actually the medical
4  director. I believe that title falls to Jon
5  Worlton.
6      Q. All right. And is it -- okay. Private
7  contractor. Let's just talk briefly about what the
8  terms of your arrangement with the jail are.
9          Are you on a flat fee, or do they pay you
10  by hour, or how does it work?
11     A.  It's a flat fee.
12     Q.  Do they pay you monthly for that?
13     A.  They do.
14     Q.  Is that the same regardless of the amount
15  of time you put in working there?
16     A.  Yes, it is.
17     Q.  As a private contractor, do you have
18  access to their record-keeping systems?
19     A.  Only when I'm on site.
20     Q.  No remote access, then?
21     A.  There is not.
22     Q.  Do -- how does the -- how do the employees
23  at the jail communicate with you?
24     A.  Several methods. Either via phone or text
25  or faxes, and they will either fax my office, call

1    Q.   Okay.   In 2014, Mr. Borrowman was working

2   at the jail as a nurse when this happened.

3             Did you have another nurse practitioner or

4   a physician's assistant that helped you at that

5   time?

6        A.   I did.   Her name was Amy Benedict.

7        Q.   Does Amy still work for you?

8        A.   She does not.

9        Q.   When did Amy stop working for you?

10       A.   I believe March of last year.

11       Q.   Is she a nurse practitioner --

12       A.   Oh, I'm sorry.

13       Q.   Oh, go ahead.

14       A.   Actually, June of last year.

15       Q.   Is she a nurse practitioner or a

16   physician's assistant?

17       A.   Nurse practitioner.

18       Q.   Do you know where she is now?

19       A.   She is working for the Heart of Dixie, a

20   cardiology group in town.

21       Q.   Do you know if Amy had any involvement

22   with Mr. Crowson's case?

23       A.   None whatsoever.

24       Q.   Outside of the jail's record-keeping

25   system, do you keep any records on inmates?

13

1      A.    I do not.

2      Q.    Do you keep any log of phone calls that

3   you receive?

4      A.    I do not.

5      Q.    If you receive a fax from someone at the

6   jail, is that kept anywhere?

7      A.    If I receive a fax from the jail, I

8   respond to the fax and send it back to them, so

9   that that would be where the record would stay.  I

10  don't keep any independent files.

11     Q.    All right.  So you, personally, do not

12  have any files related to Mr. Crowson at all?

13     A.    I do not.

14     Q.    Okay.  Do you have any independent memory

15  of these events at all?

16     A.    I do.

17     Q.    What do you remember?

18     A.    The best that I can recall, I remember

19  getting a phone call from Mike Johnson.  And what

20  he relayed to me was that a patient was having some

21  difficulties, as far as confusion, and the vital

22  signs were not very revealing.  They were pretty

23  reasonable at the time.  And I remember -- what I

24  remember independently is that we ordered some

25  blood work, a chest x-ray.  I just wanted to get a

1    better feel for what was going on, because his case

2    was not clear-cut.  And we moved him, at that

3    point, into booking for closer observation.

4         And then I also remember a call from Ryan

5    Borrowman, and at that time, the vital signs had

6    changed.  They had gone outside of the normal

7    range.  I believe most specifically the pulse rate

8    had risen.  And at that point, you know, I elected

9    to have him transported to the emergency room.

10        Those are my only recollections of the

11   plaintiff.  I actually don't recall any

12   interactions prior to that or after that.  I'm not

13   even sure I saw him in sick call, so I just don't

14   recall.

15       Q.   Okay.  Do you remember, with Mike Johnson,

16   was it one phone call or --

17       A.   I only recall one phone call on that.

18       Q.   Okay.  As far as evaluating patients, it's

19   true you rely on nurses there in large part when

20   you're not there; right?

21       A.   I do.

22       Q.   In fact, there's no other way to do it, is

23   there?

24       A.   There is not.

25       Q.   They've got to be your eyes and ears?

1    A.    They are.

2    Q.    Do you perform any training of the nurses

3    there or the staff?

4    A.    I do not.

5    Q.    Do you have any interactions with Jon

6    Worlton about training?

7    A.    I don't recall that I have.

8    Q.    If someone there were to ask you to come

9    provide training to the staff, is that something

10   that you would be able to do?

11   A.    I would.

12   Q.    Have you ever had any communications with

13   Jon Worlton about this particular case?

14   A.    The only communications I've had was that

15   there would be a case.

16   Q.    Did you speak with him at all about his

17   involvement or lack of involvement?

18   A.    I specifically did not.

19   Q.    Okay.  How about Ryan Borrowman?  Have you

20   spoken with Mr. Borrowman about the case?

21   A.    We have specifically not.  In fact, we

22   discussed not discussing the case.

23   Q.    Okay.  And the same question with Mike

24   Johnson?

25   A.    We have not discussed the case.

16

1    Q.   How often do you have contact with

2  Mr. Johnson?

3    A.   Quite often.  Whenever he works a shift, I

4  will get phone calls.  So I have contact with the

5  nursing staff at Purgatory daily.

6    Q.   All right.  I want to go back to that

7  phone call with Mr. Johnson.

8         You said you ordered blood work?

9    A.   I did.

10   Q.   What were you looking for?

11   A.   Any clues as to what was going on.

12  Anything that would help in the evaluation of the

13  plaintiff.

14   Q.   Okay.

15   A.   So I ordered a CBC, which is a complete

16  blood count.  And a comprehensive metabolic panel,

17  and that looks at a variety of items.  It can give

18  you an idea about whether or not the patient might

19  be acidotic or septic.  It can give you an idea

20  about kidney function, liver function,

21  electrolytes, fasting blood sugar.  So it's quite

22  valuable in assessment.

23   Q.   Okay.  And when you order -- had that

24  ordered, were you looking for anything specific, or

25  were you -- is it just sort of a, "Hey, this is a

1      Q.    Is there a day of the week that you go out
2  to the jail?
3      A.    Usually Tuesdays, sometimes Thursdays.
4      Q.    Okay.  During the time period, from
5  6-25-2014 to 7-1-2014, do you know what day you
6  went out to the hosp -- or to the prison, if you
7  did go out to the prison?
8      A.    I don't have a clue.  I don't remember
9  when Tuesday would have fallen in that year.  And
10  in addition, Tuesdays and Thursdays are my current
11  schedule.  I've gone Mondays.  I've gone
12  Wednesdays.  So I'm not even sure on that.
13      Q.    Okay.  No record -- do you have a record
14  of when you went to the jail?
15      A.    I do not.
16      Q.    Do you have a memory of seeing Mr. Crowson
17  at all?
18      A.    I don't recall ever seeing Mr. Crowson,
19  either during this time frame or any other time
20  frame.
21      Q.    Okay.
22      A.    I may have.  I just have no recollection
23  of it.
24      Q.    When you do see a patient, do you record
25  it in the CorEMR?

26

1    A.    I do.   There is a note for each visit that
2  I perform.

3    Q.    Okay.  So if you had seen Mr. Crowson,
4  then your name would appear here, in that third
5  column; is that correct?

6    A.    I have no idea on where it would occur.

7    Q.    Okay.

8    A.    So they have an electronic medical record,
9  and I enter in my visits.  Where it would appear or
10  not appear, I don't have a clue.

11    Q.    All right.  Have you seen anything in the
12  records, that you've reviewed, that would indicate
13  that you did, personally, see Mr. Crowson?

14    A.    I have seen no records of my personal
15  evaluation of Mr. Crowson.

16    Q.    Okay.  On 6-28-14, Mr. Johnson noted that,
17  "The BP," I assume that's blood pressure, "is
18  elevated at this time and reported to MD."

19    A.    I'm sorry.  What day?

20    Q.    On 6-28-14, at 2:07 P.M.

21    A.    I don't recall that.  So...

22    Q.    Okay.

23    A.    It certainly could have happened.  I don't
24  recall.

25    Q.    What's -- in terms of what you would have

1   withdrawal symptoms from heroin similar to what
2   they are from methamphetamine?
3          MR. MCGARRY:  Object as to form.
4      A.   The withdrawal symptoms to heroin, once
5   again, very nonspecific:  Nausea, diaphoresis,
6   tachycardia, tachypnea, elevated blood pressure.
7   And those might last longer than methamphetamine.
8   The half-life for heroin is going to be a little
9   longer.
10     Q.   Okay.  And when you say a little bit
11  longer, what's the time period, do you think?
12     A.   I don't know.  I couldn't give you a
13  precise opinion on that.
14     Q.   What about alcohol withdrawal symptoms?
15     A.   They can last longer.  Usually, the time
16  of onset is within 72 hours of cessation.  But
17  especially when you're talking about delirium
18  tremens, that can go on for days and days.
19     Q.   Can it go on for weeks?
20     A.   Not weeks.
21     Q.   Can it start weeks after?
22     A.   No, it cannot.
23     Q.   And by "delirium tremens," what do you
24  mean by that?
25     A.   The DTs, the typical symptoms:  Visual

```
 1   hallucinations, auditory hallucinations, tactile.
 2   I won't call them hallucinations.  But you can have
 3   odd tactile sensations, confusion, agitation.  And
 4   then pretty much the same symptoms as we've
 5   discussed with the others.
 6       Q.   Would not knowing what kind of work you
 7   had done prior to incarceration be a delirium
 8   tremens?
 9       A.   That's a pretty --
10            MR. MCGARRY:  Object to form.
11       A.   -- nonspecific --
12            MR. MCGARRY:  Sorry, Judd.
13       A.   Oh.
14            MR. MCGARRY:  Object to form.  Go ahead.
15       A.   Okay.  That's a pretty nonspecific
16   complaint.  So that could be part of that.
17       Q.   Okay.  Do you recall receiving any
18   information from Mike Johnson that's not contained
19   in these notes?
20       A.   I don't.
21       Q.   As you reviewed these notes, did you see
22   anything in there that you thought would be
23   specific, as it relates to a delirium tremens?
24       A.   No, I did not.  These symptoms are
25   nonspecific.  There are a lot of different disease
```

1  encephalopathy. Specifically, there is a finding

2  of fetor hepaticus. The breath smells fruity,

3  yeah, oftentimes in these individuals. Sometimes

4  there will be jaundice. They can be quite agitated

5  as well. But once again, those fall under many

6  subheadings. But those are the things you might

7  typically see in that case.

8      Q.   Okay. If you suspect that somebody has

9  metabolic encephalopathy, what's the appropriate

10  course of treatment?

11      A.   The appropriate course of treatment in

12  that case, several things. One, you treat the

13  agitation. Number two, you also would give them

14  either neomycin or lactulose. Those help reduce

15  ammonia levels. Typically, you'd give them

16  thiamine, because anyone with hepatic

17  encephalopathy is usually thiamine deficient.

18  They're also usually deficient in other vitamins,

19  so we typically give them a multi-vitamin. We give

20  them thiamine. You would treat them with lactulose

21  or neomycin. You would treat their agitation as

22  well. You know, those are the main things --

23      Q.   Okay.

24      A.   -- that you would use.

25      Q.   What diagnostic tools do you have

J. Elizabeth Van Fleet, RPR, CCR
DepomaxMerit Litigation Services

1 available to you to diagnose metabolic

2 encephalopathy?

3    A.   Once again, the blood work.  You can

4 sometimes get a clue.  If the acid base balance is

5 out of the norm, that can be reflected in a

6 comprehensive metabolic panel.  An arterial blood

7 gas would also tell you some of those items.   An

8 ammonia level.  Although, an ammonia level needs to

9 be drawn arterially to get the best product.  So an

10 arterial draw is something that generally only

11 takes place in the hospital.

12    Q.   Okay.  How about an MRI?

13    A.   I would not say that that's useful.

14    Q.   Okay.  How soon should a person be treated

15 when they have metabolic encephalopathy?

16         MR. MCGARRY:  Object to form.

17    A.   You would like to treat that person when

18 you first realize that that's what's going on.

19    Q.   Why is that?

20    A.   Quicker recovery.

21    Q.   Okay.  Can encephalopathy cause permanent

22 damage?

23         MR. MCGARRY:  Object to the form.

24         MR. MYLAR:  Object.  Also --

25    A.   Permanent?

1  nursing staff and myself are all on board with
2  this -- is:  You know, the patient comes first.
3  Whatever we need to do to make sure we protect the
4  patient.  So no.  If Mike had felt that the patient
5  needed to be transported or thought there was even
6  a question, we would have transported him at that
7  time.
8      Q.   Okay.
9      A.   I'm not going to keep someone in the jail
10 when the appropriate course of action is to have
11 them seen in the emergency room.
12     Q.   Which makes your ability to rely on
13 Mr. Johnson critical; isn't that true?
14     A.   It does.  It does.
15     Q.   Outside of the -- I know you don't keep
16 notes of -- or records outside the jail.
17          Do you have any procedures or protocols
18 for following up on patients, who you know have
19 been having some sort of symptoms, like being dazed
20 and confused?
21          MR. MCGARRY:  Let me just ask for a
22 clarification.
23          MR. SCHRIEVER:  Yeah.
24          MR. MCGARRY:  You mean -- so a patient who
25 is still an inmate, when you say "following up,"

1   not somebody who's been transferred to the

2   emergency department or been released from the

3   jail, but is sill incarcerated?

4          MR. SCHRIEVER:  Correct, and I can make it

5   more specific.

6       Q.   For example, in this case, Mr. Johnson --

7   the records indicate that he contacted you on June

8   28th.

9          Do you have any kind of tickler system or

10  policies or procedures where on June 29th you would

11  call and say, "Hey, what's going on with Inmate

12  Crowson?"

13      A.   I don't.  Mr. Crowson was transported to

14  booking or moved from wherever he was before to the

15  booking area, which is immediately adjacent to

16  medical.  And when they are moved to booking,

17  medical will do rounds on them every shift, and I

18  believe the deputies check on them every 30

19  minutes.  And so there's pretty close observation.

20  So that ensures good follow-up.  And then if

21  something occurs during their rounds or if they're

22  notified by a deputy, they would give me a call.

23      Q.   Okay.  Now, I'm not necessarily familiar

24  with hospital protocol or the way hospitals work.

25          But you have worked in a hospital; right?

1     A.    Correct.

2     ·  Q.    When you have patients under your care in

3   a hospital, is there a -- is there a time period in

4   which the doctor is going to say, "All right.   I

5   need to check up on this patient," or is there --

6   how did that work?

7             MR. MCGARRY:  Object to form.   Incomplete

8   hypothetical.

9             MR. MYLAR:  Join.

10    A.    In a hospitalized patient, you would round

11  on them daily.   That's a minimum.

12    Q.    Okay.   And that's the doctor is going to

13  round on them daily?

14    A.    Correct.

15    Q.    And then the nurses are there in addition

16  to that; right?

17    A.    Correct.

18    Q.    In the jail system, that's different?

19    A.    It's not a hospital.

20    Q.    Right.   But the purpose of putting him in

21  booking was so that he could be under observation;

22  right?

23    A.    Correct.

24    Q.    And so the nurses are there checking on

25  him once per shift at a minimum?

Case 2:15-cv-00880-TC Document 76-3 Filed 10/05/18 Page 18 of 23

1   him started on the Librium and allow that to kick

2   in.

3        Q.   What's the time frame you expect them to

4   have a response to that?

5        A.   That can be difficult, especially with

6   alcohol withdrawal. Some people, it takes a lot of

7   benzodiazepine to achieve a response. And then

8   other cases, they'll have a response quite rapidly.

9   So that is -- there is a huge amount of

10  variability.

11       Q.   Okay. And the patients that have the

12  response rapidly, is that within minutes?

13       A.   No. It would probably be within 30

14  minutes to an hour --

15       Q.   Okay.

16       A.   -- with a rapid-acting medication like

17  Ativan. Possibly longer with Librium.

18       Q.   Okay. Would you expect to take more than

19  a day to have a response?

20       A.   It can. It can, but I would hope there

21  would be some improvement.

22       Q.   How about two days?

23       A.   You know, once again, in some individuals,

24  it takes a lot. But two days, I would hope to have

25  seen a response.

1     Q.   Okay.  Now, on the 29th, were you aware

2   that Mr. Crowson had been in booking since the

3   25th?

4     A.   I think the only time I -- I'm not

5   positive when -- of that time frame.  I'm not

6   positive that I knew.

7     Q.   Okay.

8     A.   I -- let me restate that.  I didn't know

9   at that time how long he had been in booking.

10    Q.   Okay.  And we already talked about

11  earlier, but you did not know that he was up in A

12  block --

13    A.   I did not.  The first --

14    Q.   -- before that?

15    A.   I thought he was -- when I thought he was

16  in booking was when I received the call from Mike

17  Johnson.

18    Q.   All right.  Down there at the note from

19  6-29-2014 at 3:36 P.M., it's Mr. Johnson's update

20  on his visit with Mr. Crowson at that time.

21         Were you provided information about that

22  visit?

23    A.   I don't recall.  I don't recall on that.

24    Q.   Okay.  How about June 30th?

25         There's no note there.  Do you have any

1   recollection of being provided information about
2   Mr. Crowson on June 30th?
3       A.   I don't.
4       Q.   And then July 1st, 2014, Ryan Borrowman's
5   note indicates he was sent to the ER for more
6   in-depth evaluation.
7            Is that something he discussed with you?
8       A.   It is.
9       Q.   You didn't have any objection to doing
10  that; right?
11      A.   Of course not.
12      Q.   And if Mr. Johnson, on June 25th, 2014,
13  would have recommended that, you would have had no
14  objection to that either; correct?
15      A.   They are my eyes and ears.
16      Q.   Are you aware of any standards or criteria
17  for diagnosing alcohol withdrawal symptoms?
18      A.   Yes.
19      Q.   What standards are you aware of?
20      A.   Oh, we look for agitation.  Once again,
21  hallucination, verbal and auditory confusion.
22  Usually, you're going to have the tachycardia.  So
23  those are kind of the standard things that are
24  looked for.
25      Q.   All right.  Anything in these notes or

1   what you know now, were those reasonable thoughts

2   and information that they might think he's

3   withdrawing, based upon the records?

4        A.    It could have been.  You know, that was

5   certainly one of the top options in the

6   differential.

7        Q.    Okay.  All right.  And if someone just

8   starts to exhibit some symptoms of withdrawal in a

9   jail, that's not the time necessarily to send them

10  right off to the hospital, is it?

11       A.    We deal with withdrawal all the time in

12  the prison setting.  And in fact, the emergency

13  room will send these patients to us, you know, when

14  it -- when their symptoms become such -- I'll use

15  alcohol withdrawal as a specific one.  Because it's

16  the one we see most commonly, and it's easy to

17  state clearly.  But when their symptoms become such

18  that you think they're on the verge of DTs or even

19  if they go into delirium tremens, that can be a

20  life-threatening event.  And that's when we send

21  them back.

22            Otherwise, we deal with a lot of their

23  symptoms at the time with what we have available.

24  And usually, it's a Librium taper.  They will have

25  the tachycardia, the nausea, the diaphoresis.

1      A.    No.  If there's an -- if there's a thought

2   that we need to transfer them, we always err on the

3   side of transporting.

4      Q.    And Mr. Borrowman did?

5      A.    He did.

6      Q.    Have you spoken with either of them, or do

7   you have any knowledge as to why they viewed this

8   situation so differently?

9      A.    I have not.  On review of the records,

10   even in Ryan Borrowman's case, I didn't see the

11   vital signs there.  I -- it was more of a gestalt

12   on his part, I think, that the patient was doing

13   poorly.  There may have been vital signs recorded;

14   I just didn't see them.  But if he's going to tell

15   me the patient needs to go, I'm sending him.

16      Q.    Do you know what the results of the chest

17   x-ray were?

18      A.    They were negative, I believe, in that

19   there was no pathologic process noted.

20      Q.    No signs of infection either; right?

21      A.    No, there was not.

22      Q.    Okay.  You talked about -- with

23   Mr. Mylar's questions, you talked about seizures,

24   seizure activity, being a sign of withdrawal; is

25   that correct?

 1    A.    It can be, yes.

 2         Q.    No indication of seizure activity with

 3    Mr. Crowson; right?

 4    A.    There was none noted.

 5         Q.    Okay.  What is the jail policy as to when

 6    a patient should be transported to an emergency

 7    room?

 8    A.    I'm not aware of any set policy.  There

 9    may be.  I'm not aware of one.  It, usually, is

10    based on a discussion between the nursing staff and

11    myself.

12         Q.    Okay.

13    A.    Our unwritten policy, you know, is protect

14    the patient, protect our license.

15         Q.    What role did Mr. Crowson's prior drug use

16    play in his encephalopathy?

17              MR. MCGARRY:  Object to form.

18    A.    It could have played a huge role in his

19    hepatic encephalopathy.  You're not going to

20    develop hepatic encephalopathy de novo.  You have

21    to have injured your liver to the point where it's

22    in a tenuous situation, where one more insult can

23    tip you over the edge where your body is not

24    able -- where your liver is not able to eliminate

25    the ammonia, which is typically what we see go.