# Exhibit 4

```
         IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
                      *   *   *
MARTIN CROWSON,            )
                           )
        Plaintiff,         )
                           )  Case No. 2:15-cv-00880
    vs.                    )
                           )  Deposition of:
WASHINGTON COUNTY,         )
et al.,                    )  JON WORLTON
                           )
        Defendants.                 COPY
                      *   *   *




              April 16, 2018

              12:40 p.m.




       WASHINGTON COUNTY TREASURER OFFICE
            197 East Tabernacle Street
                St. George, Utah




                      *   *   *

                Linda Van Tassell
         - Registered Diplomate Reporter -
            Certified Realtime Reporter
```

1   Q.   What date range did you look at?

2   A.   I don't remember.  It was June 2014.

3   Q.   The medical record, when you pull that
4   up, can you pull it up by inmate's name?

5   A.   Yes.

6   Q.   And did it have -- for example, this
7   page that we looked at had an entry for March 11,
8   2013 all the way down to November 6, 2014.  Is it
9   all of the dates that that inmate was seen as a
10  patient during their time at Purgatory?

11  A.   Yes.

12  Q.   Do you see any records from other
13  facilities such as the Draper prison or anything
14  like that?

15  A.   No.

16  Q.   Not Gunnison either?

17  A.   No.  Unless we -- well, we request
18  records but not usually from the two state prisons.

19  Q.   When you request records, where do you
20  records?

21  A.   Whenever somebody has been in treatment
22  so if they've been seen, for example, at the
23  volunteer clinic here in town, we would call them
24  and ask for a copy of their records and that would
25  be scanned into a document section of the medical

1  record.
2      Q.  Do you see anywhere in Mr. Crowson's
3  file where there had been medical records requested
4  from another facility?
5      A.  I did not look at the document section
6  of the file, so I didn't see that.  I don't
7  remember.
8      Q.  In the printouts that we have like I
9  showed you, would the document requests show up in
10 those tables?
11     A.  No, it wouldn't show up in -- not
12 necessarily.  Sometimes a nurse will document in
13 their chart notes that they've requested records.
14 Sometimes not.  So I don't know that it would
15 necessarily show up in the chart.
16     Q.  What's the name of the program that you
17 guys use to keep track of medical treatment?
18     A.  CorEMR.  Cor for correctional and then
19 EMR for electronic medical record.
20     Q.  When you pull up CorEMR, what does the
21 front page of that look like?
22     A.  Physically or --
23     Q.  Yeah.  On the computer screen.
24     A.  Well, the initial screen is just a login
25 screen so it's password protected and all those

1    psychological.
2        A.   Okay.
3        Q.   Do you view them differently or is there
4    a distinction between those two?
5        A.   I use them interchangeably.
6        Q.   Okay.  Then I will also use them
7    interchangeably.
8        A.   Okay.
9        Q.   How much of your time is spent in
10   clinical practice at the jail?
11       A.   Half to three quarters.  Depends on the
12   workflow, I guess, and the people and the requests
13   in the jail.
14       Q.   It's my understanding, correct me if I'm
15   wrong, that you are not licensed to prescribe
16   medication; is that correct?
17       A.   That's correct.
18       Q.   You provide counseling services.
19       A.   That's correct.
20       Q.   And you also provide referrals to
21   medical professionals where you've thought
22   prescription intervention might be appropriate?
23       A.   That's correct.
24       Q.   Do you deal with alcohol withdrawal
25   patients?

1   A. Yes.
2   Q. Patients who are withdrawing from other
3   types of drugs?
4   A. Yes.
5   Q. What percentage of your clinical time is
6   spent with those type of people?
7   A. Probably a good part, 70 percent,
8   perhaps. At this point in my career I work
9   primarily in booking which is where those folks are
10  so whether it's dealing directly with that or just
11  needing to be aware that those issues may be
12  impacting what I'm seeing is a significant part.
13  Q. And you work in booking. That means
14  you're one of the first people that people may see
15  when they come into the jail, right?
16  A. The nurses would see them earlier than I
17  do.
18  Q. Okay.
19  A. Just because there's one of me and
20  several nurses and more shifts. But, yeah, in terms
21  of interacting with them for mental health problems
22  and concerns, I would be one of the first.
23  Q. What is the booking process when an
24  inmate comes to jail?
25  A. Do you want the corrections piece of

1   A.   How do I determine that?
2   Q.   Yeah.
3   A.   Well, that's a really broad question.
4   Can you be more specific?
5   Q.   Sure.
6   A.   There's lots of reasons an inmate may
7   have cognitive deficits or cognitive decline so I --
8   Q.   And what I want to get at is where is
9   the line?  At what point do you say that's a person
10  that needs to be hospitalized?  Let me back up.  We
11  can ask it in smaller chunks, how's that?
12  A.   Okay.  That's fine.
13  Q.   I don't want to be unfair to you.  Is
14  there a policy or procedure in place at the jail
15  whereby a person with decreased mentation or change
16  in mental status should be referred to you for
17  evaluation?
18  A.   There's a practice.  I would need to
19  look at the policy to see how that reads but there's
20  certainly a practice and there's certainly a way
21  that we train both corrections staff as well as
22  nursing staff that if they're concerned or they have
23  worries they can refer them to a mental health
24  person.
25  Q.   Okay.  What is the practice?  What did

1      A.    Right.
2      Q.    And I understand that Dr. Larrowe has
3  some supervision over that as well.
4      A.    Correct.
5      Q.    Seriously, I'm only asking for what
6  you're aware of or what you know.
7      A.    Right.
8      Q.    In June of 2014 were you ever called or
9  asked to evaluate, Martin Crowson?
10     A.    I seem to remember by going over the
11 notes that Mike Johnson had put something in his
12 chart note that he referred him to me and I remember
13 there being a concern about him but that's about all
14 I know.
15     Q.    Do you remember any specifics?
16     A.    I don't.
17     Q.    Is there any note that you actually saw
18 him?
19     A.    There is not.
20     Q.    When that referral comes in, what does
21 that look like?  He puts it in his note.
22     A.    Uh-huh.
23     Q.    Is there a way that you become notified
24 that he made that referral?
25     A.    Often that's done verbally.  What we try

1   to do is to also get that in a task.  In the medical
2   record there's also a place where you can enter
3   tasks.  That's one of the ways that we communicate
4   with one another.  So it could have been done either
5   way.
6       Q.   Okay.  Did you review the tasks related
7   to Martin Crowson's case?
8       A.   I did.
9       Q.   Did you see any tasks in there related
10  to referral?
11      A.   I did not.
12      Q.   Would that have been Michael Johnson's
13  responsibility to put that in the task?
14      A.   Yes.  Based on that note that I
15  reviewed.
16      Q.   If it's not put in the task would you
17  ever receive notice in another way that that had
18  been put into the note?
19      A.   Verbally.  If it wasn't communicated
20  verbally or if it wasn't included in the task, I
21  wouldn't have necessarily known.  I will take that
22  back.  I try to review who is in booking and I may
23  have come across the information that way.
24      Q.   Do you have a specific memory as you sit
25  here today that you came across information that

1  way?

2     A.   What I remember -- and I don't remember
3  a great deal.  What I remember is that Mike told me
4  that there was some concerns.  What my memory says
5  is that he was mostly concerned that he had gotten
6  involved in some drugs or homemade alcohol on the
7  block or something and he asked me to take a look at
8  him.

9     Q.   Okay.  Did he say anything to you to
10 indicate why he thought that he may have got into
11 some homemade alcohol or some drugs in the block?

12    A.   Not that I remember.

13    Q.   Do you remember Mike telling you
14 anything specific about his symptoms?

15    A.   I really don't other than he seemed to
16 be confused and was just a little different than
17 what he usually was.

18    Q.   Are you aware of whether he showed any
19 signs of increased heart rate?

20    A.   I'm not aware.

21    Q.   How about any signs of increased or
22 decreased blood pressure?

23    A.   I don't know.  I didn't look at that
24 part of the chart.

25    Q.   Are you aware of whether he was having

1   staff decision.
2       Q.   Okay.  Did the jail have a written
3   policies or procedures manual for the medical staff?
4       A.   Yes.
5       Q.   What's the title of that?
6       A.   I would have to look.  Health services
7   or something of that nature.
8       Q.   Health services?
9       A.   Health services, something like that.
10      Q.   Policies and procedures, something like
11  that?
12      A.   Something like that.
13      Q.   We'd like to request that.  I just want
14  to make sure I know how to identify it.
15      A.   I can find it.  I couldn't tell you the
16  specific title and where.
17      Q.   Is it just one book or are there more
18  than one, depending on the circumstances?
19      A.   It's a section of the policies, all
20  electronic at this point.
21      Q.   Do you know if it's posted publicly?
22      A.   I don't.  I would suspect that it's not.
23      Q.   Is it specific enough that if you're a
24  nursing staff you can look at it and say, okay, if
25  we're going to put somebody into the detox cell,

1  here's the procedure we follow?
2       A.   No.
3       Q.   Would it contain a policy or procedure
4  as to determining the likelihood that someone has,
5  an inmate has received some type of alcohol or drug
6  substance while they're in the jail?
7       A.   I'm not sure what the question is.
8       Q.   I'm going to go back and give an
9  explanation because I'm having a hard time framing
10 this question.  Mr. Crowson was in lockdown from
11 June 17th to June 25th and then he was transferred
12 to the detox cell.  Sometime in that period it
13 sounds like Mike Johnson or somebody made a decision
14 to put him in detox.
15      A.   Uh-huh.
16      Q.   So I'm wondering if the policies and
17 procedures manual provides guidance to somebody in
18 Mike Johnson's position to say if you're going to
19 put somebody in detox, find out what kind of
20 substance they were on or get a history from them of
21 what they've received or where they've been,
22 anything like that.
23      A.   I don't believe there would have been
24 specific instructions or anything like that,
25 checklist or something like that, no.

```
 1      Q.   If Mike Johnson had had access to the
 2   inmate's records so that he would have known where
 3   in the jail Mr. Crowson had been, could he look at
 4   those Stillman records?
 5      A.   Yes.
 6      Q.   Do you have access to the Stillman
 7   records?
 8      A.   Uh-huh.
 9      Q.   Is there a policy and procedure for how
10   often the nursing staff should check on somebody who
11   is in the detox cell?
12      A.   I'm not sure if it's a written policy.
13   There's a practice that they should be checked on at
14   a minimum once per shift.
15      Q.   Once every eight hours?
16      A.   Twelve.
17      Q.   Twelve hours?
18      A.   Uh-huh.
19      Q.   So two times per day at a minimum?
20      A.   Correct.
21      Q.   For example, Josh Billings was on the
22   night shift.  Was he to wake the person and check on
23   them or just physically observe them?
24      A.   Physically observe them.  Usually that
25   should have been done at the beginning of a shift so
```

```
 1         A.    Uh-huh.
 2         Q.    Do you know why that fell through the
 3   cracks?
 4         A.    I don't know --
 5               MR. MYLAR:  Objection.  Assumes facts
 6   not in evidence in this deposition.
 7               MR. SCHRIEVER:  Let me ask it a
 8   different way.
 9         Q.    Do you know why you didn't see him?
10         A.    I don't remember.  I can tell you what I
11   think but I don't remember for sure.
12         Q.    Well, with the caveat that you don't
13   remember, tell me what you think.
14               MR. MYLAR:  Objection.  Speculation.
15   Lack of foundation.  Go ahead.
16         A.    At any given time I have probably more
17   people that I can see during a given day than I can
18   get to.  My understanding, at least what I recall is
19   that Mike was believing there was some detox or that
20   he got into some drugs or those kind of things.
21   From a mental health standpoint there's not a lot
22   that I can do for somebody in that condition until
23   they sober up or until they clear from whatever
24   drug-induced problem they're experiencing, so I
25   would have prioritized that differently.
```