# Exhibit 5

1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2     FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
 3                     *    *    *
 4   MARTIN CROWSON,              )
                                  )
 5          Plaintiff,            )
                                  )   Case No. 2:15-cv-00880
 6     vs.                        )
                                  )   Deposition of:
 7   WASHINGTON COUNTY,           )
     et al.,                      )   MICHAEL T. JOHNSON
 8                                )
            Defendants.           )
 9
                           *    *    *
10

11
                     ORIGINAL
12
                   April 17, 2018
13
                     9:00 a.m.
14

15
             WASHINGTON COUNTY TREASURER OFFICE
16              197 East Tabernacle Street
                    St. George, Utah
17

18

19                       *    *    *

20                  Linda Van Tassell
             - Registered Diplomate Reporter -
21              Certified Realtime Reporter

22

23

24

25
```

15

1   Tuesday or Thursday, depending on his schedule with

2   his other stuff.

3          Q.   Okay.  What do you do when Dr. Larrowe

4   is not on site but you need a doctor's input?

5          A.   We call him directly.  We have an access

6   line to him directly through a cell phone we use at

7   the jail.  Also, if we need to call his office, his

8   clinic or his own cell phone, he's available to us

9   24/7 that way.  If he's not, he usually designates

10  one of his nurse practitioners to be on call for him

11  if he's out of town or not available.

12         Q.   What types of medical issues do you deal

13  with?

14         A.   It's a broad range.  Everything from a

15  head cold to an assault in the jail or someone

16  having a heart attack.  It covers everything.

17         Q.   So whatever medical issue comes up --

18         A.   We're the first ones that deal with it.

19         Q.   When you're on shift how many nurses are

20  on shift?

21         A.   Monday through Thursday we usually have

22  two.  Back then, it varied a little bit.  We've had

23  ongoing issues with staffing, like any other place.

24  I think Monday through Thursday we try and have two

25  nurses on and Friday, Saturday, Sunday it's usually

```
 1    scheduled appropriately.  There's also a dentist
 2    that comes out once a week so we're involved in that
 3    a little bit just to make sure patients get down
 4    there and fill out the paperwork they need.
 5            Q.   All right.  The charting you do, is that
 6    done in CorEMR?
 7            A.   Yes.
 8            Q.   Is there anywhere else that you do
 9    charting?
10            A.   No.
11            Q.   Any paper charts?
12            A.   No.
13            Q.   Paper files?
14            A.   No.
15            Q.   Paper medical records?
16            A.   No, not at that time, I don't believe
17    so.  We've had CorEMR for a long time out there.
18            Q.   Do you have access to Spillman?
19            A.   I've got access to put entries in
20    through whatever password I've got and usually that
21    entails basically just dietary things, if I order
22    certain -- like a diabetic would have a diet
23    specific to them, vegetarian stuff, just to
24    coordinate with the kitchen.  To put in actual
25    Spillman entries for inmates like the deputies do, I
```

1   Q.   Is there ever a situation where you meet

2   with an inmate out in the corridor or in the cell

3   block?

4   A.   On occasion, yeah.  If they get pulled

5   out from the cell block in their interaction with

6   the deputy, sometimes they'll have us come down,

7   say, "Hey, this guy is not acting right or this guy

8   is having problems.  Can you come down to see if we

9   need to move him or what we need to do with him."

10  So on occasion there is, yeah.

11  Q.   What training do you have in regard to

12  recognizing brain injuries?

13  A.   As an RN.  Just what I've been through

14  at school and through experience.

15  Q.   What would you list off as the things

16  you're looking for to identify brain injury?

17  A.   There's neuro checks, neurological

18  assessment.  Usually check their eyes, their

19  movement, their speech, their cognitive, whether

20  they're processing, either slow or fast, or if

21  they're having some kind of a manic episode.  We

22  check their grips.  With neurological assessment you

23  go kind of head to toe.  Have them stick their

24  tongue out, wiggle it back and forth, check their

25  eyes, see if they're dilated, pinpoints, if they can

1   move their eyes, track with their eyes, if they can

2   answer questions, if they can speak clearly enough.

3   Those are all assessment tools to do that with.

4          Q.   Okay.  And what are the different causes

5   of a brain injury?

6               MR. MYLAR:  Objection.  Lack of

7   foundation.  You can go ahead and answer.

8          A.   Trauma.  There's multiple things that

9   can cause brain injury.

10         Q.   I'm making you do the work.  I'll list

11  them off for you, how's that?

12         A.   Okay.

13         Q.   Is trauma a cause of brain injury?

14         A.   Yes.

15         Q.   Heart attack?

16         A.   Yes.

17         Q.   Stroke?

18         A.   Yes.  Can be.

19         Q.   Kidney disease?

20         A.   Can be.

21         Q.   Liver issues?

22         A.   I don't know on that one.

23         Q.   Infection?

24         A.   Can be.

25         Q.   Alcohol withdrawal?

                                                                        38
1    the essence for inmates?

2         A.    It can be.  Depends on the severity.

3         Q.    And how do you determine severity?

4         A.    Do all the assessments I just mentioned,

5    get it off to the doctor immediately, call him and

6    make sure he's aware of what's going on.

7         Q.    In the 14 years you've been there, how

8    many times have you sent somebody off to the

9    emergency room because of a brain injury?

10        A.    That's hard to say.  Specific to a brain

11   injury -- we've had concussions that have been

12   diagnosed and we've sent them off.  It has to do

13   with a doctor's order.  If the doctor orders us to

14   send them, we send them.

15        Q.    Do you guys follow any specific criteria

16   for determining the severity of a brain injury?

17        A.    Could you clarify that?  I'm not sure

18   what you're asking.

19        Q.    Are there any guides or written

20   policies --

21        A.    Not that I'm aware of.

22        Q.    -- where you give a score or numerical

23   value to the severity of a brain injury?

24        A.    There's a few scores we can use like a

25   Glasgow Coma Scale and just -- like I say, when we

1          Q.    Is that because brain injuries are

2     serious?

3          A.    Brain injuries are serious, yeah.

4          Q.    And time is of the essence in treating

5     them, right?

6          A.    Can be, yes.

7          Q.    Can be, what do you mean by that?

8          A.    I just mean depending on -- I don't

9     diagnose.  I'm not -- that's not my field.  The

10    doctor diagnoses.  I just assess and I pass that

11    information on.

12         Q.    Okay.  I'm going to switch here a little

13    bit to alcohol withdrawal.

14         A.    Okay.

15         Q.    What do you do to assess whether someone

16    is suffering from alcohol withdrawal?

17         A.    Cognitive is important, neurological, if

18    they can ambulate, eat, talk without having any

19    problems.  Vital signs are important.  Heart rate is

20    very important.  Shakes, a lot of times they'll have

21    symptoms of shakes, especially with alcoholics, so

22    we try to watch those carefully.

23         Q.    Heart rate, what does heart rate tell

24    you?

25         A.    If it's elevated, it's usually -- they

41

1     can be symptomatic of a patient having either a

2     seizure.  And most of the time with alcohol, DTs or

3     delirium tremens, that's the main thing we worry

4     about is a seizure.

5          Q.   Delirium tremens, is that when they have

6     the shakes?

7          A.   At times, yeah.  Not always.

8          Q.   If you had delirium tremens and elevated

9     heart rate then you're at risk for seizure?

10         A.   That's the risk they have, yeah.  It can

11    be risk for it.

12         Q.   As far as other symptoms of delirium

13    tremens, how do you know if someone is having that?

14         A.   You monitor their vital signs, their

15    cognitive.  Like I say, if they can eat, ambulate,

16    they usually have problems with that if they're

17    having those issues.

18         Q.   Elevated blood pressure?

19         A.   Sometimes, yes.

20         Q.   Decrease in blood pressure?

21         A.   Can be, yeah.

22         Q.   Is it your understanding that alcohol

23    withdrawals typically begin 48 to 72 hours after the

24    person last had alcohol?

25         A.   They can have them quicker than that.

1   I've seen them have them quicker than that.  Just

2   depends.  Depends on the person.

3         Q.   Is it your understanding that the

4   symptoms of alcohol withdrawal typically peak within

5   24 to 36 hours?

6         A.   Most of the time.

7         Q.   All right.  I want to ask you about

8   Mr. Crowson.  Do you have a memory of him?

9         A.   I didn't when this was first -- when I

10  was first served.  I had to go back and look at the

11  documentation and see.

12        Q.   What documentation did you look at?

13        A.   My notes.

14        Q.   Those are notes in CorEMR?

15        A.   Uh-huh.

16        Q.   Did you have any other notes?

17        A.   Pardon me?

18        Q.   Do you have any other notes?

19        A.   No.

20        Q.   Do you now recall Mr. Crowson?

21        A.   Somewhat, yeah.  The name is familiar

22  because he's been in and out of the jail a few

23  times.

24        Q.   Do you know what he looks like?

25        A.   No.

44

1    Q.    Once an entry has been made, can it be

2    edited?

3         A.    Not that I know of.  I don't know.

4         Q.    You've never edited anything there?

5         A.    No.

6         Q.    If there's a change, you notice

7    something that needs to be recorded differently, do

8    you just do a separate entry?

9         A.    Yes.

10        Q.    Okay.  The interview date, is there any

11   way to change that date after it's been entered?

12        A.    Not that I'm aware of.

13        Q.    Okay.  I'm going to flip here to 481

14   where it starts with the booking number 136931.  The

15   date on this is June 25, 2014 at 7:15 a.m. and

16   you're listed as the interviewer.  Here in the item

17   response form it says, "Confused.  Different affect

18   than is normally displayed."

19        A.    Okay.

20        Q.    As you sit here right now, do you know

21   how you knew it was different than normal?

22        A.    From the deputies.  When they report

23   they say he's acting different than he normally

24   does.

25        Q.    I'll represent to you there are notes in

46

1      Q.   What does that stand for?

2      A.   And a-n-d.

3      Q.   "Patient safety and further eval with

4   J. Worlton."

5      A.   Yes.

6      Q.   At that point you recognized that there

7   was a mental health issue happening?

8      A.   There was some kind of issue happening.

9   That's why I recommended him to Jon Worlton.  Like

10   the note says, he's acting a little bit different

11   toward the deputies.  And the way I remember

12   Mr. Crowson, he was more outgoing, not quiet,

13   reserved.  Outgoing, interactive.

14      Q.   Okay.  I want to skip down here to this

15   line.  "Booking staff," Q, does that stand for

16   question?

17      A.   No.  It stands for every.

18      Q.   "Booking staff every 30 minutes."  That

19   means you wanted them to look at him every 30

20   minutes?

21      A.   They do cell checks every 30 minutes in

22   booking on each individual.

23      Q.   Is this a detox cell we're referring to?

24      A.   It's every cell in booking.  They check

25   every 30 minutes.

1        A.    Yes.

2        Q.    Did you also recognize that it was an

3   issue that was outside the scope of what you were

4   comfortable doing on your own?

5        A.    Yes.

6        Q.    The entry on page 483 is for an earlier

7   incarceration that's dated 12-28, 2011, and this one

8   was for a detox observation.

9        A.    Okay.

10       Q.    You have a choice, don't you?  You can

11  put them in for detox observation or you can put

12  them in for mental health observation?

13       A.    Yes.

14       Q.    And those are two separate things.

15       A.    Yes.

16       Q.    And on June 25, 2014, if you had thought

17  it was detox, you could have put him in for detox

18  observation, correct?

19       A.    Yes.

20       Q.    But you didn't.  You put him in for

21  mental health observation.

22       A.    That was my first exam.

23       Q.    All right.  487, right here in the

24  middle of the page, do you recognize what type of

25  entry that is in CorEMR?  See this middle box right

Case 2:15-cv-00880-TC  Document 76-7  Filed 10/05/18  Page 14 of 31

1          Q.    Okay.  When you looked at the records

2     here in CorEMR did you pull them up using

3     Mr. Crowson's name or did you pull them up using

4     entries that you made for that time period or a

5     different way?  How did you do it?

6          A.    Pulled them up using Mr. Crowson's name

7     and I just looked at my own to review.

8          Q.    You didn't look at anything written by

9     Mr. Borrowman or anyone else?

10         A.    No.

11         Q.    Are you familiar with the CIWA-AR

12    standards for alcohol withdrawal symptoms?

13         A.    No.

14         Q.    Is that something you've learned about

15    or discussed at National Correctional Nursing

16    Association?

17         A.    I've heard of it and I've probably

18    attended training on it before but I don't remember

19    right now.

20         Q.    Nothing you recall?

21         A.    No.

22         Q.    Is that no?

23         A.    No.

24         Q.    That's the worst way to ask that

25    question.  Do you follow the CIWA-AR standards for

53
1    rating alcohol withdrawal symptoms?
2              A.    We follow what we've been trained to do
3    by Dr. Larrowe in the jail.  Right now I couldn't
4    tell you what those are.
5              Q.    Okay.  What do you do to rate the
6    severity of alcohol withdrawal symptoms in jail as
7    you've been trained?
8              A.    We do an initial assessment.  We would
9    take vital signs, we'll check neuros, we'll check if
10   there's any signs or symptoms of delirium tremens,
11   shakes, cognitive issues, anything that would seem
12   to be abnormal.
13             Q.    Okay.  I'm going to ask you some
14   questions and I want you to tell me if that's the
15   function of the nurse in the jail or if it's the
16   function of someone, okay?  I'm going to ask you
17   questions specifically about evaluating potential
18   brain injuries.
19             First off, you'd agree if you're
20   diagnosing a brain injury it would be a good idea to
21   find out if a person is having headache or head
22   pain, correct?
23             MR. MYLAR:  Objection.  Lack of
24   foundation.  He's already testified he doesn't
25   diagnose.

62

1    Mr. Crowson had been in lockdown for at least seven
2    days?
3          A.   No.
4               MR. MYLAR:  How much longer are you
5    going to go?  I just wonder if we could take a
6    break.
7               (Recess.)
8          Q.   Before we went off the record we were
9    having a discussion about diagnosing or assessing
10   for brain injuries.  In that policy or procedures
11   manual is there anything in there that says, "Hey,
12   if you get somebody with decreased mental status or
13   changed mental status you should go through this
14   list of evaluations to see if they have a brain
15   injury."
16         A.   Not that I'm aware of.
17         Q.   No policy at all.
18         A.   I don't know.
19         Q.   Okay.  Have you ever been through any
20   training with Dr. Larrowe where he said, "If you've
21   got a patient with changed mental status, I want you
22   to go through these criteria to determine if there's
23   a brain injury."
24         A.   No.
25         Q.   Ever had discussion with Dr. Larrowe

69

1     A.    It depends on who -- for me, I would

2  call the doctor if he was that way for 24 hours,

3  yes.

4     Q.    Okay.  I'm assuming that would be the

5  same answer for 48, 72, 86 and --

6     A.    Yes.

7     Q.    Every day.

8     A.    Yes.

9     Q.    Every new day that he's still dazed and

10 confused is another day that the doctor should be

11 called.

12    A.    Yes.  Or made aware of the situation to

13 see if we need to do further observation or further

14 vital signs or whatever.

15    Q.    Okay.  If he's unable to follow simple

16 instructions like get dressed, that's another reason

17 that a doctor should be contacted, correct?

18    A.    Not necessarily.  I'm not sure what

19 you're asking me there.

20    Q.    Okay.  Well --

21    A.    Just because somebody doesn't want to

22 get dressed doesn't mean I'm going to call the

23 doctor.

24    Q.    Hypothetically, if the deputy takes a

25 stack of clothes in to him and he says, "Get

1    on that, are they?

2         A.    It's usually gone through medical to get

3    ahold of Dr. Larrowe.

4         Q.    And Mr. Crowson, assuming he was able,

5    couldn't call Dr. Larrowe directly, could he?

6         A.    No.

7         Q.    When you were working at Dixie Regional

8    Medical Center one of the important things you would

9    do as a nurse is take medical history of a patient,

10   right?

11        A.    Yes.

12        Q.    Hypothetically, you're in the emergency

13   room and a patient comes in with a situation, an

14   emergent situation.  Do you take a new history of

15   that patient or do you rely on a history that was

16   given two weeks prior?

17             MR. MYLAR:  Objection.  Lack of

18   foundation.  Also incomplete hypothetical and the

19   hypothetical has no relationship to the facts in

20   this case.  Go ahead.

21        A.    And you understand this is in a jail

22   setting.  I didn't view this patient's intake when

23   he came in two weeks prior so I don't know.

24        Q.    And on 6-25-14 you didn't look at his

25   intake either, did you?

1      Q.    Wouldn't you have sent him to the

2    emergency room at that point?

3          A.    Not without a doctor's order.  I

4    reported back I believe it says here.  His lung

5    sounds were good.  He was doing okay breathing but

6    he wouldn't take any deep breaths.  His vital signs

7    were actually better with his blood pressure.  He

8    had an elevated heart rate still so we were

9    continuing to monitor him.

10         Q.    Now you're looking at the entry dated

11   June 20, 2014 at 4:24 p.m.

12         A.    That's correct.  That's just before the

13   end of my shift.

14         Q.    At this point he's been under medical

15   observation for three days and you told him to

16   breathe deep and he said he would, but he didn't.

17         A.    No.

18         Q.    Why didn't you recommend that

19   Dr. Larrowe send him to the emergency room at that

20   point?

21               MR. MYLAR:    I'm going to object as to

22   vagueness, recommend.    I'm not sure what you mean by

23   that.

24         A.    Yeah.    Like I stated, it was the end of

25   the shift, it was close to the end of the shift.  I

83

1   probably gave report to the next nurse and that was
2   what we did.
3        Q.   If that was your kid, would you want him
4   to go to the hospital?
5             MR. MYLAR:  Objection.  Incomplete
6   hypothetical.  Calls for speculation.
7        A.   We were continuing just to monitor him,
8   keep track of him at that time.
9        Q.   Okay.  If that was your kid who has been
10  dazed and confused for three days you would send him
11  to the hospital, wouldn't you?
12            MR. MYLAR:  Objection.  No foundation.
13  Calls for speculation and incomplete hypothetical.
14       A.   I don't know if I would.  I don't know.
15       Q.   If that was your wife who had been dazed
16  and confused for three days --
17       A.   If it was the same situation and he was
18  under medical care and in jail, I would trust them
19  to take care of him.
20       Q.   I'm not asking in jail.  I'm asking
21  about real people outside of jail.  If that was your
22  wife --
23       A.   This is a different situation than
24  outside of jail.
25       Q.   Why is it different?

84

1          A.    I'm not sure what you're getting at as

2     far as different.

3          Q.    I'm saying the fact of the matter is

4     inmates don't get the same care as people on the

5     outside, do they?

6                MR. MYLAR:  Objection.  Argumentative.

7                MR. WIGHT:  Go ahead.

8          A.    Ask me the question again, please.

9                MR. MYLAR:  Also object on vagueness.

10         A.    I'm not sure what you're getting at.

11         Q.    If this was somebody that you knew and

12    cared about, you would not be satisfied with that

13    care.

14               MR. MYLAR:  Objection.  Again incomplete

15    hypothetical.  Calls for speculation.

16         A.    Again, I don't know what you're trying

17    to ask me.

18         Q.    I'm asking you based on the symptoms.

19         A.    You said just a few minutes ago that

20    inmates don't get the same care.  It's a different

21    setting in the jail.  It's not different in the care

22    they get.  It's just a different setting.  We had

23    orders from the doc to observe this patient, make

24    sure if there was anything else going on and that's

25    what we were doing.

1          Q.    And that's what you were doing?

2          A.    Yeah.

3          Q.    And the fact that he had been dazed and

4    confused for three days and couldn't follow a simple

5    instruction like take a deep breath, that didn't

6    cause any alarm bells to go off?

7                MR. MYLAR:   Objection.   Lack of

8    foundation.   We don't have knowledge of three days.

9    He's already admitted he's not there.

10               MR. SCHRIEVER:   So this is the third

11   day.   He was there on the third day.

12         A.    I was there for my shift, yes, and

13   during my shift we were monitoring him.   If he at

14   any time would have had more of an issue other than

15   just dazed and confused then, yes, if the doctor

16   would have ordered it we would have sent him out to

17   the ER.   I can't answer for any of the other time

18   that I wasn't there.

19         Q.    And I'm not asking you to second guess

20   what the doctor did or did not order.

21         A.    I'm not saying I am.   I'm just saying I

22   can only answer your questions according to what I

23   charted and what I was there for.   Three days dazed

24   and confused, you're trying to lump that into a

25   whole three days that I wasn't there that whole

86

1   three days.  I was only there for my shifts.

2          Q.   So did it matter at all to you then

3   what's going on during the two days you weren't

4   there?

5          A.   I charted it and I reported it to the

6   doctor.

7          Q.   Okay.  At that point are you making the

8   assumption that it hadn't been going on consistently

9   for --

10         A.   I'm not assuming anything.

11         Q.   As a nurse who is charged with the

12  healthcare of that patient, shouldn't you be

13  assuming it's important to know whether he had been

14  dazed and confused for three solid days at that

15  point?

16              MR. MYLAR:  Objection.  Lack of

17  foundation.

18         A.   I'm still not sure what you're trying to

19  ask me.  You're trying to ask me to speculate.  I

20  can't speculate on the other time I wasn't there.

21         Q.   Let me ask you this.  Was it important

22  or was it not important to you -- it's not

23  speculating.

24         A.   In my mind --

25              MR. MYLAR:  Wait, wait, wait.  Excuse

1      Q.   So if there's a situation where the

2   inmate should be sent to a hospital, the only way

3   Dr. Larrowe is going to know that is if you tell

4   him, right?

5             MR. MYLAR:  Objection.  Incomplete

6   hypothetical.  Lack of foundation.  Calls for

7   speculation.

8        A.   I don't know what you're getting at.

9        Q.   How is it Dr. Larrowe sends them to a

10  hospital unless you tell him?

11            MR. MYLAR:  Objection.  Calls for a

12  mental impression on Dr. Larrowe and calls for

13  speculation and lack of foundation of my client.

14       A.   For the time I'm there that's the only

15  time I can speak for.  For the other two days or

16  whatever when he was there, I can't talk for that.

17  I don't know.

18       Q.   When you're there, the only way

19  Dr. Larrowe would know whether to send a patient to

20  a hospital is if you tell him, right?

21       A.   I don't tell Dr. Larrowe to send anybody

22  to a hospital.  I give him what we're observing and

23  he makes that determination.

24       Q.   You never recall where you said to

25  Dr. Larrowe, "Hey, I think this guy should go to a

 1    hospital."  Am I understanding that correctly?

 2         A.    There was never a call.

 3         Q.    You've never had a call to Dr. Larrowe

 4    where you said, "Hey, I think we should send this

 5    guy to the hospital."

 6         A.    If I thought at this point he needed to

 7    go, I would have given the information that I had to

 8    Dr. Larrowe and let him make that determination.

 9         Q.    Would you have made a recommendation --

10    let me back up.  Is it within your ability to make a

11    direct recommendation to Dr. Larrowe that he send an

12    inmate to the emergency room?

13         A.    Within my ability?

14         Q.    Yes.

15         A.    That would mean I would diagnose the

16    patient and I wouldn't diagnose the patient.  I

17    would just give him what I was observing and what

18    information I had and let him determine that.

19         Q.    Is it within your ability to call

20    Dr. Larrowe and recommend that you take a blood draw

21    from the inmate?

22         A.    I would give him information that I'm

23    seeing and let him determine if a blood draw was

24    needed.

25         Q.    Would Dr. Larrowe ever ask you, "Hey,

1   methamphetamine.  It can be a longer period.

2   Depends on the individual.  Everybody is a little

3   bit different that way.

4        Q.   DTs, the delirium tremens that you noted

5   on the 29th, do you remember how those manifested?

6        A.   Not specifically.  He would have had the

7   shakes.  He would have maybe been sweating.  Vital

8   signs are off again.  He's a little confused after

9   that amount of time.

10       Q.   If he was sweaty, you would note that,

11  wouldn't you?

12       A.   Perhaps; perhaps not.

13       Q.   Would you consider that to be an

14  important symptom?

15       A.   If it was happening in this case.

16       Q.   Delirium tremens would also be different

17  from person to person, right?

18       A.   Yes.

19       Q.   It can be very severe shakes?

20       A.   Yes.

21       Q.   It can also be so mild you would have to

22  touch his fingertip to see if they're shaking,

23  right?

24       A.   You would have to do a neuro check,

25  check his vital signs, maybe do a manual pulse.

1    Q.   Page 502, a category called scanned

2    documents.  It looks like July 3, 2014 there were

3    some documents downloaded by Elizabeth Jimenez and

4    they were medical records from Dixie Regional

5    Medical Center.  Do you know how the jail came into

6    possession of the Dixie Regional Medical Center

7    records?

8         A.   Probably requested them.

9         Q.   Okay.  Is that something as a nurse you

10   do or is that someone else's job to request records?

11        A.   We will request records at time if

12   there's a need.  Sometimes we get them, sometimes we

13   don't.  Sometimes they're delayed in getting to us.

14        Q.   Have you ever had an opportunity to look

15   at what records were downloaded?

16        A.   No.  I believe he was released on the

17   2nd; is that right?  From our custody?

18        Q.   From your custody, yes.

19        A.   And then we received these on the 3rd,

20   so I wouldn't have looked at them.

21        Q.   Okay.

22             (Discussion off the record.)

23        Q.   On July 30th there was an x-ray done to

24   rule out pneumonia is what the record states.

25             MR. MYLAR:  July 30th?

1    back a page. So on page 498 does this indicate that

2    you met with Mr. Crowson on the 30th?

3         A.    No. He wasn't in my care. Like I said,

4    Ryan and I were both on that day. Ryan had booking.

5    I had general population.

6         Q.    When somebody exhibits those symptoms,

7    is it important to take vital signs regularly?

8         A.    At least once a shift, yeah. Check on

9    him twice a day.

10        Q.    If vital signs are taken, it should be

11   recorded in CorEMR every time?

12        A.    Should.

13        Q.    Who is Trevor Benson?

14        A.    Right now he's a lieutenant over

15   housing.

16        Q.    Who was he in June of 2014?

17        A.    I'm not sure what his assignment was.

18        Q.    How about Harry Lambert?

19        A.    He was a lieutenant.

20        Q.    513, this note is dated 8-11-14 and it

21   recites down here that Crowson was transported on

22   July 14th and then it gives a description. Have you

23   ever seen this report before?

24        A.    No.

25        Q.    Were you ever asked by Trevor Benson or

 1    training?

 2         A.    Not exactly, no.

 3         Q.    Was it after this June of 2014 or

 4    before?  Any way to tell me that?

 5         A.    I don't know.

 6         Q.    I want to go back to 501.  Specifically

 7    I want to start with the June 25th entry.  It's my

 8    understanding that the June 25, 2014 entry at 7:13

 9    a.m., this is something that you entered, correct?

10         A.    Yes.

11         Q.    I don't see anywhere in this entry that

12    it states that you contacted Dr. Larrowe.  Am I

13    missing it somehow?

14         A.    No.  Not at that point I didn't get

15    ahold of him.

16         Q.    So you don't believe you contacted him

17    on June 25th?

18         A.    I don't believe so.

19         Q.    All right.  You do know that you

20    referred Mr. Crowson to Jon Worlton, though.

21         A.    Yes.

22         Q.    But I think, and I just want to make

23    sure your testimony is you're not sure what happened

24    with that referral.

25         A.    No.

113
1    Q.   You already told us that you weren't at
2    the facility on the 26th or the 27th.  Do you know
3    what nurses were at the facility those days?
4          A.   Not specifically.
5          Q.   If the nurses that were there the 26th
6    and the 27th had entered notes in CorEMR, would you
7    expect that we would see those here on 501?
8          A.   Should be there.
9          Q.   And you've never become aware of any
10   notes that were entered those days?
11         A.   No.
12         Q.   So the first note I see of a contact
13   with Dr. Larrowe was June 28, 2014, 4:22 p.m.  Does
14   that look accurate to you?
15         A.   June 28 what time?
16         Q.   4:22 p.m.  It says, "Patient status,
17   staffed with M.D."
18         A.   I reported to the doctor at 2:00, 2:07
19   on the 28th.
20         Q.   Oh, I see.  You're right.  That was the
21   first time you contacted Dr. Larrowe?
22         A.   Yes.
23         Q.   Okay.  Do you have any actual memory of
24   the conversations you had with Dr. Larrowe on the
25   28th of June?

116
1    right.

2            Q.    And you were aware of that at the time,

3    in the June 25th timeframe?

4            A.    Yeah.  He had been out there before and

5    we knew he was a user, was a drug user and had

6    problems.

7            Q.    You testified earlier that when you

8    tried to take his blood you had trouble and one of

9    the reasons is because of scarring?

10           A.    Yes.

11           Q.    Can you help us understand that

12   scarring?

13           A.    I wasn't able to get any vein

14   penetration because of the scarring on his veins.

15           Q.    Did you have an understanding of how

16   Mr. Crowson developed those scars?

17                 MR. SCHRIEVER:  Objection.  Speculation.

18           A.    I don't know.

19           Q.    Did you believe it was from heroin use,

20   intravenous drug use?

21           A.    That's normally what we see when someone

22   has been using.

23           Q.    Okay.  Do you have any recollection

24   whether those scars appeared to be fresh or older?

25           A.    No, I don't recall.