Ryan J. Schriever (Bar No. 10816)
SCHRIEVER LAW FIRM
51 East 800 North
Spanish Fork, UT 84660
Telephone: (801) 574-0883
Fax: (801) 515-8686
ryan@schrieverlaw.com
*Attorneys for Martin Crowson*

# IN THE UNITED STATES DISTRICT COURT FOR

# THE STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **MARTIN CROWSON**,<br><br>Plaintiff,<br><br>vs.<br><br>**JUDD LAROWE,** et al.,<br><br>Defendants. | MEMORANDUM IN OPPOSITION TO DEFENDANT JUDD LAROWE'S MOTION FOR SUMMARY JUDGMENT and JOINDER IN WASHINGTON COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT<br><br>Case No. 2:15-CV-880-RJS<br><br>Judge Tena Campbell |

Plaintiff, Martin Crowson, by and through counsel, submits this Memorandum in Opposition to Defendant Judd Larowe's Motion for Summary Judgment and Joinder in Washington County Defendants' Motion for Summary Judgment and Memorandum in Support.

## **INTRODUCTORY STATEMENT**

The issue before the Court is whether the only prison doctor who was contracted to provide medical services to inmates at Purgatory Jail was deliberately indifferent to the medical needs of an inmate suffering from metabolic encephalopathy. That inmate,

1

Plaintiff Martin Crowson, was isolated in a medical observation cell for over a week without any diagnosis despite suffering from metabolic encephalopathy that left him unable to communicate or understand what has happening.

Dr. LaRowe never saw Crowson during that entire week, nor did he send a physician's assistant to the jail. Dr. LaRowe's involvement was limited to three brief telephone calls over a seven-day period during which he ordered a blood panel that was never completed and during which he prescribed Ativan for drug or alcohol withdrawals that were never diagnosed. Dr. LaRowe did not follow-up to have the blood panel completed, and he never obtained the information he needed to properly diagnose or treat Crowson.

On several days, Crowson did not receive any medical observation at all. Dr. LaRowe's repeated failures to assure access to adequate medical care caused Crowson to languish incoherently in an isolated observation cell for seven-days without proper medical treatment. Without a diagnosis, and without sufficient information to make a diagnosis, Dr. LaRowe took no meaningful action to provide Crowson treatment that would have helped his condition.

Dr. LaRowe has argued that, even if he was negligent, he was not deliberately indifferent. However, the Court should reject that self-serving argument and deny Dr. LaRowe's motion. The facts of this case are sufficiently egregious that the issue of whether Dr. LaRowe's conduct crossed the line from mere negligence to deliberate indifference can not be decided as a matter of law.

## RESPONSE TO DR. LAROWE'S STATEMENT OF MATERIAL FACTS

Plaintiff Martin Crowson hereby incorporates his responses to the material facts set forth in the Washington County Defendants' Motion for Summary Judgment and Memorandum in Support as if set forth fully herein.

**Statement of Fact No. 1**: On June 28, 2014, Dr. LaRowe received a phone call from Defendant Michael ("Mike") Johnson, who reported Mr. Cowson 'was having some difficulties, as far as confusion, and the vital signs were not very revealing. They were pretty reasonable at the time. And I remember—what I remember independently is that we ordered some blood work, a chest x-ray. I just wanted to get a better feel for what was going on, because his case was not clear-cut.'

**DISPUTE**: Dr. LaRowe's concession that Crowson's "case was not clear-cut" is evidence that Dr. LaRowe knew Crowson had a serious medical need. Crowson's "vital signs were not very revealing," and his condition is one that warranted further evaluation and diagnosis. Unfortunately, Dr. LaRowe was indifferent to that need over a period of several days.

Dr. LaRowe has attempted to limit the time of his involvement by asserting that he first learned of Crowson's condition on June 28, 2014, but that was not the start of Crowson's stint in medical observation. In reality, June 28, 2014 was the fourth day Crowson was in the medical observation cell. On June 25, 2014, Crowson was placed in medical observation because he was "noted to be dazed and confused while serving breakfast, pt has been incarcerated x2 wks . . ." (Bates No. 501.) No one from medical saw Crowson on June 26 or 27, 2014. *See id.* Nurse Johnson came back on shift on June 28, 2014, but did not see Crowson until 2:07 PM. *Id.* At that time, Johnson noted

Crowson "continues to appear confused, disoriented, one word answers to questions, bp elevated @ this time, reported to md." *Id.*

Despite Johnson's recorded observation that Crowson "continue[d]" to display the same symptoms that Johnson observed on June 25, Dr. Larowe testified that when he learned of Crowson's condition on June 28, 2014, he was not aware that Crowson had already been in medical observation for four days. (Larowe Dep at 44.) Dr. LaRowe's recollection of his knowledge at that time, however, is disputed. The reasonable inference to be drawn from the medical record is that Johnson conveyed to Dr. LaRowe that Crowson was "continuing" to display symptoms. From that information, Dr. LaRowe should have known that Crowson's symptoms were not new and that there was a serious underlying issue to address.

Dr. LaRowe's failure to find out how long Crowson had been suffering with these symptoms is evidence of his deliberate indifference. He has implied that Johnson did not accurately convey complete information, but Dr. LaRowe was ultimately responsible for Crowson's medical care and his failure to verify underlying facts is evidence of deliberate indifference.

This statement of fact is also disputed as to Dr. LaRowe's statement that Crowson was "having some difficulties, as far as confusion . . ." Dr. LaRowe's word choice intentionally downplays Crowson's condition at the time and is further evidence that he continues to be deliberately indifferent toward Crowson's serious medical needs. On June 25, 2014, Crowson was "noted to be dazed and confused while serving breakfast, pt has been incarcerated x2 wks . . ." (Medical Records, Washington County's Exhibit No. 4, Bates No. 501.) On that same day, a correctional officer recorded:

> Inmate Crowson appeared to be in an unusual state of confusion and was slow to respond to my commands.  When Inmate Crowson was instructed to dress, he put his underwear on after he had his pants on.  I instructed Inmate Crowson to redress himself by putting the underwear on and then his pants over them.  He seemed to be confused and removed the underwear but did not put them on.

(Exhibit 6 to Opposition Washington County's MSJ, Bates No. 521.)

On June 28, 2014, the medical records note that Crowson "continues to appear confused, disoriented, one word answers to questions . . ."  (Medical Records, Washington County's Exhibit No. 4, Bates No. 501.)  Later that same day, at 4:24 PM, the note states "when directed to breathe deeply pt states 'ok' but non-compliant with taking any deep breaths."  (Bates No. 501.)  The medical records show that Crowson was experiencing more than "some difficulties, as far as confusion."  Crowson could not even follow the simple instruction to take a deep breath.

**Statement of Fact No. 2**:  The blood work Dr. LaRowe ordered was 'a CBC, which is a complete blood count. And a comprehensive metabolic panel, and that looks at a variety of items. It can give you an idea about whether or not the patient might be acidotic or septic. It can give you an idea about kidney function, liver function, electrolytes, fasting blood sugar. So it's quite valuable in assessment.'

**DISPUTE**:  The irony of this statement of fact is that Dr. LaRowe clearly understood the importance of the CBC for potentially diagnosing Crowson.  In his own words, "it's quite valuable in assessment."  And yet, Dr. LaRowe did nothing to make sure that Crowson obtained the CBC after Johnson failed to draw Crowson's blood.  Johnson testified that "I wasn't able to get any vein penetration because of the scarring on his veins."  (Johnson Dep at 116.)  The CorEMR record states that the "cbc/cmp attempted

without success, severe scarring and pt not willing to hold still." (Bates 501.) There is a dispute about whether any scarring prevented Johnson from drawing blood because Crowson does not have scarring on his arms, and because Crowson has had blood drawn from his arms multiple times at the Draper prison after his incarceration at Purgatory Jail. (Crowson Declaration ¶¶ 2, 4; *accord* Crowson Dep at 80-81.) However, the fact remains that Dr. LaRowe did nothing to follow-up on the results of the CBC or to ensure that Crowson received a CBC.

Even if Crowson's condition had made it difficult to draw blood, Dr. Larowe could have sent Crowson to the hospital. Nurse Borrowman testified that when he was unable to draw blood from an inmate he "would always send them to the hospital because they've got Doppler ultrasound that they can find veins. So even there I wouldn't say that we were limited because we have an ER that was always available to us." (Borrowman Dep at 31.) The facts show that Dr. LaRowe understood the significance of the test he ordered, but simply did nothing about it when Nurse Johnson failed to perform the test.

**Statement of Fact No. 3**: Dr. LaRowe ordered the CBC as a general evaluation and diagnostic tool, 'because of the patient's vague complaints' and in hopes of getting 'some clue as to where to go next.'

**DISPUTE**: Please see the response to Statement of Fact No. 2. In addition, it is important to note that Dr. LaRowe ordered the CBC to get "some clue as to where to go next." Without that test, or any sort of equivalent testing, Dr. LaRowe did not have a clue as to where to go next, and he was deliberately indifferent to the serious need to get some clues. As previously stated, Crowson went seven days without a diagnosis before he was

6

sent to the hospital.  Dr. LaRowe's inaction for that length of time is significant evidence of his deliberate indifference.

**Statement of Fact No. 4**:  Dr. LaRowe testified that blood work is one diagnostic tool available to diagnose metabolic encephalopathy by showing '[i]f the acid base balance is out of the norm.'

**DISPUTE**:  Please see the responses to Statements of Fact two and three.

**Statement of Fact No. 5**:  Dr. LaRowe also ordered a chest x-ray to rule out a potential 'lower respiratory infection that might explain a lot of the symptoms that he was having.'

**DISPUTE**:  The chest x-ray was returned normal.  With that information, Dr. LaRowe should have sought additional medical evidence in an effort to make a diagnosis, but he did not.

**Statement of Fact No. 6**: On June 29, 2014, Mike Johnson called Dr. LaRowe a second time to report that Mr. Cowson had an elevated heart rate. Dr. LaRowe prescribed Ativan to treat his symptoms of agitation at that time.

**DISPUTE**: The plaintiff disputes the assertion he was having symptoms of agitation.  Dr. LaRowe has asserted he prescribed Ativan for agitation, but there is no documented evidence of agitation.  According to Dr. LaRowe, agitation

> can be a variety of findings.  Anywhere from being violent and aggressive to not knowing where you're at, what you're doing, not having a recollection of things that have occurred.  You know, the classic seeing spiders on the wall sort of thing.  Patients can be terribly uncooperative during these times.

(LaRowe Dep at 46-47.)   According to Meriam-Webster, the medical definition of "agitation" is "a state of excessive psychomotor activity accompanied by increased

7

tension and irritability." (*available at* https://www.merriam-webster.com/dictionary/agitation (last visited November 2, 2018).)

There is nothing in the record to indicate Crowson was demonstrating excessive psychomotor activity or increased tension and irritability.  (*See* Medical Records, Washington County's Exhibit No. 4, Bates No. 501.)  To the contrary, Crowson was demonstrating decreased psychomotor activity with no evidence of increased tension or irritability.  Dr. LaRowe's continued indifference to Crowson's actual symptoms helps explain why Crowson went undiagnosed and untreated for a week in Purgatory Jail.

**Statement of Fact No. 7**:  Dr. LaRowe testified that '[i]t sounded like [Mr. Cowson] was having symptoms that would be consistent with withdrawal,' and that Ativan is appropriately used to treat agitation associated with substance withdrawal.

**DISPUTE**:   There are two genuinely disputed material facts in this statement.  First, Crowson was not having symptoms that would be consistent with withdrawal.  And second, Crowson was not demonstrating agitation as stated in response to Statement of Fact number six.

The medical records are inconsistent with alcohol or drug withdrawal. By the time Nurse Johnson noted delirium tremens, it was too late for Crowson to have been experiencing withdrawal symptoms.  The medical note from June 29, 2014 is the first and only note that mentions delirium tremens.  It states, "0730 – pt hr elevated @140, noted dt's [delirium tremens] occurring, staffed pt status with MD, to:Ativan 2gm IM now then start on Librium protocol, cont to monitor pt closely, pt tolerated IM injection well." (Medical Records, Washington County's Exhibit No. 4, Bates No 501.)

People experiencing alcohol withdrawal usually begin experiencing symptoms no later than 72 hours after cessation of alcohol. (Larowe Dep at 30.) Crowson had been in medical observation since July 25, 2018, at least 96 hours before anyone suggested Crowson may have been experiencing withdrawal symptoms. Prior to that, he had been in solitary confinement for eight days, with access only to prison guards. (Lyman Dep at 34-36.) In other words, there was no opportunity for Crowson to have been exposed to any alcohol or drugs within the time period necessary for Crowson to have been withdrawing.

In addition, the symptoms contained in the medical records are not consistent with withdrawal or delirium tremens. The symptoms of alcohol withdrawal include confusion, hypertension, diaphoresis (profuse sweating), tachypnea (rapid respiratory rate), and tachycardia (rapid pulse rate) and delirium tremens. (LaRowe Dep at 28.) According to Dr. LaRowe, "typical symptoms" of delirium tremens include "[v]isual hallucinations, auditory hallucinations . . . odd tactile sensation, confusion, agitation." (Larowe Dep at 30-31.)

On June 29, 2014, the symptoms noted by Nurse Johnson were a heart rate of 140 beats per minute and "dts." There was no mention of diaphoresis, tachycardia, hypertension, visual hallucinations, auditory hallucinations, odd tactile sensation or agitation. At the time of his deposition, Nurse Johnson did not have a specific memory of Crowson having delirium tremens, but he speculated Crowson was "probably shaking." (Johnson Dep at 95, 101-102.)

**Statement of Fact No. 8**: Dr. LaRowe also testified that one course of treatment for a diagnosis of metabolic encephalopathy is to treat for agitation. Dr. LaRowe testified he has used Ativan for such treatments in hospital settings.

**DISPUTE**: *Please see* the Response to Statement of Fact number six. Crowson did not demonstrate symptoms of agitation.

**Statement of Fact No. 9**: Dr. LaRowe also testified about a call he received on July 1, 2014 from Ryan Borrowman: at that time, the vital signs had changed. They had gone outside of the normal range. I believe most specifically the pulse rate had risen. And at that point, you know, I elected to have him transported to an emergency room.'

**DISPUTE**: There is nothing in the record to indicate that Crowson's "vital signs had changed" or that they "had gone outside of the normal range." (*See* Medical Records, Washington County's Exhibit No. 4, Bates No. 501.) The note from July 1, 2014 is silent as to Crowson's vitals signs. Furthermore, the medical records contain no information at all about Crowson's condition on June 30, 2014 and it does not appear Dr. LaRowe made any effort to find out how Crowson was doing on that day. *See id.*

## STATEMENT OF ADDITIONAL MATERIAL FACTS

1. Dr. LaRowe did not visit Purgatory Jail at any time that Crowson was incarcerated in the medical cell. (Larowe Dep at 25-26.)

2. Dr. Larowe had a nurse practitioner that he could have sent in his place. (Johnson Dep at 15.)

3. Aside from answering a telephone call from Johnson, Dr. Larowe did nothing to follow up on Crowson's condition except to expect that the nurses would be

checking on him one time per shift. (*See* Larowe Dep at 38-39.) In a hospital situation, by contrast, a doctor will "round on them daily. That's a minimum." (Larowe Dep at 40.)

4. Dr. Larowe, however, readily conceded that inmates in Purgatory Jail do not receive the same standard of care as a patient in a hospital. (Larowe Dep at 40.)

9. Upon reviewing Crowson's medical records, and with the benefit of hindsight, Dr. Larowe opined that Crowson was suffering from metabolic encephalopathy, not alcohol withdrawal. (Larowe Dep at 34.)

10. The treatment for metabolic encephalopathy is to treat the patient's agitation and to administer neomycin or lactulose to reduce ammonia levels. (Larowe Dep at 34.)

11. Treatment for metabolic encephalopathy should begin as soon as the symptoms appear. (Larowe Dep at 35.)

12. Brain injuries are serious medical conditions. (Johnson Dep. at 40.)

13. Dr. Larowe has not provided training to Purgatory Jail medical staff about how to determine whether there has been a brain injury. (Johnson Dep at 62; Borrowman Dep at 10.)

## ARGUMENT

The right secured for prisoners under the Eighth Amendment is access to medical care. In the Supreme Court's words,

> elementary principles establish the government's obligation to provide medical care to those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical torture or a lingering death, the evils of most immediate concern to the drafters of the [Eighth] Amendment.

*Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (citation omitted).

## I. STANDARD FOR SUMMARY JUDGMENT

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The rule requires the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence... of a genuine dispute[.]" Fed.R.Civ.P. 56(c)(1).

## II. ARGUMENTS INCORPORATED BY REFERENCE

In response to Dr. LaRowe's arguments in sections (I)(A), (II) and (III), the plaintiff adopts and incorporates by reference the factual and legal arguments found in his Memorandum in Opposition to the Washington County Defendants' Motion for Summary Judgment in addition to the arguments and factual assertions stated herein.

The plaintiff also incorporates the facts asserted and the legal arguments he made in opposition to the Washington County Defendants' Motion for Summary Judgment as it relates to the performance of the gatekeeper function and the lack of training and policies.

## III. THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER DR. LAROWE'S ACTIONS AND INACTIONS SHOWED DELIBERATE INDIFFERENCE

Dr. LaRowe owed Martin Crowson a duty to provide him access to adequate medical care. A prison official's burden on summary judgment is to show that there are not disputed issues of material facts and that the office did not demonstrate deliberate indifference to the "inmate's serious medical needs" in "violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "The test for constitutional liability of prison officials involves both an objective and a subjective component." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).

The subjective prong of the deliberate indifference test requires the plaintiff to present evidence of the prison official's culpable state of mind. *Mata v. Saiz*, 427 F.3d 745, (Cir. 2005). The subjective component is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Id*. A prison medical professional who serves "solely . . . as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper role." *Id.* (*quoting Sealock*, 218 F.3d at 1211; *see also Estelle*, 429 U.S. at 104-105 (deliberate indifference is manifested by prison personnel

13

"in intentionally denying or delaying access to medical care"). "Deliberate indifference does not require a finding of express intent to harm." *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 2012). The deliberate indifference standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer*, 511 U.S. at 836. "An official 'would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Mata*, 427 F.3d 745 (*quoting Farmer*, 511 U.S. at 843 n.8.)

It is difficult for a prison official to prevail on the question of whether there was a substantial risk because "substantial risk is a question subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Mata*, 427 F.3d 745. "[I]f a risk obvious so that a reasonable man would realize it, we might well infer that the defendant did in fact realize it." *Id.*

Dr. LaRowe has argued that he is not liable because his conduct was, at most, negligent. However, a prison doctor who consistently neglects the care of an inmate and repeatedly fails to verify underlying facts crosses the line from negligence to deliberate indifference. A reasonable jury could hear the facts of this case and decide that Dr. LaRowe was deliberately indifferent. For that reason, the Court should deny Dr. LaRowe's Motion for Summary Judgment.

Dr. LaRowe contends that he was not deliberately indifferent because "Crowson exhibited nonspecific---or vague---symptoms, which could have characterized any number of diagnoses . . ." (LaRowe Motion at 7-8.) Because Crowson's symptoms were

14

"not 'clear cut,'" Dr. LaRowe has asserted he should escape liability. The Court should reject that argument. Crowson's symptoms were "not clear cut" because Dr. LaRowe did not care enough to find out what Crowson's actual symptoms were. Dr. LaRowe was derelict in his duties to evaluate, assess and diagnose Crowson. Dr. LaRowe's inaction lasted several days and resulted in the delay and prolongation of Crowson's suffering.

Dr. LaRowe has essentially argued that he should escape liability because he did not do nothing. In his motion, Dr. LaRowe pointed out that he "ordered an x-ray to rule out a lower respiratory infection," "ordered a CBC, a valuable diagnostic tool to determine a variety of potential issues," and he "ordered the administration of Ativan to treat Mr. Crowson's symptoms of agitation." *Id.* at 8.

However, those token actions do not change the fact that Dr. LaRowe did not verify underlying facts, did not perform his gatekeeper role, and his consistent indifference resulted in a delay of several days before Crowson was sent to the hospital to receive care. Dr. LaRowe's arguments ignore the fact that he: (1) did not visit Purgatory Jail or see Crowson at all during the period of June 25, 2014 to July 1, 2014; (2) did not send his physician's assistant to Purgatory Jail to examine Crowson; (3) did not obtain any information about Crowson's status on June 25, June 26, June 27 or June 30, 2014; (4) did not follow-up to ensure that Crowson's blood was drawn for the CBC, which would have been a "valuable diagnostic tool;" (5) did not obtain sufficient information to make a diagnosis at any time during Crowson's incapacitation; (6) failed to verify information regarding Crowson symptoms that were necessary to make a proper diagnosis; (7) falsely assumed that Crowson was experiencing withdrawal symptoms without knowing sufficient facts to determine whether that was even possible; (8) did not provide training

to the Purgatory Jail staff about how to recognize a brain injury; and (9) did not send Crowson somewhere where he could receive adequate medical care for seven days.

Dr. LaRowe has asked to be exonerated for treating Crowson with Ativan for symptoms of agitation that did not even exist.  Dr. LaRowe has asked to be free of liability for assuming that Crowson may have been withdrawing from drugs or alcohol without medical evidence.  Dr. LaRowe can not defend a seven-day delay in obtaining adequate medical for Crowson by asserting that on day five of seven, he prescribed a medication for symptoms that did not exist.  The doctor's role is not to haphazardly throw medication at a patient without first making a diagnosis.  Over the course of seven days, Dr. Larowe and the medical system for which he was responsible failed to provide access to adequate medical care.

Dr. LaRowe has not offered any reasonable explanation of why it took seven days to send Crowson to the hospital.  That is because there is no reasonable explanation.  The only explanation is that Dr. LaRowe was deliberately indifferent to his role as a gatekeeper and diagnostician.

With the benefit of "20/20 hindsight," Dr. LaRowe can now recognize that Crowson was suffering from metabolic encephalopathy.  (LaRowe Dep at 33.)  Had he not been deliberately indifferent to Crowson's serious medical need over a seven-day period, however, Dr. LaRowe would have not required the benefit of hindsight.  And more importantly, Crowson would not have languished incoherent in a medical cell at Purgatory Jail for an entire week.

Had Dr. LaRowe visited Purgatory Jail or sent his physician's assistant as he was contractually obligated to do, Dr. LaRowe would have been able to evaluate Crowson and

determine an appropriate course of treatment. Had Dr. LaRowe followed up to ensure that the CBC blood panel was completed, Dr. LaRowe would have had information about Crowson's condition to provide him adequate medical care. Had Dr. LaRowe obtained more information about Crowson's condition on June 25th, June 26th, June 27th, June 28th, June 29th or June 30th, he could have sent Crowson to the hospital earlier than July 1st.

Dr. LaRowe's conduct demonstrates a pattern of not caring. He testified that a patient in Crowson's condition would be seen by a doctor at least daily in a hospital. However, Crowson was not seen by a doctor during the entire seven-day period. Dr. LaRowe's argument that he was merely negligent is not persuasive. Negligence does not result in inaction for seven days. When a prison doctor's inaction over a week results in a failure to obtain sufficient evidence to make a diagnosis of encephalopathy that is deliberate indifference.

Based on the genuinely disputed issues of material fact, the Court should deny Dr. LaRowe's motion and allow the case to proceed to trial.

## **CONCLUSION**

The Court should deny Dr. LaRowe's Motion for Summary Judgment and Joinder the Washington County Defendants' Motion for Summary Judgment because there are genuine issues of material facts as to Dr. LaRowe's deliberate indifference. For this reason, and for the reasons set forth in opposition to the Washington County Defendants' Motion for Summary Judgment, the Court should allow the case to proceed to trial.

DATED this 2nd day of November, 2018.

          SCHRIEVER LAW FIRM

          /s/ Ryan J. Schriever
          _____
          Ryan J. Schriever
          *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 2nd day of November, 2018 she/he filed the foregoing MEMORANDUM IN OPPOSITION TO DEFENDANT JUDD LAROWE'S MOTION FOR SUMMARY JUDGMENT using the Court's electronic filing system that automatically generated notice to the following:

Kipp & Christian
Gary Wight
10 Exchange Place, 4th Floor
Salt Lake City, UT 84111
gwight@kippandchristian.com

Frank D. Mylar
2494 Bengal Boulevard
Salt Lake City, UT 84121
mylar_law@me.com

/s/ Ryan J. Schriever
_____