CROWSON

vs

WASHINGTON COUNTY

RYAN T. BORROWMAN

April 17, 2018





333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

```
 1          IN THE UNITED STATES DISTRICT COURT
 2     FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
 3                       *   *   *
 4   MARTIN CROWSON,          )
                              )
 5          Plaintiff,        )
                              )  Case No. 2:15-cv-00880
 6      vs.                   )
                              )  Deposition of:
 7   WASHINGTON COUNTY,       )
     et al.,                  )  RYAN T. BORROWMAN
 8                            )
            Defendants.       )
 9
                         *   *   *
10
```

COPY

April 17, 2018

1:00 p.m.

WASHINGTON COUNTY TREASURER OFFICE
197 East Tabernacle Street
St. George, Utah

\*   \*   \*

Linda Van Tassell
- Registered Diplomate Reporter -
Certified Realtime Reporter

**Page 2**

```
              A P P E A R A N C E S
    For the Plaintiff:        Ryan J. Schriever
                              SCHRIEVER LAW FIRM
                              51 East 800 North
                              Spanish Fork, Utah  84660

    For the Defendant         Frank D. Mylar
    Washington County:        MYLAR LAW, PC
                              2494 Bengal Boulevard
                              Salt Lake City, Utah  84121

    For the Defendant         Gary T. Wight
    Larrowe:                  KIPP & CHRISTIAN
                              10 Exchange Place, 4th Floor
                              Salt Lake City, Utah  84111

    Also Present:             Brian Graf

                     *   *   *

                    I N D E X

    EXAMINATION                                        PAGE

    By Mr. Schriever                                      3

    By Mr. Wight                                         46
```

**Page 3**

P R O C E E D I N G S

RYAN T. BORROWMAN, called as a witness on behalf of the plaintiff, being duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. SCHRIEVER:

Q. Please state your full name.
A. Ryan T. Borrowman.
Q. How do you spell Borrowman?
A. B-o-r-r-o-w-m-a-n.
Q. What is your date of birth?
A. November 8, 1975.
Q. Where do you currently live?
    MR. MYLAR: I want to object to his personal address.
Q. Sure.
A. Washington Fields.
Q. How long have you lived in Washington Fields?
A. Maybe four years.
Q. Do you have any plans of moving anytime soon? Is that no?
A. Yeah. No. Sorry, I forgot.
Q. I know you've had a chance to talk with

**Page 4**

your attorney about what a deposition is. I like to always explain a little bit at the beginning. Your deposition is my chance to ask you questions. You're under oath so you're obligated to tell the truth. What I'm after is your recollection and memories of events. I may also ask you for your interpretation of some facts --
A. Okay.
Q. -- your mental impressions. If I ask you for the mental impressions of other people, your attorney will probably object.
A. Okay.
Q. In most situations like that he can object and I can still ask you to answer the question --
A. Okay.
Q. -- because we can try to figure out how it is you come to think things or know things.
A. Okay.
Q. He's preserving the objection for later on if we have to go to court and I try to use it for reasons he doesn't think is proper.
A. Right.
Q. Along those lines, everything that you or I or anybody here says is being recorded and will

**Page 5**

be written down in booklet. So if I do remind you to say yes or no if you've shaken your head, I'm not trying to be rude.
A. Yeah.
Q. If you need to take a break for any reason at all just let me know. That's not a big deal.
A. All right.
Q. If I ask you a question that you don't feel like you can completely or honestly answer or if you don't understand a question that I'm asking, tell me that and I will do my best to try to rephrase it.
A. Okay.
Q. Any questions about the deposition process?
A. Not that I understand.
Q. Okay. What is your current job with Washington County?
A. I'm not currently employed with them.
Q. Where do you work?
A. Riverview Medical as a doctor of nursing practice.
Q. When did you stop working for Washington Jail?

Page 10

1   A.  Yes, there's courses there that we take.
2   I don't remember specifically but we do touch on
3   psychological and behavioral problems during those
4   years.
5        Q.  How about recognition of alcohol
6   withdrawal symptoms?
7        A.  Yes.  Both in my LPN and my RN year.
8   And then we would also review those I think in our
9   yearly trainings, I believe.  I'm not 100 percent
10  sure but I know it was very highly -- it's a highly
11  discussed topic since we see so many people.  I
12  don't know if it was inhouse or in our yearly
13  training.
14       Q.  What yearly training did you do?
15       A.  The county has yearly training.  Just
16  staff training that they do.
17       Q.  And you address alcohol withdrawal
18  symptoms specifically?
19       A.  Not that I really -- I don't know that I
20  can recall exactly if it was specific or not.
21       Q.  Do you recall if it was specific to
22  withdrawal from other types of drugs?
23       A.  There was a section every year but maybe
24  I'm -- it seems like that's where it was at.  I
25  can't recall exactly.

Page 11

1        Q.  How would you describe the training?
2   What did they teach you?
3        A.  Number one, to notice when somebody is
4   behaving differently and pupil dilation, those types
5   of things where they could be showing signs of being
6   on a stimulant, or pupil constriction that could be
7   showing signs of brain or alcohol, those types of
8   things.  They tried to keep it pretty simple,
9   especially so deputies even would be able to
10  recognize it.
11       Q.  Did they have any type of assessment
12  that you could do to determine the severity of
13  withdrawals so they could determine what treatment
14  is appropriate?
15       A.  At the time -- I don't know if it's
16  there any longer but one of the nurses posted on a
17  little whiteboard that we had a thing that showed
18  specifically heroin and alcohol withdrawal but
19  didn't show anything for meth or -- but I don't even
20  know if that's there anymore.
21       Q.  Do you know what the criteria were?
22       A.  Heroin you go through the -- there was a
23  point scale for like if you saw goose bumps or if
24  their pupils were dilated or if they were sweating,
25  tremors in their hands, those types of things, and

Page 12

1   you would add up the point system and that would
2   tell you how bad they were in heroin withdrawal.
3        Alcohol withdrawal, I don't recall there
4   being a point system but it was you were looking for
5   delirium and then you were looking for tremors and
6   looking for unstable vital signs.  That's all I
7   remember.  There could have been more but that's all
8   I remember of it.
9        Q.  Would that include an increase in
10  anxiety?
11       A.  For which one?
12       Q.  For alcohol?
13       A.  I don't recall if that was on that list.
14  I know that I knew that, to be looking for anxiety
15  issues.
16       Q.  You say you knew that?
17       A.  Uh-huh.  Where I picked it up, I don't
18  recall.  I don't know if it was on that paper.
19       Q.  How about hallucinations?
20       A.  That would be delirium.
21       Q.  Is change in mental status something
22  different than delirium?
23       A.  No.  That's what you would be looked for
24  with alcohol withdrawal.
25       Q.  How about a temperature above 100.4, is

Page 13

1   that something you would look for?
2        A.  If it is, I don't remember that.  I'm
3   sure it probably is but --
4        Q.  Increases or decreases in blood pressure
5   and heart rate?
6        A.  Right.  Stable vital signs is --
7        Q.  What about insomnia?
8        A.  That would be on the list but you would
9   have to take into account everything else for
10  insomnia to really be a specific concern.  Pretty
11  much everyone in the jail could have insomnia just
12  because of the location.  If someone just came to me
13  and said, "I've got insomnia," I wouldn't be
14  thinking alcohol withdrawal.
15       Q.  Okay.  How about abdominal pain?
16       A.  If that's on the list, I don't recall
17  it.
18       Q.  Changes in responsiveness of pupils?
19       A.  Yeah.  That would be the -- I think I
20  mentioned that already.
21       Q.  What about heightened deep tendon
22  reflexes?
23       A.  Yes.
24       Q.  Ankle clonus?
25       A.  Yes.  And that can also be back

**Page 14**

1  injuries, so that alone you wouldn't be thinking
2  alcohol withdrawal.
3     Q.  But if you saw somebody that had most or
4  all of these --
5     A.  Oh, yeah.  It would be -- I would be
6  thinking alcohol withdrawal.
7     Q.  Okay.  And did the jail have criteria
8  like this that you were required to use when
9  determining alcohol withdrawal?
10    A.  Mostly I went off memory.  I don't
11 remember if there was anything specific.  We were
12 all trained in that.
13    Q.  Did the jail have criteria that you
14 would look at if you were considering a brain
15 injury?
16    A.  There was the Glasgow Coma Score --
17 Glas-cow, however you want to say it.
18    Q.  After Dr. Glasgow, who was a woman by
19 the way.
20    A.  I did not know that.
21    Q.  It's on Facebook.
22    A.  It could be or couldn't be true.
23    Q.  It's on the Internet.  Any other
24 criteria you'd look at other than the Glasgow Coma
25 Score?

**Page 15**

1     A.  No.  That was pretty much the deciding
2  one.
3     Q.  Are you familiar with the CIWA-AR scale
4  of alcohol withdrawal?
5     A.  Yeah.  I wouldn't be able to -- I've
6  encountered it.  That was one of the scales that was
7  used when I was working at Brookstone but I didn't
8  commit it to memory.  I wouldn't be able to recite
9  it back to you.
10    Q.  Okay.  All right.  While you were
11 working at the jail did you ever record notes or
12 charts outside of CorEMR?
13    A.  No, I didn't.
14    Q.  And when you would make an entry into
15 CorEMR, was that your own account?  You had a
16 password --
17    A.  Yes.
18    Q.  -- that would log you in?
19    A.  Right.
20    Q.  And if you entered a note, would it
21 automatically assign you as the person doing that?
22    A.  Yes.
23    Q.  Did it also automatically assign a date
24 and timestamp?
25    A.  That was my understanding, although I

**Page 16**

1  didn't look into how it actually did things and kept
2  track in a database.  I just assumed that it did.
3     Q.  Did you have access to go back in and
4  change or modify any prior entries that you had
5  made?
6     A.  I think somebody could but if they made
7  the change, I think it would track it.  So I don't
8  think you could make changes with it.  That's my
9  understanding.  If it's possible, I'm not aware of
10 how.
11    Q.  Okay.
12    A.  But I think an administrator could
13 unlock something but I would assume that that would
14 be tracked, too.
15    Q.  Was it your practice to always document
16 interactions when you were seeing patients?
17    A.  That was always my -- there were times
18 that I would not be able to because of the workload,
19 trying to go through and assess everyone, but
20 because of the time constraints or how many people,
21 there were times that I would not be able to.
22        However, that being said, if there was
23 ever a situation where there was something abnormal,
24 I wouldn't -- I would always make sure that that was
25 in.

**Page 17**

1     ==Q.  How about something routine like==
2  ==checking somebody's vital signs, is that something==
3  ==you would chart in CorEMR?==
4     ==A.  If I were in charge of booking,==
5  ==probably -- same rules there.  If it were a busy day==
6  ==I wouldn't always get it done.  On the days that==
7  ==were slower and that we had time to get everything==
8  ==caught up, but I would take vitals with everyone==
9  ==even if I didn't chart it.==
10    Q.  Did you take vitals with everyone you
11 saw?
12    A.  I want to say yes.  I'm sure there's
13 some times when I may have missed somebody but to my
14 recollection I always hooked the tree around, the
15 vitals tree, especially if it were a detox or one of
16 the med cells.  I can't say that for some of the
17 intake cells where the people were sitting there
18 waiting for -- to be moved somewhere but in med
19 cells, yes.
20    Q.  How many inmates did you see on a daily
21 basis?
22    A.  In booking it would just depend on how
23 many inmates were brought in and how many were in
24 med observation.  And then if I didn't have booking
25 and I had kites and tasks, which are the medical

**Page 18**

1  requests that the inmates put in, that could range
2  anywhere from five to 25, just depending on the day.
3      Q.  How is it that you would know what
4  inmates to see?
5      A.  I don't remember if CorEMR or if --
6  there's a new computer system that they put in that
7  they would be able to put it in on the kiosk.  I
8  don't recall if that was active at the time.  And,
9  if it wasn't, then they would put in a medical
10  request kite.  There's a box in every single block
11  that they can just go up, grab one, fill it out and
12  then they put it into a little box that the deputies
13  get.  So we'd get -- we call them kites because the
14  inmates would say they were flying us a kite or
15  flying a kite to whatever and they would -- we would
16  get those every day.  We would see everyone for the
17  kites every day that came to us.
18      Q.  You mentioned some different areas.  One
19  was booking, one was med observation cells --
20      A.  Whoever had booking had med observation
21  cells.
22      Q.  Okay.  And then you also had just the
23  general population, right?
24      A.  Yeah.  We called it doing kites and
25  tasks.

**Page 19**

1      Q.  Did people in the med observation cells
2  have to put in requests?
3      A.  No.  We would see them multiple times a
4  day, so whoever was in charge of that would go up
5  there.  Initially they would do vitals on everyone
6  and then from there they would walk through multiple
7  times a day in booking to look over them.
8      Q.  Does that mean that you went in and took
9  vitals on the inmates multiple times per day?
10      A.  Each nurse normally would do it one
11  time.
12      Q.  Any other times to check them to see if
13  they're responsive?
14      A.  Skin color, if they were sleeping, if
15  there were respirations, if they were talking to
16  themselves or just anything abnormal.
17      Q.  If it was abnormal, then you would note
18  it.
19      A.  Yeah.
20      Q.  If it was normal then --
21      A.  Then I wouldn't.
22      Q.  In the medical observation cells was it
23  your practice to be more vigilant about charting
24  things?
25      A.  It was my practice, yes.  I tried.  If I

**Page 20**

1  missed something it was either -- I can't think of a
2  situation but just if something crazy was going on,
3  maybe a suicide attempt or something in the back
4  where we were completely distracted for a little
5  bit.  It would had to have been something really big
6  for me to miss it, though.
7      Q.  Is the medical observation cell the same
8  as the detox cell?
9      A.  Yeah.  There's also some that are padded
10  where if we feel somebody is a danger to themselves
11  they would be there.  And then for long-term stable
12  patients that we wanted to observe but we were a lot
13  more comfortable that they were stable, there were
14  some cells that you could still see in there but
15  they were different than the detox cells and they
16  were technically medical cells but the terms are
17  interchangeable.  If they were brought up for
18  medical observation, we wanted direct eyes on them,
19  we would call one of the detox cells a medical cell
20  where the deputies in booking had constant visual on
21  them.
22      Q.  Was there a deputy that would accompany
23  you when you would do visits in the med cells?
24      A.  Yes.  Every single time.  I couldn't go
25  in there without a deputy.

**Page 21**

1      Q.  What about when inmates came back to the
2  exam room?
3      A.  There's a deputy there as well.
4      Q.  Is that the same deputy throughout the
5  day?
6      A.  No.  It could be a different deputy.
7  Normally a deputy from booking would escort us in
8  booking and a deputy from the blocks would escort us
9  in the blocks.  But it could, just depending on the
10  need.  I guess one of them may come up from the
11  blocks to go around with us in booking but we
12  couldn't be alone.
13      Q.  Okay.  Were you able to enter the
14  charting with CorEMR from the medical observation
15  cells?
16      A.  No.
17      Q.  You would have to go back to the exam
18  room --
19      A.  Right.
20      Q.  -- with your own computer?
21      A.  Uh-huh.
22      Q.  Is that yes?
23      A.  Yes.
24      Q.  My understanding is that Dr. Jim Larrowe
25  was the medical director for the county.

**Page 22**

1   A.   Uh-huh.
2   Q.   Is that a yes?
3   A.   Yes.
4   Q.   What's your understanding of what his
5   role was?
6   A.   He was the doctor. You couldn't do
7   anything without the doctor okaying it. As a nurse
8   you don't have that authority. So if you see
9   something, you call the doctor and ask what he wants
10  to have done.
11  Q.   It is the doctor who is ultimately
12  responsible for the inmates' care, correct?
13  A.   That's how the entire medical system is.
14  Not just there but nurses at the hospital, everyone
15  reports to a doctor.
16  Q.   Right.
17  A.   That's just part of the hierarchy.
18  Q.   And the nurses, before they administer
19  medication, get an order from the doctor.
20  A.   Uh-huh.
21  Q.   Is that a yes?
22  A.   Yes.
23  Q.   And nurses before they draw blood have
24  to get an order from the doctor?
25  A.   Yes.

**Page 23**

1   Q.   Nurses before they send anything out for
2   some kind of test like an x-ray --
3   A.   Yes, they do.
4   Q.   Was there an x-ray at the jail?
5   A.   No. We had to send them to the
6   hospital.
7   Q.   Was there any type of imaging capability
8   at the jail?
9   A.   No. Not that I'm aware of.
10  Q.   If you take a blood draw how would you
11  find the result of that?
12  A.   We would send it to our lab and they
13  would send us the results.
14  Q.   What are nurses authorized to do without
15  a doctor's order?
16  A.   The whole nurse structure is you can do
17  a nursing assessment. We call it ADPI assessment.
18  It's been a while since I did that. You're
19  basically going through the same steps as a doctor
20  in assessing, evaluating, implementing and going
21  back and making sure that what is implemented
22  occurred.
23       You can do things like Gatorade if you
24  feel like the patient is dehydrated, if you feel
25  like the patient is -- there's nothing real medical,

**Page 24**

1   really, I guess. You're just going through and
2   doing an assessment to look for simple things that
3   they can discuss with them, how they could better
4   handle a situation. Just do some general things
5   like that. I don't know if that's very clear but --
6   Q.   Clear as mud. So this ADPI, that's an
7   acronym?
8   A.   Yes.
9   Q.   A stands for assessment?
10  A.   Uh-huh.
11  Q.   The D stands for diagnosis?
12  A.   Right. So you've got a nursing
13  diagnosis which is different than a doctor's
14  diagnosis.
15  Q.   In what way is it difference?
16  A.   For instance, dehydration, for example.
17  You don't necessarily have any supporting
18  documentation like a lab result. You can't order
19  lab results to be able to say a person is dehydrated
20  but if they tell you, "I'm thirsty. I haven't been
21  drinking a lot of water."
22       So my diagnosis of dehydration may
23  include talking to the doctor about it and getting a
24  medical order for IV or something, something that I
25  couldn't do as a nurse. But I could say, "Let's

**Page 25**

1   start pushing water. Let's have you drink. Let's
2   get you some Gatorade." Does that clear it up any?
3   Q.   So using this hypothetical then, you
4   could call the doctor and say, "Hey, I believe this
5   patient is dehydrated. Can we go ahead and start an
6   IV on them?"
7   A.   Right. If I felt like just standard
8   things that a normal person could do, like drink
9   water, were not going to be enough.
10  Q.   Would it be standard practice for you to
11  make that type of a recommendation to a doctor?
12  A.   Yes.
13  Q.   And the doctor could say yes or no?
14  A.   Yes.
15  Q.   As far as planning goes, what does the P
16  stand for?
17  A.   That's where you start to -- you're
18  going to come up with what you're going to do. So
19  if the plan is talk to the doctor, get orders, then
20  that's what you're going to do. If the plan is to
21  hydrate with Gatorade, that's what the plan is. So
22  it's just what you're going to do to try and address
23  the diagnosis that you came up with.
24  Q.   **Okay. And what is the nurse's role in**
25  **planning as opposed to the doctor's role in**

**Page 26**

1  planning?
2      A.  The nurse can't make any medical
3  diagnoses, so to speak.  So if they feel like a
4  situation is needing more than just something
5  simple, you have to talk to the doctor in order to
6  see if he feels, number one, that something more
7  needs to be done, or, if he agrees that you just
8  need to do what you were going to do, push water or
9  whatever.  They're different.  A nurse can't order
10 things, so to speak, that isn't commonly available
11 to the normal person at home, if that makes sense.
12     Q.  Sure.  As a nurse was there such thing
13 that you feel like a lot of times you knew what the
14 inmate needed as far as treatment goes but you still
15 needed to get a doctor's approval for that?
16     A.  On almost anything that was related to
17 drugs, alcohol, blood pressures, there were very few
18 options available to a nurse.  You could just give
19 the inmate what's available to the general
20 population.  So a majority of what I did, anyway,
21 involved the doctor.
22     Q.  Okay.  And those conversations with a
23 doctor, specifically Dr. Larrowe, would that consist
24 of you calling him?  I'm going to break this down.
25 Would you call him?

**Page 27**

1      A.  Yes.
2      Q.  And my understanding is he was there at
3  the jail one time a week?
4      A.  Most of the time two times a week.
5      Q.  Two times?
6      A.  Tuesday and Thursdays.
7      Q.  How many hours would he be there?
8      A.  Just depends on how many patients he had
9  to see.  I've seen him there for as short as maybe
10 30 or 40 minutes and a couple of hours, maybe.  Just
11 depends on what he had, if there was something
12 complex or not.  I don't remember that very well.
13 It's been a long time.
14     Q.  Did he ever send out a PA or nurse
15 practitioner --
16     A.  Yes.
17     Q.  -- instead of him coming out?
18     A.  Yes.
19     Q.  How often did that happen?
20     A.  You know, that was so long ago.  He
21 hasn't had a PA or a nurse practitioner since
22 before -- Amy, who was the nurse practitioner there,
23 didn't want to come out so I couldn't tell you how
24 long it's been but I think maybe the last one was
25 Justin Brinkerhoff.  That would be -- I don't

**Page 28**

1  remember, but very rarely before that.  I mean
2  Justin would come out at that time but that was, I
3  believe, long before this ever happened.
4      Q.  So your memory was in 2014 it was mostly
5  Dr. Larrowe who would come?
6      A.  I believe so.  I could be wrong but --
7      Q.  Do you have any criticisms of the way
8  that Dr. Larrowe handled inmates?
9          MR. MYLAR:  Objection.  Lack of
10 foundation.
11         MR. WIGHT:  Join.
12     Q.  You can still answer.
13     A.  No.  I felt like he -- I think he was
14 very fair with then.  I know that there was even a
15 time or two that my perspective was that the inmate
16 was lying or that all the data that inmate was
17 giving me was not correct but when he went before
18 Dr. Larrowe he seemed to really get down and go
19 through all of the data and listen to them.  He
20 would make decisions that from my initial assessment
21 I wouldn't have come to without digging as deep as
22 he dug, so I think he really tried to do what's
23 right for the inmates.
24     Q.  All right.  Circling back to where we
25 were.  We were on a little side tangent for a

**Page 29**

1  minute.  You were talking about planning.  So you
2  had mentioned that you could call Dr. Larrowe.  If
3  he wasn't there on the site you could call him and
4  you could have a conversation, correct?
5      A.  Yes.
6      Q.  As part of that conversation was it your
7  practice to give him the medical history of the
8  inmate that you were observing?
9      A.  Yes.
10     Q.  How about describing the symptoms that
11 they were having?
12     A.  Yes.
13     Q.  Did you give him your thoughts on what
14 was happening with the inmate?
15     A.  That would be standard for me, yes.
16     Q.  Did you also tell him, make
17 recommendations as to what you thought would be
18 appropriate treatment?
19     A.  I didn't.  I know of nurses that will do
20 that but unless -- I would question him if I thought
21 maybe he was making a decision that because I hadn't
22 explained things but I wouldn't just tell him I
23 think you need to do this.
24     Q.  But if you had sensed that he had maybe
25 not understood the situation as you did, then you

30

1 would kind of follow up and provide more
2 information, provide additional information.
3     A.  Right.  Or he would oftentimes, if he
4 didn't feel he understood it, he would say, "Okay, I
5 want you to go up and check this out and this out
6 and get more information for me."
7     Q.  Okay.  And then implementation, you
8 mentioned that is --
9     A.  That's when you take what the doctor
10 ordered and you actually do it.  So if he says give
11 them blood pressure medication, you're going to
12 administer blood pressure medication.  So that's the
13 implementation part.
14     Q.  Are there some limitations in the jail
15 about implementing plans?
16     A.  I'm not sure I understand.
17     Q.  Let me give you a hypothetical.  Let's
18 say Dr. Larrowe said to you, "Take a blood draw from
19 an inmate," but maybe his veins were scarred from
20 heroin use or some other thing and you were unable
21 to get the blood in that way, are there other
22 avenues you may have to try to follow up on
23 implementing that plan or do you abandon the plan or
24 what do you do?
25         MR. MYLAR:  Objection.  Lack of

31

1 foundation.  Incomplete hypothetical and calls for
2 speculation.
3     A.  So in that situation I would always send
4 them to the hospital because they've got Doppler
5 ultrasound that they can find veins.  So even there
6 I wouldn't say that we were limited because we have
7 an ER that was always available to us.
8     Q.  And then the evaluation part of the ADPI
9 method, what does that entail?
10     A.  You implement it.  Sticking with the
11 blood pressure example, you're going to start
12 checking blood pressure and see if the blood
13 pressure starts to improve over the next day or two.
14 You're going to be tracking to see if what was
15 implemented is working.  And, if it's not, you're
16 going to start over and start going through it.  If
17 it's working, you're going to keep tracking it and
18 really kind of just goes from there.  It doesn't
19 circle back around.
20     Q.  You take a step back and you look and
21 see is what we're doing working?
22     A.  Right.
23     Q.  If not, what can we do different?
24     A.  Right.
25     Q.  How often should you in a shift or in a

32

1 week or in a day take that evaluation status where
2 you're looking at what you're doing?
3     A.  It depends on what you're implementing.
4 If it's like a blood pressure medication, some of
5 those can be as effective as they're going to be in
6 a half hour.  Some of them are going to take three
7 or four days to build up enough in the blood to
8 change it, so it just depends on what it is you're
9 implementing how quickly you feel you need to circle
10 around.
11     Q.  And the doctor isn't out there every day
12 so the nurse has to make that judgment call.
13     A.  It's the same in any medical situation,
14 care center or whatever it is, the doctor is not
15 there every day.
16     Q.  As a nurse do you consider yourself the
17 eyes and ears of the doctor?
18     A.  Yes.
19     Q.  And along with that requires critical
20 thinking, correct?
21     A.  Yes.
22     Q.  Analysis?
23     A.  Uh-huh.
24     Q.  Is that a yes?
25     A.  Yes.  Sorry.

33

1     Q.  Have you reviewed any documents in
2 preparation for your deposition?
3     A.  I looked over my assessment, my initial
4 assessment and then the note that I did to send him
5 to the hospital.
6     Q.  You did his initial assessment and
7 booking?
8     A.  Yes.
9     Q.  Did anything stand out to you in that as
10 being --
11     A.  Abnormal?
12     Q.  Yeah.
13     A.  No.  The patient -- I actually remember
14 him coming in.  I had seen him before.  I had
15 multiple interactions with him.  Not always on a
16 medical.  Just we like to talk to people.  He denied
17 having done anything.  The officer I remember
18 saying, "He says he hasn't done anything but we have
19 been told that he did heroin a couple of days ago."
20     Q.  So on the intake form it says that he
21 had done heroin a couple of days ago.  Let me pull
22 it up.  Page 488, are these your intake answers out
23 of CorEMR?
24     A.  Oh, yeah.
25     Q.  Okay.