CROWSON

v

LAROWE

DR. JUDD LAROWE

June 06, 2018



333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

```
                                                                    1
 1            IN THE UNITED STATES DISTRICT COURT

 2                       CENTRAL DIVISION

 3

 4

 5  MARTIN CROWSON,                    )
                                       )
 6       Plaintiff,                    )
                                       )
 7       vs.                           )Case No.
                                       )2:15-CV-880-RJS
 8  JUDD LAROWE, BRET LYMAN, et al.,)
                                       )Judge Tena
 9       Defendant.                    )Campbell
    _____)

10

11

12

13          DEPOSITION OF DR. JUDD LAROWE

14       Taken at the Courtyard Marriott
                185 South 1470 East
15               St. George, Utah

16        On Wednesday, June 6, 2018
                At 9:03 A.M.
17

18

19

20

21

22

23

24

25  Reported by:  J. Elizabeth Robison, RPR, CCR
```

## Page 2

```
 1           A P P E A R A N C E S
 2   FOR THE PLAINTIFF:
 3     Ryan J. Schriever, Esq.
       ryan@schrieverlaw.com
 4     SCHRIEVER LAW FIRM
       51 East 800 North
 5     Spanish Fork, Utah  84660
       801.574.0883
 6
     FOR THE DEFENDANT JUDD LAROWE:
 7
       Shawn McGarry, Esq.
 8     smcgarry@kippandchristian.com
       KIPP AND CHRISTIAN
 9     10 Exchange Place, Suite 400
       Salt Lake City, Utah  84111
10
     FOR WASHINGTON COUNTY DEFENDANTS:
11
       Brian Graf, Esq.
12     brian.graf@washco.utah.gov
       WASHINGTON COUNTY ATTORNEY'S OFFICE
13     33 North 100 West
       Suite 200
14     St. George, Utah  84770
       435.986.2610
15
       Frank D. Mylar, Esq.
16     Mylar_law@me.com
       2494 Bengal Boulevard
17     Salt Lake City, Utah  84121
18   ALSO PRESENT:
19     James Kenner
20              EXAMINATION INDEX
21   DR. JUDD LAROWE                        PAGE
22     By Mr. Schriever . . . . . . . . . . . 3
23     By Mr. Mylar . . . . . . . . . . . . 63
24     By Mr. Schriever . . . . . . . . . . 70
25
```

## Page 3

         P R O C E E D I N G S
              * * *
         DR. JUDD LAROWE,
having been first duly sworn to testify to the
truth, the whole truth and nothing but the truth,
was examined and testified as follows:
              -oOo-
         EXAMINATION
BY MR. SCHRIEVER:

Q. Dr. LaRowe, my name is Ryan Schriever. I represent an inmate by the name of Martin Crowson.
   Do you know Mr. Crowson?
A. I do not.
Q. Okay. We are here to take your deposition today.
   Have you ever had a deposition taken before?
A. Once, a number of years ago. I'm not even sure when.
Q. Okay. What did that case involve?
A. I was asked to be an expert witness in a case where a patient had been on Coumadin and things went awry.
Q. Okay.
A. So...

## Page 4

Q. All right. And that was a number of years ago?
A. It was. Probably at least a decade.
Q. Okay. Well, by way of refresher, then -- and I know you've had a chance to talk to Mr. McGarry, who is an excellent attorney -- but the deposition is our chance to just find out what you would be able to testify to if we were to get to trial. So you're under oath. It's the same as being in trial, except there's no judge here. There's no jury, and we're given a little bit more, latitude to just find out things about the case.
   So I'm going to ask you things about your background, qualifications, what you do with the Department of Corrections, what your practice is, and then any knowledge or memory you have of the specific events related to this case.
   Does that make sense?
A. Yes, it does.
Q. Okay. You're answering audibly, which is exactly what we need you to do, because we are making a transcript of the deposition. And a lot of times in conversation we have speech patterns that make it really casual, like saying "uh-huh" or "huh-uh." And that requires our court reporter to

## Page 5

make -- to interpret what you're saying. So if you don't say "yes" or "no" to a yes-or-no question, I might remind you just to say "yes" or "no."
A. That would be fine.
Q. Okay.
A. Thank you.
Q. All right. We also -- I don't anticipate that we'll be too long. But if you want to take a break at any point, we can do that.
A. Thank you.
Q. And if I ask you a question that you don't know the answer to or you don't remember, you can tell me that you don't know or you don't remember. That -- those are fine answers. I may probe around the edges to see if we can jog your memory. But I -- we need to know what your knowledge is, what your firsthand knowledge is.
   Does that make sense?
A. Yes, it does.
Q. Thank you.
   Well, to get started, would you please state your name for the record?
A. My name is Judd LaRowe.
Q. Okay. And LaRowe is spelled -- how do you spell LaRowe?

Page 30

1  withdrawal symptoms from heroin similar to what
2  they are from methamphetamine?
3        MR. MCGARRY: Object as to form.
4     A. The withdrawal symptoms to heroin, once
5  again, very nonspecific: Nausea, diaphoresis,
6  tachycardia, tachypnea, elevated blood pressure.
7  And those might last longer than methamphetamine.
8  The half-life for heroin is going to be a little
9  longer.
10    Q. Okay. And when you say a little bit
11  longer, what's the time period, do you think?
12    A. I don't know. I couldn't give you a
13  precise opinion on that.
14    Q. What about alcohol withdrawal symptoms?
15    A. They can last longer. Usually, the time
16  of onset is within 72 hours of cessation. But
17  especially when you're talking about delirium
18  tremens, that can go on for days and days.
19    Q. Can it go on for weeks?
20    A. Not weeks.
21    Q. Can it start weeks after?
22    A. No, it cannot.
23    Q. And by "delirium tremens," what do you
24  mean by that?
25    A. The DTs, the typical symptoms: Visual

Page 31

1  hallucinations, auditory hallucinations, tactile.
2  I won't call them hallucinations. But you can have
3  odd tactile sensations, confusion, agitation. And
4  then pretty much the same symptoms as we've
5  discussed with the others.
6     Q. Would not knowing what kind of work you
7  had done prior to incarceration be a delirium
8  tremens?
9     A. That's a pretty --
10       MR. MCGARRY: Object to form.
11    A. -- nonspecific --
12       MR. MCGARRY: Sorry, Judd.
13    A. Oh.
14       MR. MCGARRY: Object to form. Go ahead.
15    A. Okay. That's a pretty nonspecific
16  complaint. So that could be part of that.
17    Q. Okay. Do you recall receiving any
18  information from Mike Johnson that's not contained
19  in these notes?
20    A. I don't.
21    Q. As you reviewed these notes, did you see
22  anything in there that you thought would be
23  specific, as it relates to a delirium tremens?
24    A. No, I did not. These symptoms are
25  nonspecific. There are a lot of different disease

Page 32

1  states that these could be present in.
2     Q. Are they consistent with encephalopathy?
3     A. They could be.
4     Q. Now, you reviewed the records from Dixie
5  Regional Medical Center; is that correct?
6     A. I did.
7     Q. Did you agree with the diagnosis of toxic
8  metabolic encephalopathy?
9        MR. MYLAR: Objection. Lack of found --
10  lack of foundation.
11    A. Without examining the patient, and just
12  based on my review of the records, I would agree.
13  That's a pretty nonspecific clinical diagnosis, so
14  it would cover a broad range of possibilities. And
15  it would be an appropriate diagnosis from what I
16  reviewed.
17    Q. Okay. Did -- having reviewed those
18  records from Dixie Regional Medical Center, do you
19  have an opinion as to what Mr. Crowson's condition
20  or diagnosis would have been during the time he was
21  in Purgatory jail?
22       MR. MYLAR: Objection. Lack of
23  foundation.
24       MR. MCGARRY: Join. Go ahead.
25    A. Would you restate that, please?

Page 33

1     Q. I will try. I -- that's a fair -- that's
2  a fair request that I try to restate that.
3        Given all the information you reviewed,
4  which I believe -- well, let's see here.
5        All the information you reviewed is the
6  CorEMR notes and the Dixie Regional Medical Center
7  notes; correct?
8     A. Correct.
9     Q. You haven't reviewed anything outside of
10  those?
11    A. I have not.
12    Q. Okay. So having reviewed those records,
13  do you have an opinion as to what the appropriate
14  diagnosis for Mr. Crowson was, during the time he
15  was in Purgatory jail, from 6-25-2014 to 7-1-2014?
16    A. Yes, I do.
17    Q. What's that?
18    A. Well, fortunately, I have 20/20 hindsight,
19  and I can say it would be metabolic encephalopathy.
20    Q. Okay. When you are diagnosing a patient
21  with metabolic encephalopathy, what are the
22  symptoms that you're looking for?
23    A. Confusion is one of the large ones. There
24  also is a physical finding called asterixis, which
25  is very typical if you're dealing with hepatic

**Page 34**

1 encephalopathy.  Specifically, there is a finding
2 of fetor hepaticus.  The breath smells fruity,
3 yeah, oftentimes in these individuals.  Sometimes
4 there will be jaundice.  They can be quite agitated
5 as well.  But once again, those fall under many
6 subheadings.  But those are the things you might
7 typically see in that case.
8    Q.  Okay.  If you suspect that somebody has
9 metabolic encephalopathy, what's the appropriate
10 course of treatment?
11    A.  The appropriate course of treatment in
12 that case, several things.  One, you treat the
13 agitation.  Number two, you also would give them
14 either neomycin or lactulose.  Those help reduce
15 ammonia levels.  Typically, you'd give them
16 thiamine, because anyone with hepatic
17 encephalopathy is usually thiamine deficient.
18 They're also usually deficient in other vitamins,
19 so we typically give them a multi-vitamin.  We give
20 them thiamine.  You would treat them with lactulose
21 or neomycin.  You would treat their agitation as
22 well.  You know, those are the main things --
23    Q.  Okay.
24    A.  -- that you would use.
25    Q.  What diagnostic tools do you have

**Page 35**

1 available to you to diagnose metabolic
2 encephalopathy?
3    A.  Once again, the blood work.  You can
4 sometimes get a clue.  If the acid base balance is
5 out of the norm, that can be reflected in a
6 comprehensive metabolic panel.  An arterial blood
7 gas would also tell you some of those items.  An
8 ammonia level.  Although, an ammonia level needs to
9 be drawn arterially to get the best product.  So an
10 arterial draw is something that generally only
11 takes place in the hospital.
12    Q.  Okay.  How about an MRI?
13    A.  I would not say that that's useful.
14    Q.  Okay.  How soon should a person be treated
15 when they have metabolic encephalopathy?
16       MR. MCGARRY:  Object to form.
17    A.  You would like to treat that person when
18 you first realize that that's what's going on.
19    Q.  Why is that?
20    A.  Quicker recovery.
21    Q.  Okay.  Can encephalopathy cause permanent
22 damage?
23       MR. MCGARRY:  Object to the form.
24       MR. MYLAR:  Object.  Also --
25    A.  Permanent?

**Page 36**

1       MR. MYLAR:  -- lack of foundation.
2    Q.  Permanent injury to the brain?
3       MR. MCGARRY:  Same objections.
4       MR. MYLAR:  Same objection.
5    A.  On that, I -- I'm not sure I can speak to
6 that.  I don't believe so.
7    Q.  If a patient has encephalopathy, it
8 wouldn't be appropriate to wait seven or eight days
9 to treat them, would it?
10       MR. MCGARRY:  Object to form.  Foundation.
11 Speculation.
12       MR. MYLAR:  I join on those objections.
13       MR. MCGARRY:  You may answer.  Sorry.
14       THE WITNESS:  Okay.  Oh.
15       MR. MCGARRY:  You were waiting for me to
16 add some more?
17       THE WITNESS:  Yes, I was.
18       MR. MCGARRY:  Incomplete hypothetical.
19 Sorry.  If you want to critique my lawyering, just
20 feel free, Doctor.
21       THE WITNESS:  Am I paying you hourly?
22       MR. MCGARRY:  Apparently, you're not
23 getting your money's worth maybe.
24       THE WITNESS:  Once again, could you
25 restate the question?

**Page 37**

1       MR. SCHRIEVER:  Yeah.  Well, in fact, why
2 don't we just have it read back.  Then the
3 objections are on the record.
4       THE WITNESS:  All right.  Thank you.
5       (Question read by the reporter.)
6       THE WITNESS:  No.  You would want to treat
7 the patient as soon as you realize what the
8 diagnosis is.
9       MR. SCHRIEVER:
10    Q.  All right.  Now, I'll represent to you,
11 Dr. LaRowe, that when I -- when we deposed Ryan
12 Borrowman --
13    A.  Yes.
14    Q.  -- I'll -- I'm paraphrasing, obviously.
15 So we'll just note the objection on the record
16 already.
17       He didn't have any difficulty identifying
18 Mr. Crowson's symptoms as serious enough to
19 recommend to you that Mr. Crowson be transported?
20    A.  Correct.
21    Q.  Did anything Mr. Johnson ever tell you
22 give you an indication that he -- that Mr. Johnson
23 thought Mr. Crowson's symptoms were significant
24 enough to be transported?
25    A.  No.  And our policy -- and I -- the

### Page 38

1  nursing staff and myself are all on board with
2  this -- is: You know, the patient comes first.
3  Whatever we need to do to make sure we protect the
4  patient. So no. If Mike had felt that the patient
5  needed to be transported or thought there was even
6  a question, we would have transported him at that
7  time.
8  **Q. Okay.**
9  A. I'm not going to keep someone in the jail
10  when the appropriate course of action is to have
11  them seen in the emergency room.
12  **Q. Which makes your ability to rely on**
13  **Mr. Johnson critical; isn't that true?**
14  A. It does. It does.
15  **Q. Outside of the -- I know you don't keep**
16  **notes of -- or records outside the jail.**
17  **Do you have any procedures or protocols**
18  **for following up on patients, who you know have**
19  **been having some sort of symptoms, like being dazed**
20  **and confused?**
21       MR. MCGARRY: Let me just ask for a
22  clarification.
23       MR. SCHRIEVER: Yeah.
24       MR. MCGARRY: You mean -- so a patient who
25  is still an inmate, when you say "following up,"

### Page 39

1  not somebody who's been transferred to the
2  emergency department or been released from the
3  jail, but is sill incarcerated?
4       MR. SCHRIEVER: Correct, and I can make it
5  more specific.
6  **Q. For example, in this case, Mr. Johnson --**
7  **the records indicate that he contacted you on June**
8  **28th.**
9  **Do you have any kind of tickler system or**
10  **policies or procedures where on June 29th you would**
11  **call and say, "Hey, what's going on with Inmate**
12  **Crowson?"**
13  A. I don't. Mr. Crowson was transported to
14  booking or moved from wherever he was before to the
15  booking area, which is immediately adjacent to
16  medical. And when they are moved to booking,
17  medical will do rounds on them every shift, and I
18  believe the deputies check on them every 30
19  minutes. And so there's pretty close observation.
20  So that ensures good follow-up. And then if
21  something occurs during their rounds or if they're
22  notified by a deputy, they would give me a call.
23  **Q. Okay. Now, I'm not necessarily familiar**
24  **with hospital protocol or the way hospitals work.**
25  **But you have worked in a hospital; right?**

### Page 40

1  A. Correct.
2  **Q. When you have patients under your care in**
3  **a hospital, is there a -- is there a time period in**
4  **which the doctor is going to say, "All right. I**
5  **need to check up on this patient," or is there --**
6  **how did that work?**
7       MR. MCGARRY: Object to form. Incomplete
8  hypothetical.
9       MR. MYLAR: Join.
10  A. In a hospitalized patient, you would round
11  on them daily. That's a minimum.
12  **Q. Okay. And that's the doctor is going to**
13  **round on them daily?**
14  A. Correct.
15  **Q. And then the nurses are there in addition**
16  **to that; right?**
17  A. Correct.
18  **Q. In the jail system, that's different?**
19  A. It's not a hospital.
20  **Q. Right. But the purpose of putting him in**
21  **booking was so that he could be under observation;**
22  **right?**
23  A. Correct.
24  **Q. And so the nurses are there checking on**
25  **him once per shift at a minimum?**

### Page 41

1  A. I believe so, yes.
2  **Q. Okay. But there's no procedure for a**
3  **doctor or a nurse practitioner or a physician's**
4  **assistant to round on those inmates daily; correct?**
5  A. No. There is no provision for that.
6  **Q. Okay. Okay. On June 29th, 2014, the note**
7  **from 7:48 A.M. indicates a heart rate elevated at**
8  **140. And again, there's a note here that says,**
9  **"Staffed patient status with MD."**
10  **Do you recall having a second call with**
11  **Mr. Johnson on June 29th?**
12  A. I did recall, after reading the notes,
13  yes. And then it -- I did re -- recall that, yes.
14  **Q. Okay. And this protocol is Ativan two**
15  **milligrams IM. What does that mean?**
16  A. Intromuscularly.
17  **Q. Okay. Means give a shot?**
18  A. Yes, it does.
19  **Q. Why Ativan at that point?**
20  A. Ativan has a rapid onset, so I was hoping
21  we'd get a quick response for him. And you know,
22  his symptoms at that time with the agitation, I
23  thought the benzodiazepine would help.
24  **Q. And that's for the liver, the**
25  **benzodiazepine; correct?**