Case 2:15-cv-00880-TC Document 83-5 Filed 11/02/18 Page 1 of 6

CROWSON

vs

WASHINGTON COUNTY

BRETT LYMAN

April 16, 2018





333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

```
                IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
                          *   *   *
MARTIN CROWSON,            )
                           )
       Plaintiff,          )
                           )  Case No. 2:15-cv-00880
   vs.                     )
                           )  Deposition of:
WASHINGTON COUNTY,         )
et al.,                    )  BRETT LYMAN
                           )
       Defendants.         )
                          *   *   *



                    April 16, 2018

                     9:00 a.m.



           WASHINGTON COUNTY TREASURER OFFICE
              197 East Tabernacle Street
                 St. George, Utah



                       *   *   *

                   Linda Van Tassell
           - Registered Diplomate Reporter -
              Certified Realtime Reporter
```

## Page 2

```
 1              A P P E A R A N C E S
 2   For the Plaintiff:        Ryan J. Schriever
                               SCHRIEVER LAW FIRM
 3                             51 East 800 North
                               Spanish Fork, Utah  84660
 4
     For the Defendant         Frank D. Mylar
 5   Washington County:        MYLAR LAW, PC
                               2494 Bengal Boulevard
 6                             Salt Lake City, Utah  84121
 7   For the Defendant         Gary T. Wight
     Larrowe:                  KIPP & CHRISTIAN
 8                             10 Exchange Place, 4th Floor
                               Salt Lake City, Utah  84111
 9
     Also Present:             Brian Graf
10
                               * * *
11
                           I N D E X
12
     EXAMINATION                                       PAGE
13
     By Mr. Schriever                                     3
14
     By Mr. Wight                                        79
15
     By Mr. Schriever                                    80
16
```

## Page 3

             P R O C E E D I N G S
             BRETT LYMAN,
called as a witness on behalf of the plaintiff,
being duly sworn, was examined and testified as
follows:
             EXAMINATION
BY MR. SCHRIEVER:
   Q.  Would you please state your full name for the record.
   A.  Brett Armand Lyman.
   Q.  Brett is with one T or two Ts?
   A.  Two.
   Q.  And how do you spell Armand?
   A.  A-r-m-a-n-d.
   Q.  Where do you currently live?
   A.  In Hurricane, Utah.
   Q.  What's your phone number?
   A.  (435) 632-8622.
   Q.  Have you ever had a deposition taken before?
   A.  No.
   Q.  Well, as you are aware, I believe, we're here in regard to a lawsuit involving a man named Martin Richard Crowson.  Are you familiar him?
   A.  Yes.

## Page 4

   Q.  The allegations here are that there were some things that happened regarding medical treatment that shouldn't have happened.  Do you know the incident I'm referring to?
   A.  After reading about it, yes.
   Q.  I'm going to get to that.  A deposition is testimony under oath.  There's obviously no judge here today.  This is called a discovery deposition.
   A.  Right.
   Q.  Which means I get to ask you questions about the incident, about your memory of the event.  The only thing I expect is that you'll give us truthful complete answers.
   A.  Right.
   Q.  From time to time I may ask you a question that your counsel will object to.  That is usually for the purpose to make sure the objections are preserved later on so when we're in court he can argue that he did object.
   A.  Right.
   Q.  Most of the time you'll answer.  If he doesn't want you to answer, he'll instruct you not to answer.
   A.  Right.
   Q.  It's not a marathon.  I don't expect

## Page 5

that we're going to be here -- we've got about three hours set aside for this but I don't think it will take that long but if you do need a break for any reason, let me know and we can do that.
   A.  Right.
   Q.  Do you have any questions as to what a deposition is?
   A.  No.
   Q.  Have you taken any medications that would impair your ability to understand questions and answer appropriately?
   A.  No.
   Q.  Just to give you a road map of the organization that I'm going to try to follow today, although it may be loose because I may follow your train of thought from time to time as well, I just want to get some background information about who you are and kind of what your experience is.
   A.  Okay.
   Q.  Then I want to talk to you about the procedures and processes in place at Purgatory jail to the best of your knowledge and what you did there as a job.
   A.  Okay.
   Q.  And then I want to speak with you

Page 30

1  go to our supervisor, explain what we saw.  If we
2  had an idea of where to move them, we could suggest
3  that.
4        There were times when if you had inmates
5  that got in a fight, well of course they had to be
6  moved.  If there was a medical emergency -- well, we
7  wouldn't have anything to do with moving somebody
8  like that.  That would be the medical department.
9      Q.  Let me ask you a couple of followups
10 then.  So let's just use the example of inmates who
11 got into a fight.
12     A.  Uh-huh.
13     Q.  What's the process then to have them
14 moved or separated?  What do you have to do?
15     A.  Depending on the extent of the injuries,
16 but you would always have them checked out by
17 medical.  Usually if there were two combatants you
18 would have them checked out by medical and they
19 would both go to A block for lockdown, pending a
20 hearing.
21     Q.  Okay.  So A block was lockdown?
22     A.  Yes.
23     Q.  And did I misunderstand you earlier to
24 say F block was maximum security?
25     A.  Yes.  That was what they called that end

Page 31

1  of the jail because it was lockdown.  It wasn't -- I
2  don't know -- anyway.
3      Q.  So let me try to get to what I
4  understand the difference between maximum security
5  as used to describe F block and lockdown as used to
6  describe A block.
7      A.  Right.
8      Q.  What's the difference?
9         MR. MYLAR:  And again objection.  Lack
10 of foundation.  Go ahead.
11     A.  F block was intake.  The inmates that
12 were able to go to general population but usually
13 there was no room to put them right into general
14 population, they waited in F block.  A block, which
15 is lockdown, was punitive or they were waiting to
16 have a hearing pending -- they were there pending a
17 hearing.
18     Q.  All right.  So using my knowledge of old
19 movies, there's a term called solitary confinement.
20     A.  Yes.
21     Q.  You can tour Alcatraz and see where the
22 Birdman lived.  Was A block like that, like solitary
23 confinement?
24        MR. MYLAR:  Objection.  Lack of
25 foundation.

Page 32

1      A.  Impressions today, at least in our
2  facility, there was no such thing as solitary
3  confinement as a specific term.  There were inmates
4  that refused to get along with other inmates and you
5  could call that solitary confinement but it was not
6  something that was used as a specific term.
7      Q.  The term wasn't used.
8      A.  No.
9      Q.  Did A block have -- was it open between
10 the cells?  Was there bars between the cells like
11 you see in the old western movies?
12     A.  No, no bars.  There were doors.  Each
13 door had a window in it.
14     Q.  How big was the window?
15        MR. MYLAR:  Objection.  Lack of
16 foundation.
17     Q.  Well, if you know.
18     A.  I want to say maybe 5 inches by 16
19 inches.
20     Q.  And they would be in that room by
21 themselves.
22     A.  Yes.  Well, not specifically.  They were
23 two-man cells, so there was two bunks in there.
24     Q.  So just depending on how many inmates
25 were in that particular block then.

Page 33

1      A.  Yes.
2      Q.  They might be alone at times.  They
3  might have a bunkmate at other times.
4      A.  Right.
5      Q.  Well, actually before we leave A, you
6  told us what the schedule was but I want to make
7  sure I'm clear.  Were they allowed out of their
8  lockdown cells?
9      A.  Yes.
10     Q.  How often?
11     A.  Well, you had different levels.  There
12 was a level system for the inmates.  In A block you
13 have level 1A, which is, I guess for lack of better
14 term, worst of the worst, depending on the charges
15 he was arrested on, behavior while he was in there,
16 and he did not -- those did not come out of their
17 cell without restraints on.
18        And then there was a level 1 and then
19 there were lockdown.  Level 1s could come out seems
20 to me more than an hour a day if there was time but
21 the lockdowns came out I think an hour every day --
22 every other day.
23     Q.  Okay.  At least every other day?
24     A.  Yeah.
25     Q.  And I'll ask you some specific questions

**Page 34**

1  about Mr. Crowson here in a minute.
2      A.  Okay.
3      Q.  How often were the people in A block
4  observed by a correctional officer?
5      A.  Well, we were required to walk through
6  the sections at least once every hour and then if we
7  had to go in there to conduct business, more than
8  once an hour.  They are constantly being watched
9  from the control room.  A block especially a lot of
10  times would be listened to because they're yelling,
11  communicating to each other.
12      Q.  Okay.  Did they go out for meals or were
13  meals brought to them?
14      A.  Meals were brought to them in their
15  cells.
16      Q.  Was that done by correctional officers
17  or was there separate staff that did that?
18      A.  No.  Correctional officers would take
19  them in.
20      Q.  Was it the type of situation where it
21  was slid through the windows?
22      A.  There is a cuff port on the doors that
23  is probably 4 inches by maybe 12 inches.  There's a
24  lock on it.  You open that up and you slide the
25  trays through that.

**Page 35**

1      Q.  And then you receive the trays back the
2  same way?
3      A.  In A block they had Styrofoam trays and
4  so when they came out they were required to clean
5  their cells.  Sometime before the end of the day
6  corrections staff would go in and collect all their
7  garbage through their cuff port.  We have a big
8  garbage bag and they'd throw their garbage out.
9      Q.  They were Styrofoam trays?
10      A.  Yeah.  The white Styrofoam trays that
11  had a lid that folded over.
12      Q.  Okay.  So everything was disposable?
13      A.  Yeah.
14      Q.  Was that to avoid having a situation
15  where they would have something they could use to
16  create a weapon?
17      A.  Yes.
18      Q.  Were they fed different food than the
19  general population?
20      A.  No.  Same food.
21      Q.  What was a typical menu?
22      A.  Depends on the supervisor of the
23  kitchen.  We had one guy out there that was buying a
24  lot of pre-prepared food.  They had another guy that
25  they would cook everything.  There was a lot of

**Page 36**

1  variety.  I know at times there was probably a set
2  menu.
3      Q.  Were they given fruit?
4      A.  Yes.
5      Q.  How often?
6      A.  At least once a day with breakfast,
7  lunch or dinner.  There was always fruit on one of
8  the trays.
9      Q.  How were medications administered in A
10  block?
11      A.  The nurses would come down and they
12  would be escorted in by an officer and then they
13  would go -- depending which inmates had medications
14  we would go from door to door to door and they would
15  be given their medications through the cuff door.
16      Q.  Okay.  If an inmate was in A block,
17  would they have access to anyone other than a
18  correctional officer or a nurse?
19      A.  What do you mean access?
20      Q.  Was there any possibility for a person
21  who is either not a nurse or correctional officer to
22  come in contact with them?
23      A.  No.
24      Q.  Did the cells in A block have a toilet
25  with running water?

**Page 37**

1      A.  Yes.
2      Q.  Sink with running water?
3      A.  Yeah.  It's all one unit.
4      Q.  Anything else in there besides a bunk,
5  toilet and sink?
6      A.  There is a metal desktop that's embedded
7  in the block wall and then there's a metal stool
8  that's into the concrete floor.  There's two of
9  those.
10      Q.  Any drawers?
11      A.  No.
12      Q.  Closets?
13      A.  No.
14      Q.  Were they allowed to take any personal
15  belongs into A block?
16      A.  At first, no, when they're locked down.
17  But after they were -- well, I don't recall what the
18  matrix was.  I know that as a level 1, when you're
19  not on lockdown status you're allowed minimal
20  personal items, letters, pictures, not very much.
21  But I don't recall the exact matrix for that.
22      Q.  And if you're on lockdown status, you're
23  not allowed any personal items at all then.
24      A.  I don't believe so.
25      Q.  Let's move back to F block for a minute.

**Page 38**

1  A.  Okay.
2  Q.  This is where people who came in for
3  intake, so the first place they were sent?
4  A.  Yes.
5  Q.  Did you mention there were detox cells
6  in F block as well?
7  A.  No.
8  Q.  Where were detox cells?
9  A.  In booking.
10 Q.  They were in booking.
11 A.  Yes.
12 Q.  Okay.  And I thought F block and booking
13 were the same thing.
14 A.  No.  F block -- in max control the
15 sections were kind of pie-shaped with the control
16 room in the center so that's A, B, C, D, E and F.
17 Q.  Okay.  And then booking is separate from
18 that.
19 A.  Yes.
20 Q.  Were there specific cells that were
21 designated as detox cells?
22 A.  There was one that actually had that on
23 it, yes, in booking.
24 Q.  And when did inmates go to the detox
25 cell?

**Page 39**

1  A.  Generally when they were intoxicated,
2  under the influence of something.
3  Q.  Who would make the decision to put
4  someone in detox?
5      MR. MYLAR:  Objection.  Lack of
6  foundation.
7  A.  Specifically I couldn't tell you.
8  Q.  Could it be anyone on the floor?
9  A.  When somebody is under the influence of
10 something it would -- well, I could guess but I
11 don't know if you want me to guess.
12 Q.  Well, I don't want you to guess.
13 A.  I worked out there long enough to know
14 that medical would be involved.
15 Q.  Okay.
16 A.  Somehow, some way, as well as whoever is
17 supervising booking.
18 Q.  So as a correctional officer, if thought
19 somebody was under the influence of something, would
20 you report that to medical?
21 A.  Yes.
22 Q.  And then you would allow medical to take
23 care of it or were there steps that you were also
24 required to take as a correctional officer?
25 A.  It depended on the day.  Sometimes the

**Page 40**

1  nurses would come down to us and sometimes they
2  would have us bring the inmate to them.
3  Q.  How many correctional officers were on
4  duty at any given time?
5  A.  Eight, nine, ten, 13, 14, 15, 16, 17 --
6  I'm going to say somewhere between 15 and 19.
7  Q.  Do you know how many nurses were on duty
8  at any given time?
9  A.  No.  One, as far as I know.  I know that
10 during the day there were more.  I have no knowledge
11 of their schedule or access to it or anything.
12 Q.  Okay.  For inmates who were in detox,
13 were they still under the observation of the
14 correctional officers?
15 A.  I believe so.  They were not put in a
16 medical cell so, yes, I believe they were under the
17 observation of a correctional officer.
18 Q.  Did you receive any training on how to
19 recognize whether someone was under the influence of
20 alcohol?
21 A.  No.
22 Q.  Did you receive any training as to how
23 to recognize whether someone was under the influence
24 of medications or drugs?
25 A.  I don't believe so.

**Page 41**

1  Q.  Did you receive any training on how to
2  recognize symptoms of alcohol withdrawal?
3  A.  I don't recall that.
4  Q.  Do you know what the symptoms of alcohol
5  withdrawal are?
6      MR. MYLAR:  Objection.  Lacks
7  foundation.  Go ahead.
8  Q.  This is a foundational question.  You
9  can answer yes or no as to whether you know.
10 A.  No, not specifically.
11 Q.  Do you know what the symptoms of drug
12 withdrawals are?
13 A.  Not specifically, no.
14 Q.  And setting aside -- I'm not claiming
15 you're an expert in these things but do you
16 generally have an idea what they are?
17 A.  No.  Not -- a least for me, not
18 specifically.
19 Q.  In your time at the prison, at the jail,
20 I guess -- do you call it a jail or prison?
21 A.  Jail.
22 Q.  Jail?
23 A.  Yeah.
24 Q.  During your time at the jail did you
25 ever recommend that an inmate be placed into the