CROWSON

vs

WASHINGTON COUNTY

BRETT LYMAN

April 16, 2018





333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

1

2              IN THE UNITED STATES DISTRICT COURT

3        FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

4                       *   *   *

5   MARTIN CROWSON,          )
                             )
6          Plaintiff,        )
                             )   Case No. 2:15-cv-00880
7      vs.                   )
                             )   Deposition of:
8   WASHINGTON COUNTY,       )
    et al.,                  )   BRETT LYMAN
9                            )
           Defendants.       )   **COPY**
10                           )
                        *   *   *

11

12

13

14                    April 16, 2018

15                    9:00 a.m.

16

17        WASHINGTON COUNTY TREASURER OFFICE
            197 East Tabernacle Street
18              St. George, Utah

19

20                    *   *   *

21              Linda Van Tassell
          - Registered Diplomate Reporter -
22         Certified Realtime Reporter

23

24

25

**2**

```
                A P P E A R A N C E S
For the Plaintiff:    Ryan J. Schriever
                      SCHRIEVER LAW FIRM
                      51 East 800 North
                      Spanish Fork, Utah  84660

For the Defendant     Frank D. Mylar
Washington County:    MYLAR LAW, PC
                      2494 Bengal Boulevard
                      Salt Lake City, Utah  84121
For the Defendant     Gary T. Wight
Larrowe:              KIPP & CHRISTIAN
                      10 Exchange Place, 4th Floor
                      Salt Lake City, Utah  84111

Also Present:         Brian Graf

                      * * *

                I N D E X

EXAMINATION                              PAGE

By Mr. Schriever                           3

By Mr. Wight                              79

By Mr. Schriever                          80
```

**3**

```
             P R O C E E D I N G S
              BRETT LYMAN,
called as a witness on behalf of the plaintiff,
being duly sworn, was examined and testified as
follows:
              EXAMINATION
BY MR. SCHRIEVER:
     Q.  Would you please state your full name
for the record.
     A.  Brett Armand Lyman.
     Q.  Brett is with one T or two Ts?
     A.  Two.
     Q.  And how do you spell Armand?
     A.  A-r-m-a-n-d.
     Q.  Where do you currently live?
     A.  In Hurricane, Utah.
     Q.  What's your phone number?
     A.  (435) 632-8622.
     Q.  Have you ever had a deposition taken
before?
     A.  No.
     Q.  Well, as you are aware, I believe, we're
here in regard to a lawsuit involving a man named
Martin Richard Crowson.  Are you familiar him?
     A.  Yes.
```

**4**

```
     Q.  The allegations here are that there were
some things that happened regarding medical
treatment that shouldn't have happened.  Do you know
the incident I'm referring to?
     A.  After reading about it, yes.
     Q.  I'm going to get to that.  A deposition
is testimony under oath.  There's obviously no judge
here today.  This is called a discovery deposition.
     A.  Right.
     Q.  Which means I get to ask you questions
about the incident, about your memory of the event.
The only thing I expect is that you'll give us
truthful complete answers.
     A.  Right.
     Q.  From time to time I may ask you a
question that your counsel will object to.  That is
usually for the purpose to make sure the objections
are preserved later on so when we're in court he can
argue that he did object.
     A.  Right.
     Q.  Most of the time you'll answer.  If he
doesn't want you to answer, he'll instruct you not
to answer.
     A.  Right.
     Q.  It's not a marathon.  I don't expect
```

**5**

```
that we're going to be here -- we've got about three
hours set aside for this but I don't think it will
take that long but if you do need a break for any
reason, let me know and we can do that.
     A.  Right.
     Q.  Do you have any questions as to what a
deposition is?
     A.  No.
     Q.  Have you taken any medications that
would impair your ability to understand questions
and answer appropriately?
     A.  No.
     Q.  Just to give you a road map of the
organization that I'm going to try to follow today,
although it may be loose because I may follow your
train of thought from time to time as well, I just
want to get some background information about who
you are and kind of what your experience is.
     A.  Okay.
     Q.  Then I want to talk to you about the
procedures and processes in place at Purgatory jail
to the best of your knowledge and what you did there
as a job.
     A.  Okay.
     Q.  And then I want to speak with you
```

6

1    specifically about Mr. Crowson --
2        A.  Okay.
3        Q.  -- and then about the events that you
4    remember.
5        A.  All right.
6        Q.  What is your date of birth?
7        A.  12-10-66.
8        Q.  Are you currently employed?
9        A.  Yes.
10       Q.  Where are you employed?
11       A.  Intermountain Healthcare.
12       Q.  What do you do for Intermountain
13   Healthcare?
14       A.  I work as a security officer for the
15   hospital.
16       Q.  At Dixie Regional?
17       A.  Yes.
18       Q.  How long have you been doing that?
19       A.  Almost a year.
20       Q.  When were you employed with the county?
21       A.  April of '98 until July of 2015.
22       Q.  And since that time have you been
23   employed with Intermountain?
24       A.  No.
25       Q.  Where else have you worked?

7

1        A.  I've worked for McNabb Trucking in
2    Pocatello, Idaho.  I've worked with Harley-Davidson,
3    Zion Harley-Davidson.  I've worked for Saddleback
4    Lighting.  That's pretty much it.
5        Q.  Were all those jobs in between 2015 and
6    2018?
7        A.  Yes.
8        Q.  Prior to getting employment with the
9    county in April of -- you said 1998?
10       A.  Uh-huh.
11       Q.  Prior to that, what did you do for a
12   living?
13       A.  Construction.
14       Q.  What kind of construction did you do?
15       A.  You name it, I've done it.  Mostly
16   concrete but framing, painting, sheetrock, finish
17   carpentry.
18       Q.  What's your educational background?
19       A.  I have about three years of college,
20   maybe a little bit more.
21       Q.  Where did you go to college?
22       A.  San Bernardino Valley College, Riverside
23   Community College and Palomar College, all down in
24   California.
25       Q.  Is that where you were raised, in

8

1    Southern California?
2        A.  Yes.
3        Q.  How long have you lived in Utah?
4        A.  Twenty-five, 26 years.
5        Q.  Do you have any degrees or certificates?
6        A.  No.
7        Q.  What did you do to become a correctional
8    officer?
9        A.  The testing process, is that what you're
10   looking for?
11       Q.  Yeah.  What process did you go through
12   to become a correctional officer?
13       A.  The county was in the process of
14   building Purgatory and they did an inhouse academy
15   which at that time was called Special Function.  It
16   was the first part of becoming a law enforcement
17   officer but you only had to have that first part in
18   order to work at the jail.  And we came here Monday
19   through Thursday nights for four hours and four
20   hours on Saturday mornings and we did that for I
21   think three to four months.  And in order to get
22   there, though, you had to do a physical fitness test
23   and extensive background checks.  That's about it.
24       Q.  Did you complete all that prior to your
25   employment in 1998?

9

1        A.  Yes.
2        Q.  Did you do any POST training anywhere
3    else?
4        A.  Not outside the county, no.  There is a
5    lot of training we did over the years when I was
6    employed with the county.
7        Q.  What kind of training is that?  What are
8    you talking about?
9        A.  Firearms instructor training, extensive
10   firearms basic training, carbine training, shotgun
11   training.  We go through an annual training.  You
12   have to maintain 40 hours of training every year to
13   recertify your law enforcement certification and so
14   there was a lot of first-aid, CPR, AED, a lot of
15   like HIPAA and there were a lot of other laws
16   pertaining to corrections that we trained every year
17   as part of that.
18       Q.  Okay.  You mentioned several things
19   related to healthcare, even some that aren't viewed
20   as healthcare like first-aid, CPR, things like that.
21       A.  Right.
22       Q.  Did you receive any training alongside,
23   for example, the nurses that worked at the prison?
24       A.  They would actually -- a lot of the
25   nurses would do the first-aid training themselves

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Brett Lyman

10

1  but we received that training and a lot of them were
2  in the trainings as well.
3      Q.  Okay.
4      A.  When you say alongside --
5      Q.  Well, I don't have any answer in mind
6  when I ask the question.  I'm listening to you.
7      A.  Okay.
8      Q.  So did any of the training involve
9  things like recognizing medical conditions, anything
10  like that?
11      A.  Not specifically that I can recall.  It
12  was just basic CPR and first-aid.
13      Q.  Any training in inmate discipline?
14      A.  No.
15      Q.  Did you ever work for the county at the
16  Purgatory jail?
17      A.  Yes.  I worked at the fifth district
18  courthouse and justice court as court security
19  three or four different times but a total of about
20  five years of my time with the county.
21      Q.  Okay.  Other than that, were you a
22  correctional officer at Purgatory?
23      A.  Yes.  Now, at that time the court
24  security was under the corrections side of the
25  sheriff's office.  These days it's under the patrol

11

1  side.
2      Q.  Help me understand that a little bit
3  better.  Well, let me ask you first.  At all times
4  when you worked for the county --
5      A.  I was in corrections, yes.
6      Q.  And you're saying now it's changed?
7      A.  No.  The correction or the court
8  security in its little division, whatever you want
9  to say, you have the corrections part of the
10  sheriff's office, you have the patrol side and when
11  I worked court security the courts fell under the
12  corrections side of the sheriff's office as far as
13  day-to-day stuff.  At some point after I left court
14  security, they put it under the patrol side of the
15  sheriff's office.
16      Q.  Okay.
17      A.  I have no idea why.  That's just what
18  happened.
19      Q.  And that never affected you --
20      A.  Right.
21      Q.  -- because you were always in the
22  corrections side.
23      A.  Right.
24      Q.  When you left your job in 2015, what was
25  the reason you left your job?

12

1      A.  Well, I --
2      MR. MYLAR:  I'm just going to interject
3  here.  To the extent you talk about his employment
4  background that's not completely relevant to the
5  suit, I'm going to ask that it be considered
6  confidential and protected so that it would not be
7  able to be filed or be filed under seal and that
8  type of thing.
9      MR. SCHRIEVER:  I'll stipulate, too.
10      MR. MYLAR:  Okay, great.  So if you
11  could just make a marking now in the deposition this
12  is confidential.
13      MR. SCHRIEVER:  Okay.
14      MR. MYLAR:  Thanks.
15
16
17
18
19
20
21
22
23
24
25

13

1          C O N F I D E N T I A L
2      Q.  Go ahead.  I was asking you about the
3  reasons you left your employment and are no longer
4  at Washington County.
5      A.  An inmate of African American heritage
6  claimed that I called him a nigger and that prompted
7  an investigation which on that part of it -- well,
8  throughout the whole investigation I had been
9  cleared but there were other things that other staff
10  brought up as far as making complaints against me,
11  not just the inmates but there were other inmates
12  that backed my side of the story because that is not
13  the type of person that I am.  I never did my job
14  that way.  I don't think that way.
15      So after the investigation was over then
16  they decided to put me on administrative leave and I
17  took it as a sign for me to resign.  Usually during
18  an investigation they put you on administrative
19  leave pending the outcome but there were -- it
20  wasn't the normal way of doing things and you either
21  take the chance on not getting fired and keeping
22  what years of service you have towards a retirement
23  or, if you get fired, you lose all that.
24      And so at that time, even though I knew
25  that I had been cleared in the investigation that
          C O N F I D E N T I A L

CROWSON vs WASHINGTON COUNTY
April 16, 2018                                                                                      Brett Lyman

14

1  the county decided to put me on administrative leave
2  that it didn't bode well for me.
3      **Q.  You said there were staff complaints.**
4  **What kind of complaints did the staff make?**
5      A.  The only one that I was bringing outside
6  food in for the inmates, which I didn't bring
7  outside food in for myself.  I know that there was a
8  couple of people on our shift that on Saturdays or
9  Sundays they would go get pizzas or donuts.  I have
10  no idea how that turned to me but I know that there
11  were at least from how I saw things there were young
12  younger staff that did not like working for me
13  because the new generation coming in didn't have a
14  work ethic and they didn't like me.  You come, you
15  to work, you get to work.  You better be ready to
16  work, have your shirt tucked in, your boots tied up
17  and be ready to go.  Anyway, I was being really
18  difficult to be around and I sometimes wonder if
19  that was what -- I was driving myself away.
20      **Q.  Okay.  I want to ask you about the --**
21  **well, any other grievances or complaints that you**
22  **remember that were significant in regard to that?**
23      A.  No.
24      MR. SCHRIEVER:  And I don't have any
25  other questions if we want to remove the designation
C O N F I D E N T I A L

15

1  that we're in.
2      MR. MYLAR:  You're not going to have any
3  other questions on that area, is that what you're
4  saying?
5      MR. SCHRIEVER:  There are still some
6  issues of grievances but nothing about losing his
7  employment.
8      MR. MYLAR:  Well, to the extent the
9  grievances don't have anything to do with this
10  instance --
11      MR. SCHRIEVER:  Or at least this inmate.
12      MR. MYLAR:  Yeah.
13      MR. SCHRIEVER:  Right.
14      THE WITNESS:  Well, when you say
15  grievances, to me -- I know what you're probably
16  going to get at.
17      MR. MYLAR:  Well, let him ask the
18  questions.
19      THE WITNESS:  Okay.
20      MR. SCHRIEVER:  The whole thing can be
21  filed under sealed for all I care.  That doesn't
22  really bother me.
23      MR. MYLAR:  Okay.
24      MR. SCHRIEVER:  I'm not here to try to
25  get any kind of media attention to this.
C O N F I D E N T I A L

16

1      MR. MYLAR:  Okay.
2      MR. SCHRIEVER:  We already turned down a
3  news interview from ABC, to be honest with you.
4  That's not what I'm after.
5      MR. MYLAR:  Okay.
6      **Q.  I guess the question that he raised is**
7  **complaints with the employment versus grievances.**
8  **Do you see those as two separate things?**
9      A.  Well, there are inmate grievances as far
10  as inside the correctional setting that dealt with
11  day-to-day things, not a grievance that is going to
12  get somebody terminated.
13      **Q.  And we're still under seal here.  This**
14  **particular one that you mentioned, the incident**
15  **where the inmate accused you of calling him a**
16  **nigger --**
17      A.  Right.
18      **Q.  -- that began as an inmate grievance.**
19      A.  Yes.
20      **Q.  And then during the investigation it**
21  **escalated into something more than that because**
22  **there were other staff members and other things who**
23  **piled on, I guess.**
24      A.  Right.  Yeah.
25      **Q.  And had their own complaints.**
C O N F I D E N T I A L

17

1      A.  They didn't -- yeah.
2      **Q.  So when we're talking about inmate**
3  **grievances, we're talking about things that start**
4  **with the inmate making a complaint.**
5      A.  Right.
6      **Q.  And where do they file that or how do**
7  **they initiate that?**
8      A.  Well, in the first part of my career
9  they started by writing it on a piece of paper and
10  then they have -- they brought these TellMate kiosks
11  into the sections and then the inmates I believe did
12  it on one of those.
13      **Q.  And I don't know if I just didn't hear**
14  **you correctly or if I don't know the words that you**
15  **used.  You said tail --**
16      A.  TellMate.
17      **Q.  TellMate, what is that?**
18      A.  It is a video -- well, it's a phone and
19  a video visiting unit that the county bought into
20  and basically everything is done electronically
21  rather than writing things on pieces of paper.  Like
22  an inmate requests, "Hey, I only have one pair of
23  socks.  I need two pairs of socks."  Rather than
24  write that on a piece of paper, now it's done
25  electronically.
C O N F I D E N T I A L

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Brett Lyman

18

1    Q.  And they use a kiosk?
2    A.  Yes.
3    Q.  So it's a physical station in the
4  section?
5    A.  Yeah.
6    Q.  Where the inmate can go to.  Do they
7  pick up a phone and --
8    A.  Uh-huh.
9    Q.  -- dictate or transcribe whatever they
10  say?
11    A.  No.  They have to type it.
12    Q.  Oh, they type it.
13    A.  Yeah.
14    Q.  They type it.  Then where does it go
15  from there?
16    A.  I don't know.  As far as I know, each --
17  I don't really know or I don't recall.
18    Q.  Okay.  They use TellMate to initiate a
19  grievance then?
20    A.  Yes.
21    Q.  Can they use it to report that they have
22  had confrontation with another inmate?
23    A.  They could, yes.
24    Q.  Could they talk about how they had a
25  confrontation with a correctional officer?
C O N F I D E N T I A L

19

1    A.  They could, yes.
2    Q.  Could they use it to report that they
3  didn't like their lunch?
4    A.  Yeah.
5    Q.  What are the types of things they can
6  use that for, or did they use that for?
7    A.  If they had money, they could play games
8  on it.  They can set up video visiting with their
9  family.
10    Q.  How many of these were there in each
11  section?
12    A.  I want to say at least two but they were
13  relatively new.  I don't know -- it wasn't there
14  that long before I left so I never really got to
15  know much about them.
16    Q.  Okay.  Prior to this installation of
17  TellMate kiosks, was the process for the inmate to
18  initiate a grievance that the inmate would write out
19  on a piece of paper what the grievance was?
20    A.  Yes.
21    Q.  And then they would give it to someone.
22  Who would they give it to?
23    A.  They had to give it to an officer.
24    Q.  And then what would the officer do with
25  it?
C O N F I D E N T I A L

20

1    A.  We would go into the computer system and
2  log that into their -- each inmate is assigned a
3  number.  You go into their number so you're into
4  their whole system and you have to put that you
5  accepted that grievance, which means that you accept
6  responsibility to turn that in to the proper place
7  in a proper manner.
8    Q.  So it just goes into like a file for the
9  inmate under that inmate's number, is that what it
10  is?
11    A.  Well, the paper doesn't.  You just go
12  into the computer system and so that there's kind of
13  a timestamp on when it was accepted by the officer
14  and then the officer puts it or directs it where it
15  needs to go.
16    Q.  Let me ask you, as long as we're talking
17  about this computer system, what types of things --
18  did the computer system have a name?
19    A.  As far as -- oh, Spillman.
20    Q.  Is it Spillman?
21    A.  Yes.
22    Q.  Okay.  So you put all these grievances
23  into Spillman.  What else goes into Spillman?
24    A.  Every time they left for court, every
25  time they went out to the recreation yard, every
C O N F I D E N T I A L

21

1  time they went to medical, every time you had a
2  conversation with an inmate, depending on what it
3  was.  You know, you go into the dormitory section
4  and you shake down an inmate's bunk, you go back in
5  and if there was anything that you found you just
6  put it down that that happened to that inmate, his
7  bunk, whether there was no findings or any rule
8  violations or not, just so there was a record that
9  it was done.
10    Q.  Were there any other computer files kept
11  by correctional officers other than Spillman?
12    A.  As far as --
13    Q.  Anything.
14    A.  Not that I know of.  I didn't keep any.
15    Q.  Did you have to enter information into
16  any program other than Spillman?
17    A.  No, I did not.
18    Q.  Were there other people at the prison
19  who did?
20    A.  I don't know.
21    Q.  What about medical people, did they
22  enter their notes into Spillman?
23    A.  I think they did some in Spillman.
24    MR. MYLAR:  Objection.  Lack of
25  foundation.
C O N F I D E N T I A L

22

1      Q.  Just to the extent that you know.
2      A.  Not that I know of.  I was not privy to
3   that.
4      Q.  Did you ever have access to any of the
5   inmates' medical records or medical histories?
6      A.  No.
7      Q.  Were there ever instances where an
8   inmate had a medical instance you were made aware of
9   so you could watch for symptoms?
10     A.  Well, not that we were made aware of but
11  there were several inmates that were frequent enough
12  in there that we knew, like diabetics, couple of
13  guys had food allergies, that type of stuff.
14     Q.  To your knowledge, walk me through the
15  process of an inmate coming into the jail.  To your
16  knowledge, what's the booking process?
17        MR. MYLAR:  Wait.  I think we could
18  probably just remove the confidential at this point.
19
20        END CONFIDENTIAL
21
22
23
24
25
         C O N F I D E N T I A L

23

1      A.  It's been so long since even long before
2   I left out there I had nothing to do with booking.
3      Q.  Okay.
4      A.  I could tell you the law enforcement
5   agency arrests somebody, they bring them in, they
6   book them on the computer system.  I know a nurse
7   talks to them.  At some point in time the booking
8   staff completes their intake of a person and then,
9   depending on who knows what, will depend on where
10  they get housed.
11        I worked booking -- I take that back.  I
12  did work booking probably about two years in but it
13  was only for about six months and by the time I left
14  the process was nothing like it was when I was there
15  and I never put in to work booking.  I never asked
16  to.  Just seemed like it was a big headache to me.
17     Q.  Okay.  As a correctional officer, did
18  you ever have access to any of the information that
19  was obtained during the booking process?
20     A.  Yeah.  You could go into Spillman and
21  look but it was not something that was encouraged.
22  Usually it seemed like the new officers always
23  wanted to see why somebody was arrested and I
24  discouraged that from happening because as a
25  corrections officer it didn't matter who or why

24

1   somebody was in there unless they posed a threat to
2   safety.  You didn't want that clouding your judgment
3   on how you dealt with people.
4      Q.  Okay.  So the booking information was in
5   Spillman as well?
6      A.  Yes.
7      Q.  And that would contain the crime that
8   they were convicted of?
9      A.  Not convicted.  Why they were arrested.
10     Q.  So this is --
11     A.  Just the charges.
12     Q.  You had people in there who had been
13  convicted as well, didn't you, or were these just
14  people who had only been arrested but not yet
15  convicted?
16     A.  No.  We had people that were sentenced,
17  yes, that had convictions.  But prior convictions,
18  unless they were there doing their time for that
19  specific conviction, their past convictions -- I
20  guess I don't know if that was in there or not.
21     Q.  And you indicated that your belief was
22  that a nurse would go out and see the inmates who
23  had been booked as well.
24     A.  I believe so, yes.
25     Q.  Did you personally observe that?

25

1      A.  No.
2      Q.  What's your basis for your belief that
3   that happened?
4      A.  Hearing people talk about it.  I would
5   come up to booking from time to time.  You would see
6   people come in, especially if there was a combative
7   person coming in and officers would go to booking
8   and there would always be a nurse there and so I
9   guess in a way I did see it but it wasn't part of my
10  job.  It wasn't part of my job description, so to
11  speak.  It's not where I was assigned.
12     Q.  Okay.  How many blocks were there at the
13  prison?
14     A.  A, B, C, D, E, F, G, H, I, J and K, so
15  11.
16     Q.  Were they divided up by sections or how
17  was it organized?
18     A.  By sections, yes.
19     Q.  What were the sections?
20     A.  A, B and C were cells.  There were seven
21  on top, seven on bottom.  D block was 48 inmates.
22  E block was 50.  F block was 60.  F block was
23  divided into two tiers, top and bottom, 30 on each.
24  F block was intake and at that time that was the max
25  control side.  Now they're called east and west and

CROWSON vs WASHINGTON COUNTY
April 16, 2018                                                                    Brett Lyman

26

1  I couldn't tell you what's what.  They did that
2  after I left.
3      Q.  And I really just want to know what it
4  was at the time you were there.
5      A.  G and H were female sections and I, J
6  and K were dormitory -- and D, E and F were
7  dormitory.
8      Q.  And by dormitory you mean --
9      A.  Bunks, two-man bunks and it was all out
10 in the open.
11     Q.  And F was maximum security?
12     A.  Yes.  It was the intake.  So that was
13 the first place that people would come was in there
14 and they would wait for a bed in general population.
15     Q.  Okay.  Depending on where they needed to
16 be in general population.
17     A.  Right.
18     Q.  So F block was that single bunk cell?
19     A.  No, it was not a cell.  It was
20 dormitory.  It was divided 30 on the bottom and 30
21 on the top and they were behind glass and closed
22 doors, locked doors, so every four hours that would
23 switch.  The top guys would come out and have access
24 to the day room and the TV and the TellMates and go
25 outside to the rec yard and then after their four

27

1  hours was done they would go back in and the other
2  tier would come out.  So they would have a total of
3  eight hours out a day.
4      Q.  So the top part had glass doors that
5  would be sealed inside of the dormitory?
6      A.  Yes.
7      Q.  Could they still wander around inside of
8  that area?
9      A.  Yes.
10     Q.  Were they assigned a specific bunk?
11     A.  Yes.
12     Q.  Okay.
13     A.  And there were speaker boxes inside so
14 they could press a button and talk to officers in
15 the control room.
16     Q.  All right.  And that's 30 inmates on
17 each level.
18     A.  Thirty beds on each level, yes.
19     Q.  So if it was full, it was 30.  If it was
20 less than that, it was less than that.
21     A.  Right.
22     Q.  And then that was F block.  The other
23 one that I was interested in is the A, B --
24     A.  And C were cells.
25     Q.  Okay.

28

1      A.  There were seven two-man cells on top
2  and seven on the bottom.
3      Q.  Okay.  What was their schedule?
4      A.  It depended on A block, usually they
5  were out an hour a day for each cell and in B block
6  they were on the same rotation as F block where the
7  top and the bottom would rotate every four hours.
8  And then C block was medical and mental health and
9  depending on the inmates that were in that section
10 at the time it would either be split up into fourths
11 and every four hours they would rotate or it would
12 be split top and bottom.
13     Q.  Okay.  Why was C block medical?
14     A.  Just it used to be B block and C block
15 was switched and then they switched them and why I
16 don't know.  It was for people that had crutches and
17 walkers because they didn't want those going into
18 general population because there's a lot more chance
19 of one of those -- an implement like that being used
20 to hurt somebody.  And so if you had somebody that
21 was in a wheelchair or had to have a walker or
22 crutches or somebody that had a cast on their arm
23 seemed to be put there.
24     Q.  Okay.  What about people with mental
25 disorders and psychiatric issues?

29

1      A.  From what I experienced it depended on
2  the person and I'm not a mental health expert.  I
3  did a lot of communicating with mental health
4  inmates.  I don't know why I could get through to
5  them but I somehow did.  They either seemed to be
6  kept in booking or in C block, depending on the
7  level of whatever, I don't know.  I don't know the
8  specific answer for that.
9      Q.  Who made the assignments into the
10 blocks?
11     A.  I want to say the supervisor in booking
12 if there were no medical or mental health issues.
13         MR. MYLAR:  I'm going to object again.
14 Lack of foundation.
15     Q.  Let's say you observed an inmate who was
16 struggling in a certain block.  Was there a process
17 or a procedure for you to recommend that they be
18 transferred to a different location?
19     A.  It depended on the situation.
20         MR. MYLAR:  Objection.  Lack of
21 foundation again.  Go ahead.
22     A.  A lot of times inmates weren't open to
23 us and telling us what their problems were.  If it
24 was something that we saw or if we were familiar
25 with that inmate, we could look into it and we could

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Brett Lyman

---

**30**

1  go to our supervisor, explain what we saw.  If we
2  had an idea of where to move them, we could suggest
3  that.
4         There were times when if you had inmates
5  that got in a fight, well of course they had to be
6  moved.  If there was a medical emergency -- well, we
7  wouldn't have anything to do with moving somebody
8  like that.  That would be the medical department.
9     **Q.  Let me ask you a couple of followups**
10 **then.  So let's just use the example of inmates who**
11 **got into a fight.**
12    A.  Uh-huh.
13    **Q.  What's the process then to have them**
14 **moved or separated?  What do you have to do?**
15    A.  Depending on the extent of the injuries,
16 but you would always have them checked out by
17 medical.  Usually if there were two combatants you
18 would have them checked out by medical and they
19 would both go to A block for lockdown, pending a
20 hearing.
21    **Q.  Okay.  So A block was lockdown?**
22    A.  Yes.
23    **Q.  And did I misunderstand you earlier to**
24 **say F block was maximum security?**
25    A.  Yes.  That was what they called that end

---

**31**

1  of the jail because it was lockdown.  It wasn't -- I
2  don't know -- anyway.
3     **Q.  So let me try to get to what I**
4  **understand the difference between maximum security**
5  **as used to describe F block and lockdown as used to**
6  **describe A block.**
7     A.  Right.
8     **Q.  What's the difference?**
9        MR. MYLAR:  And again objection.  Lack
10 of foundation.  Go ahead.
11    A.  F block was intake.  The inmates that
12 were able to go to general population but usually
13 there was no room to put them right into general
14 population, they waited in F block.  A block, which
15 is lockdown, was punitive or they were waiting to
16 have a hearing pending -- they were there pending a
17 hearing.
18    **Q.  All right.  So using my knowledge of old**
19 **movies, there's a term called solitary confinement.**
20    A.  Yes.
21    **Q.  You can tour Alcatraz and see where the**
22 **Birdman lived.  Was A block like that, like solitary**
23 **confinement?**
24       MR. MYLAR:  Objection.  Lack of
25 foundation.

---

**32**

1     A.  Impressions today, at least in our
2  facility, there was no such thing as solitary
3  confinement as a specific term.  There were inmates
4  that refused to get along with other inmates and you
5  could call that solitary confinement but it was not
6  something that was used as a specific term.
7     **Q.  The term wasn't used.**
8     A.  No.
9     **Q.  Did A block have -- was it open between**
10 **the cells?  Was there bars between the cells like**
11 **you see in the old western movies?**
12    A.  No, no bars.  There were doors.  Each
13 door had a window in it.
14    **Q.  How big was the window?**
15       MR. MYLAR:  Objection.  Lack of
16 foundation.
17    **Q.  Well, if you know.**
18    A.  I want to say maybe 5 inches by 16
19 inches.
20    **Q.  And they would be in that room by**
21 **themselves.**
22    A.  Yes.  Well, not specifically.  They were
23 two-man cells, so there was two bunks in there.
24    **Q.  So just depending on how many inmates**
25 **were in that particular block then.**

---

**33**

1     A.  Yes.
2     **Q.  They might be alone at times.  They**
3  **might have a bunkmate at other times.**
4     A.  Right.
5     **Q.  Well, actually before we leave A, you**
6  **told us what the schedule was but I want to make**
7  **sure I'm clear.  Were they allowed out of their**
8  **lockdown cells?**
9     A.  Yes.
10    **Q.  How often?**
11    A.  Well, you had different levels.  There
12 was a level system for the inmates.  In A block you
13 have level 1A, which is, I guess for lack of better
14 term, worst of the worst, depending on the charges
15 he was arrested on, behavior while he was in there,
16 and he did not -- those did not come out of their
17 cell without restraints on.
18       And then there was a level 1 and then
19 there were lockdown.  Level 1s could come out seems
20 to me more than an hour a day if there was time but
21 the lockdowns came out I think an hour every day --
22 every other day.
23    **Q.  Okay.  At least every other day?**
24    A.  Yeah.
25    **Q.  And I'll ask you some specific questions**

---

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Brett Lyman

34

1  about Mr. Crowson here in a minute.
2      A.  Okay.
3      Q.  How often were the people in A block
4  observed by a correctional officer?
5      A.  Well, we were required to walk through
6  the sections at least once every hour and then if we
7  had to go in there to conduct business, more than
8  once an hour.  They are constantly being watched
9  from the control room.  A block especially a lot of
10  times would be listened to because they're yelling,
11  communicating to each other.
12     Q.  Okay.  Did they go out for meals or were
13  meals brought to them?
14     A.  Meals were brought to them in their
15  cells.
16     Q.  Was that done by correctional officers
17  or was there separate staff that did that?
18     A.  No.  Correctional officers would take
19  them in.
20     Q.  Was it the type of situation where it
21  was slid through the windows?
22     A.  There is a cuff port on the doors that
23  is probably 4 inches by maybe 12 inches.  There's a
24  lock on it.  You open that up and you slide the
25  trays through that.

35

1      Q.  And then you receive the trays back the
2  same way?
3      A.  In A block they had Styrofoam trays and
4  so when they came out they were required to clean
5  their cells.  Sometime before the end of the day
6  corrections staff would go in and collect all their
7  garbage through their cuff port.  We have a big
8  garbage bag and they'd throw their garbage out.
9      Q.  They were Styrofoam trays?
10     A.  Yeah.  The white Styrofoam trays that
11  had a lid that folded over.
12     Q.  Okay.  So everything was disposable?
13     A.  Yeah.
14     Q.  Was that to avoid having a situation
15  where they would have something they could use to
16  create a weapon?
17     A.  Yes.
18     Q.  Were they fed different food than the
19  general population?
20     A.  No.  Same food.
21     Q.  What was a typical menu?
22     A.  Depends on the supervisor of the
23  kitchen.  We had one guy out there that was buying a
24  lot of pre-prepared food.  They had another guy that
25  they would cook everything.  There was a lot of

36

1  variety.  I know at times there was probably a set
2  menu.
3      Q.  Were they given fruit?
4      A.  Yes.
5      Q.  How often?
6      A.  At least once a day with breakfast,
7  lunch or dinner.  There was always fruit on one of
8  the trays.
9      Q.  How were medications administered in A
10  block?
11     A.  The nurses would come down and they
12  would be escorted in by an officer and then they
13  would go -- depending which inmates had medications
14  we would go from door to door to door and they would
15  be given their medications through the cuff door.
16     Q.  Okay.  If an inmate was in A block,
17  would they have access to anyone other than a
18  correctional officer or nurse?
19     A.  What do you mean access?
20     Q.  Was there any possibility for a person
21  who is either not a nurse or correctional officer to
22  come in contact with them?
23     A.  No.
24     Q.  Did the cells in A block have a toilet
25  with running water?

37

1      A.  Yes.
2      Q.  Sink with running water?
3      A.  Yeah.  It's all one unit.
4      Q.  Anything else in there besides a bunk,
5  toilet and sink?
6      A.  There is a metal desktop that's embedded
7  in the block wall and then there's a metal stool
8  that's into the concrete floor.  There's two of
9  those.
10     Q.  Any drawers?
11     A.  No.
12     Q.  Closets?
13     A.  No.
14     Q.  Were they allowed to take any personal
15  belongs into A block?
16     A.  At first, no, when they're locked down.
17  But after they were -- well, I don't recall what the
18  matrix was.  I know that as a level 1, when you're
19  not on lockdown status you're allowed minimal
20  personal items, letters, pictures, not very much.
21  But I don't recall the exact matrix for that.
22     Q.  And if you're on lockdown status, you're
23  not allowed any personal items at all then.
24     A.  I don't believe so.
25     Q.  Let's move back to F block for a minute.

38

1    A.  Okay.
2    Q.  This is where people who came in for
3  intake, so the first place they were sent?
4    A.  Yes.
5    Q.  Did you mention there were detox cells
6  in F block as well?
7    A.  No.
8    Q.  Where were detox cells?
9    A.  In booking.
10    Q.  They were in booking.
11    A.  Yes.
12    Q.  Okay.  And I thought F block and booking
13  were the same thing.
14    A.  No.  F block -- in max control the
15  sections were kind of pie-shaped with the control
16  room in the center so that's A, B, C, D, E and F.
17    Q.  Okay.  And then booking is separate from
18  that.
19    A.  Yes.
20    Q.  Were there specific cells that were
21  designated as detox cells?
22    A.  There was one that actually had that on
23  it, yes, in booking.
24    Q.  And when did inmates go to the detox
25  cell?

39

1    A.  Generally when they were intoxicated,
2  under the influence of something.
3    Q.  Who would make the decision to put
4  someone in detox?
5      MR. MYLAR:  Objection.  Lack of
6  foundation.
7    A.  Specifically I couldn't tell you.
8    Q.  Could it be anyone on the floor?
9    A.  When somebody is under the influence of
10  something it would -- well, I could guess but I
11  don't know if you want me to guess.
12    Q.  Well, I don't want you to guess.
13    A.  I worked out there long enough to know
14  that medical would be involved.
15    Q.  Okay.
16    A.  Somehow, some way, as well as whoever is
17  supervising booking.
18    Q.  So as a correctional officer, if thought
19  somebody was under the influence of something, would
20  you report that to medical?
21    A.  Yes.
22    Q.  And then you would allow medical to take
23  care of it or were there steps that you were also
24  required to take as a correctional officer?
25    A.  It depended on the day.  Sometimes the

40

1  nurses would come down to us and sometimes they
2  would have us bring the inmate to them.
3    Q.  How many correctional officers were on
4  duty at any given time?
5    A.  Eight, nine, ten, 13, 14, 15, 16, 17 --
6  I'm going to say somewhere between 15 and 19.
7    Q.  Do you know how many nurses were on duty
8  at any given time?
9    A.  No.  One, as far as I know.  I know that
10  during the day there were more.  I have no knowledge
11  of their schedule or access to it or anything.
12    Q.  Okay.  For inmates who were in detox,
13  were they still under the observation of the
14  correctional officers?
15    A.  I believe so.  They were not put in a
16  medical cell so, yes, I believe they were under the
17  observation of a correctional officer.
18    Q.  Did you receive any training on how to
19  recognize whether someone was under the influence of
20  alcohol?
21    A.  No.
22    Q.  Did you receive any training as to how
23  to recognize whether someone was under the influence
24  of medications or drugs?
25    A.  I don't believe so.

41

1    Q.  Did you receive any training on how to
2  recognize symptoms of alcohol withdrawal?
3    A.  I don't recall that.
4    Q.  Do you know what the symptoms of alcohol
5  withdrawal are?
6      MR. MYLAR:  Objection.  Lacks
7  foundation.  Go ahead.
8    Q.  This is a foundational question.  You
9  can answer yes or no as to whether you know.
10    A.  No, not specifically.
11    Q.  Do you know what the symptoms of drug
12  withdrawals are?
13    A.  Not specifically, no.
14    Q.  And setting aside -- I'm not claiming
15  you're an expert in these things but do you
16  generally have an idea what they are?
17    A.  No.  Not -- a least for me, not
18  specifically.
19    Q.  In your time at the prison, at the jail,
20  I guess -- do you call it a jail or prison?
21    A.  Jail.
22    Q.  Jail?
23    A.  Yeah.
24    Q.  During your time at the jail did you
25  ever recommend that an inmate be placed into the

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Brett Lyman

42

1  detox cell?
2      A.  I don't recall whether I have or
3  haven't.  Right off the top of my mind it's not
4  something I would recommend because it's not my area
5  to work so I would have -- I wouldn't have anything
6  to do with where somebody went up in booking or why.
7  Usually that would be the booking staff, supervisor
8  or medical.
9      Q.  As far as inmate discipline goes, if you
10  observed something that you felt warranted
11  discipline, is there a process that you would
12  initiate to have that done?
13      A.  Yeah.  We would write a report and we
14  would do an inmate write-up.
15      Q.  Where was that entered?
16      A.  In the computer.
17      Q.  In Spillman?
18      A.  In Spillman.
19      Q.  And then what was the disciplinary
20  process?
21      A.  You would do the write-up and you could
22  either -- depending on the circumstances, you could
23  either leave them where they were and do the
24  write-up and they would have a hearing with the
25  inmate disciplinary officer and then they would mete

43

1  out the sanctions.  Or, depending if one or more
2  inmates had to be removed from that environment, you
3  could put them into lockdown pending the hearing and
4  then the hearing officer could have the hearing to
5  recommend longer lockdown time, give them credit for
6  the time they were placed in that cell or give them
7  time served and put them back somewhere in general
8  population.  There were several different outcomes
9  that could happen.
10      Q.  So the correctional officer, if they
11  feel like there's immediate -- let me back up.  I
12  want to ask the question a little bit differently.
13  Under certain situations the correctional officer
14  can put them into lockdown pending the disciplinary
15  hearing.
16      A.  Right.
17      Q.  What are the criteria for determining
18  when the correctional officer had the discretion to
19  make that decision?
20      A.  Safety.  Usually it's not -- initially
21  when we do that it's not punishment, it's
22  management.  Because so many times people refuse to
23  manage themselves as far as following the rules,
24  getting along with others, we have to step in and
25  make some changes.

44

1      Q.  Did you have access to the nurses who
2  worked there at the jail?
3      A.  Yes.
4      Q.  Did you have the ability to alert them
5  to any situations that you thought required medical
6  attention?
7      A.  Yes.
8      Q.  Did you have any issues with inmates
9  getting access to alcohol while they were
10  incarcerated?
11      A.  Homemade alcohol, yes.  Outside alcohol,
12  no.
13      Q.  Tell me about the homemade alcohol.
14      A.  Fruit, sugar, bread, sometimes rice.
15  They would just -- to me it was just an abomination.
16  It was horrible.  More times than not the inmates
17  appeared to be sick, start vomiting and -- I don't
18  know exactly how it was made other than just -- I
19  don't know how to explain it.
20      Q.  Well, let's start with you identified
21  some of the ingredients.
22      A.  Right.
23      Q.  Where would they put it for it to
24  ferment?
25      A.  Well, years ago we had a group of

45

1  guys -- they have these game tables in the dormitory
2  sections.  They're round and they have a base
3  that's, I don't know, it looks like -- you have a
4  five-gallon bucket but this looks like it's about an
5  eight-gallon bucket screwed to the bottom of the
6  table.  Somehow they emptied all the sand and stuff
7  out of that base and put a garbage bag in there and
8  made some of it.  From what I remember, it was
9  pretty potent stuff.
10      A lot of times the guys in the cells
11  will put them in their shampoo or lotion bottles and
12  will leave them in the window to try to warm up to
13  try to start cooking it.  I've seen them -- they
14  have peanut butter jars.  They'll just leave them in
15  their drawers or leave them laying around somewhere
16  and just let them ferment.
17      One guy wrapped his up in plastic bags
18  and made this tube come off for it to vent off.
19      Q.  He was a real moonshiner then.  He
20  actually knew what he was doing.
21      A.  Well, it was pretty evident when you
22  walked by his area of the bunk, the smell we were
23  smelling.
24      Q.  Yeah.
25      A.  But I've seen that stuff where the

---

46

1  peanut butter jar lid was cracked open and it starts
2  pushing up out through the top of the jar.  It's
3  fermenting.  And that's been my experience with it.
4      Q.  Okay.  How often would you guys discover
5  something like that?
6      A.  From what I saw or knew about, which I'm
7  not there all the time, maybe two or three times a
8  month.
9      Q.  Okay.  How about illegal drugs in the
10  jail, is that something you guys found?
11     A.  Yes.  Illegal drugs were found in the
12  jail probably weekly.
13     Q.  How did they get into the jail, do you
14  know?
15     A.  Specifically, no.  I can speculate but I
16  don't know if that's what you want.
17     Q.  I don't.
18     A.  Okay.
19     Q.  I mean there's part of me that does,
20  I'll be honest.  The illegal drugs, you say weekly.
21  What types of drugs would you guys discover in the
22  prison?
23     A.  The last few years I was there a lot of
24  heroin, I guess what they call black tar heroin.
25  Just maybe four or five times the size of a wooden

47

1  match head.  It would be black and be wrapped up in
2  tinfoil or paper or something.
3      MR. MYLAR:  Could we take a break?
4      MR. SCHRIEVER:  Sure.  Yeah, we can take
5  a five- or ten-minute break.
6      (Recess.)
7      Q.  Mr. Lyman, I want to ask you, do you
8  remember Martin Crowson?
9      A.  Yes.
10     Q.  Why is it that you remember Martin?
11     A.  I had a lot of interaction with him over
12  the years.
13     Q.  When you say interaction, what do you
14  mean?
15     A.  Just dealing with him.  He seemed to
16  always bring a lot of attention on himself, talking,
17  being boisterous.
18     Q.  Do you know what he looks like?
19     A.  Yeah.
20     Q.  How would you describe him?
21     A.  Like height, weight?  Medium build,
22  sometimes he could be a little husky, short hair,
23  usually had some facial hair.
24     Q.  Tattoos?
25     A.  Yeah.

48

1      Q.  Do you remember anything specific about
2  tattoos?
3      A.  No.
4      Q.  Did he have any nicknames or anything
5  like that?
6      A.  Not that I was aware of.
7      Q.  How would you refer to him?
8      A.  By Crowson, last name.
9      Q.  So last name?
10     A.  Yes.
11     Q.  So if we call him Crowson then you know
12  who he is?
13     A.  Yeah.
14     Q.  Did he have a brother that had been
15  incarcerated as well?  Did you know his brother?
16     A.  Jerry Crowson?
17     Q.  Is that his name?
18     A.  Yeah.
19     Q.  Why did you know him?
20     A.  I had a lot of experience with him, too.
21     Q.  Okay.  Had you ever initiated
22  disciplinary proceedings against Crowson?
23     A.  No.
24     Q.  Has he ever filed grievances against
25  you?

49

1      A.  Maybe.  I don't recall.
2      Q.  You mentioned earlier that there were
3  times when you were aware of inmates, maybe just
4  because they've been there a lot.
5      A.  Uh-huh.
6      Q.  Were you aware of any medical conditions
7  that Crowson had?
8      A.  No.
9      Q.  Are you aware whether he had diabetes?
10     A.  I don't believe so.  Not at the time I
11  was there.
12     Q.  Are you aware whether he had
13  Hepatitis C?
14     A.  I was not aware.
15     Q.  Is that something that correctional
16  officers would be interested in knowing?
17     A.  Some probably, yeah.
18     Q.  Would it change anything with the way
19  you dealt with inmates in any type situations if
20  they had Hepatitis C?
21     A.  It wouldn't change the way I dealt with
22  inmates, no.
23     Q.  How did you deal with inmates?
24     A.  Fair, respectful, best I could.  We used
25  a lot of humor, talked a lot.  Inmates knew that so

50

1  long as they talked -- they could come to me with
2  anything that they wanted to say so long as they
3  talked and were respectful and did it in a proper
4  manner?
5      Q.  Okay.
6      A.  Even if they wanted to call me a dirty
7  rotten SOB, so long as they did it the right way.
8      Q.  Would it surprise you to learn that
9  Crowson didn't feel like you were respectful to him?
10     A.  No, that would not be surprising to me.
11     Q.  Why is that?
12     A.  Because I didn't give him what he seemed
13  to expect from everybody.
14     Q.  What's that?
15     A.  He wanted everybody to respect him.
16  From my experience dealing with people in the jail,
17  when they talk respect they mean fear a lot of the
18  times.  I had no reason to fear him.  I wasn't going
19  to back down and whenever I was dealing with him he
20  always seemed to think that he was pretty important.
21  He was no more important than anybody else but at
22  times he thought he was.
23     Q.  How did you deal with that when he felt
24  like he was more important?
25     A.  Depending on the situation.

51

1      Q.  Do you want to give me examples?
2      A.  Yeah.
3      Q.  What are those?
4      A.  He was going to try to feed lunch -- he
5  was in E block at the time and before lunch we do a
6  head count, which is a numbers count.  At the time
7  the meals are served inmates come to the door to get
8  their tray with their ID card.  We check their name
9  off the roster.  We do a face count.  So this one
10  particular day you kind of wait for the inmates to
11  line up at the door and Mr. Crowson was on the phone
12  so I stepped inside the section and kind of waiting
13  for him.  I know that I said something, I don't
14  specifically recall, but he put his finger up -- he
15  was talking on the phone and he was like --
16     Q.  You were giving him the sign.  I want to
17  get it described for the record.
18     A.  Holding up his finger like wait a
19  minute.
20     Q.  He was holding up his finger like wait a
21  minute?
22     A.  He wants me and the other 40 something
23  inmates to wait for him to get done with his phone
24  call before we get to the meal, and in a
25  correctional setting you don't do that.  You don't

52

1  make other inmates wait for their food.
2         And in that particular instance I turned
3  the phone call off -- I had the phones turned off --
4  they should have been turned off before.  And he
5  started making loud complaints about cutting his
6  phone call off.  And I said, "We're waiting for you
7  to get in line for meals."
8         And he went back to his bunk and
9  started, I don't remember -- doing nothing but
10  wasn't going to get in line.  He was still making
11  everybody wait to get lunch served and he was making
12  a loud production of it.
13         And so I had him turn around and put
14  handcuffs on him and escorted him out of the section
15  because it was -- at least for me, inmates weren't
16  allowed to make a big production in front of
17  everybody and not have something happen.  More times
18  than not I will cuff them up, take them out and talk
19  to them and try to make some sense of the situation
20  to them and give them the opportunity to kind of
21  step back and realize what they were doing didn't
22  coincide with the environment.
23         But Mr. Crowson, everything was about
24  him and so he was -- I don't know if I put him in
25  lockdown or if I put him in B block, in level 2

53

1  section.  I know that he complained that I was
2  punishing him.  I said, "I'm not punishing you.  I'm
3  managing you because you can't manage yourself or
4  you don't manage yourself."
5      Q.  As to this situation, how do you view
6  the difference between punishment and management?
7      A.  Well, the management part was because he
8  actually put himself in harm's way by making the
9  other 40 some odd inmates wait on him.  And in worst
10  places, correctional settings, you get seriously
11  hurt over that.  And it's kind of an unwritten rule
12  in corrections that you don't come between an inmate
13  and his food.
14     Q.  Are you aware in that particular
15  situation of any direct threat of harm to
16  Mr. Crowson?
17     A.  No.  If there was, he didn't act like
18  it.  But at the same time, when an inmate does that
19  I'm not going to wait around to find out either.
20  That was a situation where I felt that he needed to
21  be removed from that environment.
22     Q.  Do you remember the approximate dates
23  that occurred?
24     A.  No.
25     Q.  What are some other things you remember

54

1 about Mr. Crowson?
2       A.   I remember when he was in B block he was
3 constantly complaining that I was after him, that I
4 didn't like him, which was true, I didn't like him.
5 He just refused to do his own time, wanted to always
6 make things a big production, especially what he
7 thought was going on between he and I.
8       Q.   What do you mean by that?
9       A.   Just that there was no love lost there
10 which for me it was neither here nor there.  It was
11 my job.  I wasn't there to be a miserable person.
12 It was a miserable environment to begin with.  And
13 my first priority every day was not to be a
14 miserable person and not to make people's lives more
15 miserable than they already are.  The corrections
16 staff is not part of the punishment equation.  We're
17 there to make sure the inmates are healthy and are
18 cared for.
19       Q.   Okay.  The part about being cared for,
20 is that part of a mission statement or policy that's
21 written down?
22       A.   No.  That's how I saw it.
23       Q.   Were there other correctional officers
24 who dealt with Mr. Crowson differently?
25            MR. MYLAR:  Objection.  Lack of

55

1 foundation.  Calls for speculation.
2       Q.   Let me ask that question again and we
3 can get the objection as well.  Are you aware of
4 other correctional officers who handled Mr. Crowson
5 in any different manner?
6       A.   No.
7       Q.   You're not aware of any others?
8       A.   No.  I don't recall.  I'm not there
9 24/7.
10       Q.   Did you ever observe any other
11 correctional officers handcuff Mr. Crowson and take
12 him to a different block?
13       A.   No.
14       Q.   Did you ever observe other correctional
15 officers have interactions with Mr. Crowson?
16       A.   I'm sure that I did but I specifically
17 don't recall.
18       Q.   Do you recall any other incidences of an
19 adverse interaction with Mr. Crowson between you and
20 Mr. Crowson?
21       A.   Not off the top of my head, no.
22       Q.   Do you remember an incident where there
23 was an inmate who ejaculated into peanut butter and
24 had another inmate eat it?
25       A.   No, I do not recall that at all.

56

1       Q.   You don't recall that at all.
2       A.   No.
3       Q.   Do you feel like you knew Mr. Crowson
4 well enough to tell if he was acting abnormally?
5       A.   Yeah.
6       Q.   Do you know how many times Mr. Crowson
7 had been incarcerated in Purgatory?
8       A.   No.
9       Q.   This particular incident happened in
10 June of 2014.
11       A.   Which one?
12       Q.   The one that this lawsuit is about.
13       A.   Oh, okay.
14       Q.   Just in general.  I'm not talking about
15 any specific things that happened with you that day.
16       A.   Okay.
17       Q.   In June 2014.  The records indicate that
18 Mr. Crowson came in on June 11, 2014.  Do you know
19 if that's accurate?
20       A.   I have no idea.
21       Q.   What records did you review to prepare
22 for your deposition?
23       A.   Whatever came from his law firm.
24       Q.   Let me give you some instructions
25 because I don't want you to say anything that would

57

1 violate an attorney-client communication --
2       A.   Okay.
3       Q.   -- but if there were specific documents
4 that you looked at, we can find out what you looked
5 at.
6       A.   I don't know specifically what I was
7 looking at.
8       Q.   Okay.  Do you know if it was a printout
9 of what was in Spillman?
10       A.   No.
11       Q.   Can you describe what the documents
12 looked like?
13       A.   Like that right there.
14       Q.   I was going to get to these.
15       A.   Okay.
16       Q.   So, for example, I'm just showing you
17 what's been marked as Washington Crowson 050.
18       A.   No.  That's a Spillman printout and I've
19 not reviewed any of those.
20       Q.   You haven't looked at that?
21       A.   No.
22       Q.   How about this?
23       A.   That format looks familiar.
24       Q.   0483, this format looks familiar to you?
25       A.   Yeah.

58

1    Q.  You did not look at any Spillman
2  printouts then?
3    A.  No.
4    Q.  What kind of information was in the
5  records that you looked at?
6    A.  I believe it was a timeline, some kind
7  of timeline for --
8    MR. MYLAR:  Just for the record, that
9  would have been attorney work product if he looked
10  at a timeline.
11    A.  Okay.
12    Q.  So a timeline.  Anything else?
13    A.  No.  Just the legal filings.
14    Q.  Okay.  Are you aware of any document or
15  log that could be printed from the prison system
16  other than in Spillman?
17    A.  I'm not aware, no.
18    Q.  Did the document that you looked at have
19  dates and times on it?
20    A.  I believe it had dates.  I don't believe
21  it had times on it.
22    Q.  Do you know who Ryan Borrowman is?
23    A.  Yes.
24    Q.  Who is Ryan?
25    A.  He is a nurse, or when I was still

59

1  employed with the county he was a nurse at the jail.
2    Q.  Do you know who Alan Dressler is?
3    A.  Yes.
4    Q.  Who is Alan Dressler?
5    A.  He is or was a reserve officer with the
6  county.
7    Q.  Did he work in the jail?
8    A.  Not that I ever saw.  I know I saw him
9  as a reserve on the patrol side.
10    Q.  How about Paul Dolgnar?
11    A.  He was a corrections officer in the
12  jail.
13    Q.  Do you know if Mr. Dolgnar worked in
14  booking?
15    A.  I don't know for sure.
16    Q.  How about Jason Wittwer?
17    A.  I don't know who that is.
18    Q.  How about Pete Merrill?
19    A.  Pete Merrill is -- was, is a corrections
20  officer.
21    Q.  How about Brian Jensen?
22    A.  Brian Jensen was a corrections officer
23  when I was there.
24    Q.  Clint Allred?
25    A.  He was a corrections officer while I was

60

1  there.
2    Q.  Robert Bates Brandt?
3    A.  Robert Brandt was a corrections officer
4  and he I believe got his master's degree, some kind
5  of social worker/therapist.  I don't know exactly
6  what.  I just know he went back to college.
7    Q.  Okay.  How about Bill Crocker?
8    A.  Bill was a corrections officer while I
9  was there.
10    Q.  Jay Scouser?
11    A.  He was a corrections officer at some
12  point while I was there.
13    Q.  Do you know who the hearing officer
14  would have been for disciplinary proceedings at that
15  time?
16    A.  No.
17    Q.  That was somebody who was a corrections
18  officer?
19    A.  Yes.
20    Q.  Did it rotate through people or how was
21  it set up?
22    A.  I don't know.  They received special
23  training for it but I don't know who or what, when
24  or why.
25    Q.  Let me put this in context of what the

61

1  logs tell me, okay?
2    A.  Uh-huh.
3    Q.  This is just for the record.  Washington
4  Crowson 0510 indicates that there was an inmate
5  disciplinary hearing on June 18, 2014.  The officer
6  is listed as Robert Brandt.
7    A.  Okay.
8    Q.  Do you know if that means that he was
9  the hearing officer?
10    MR. MYLAR:  Objection.  Lack of
11  foundation.
12    Q.  I can show you what I'm looking at.
13    A.  To my understanding and what I remember,
14  that would have meant that he was the disciplinary
15  hearing officer.
16    Q.  Okay.  IDHO Brandt?
17    A.  Correct.
18    Q.  Do you know what IDHO stands for?
19    A.  Inmate disciplinary hearing officer.
20    Q.  What was the hierarchy of the
21  correctional officer structure -- sergeants,
22  lieutenants?
23    A.  Sergeants and lieutenants and jail
24  commander.
25    Q.  What position did you hold?

62

1     A.  Line staff.
2     Q.  What's the difference between -- what's
3  the ranking, hierarchy?
4     A.  What do you mean?
5     Q.  Who's in charge of who?
6     A.  I'm not --
7     Q.  What's the highest rank, sergeant or
8  lieutenant?
9     A.  The jail commander.
10     Q.  Jail commander?  And then under jail
11  commander, who?
12     A.  Lieutenant, sergeant, then all of the
13  line staff.
14     Q.  Okay.  Were you ever considered or did
15  you ever put in for promotion to sergeant or
16  lieutenant?
17     A.  No.
18     Q.  I'm looking at, for the record,
19  Washington Crowson 0524.  This one says in that
20  description, block A and then it has upper tier.  It
21  has an X after the upper tier.
22     A.  That means he was housed on the upper
23  tier, whoever that is about.
24     Q.  And the date on this is July 20, 2014
25  and it says type of event, TOC, time out of cell.

63

1     A.  Correct.
2     Q.  What would that mean?
3     A.  Well, for whatever inmate that is on, if
4  it's on Mr. Crowson, that would indicate that he
5  received one hour out of his cell.
6     Q.  Okay.  And this was lockdown checked
7  yes.
8     A.  Right.
9     Q.  He's in A block on lockdown.
10     A.  Correct.
11     MR. MYLAR:  What year is this?
12     MR. SCHRIEVER:  June 20, 2014.
13     MR. MYLAR:  Okay.
14     Q.  At 6:57:33.  The officer was Brian
15  Jensen.  He was the correctional officer, correct?
16     A.  Yes.
17     Q.  And then Washington Crowson 0525, this
18  is 6:18:14.  Same thing but Officer Bill Crocker.
19  Time out of cell.  Would there be a record kept for
20  every time he was let out of his cell?
21     A.  There should have been.
22     Q.  So he was out for one hour every other
23  day?
24     A.  Correct.
25     Q.  Is there enough information to know

64

1  whether he would have been let out, restrained in
2  handcuffs and shackles?  If he was on lockdown would
3  that be the policy or not?
4     A.  No, not necessarily, if he was a level
5  1A.  If he was just on lockdown then he would not be
6  restrained when he came out of his cell.
7     Q.  Where would he be allowed to go?
8     A.  To the day room.  He would have access
9  to a phone to call an attorney, or the kiosk, the
10  shower and I believe that would be it.
11     Q.  Would there be anybody else in the day
12  room at that time?
13     A.  No.
14     Q.  He would have been in there by himself?
15     A.  Should have been, yes.
16     Q.  Okay.  Just for the record, looking at
17  Washington Crowson 0539, on this one it says the
18  type of event is ICC, inmate cell change, the date
19  6-25-14?
20     A.  Uh-huh.
21     Q.  Do you know what that refers to?
22     A.  That would refer to him being reassigned
23  another location from where he was.
24     Q.  Okay.  And down here it says assigned
25  from Purg max at block main 27 to Purg max at block

65

1  main 12.
2     A.  Right.  So 27 would be an upper bunk.
3  All the odd numbers are upper bunks and all the even
4  bunks are lower so he was given a lower bunk.
5     Q.  Okay.
6     A.  So this right here is automatically
7  generated from the computer when you enter the ICC.
8  So this is not entered by a staff.  Does that make
9  sense?
10     Q.  Yeah.  Does staff select which bunk to
11  put him in?
12     A.  Yes.
13     Q.  But the wording here is automatically
14  generated by the computer?
15     A.  Correct.
16     Q.  Okay.  And the timestamp here of
17  3:31:52, do you know if that would be a.m. or p.m.?
18     A.  Is it zero 3?
19     Q.  Yes.
20     A.  That would be a.m.  I believe the time
21  in Spillman is 24-hour time.
22     Q.  Okay.  Does that mean that at 3:30 in
23  the morning somebody physically went to F block main
24  27 and transferred him to F block main 12?
25     A.  No, that's not what that means.

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Brett Lyman

66

1    Q.  What does that mean?
2    A.  That means that they changed it in the
3  computer at that time.  It doesn't mean that he was
4  physically moved at that time.
5    Q.  Okay.  Flipping back one page to 0538
6  and this is one you're indicated on, Brett Lyman.
7    A.  Okay.
8    Q.  It's reassigned from -- a couple of
9  reassignments.  Is that a reference to court
10  appearance or anything like that or what would that
11  concern?
12    A.  Yes, that would have been -- I've never
13  seen one like this before where it has all the
14  different ones.
15    Q.  Let me ask you this.  So you're listed
16  here as the officer.
17    A.  Uh-huh.
18    Q.  Does that mean that you made these
19  entries only or does it mean you actually moved him
20  from these places?
21    A.  I don't know.  Because, like I said,
22  I've never seen this part before.
23    MR. MYLAR:  Just for the record, you're
24  indicating the bottom of that wording there on page
25  538.

67

1    A.  Because it has one, two, three different
2  reassignments and I've never seen that before.
3    Q.  Okay.  Let me ask you about each one of
4  these separately.
5    A.  Okay.  There is not a date associated
6  with each time.
7    Q.  Right.  There's just the one date, June
8  25, 2014.
9    A.  Right.
10    Q.  And it's 16:10:25, so that would be 4:10
11  in the afternoon?
12    A.  Correct.
13    Q.  That's when this was entered, not
14  necessarily when these events occurred.
15    A.  Correct.
16    Q.  All right.  So let me ask you this.  The
17  temporary location.
18    A.  From --
19    Q.  From the court.
20    A.  Right.
21    Q.  Is that referring to a holding cell at
22  the court?
23    A.  All right.  See, I never have been to
24  the new courthouse where they actually have holding
25  cells so I don't know what's there.  We would always

68

1  put inmates on a temporary out count when they went
2  to court so that when we went through the sections
3  to do our body count we would know where they were.
4  They would leave the ID cards with us.  So if that's
5  referring to a cell number 16, then that's something
6  that -- I don't know.
7    Q.  Okay.
8    A.  The temporary court and he was
9  reassigned back to 12 when he came back from court.
10    MR. MYLAR:  For the record, a minute ago
11  counsel said it was July 25th.  It looks like the
12  record says June 25, 2014.
13    Q.  Yes.  I misspoke on that.  June is what
14  I meant.  Does that make any sense to you?
15    A.  Yeah, it makes a little bit of sense.
16  But, like I said, I've never seen it have more than
17  one of the reassignments on there like that.
18    Q.  All right.  And this reassignment from F
19  block 12 to detox, do you know what went behind that
20  decision?
21    A.  No.
22    Q.  Anything that you personally observed?
23    A.  Not that I recall.
24    Q.  Okay.  And I'll just represent to you
25  some of the records indicate that he was slow to

69

1  respond verbally, wasn't giving coherent answers to
2  questions, things like that.  Did you observe
3  anything like that?
4    A.  Not that I recall.
5    Q.  And then the very last one is reassigned
6  from the detox, was back to the court.  Do you know
7  why that's in there?
8    A.  That would be that he was in the detox
9  cell and went to court.
10    Q.  This record stops right here.  It means
11  he left court or is there another record that checks
12  him back in?
13    A.  There should be another record that
14  checks him back in.
15    Q.  Can anybody else go in and change this
16  report or does it have to be you once you're listed
17  as the officer that's making that report?
18    MR. MYLAR:  Objection.  Lack of
19  foundation.
20    A.  Don't recall.
21    Q.  Just so I'm clear, the fact that you
22  entered this into the computer doesn't mean that you
23  were the one that --
24    A.  That means that I did a move.
25    Q.  Okay.

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Brett Lyman

70

1    A.  Because nobody else can log in under my
2  name.
3       Q.  Okay.  So that means that you did put
4  him in detox?
5       A.  No.  From what I understand that means
6  that I put him to court because that's the one on
7  top.
8       Q.  Okay.
9       A.  Because, like I said, I've never seen
10  where it has more than one reassignment on there.
11       Q.  Do you know if it was -- so you wouldn't
12  know the order then that these happened in.
13       A.  No.  There's no date assigned to them
14  other than the date that I made the log entry which,
15  when I was there, would have been that top
16  reassignment.
17       Q.  Okay.  But the fact that your name is on
18  this does mean that you were the one who did these
19  transfers.
20       A.  No.
21       Q.  No?
22       A.  Like I said, to my recollection, it
23  means that I did the top one.
24       Q.  Okay.  Only the top one.
25       A.  Yes.  Because I have not seen --

71

1  Spillman goes through updates and it changes from
2  time to time and I have never seen it like that
3  before.
4       Q.  Okay.  Is it possible somebody went in
5  after the fact and changed your entry?
6       A.  I guess it could be.
7       Q.  As line staff did you have access to
8  change entries made by other officers?
9       A.  I don't really know.  I know there was
10  some things that once they were done you couldn't go
11  back and change them.  It would generate another
12  report because they would have a modify button or
13  something somewhere but I don't recall enough about
14  Spillman to remember what could or what couldn't.
15       Q.  Okay.  Did you have any conversations
16  with any of the other corrections officers about
17  particular inmates?
18       A.  I don't recall specific conversations,
19  no.
20       Q.  For example, did you ever have any
21  conversations with other correctional officers about
22  Martin Crowson?
23       A.  I don't recall specifically.
24       Q.  Okay.  Let me ask you about the
25  difference here between 0531 and 0538.  0531 is out

72

1  to court also entered by you on June 25, 2014 at
2  13:30.  And then at 16:25 on June 25, 2014 that's
3  where we get the multiple entries on 0538.
4       A.  So that one is from court to F12.  And
5  what's this one?  This one is reassigned 12.  So he
6  would have gone to court.  This one is when he left
7  to court and that other one is when he was coming
8  back.
9       Q.  So 16:10, which is 4:10 p.m., he comes
10  back and then these entries get put in here?
11       A.  Like I said, I don't recognize that
12  format.
13       Q.  Okay.
14       A.  Usually they look like the other two
15  where it just has the single thing.
16       Q.  Okay.  This wasn't you but it was Jason,
17  0540, again we're on June 25, 2004 at 2:32 which
18  is --
19       A.  A.m.
20       Q.  -- a.m. and this one is assigned from
21  Purg max A block mezz 205B to Purg max F block main
22  27.
23       A.  Right.  So he would have been moved from
24  A block to F block.
25       Q.  Sometime before 2:32 a.m. on June 25th.

73

1       A.  Yeah.
2       Q.  At or before.
3       A.  It could be after.  They could have gone
4  in and moved him physically and then come back in
5  and then done the computer.  But it would have been
6  close to that time that he physically moved, I
7  guess.
8       Q.  Okay.  So based on these records and the
9  way you understand that it worked, would he have
10  been in A block on lockdown from at least June 18th
11  to June 25th?
12       A.  Sounds like it, yes.
13       Q.  Okay.
14       A.  How many days would that have been?
15  Seven days?
16       MR. MYLAR:  Let me say that I object to
17  lack of foundation because he doesn't have personal
18  knowledge about what was happening on some of these.
19       MR. SCHRIEVER:  Okay.
20       Q.  Actually, let me go back here because on
21  05401 on 6-17-14 at 5:22 a.m. it's an ICC, inmate
22  cell change, Officer Glen Allred, F block, May 29 to
23  mezz 205B he got transferred to A block.
24       A.  Yes.
25       Q.  Okay.  So 6:17, sometime on the 25th,

74

1    seven to eight days?
2        A.  Right.
3        Q.  And then every one of these says Purg
4    max.  Is that just referring to the jail in general?
5        A.  Yes.  Max is the one end of the jail.
6    The other end of the jail would have been central or
7    listed like that would be CENT.
8        Q.  And which blocks were in Purg central?
9        A.  G, H, I, J, K.
10       Q.  And as you sit here today you have no
11   memory of putting Crowson into the detox cell; is
12   that right?
13       A.  No, I don't.
14       Q.  And looking at that document, does that
15   refresh your recollection as to whether or not you
16   did that?
17       A.  No.
18       MR. WIGHT:  What was the date of your
19   last question?
20       MR. SCHRIEVER:  June 17th was the last
21   one.
22       Q.  Do you have any memory of Mr. Crowson
23   being transported to Dixie Regional Hospital on or
24   about July 1, 2014?
25       A.  No.

75

1        Q.  If a decision was made to move an inmate
2    to detox, were there forms to be filled out?
3        A.  I don't believe so.
4        Q.  Other than Spillman, any log kept of
5    reasons for cell transfer other than that, anything
6    like that?
7        A.  If it was medical, then it would be a
8    medical thing.  It seems like somebody should have
9    kept one about why.
10       Q.  Okay.  I want to show you what is
11   Washington Crowson 0529.  You're listed as the
12   officer.
13       A.  Okay.
14       Q.  Would you read the description.
15       A.  Sure.
16       Q.  Can you read it out loud or read it to
17   yourself, whatever you prefer.
18       A.  "Inmate Crowson did not show up to the
19   line for breakfast this morning.  I stepped into the
20   section and called for him.  When he did come out of
21   the lower tier he appeared to me to be lethargic and
22   slow.  I asked him to get a food tray.  He turned
23   around, went back to the lower tier.  Deputy Dolgnar
24   came to F block and escorted him to booking.
25   Medical checked Crowson and found nothing wrong with

76

1    his vitals.  He was later moved to the detox cell
2    for observation."
3        Q.  Does that refresh your recollection as
4    to anything that happened that day?
5        A.  Not specifically, no.  The whole
6    incident of him right here, I mean I kind of
7    remember in general but I don't remember the
8    specifics about it.
9        Q.  What do you generally remember about it?
10       A.  Just what happened, that something was
11   wrong with him and he went to medical and medical
12   saw him.  That's about as specific as my memory is
13   about it.
14       Q.  And then you don't have any other -- do
15   you have any memories of him after that?
16       A.  No, I don't.
17       Q.  Any memory of him in Purgatory jail
18   after that?
19       A.  No.
20       Q.  Okay.  Just so that we're clear, the
21   date on this one is also June 25, 2014; is that
22   correct?
23       A.  You're asking me?
24       Q.  Yeah.  Well, I'm just asking to confirm
25   that's correct.

77

1        MR. MYLAR:  Are you asking if the
2    document says that?
3        MR. SCHRIEVER:  Right.
4        Q.  And the timestamp is 17:48:10.
5        A.  Yes.  That would have been 5:00 in the
6    afternoon so that probably would have had to do
7    with -- well, I entered that probably right before
8    shift change.
9        Q.  Okay.  And the other timestamp that had
10   the multiple cell changes on it was roughly an hour
11   before that.  Why is that?  Why would that be?
12       A.  Depends on --
13       MR. MYLAR:  I'm going to object.  Lack
14   of personal knowledge.  Lack of foundation.  And
15   you're calling for speculation right now.
16       A.  If things got really busy and hectic,
17   usually these things got left until the very end of
18   the shift because inmates are coming back from
19   court, if you had some kind of emergency, inmates
20   had to be moved, there could have been several
21   reasons why.  Specifically, I couldn't tell you.
22       Q.  Did your shift end at 6:00?
23       A.  It did.
24       Q.  If Mr. Crowson were in the detox cell
25   would you have still been in a position where you

78

1 would have been observing him in any capacity?
2     A.  Official capacity, no.
3     Q.  How about when he was in A block, would
4 you have had any official reason to observe him
5 while he was in A block?
6     A.  Yeah.  If I had been going through my
7 hourly cell check, if I happened to be by there
8 while he was out of his cell, yeah, that would have
9 been included in the work area.
10     Q.  Do you have any memories of him being in
11 A block during that time period?
12     A.  No.
13     Q.  What is a visual body cavity search?
14     A.  I believe it is where you make an
15 observation of each -- well, I don't want to say
16 each orifice but I know it includes them naked and
17 spreading their checks apart and making sure there's
18 nothing visible in their anal cavity.
19     Q.  Does that include mouth as well?
20     A.  Yeah.  Mouth, ears --
21     Q.  Nose?
22     A.  -- nose, toes, in between their toes,
23 bottoms of their feet, under their armpits.
24     Q.  Is it typical to perform a visual body
25 cavity search before an inmate went into lockdown?

79

1     A.  Yes, absolutely.
2     Q.  How about when they came out of
3 lockdown?
4     A.  Probably not so much.
5     Q.  Are you aware of any correctional
6 officers who were providing drinks or alcohol to
7 inmates?
8     A.  Nope.
9         MR. SCHRIEVER:  All right.  Mr. Lyman, I
10 believe those are all the questions I have for you.
11             EXAMINATION
12 BY MR. WIGHT:
13     Q.  I just have a couple of brief questions.
14 Are you familiar with Dr. Judd Larrowe?
15     A.  Yes.
16     Q.  Do you have any recollection of
17 Dr. Larrowe treating Mr. Crowson?
18     A.  Not specifically, no.
19     Q.  Were you involved in any of that?
20     A.  In treating him?
21     Q.  No.  Were you ever there to observe
22 Dr. Larrowe treating Mr. Crowson that you can
23 recall?
24     A.  It's commonplace for us to be around or
25 for officers to be around when inmates are with the

80

1 doctor.  Specifically me and Crowson, I don't recall
2 that.
3         MR. WIGHT:  All right.  That's all the
4 questions I have.  Thank you.
5         MR. MYLAR:  I don't have any.
6         FURTHER EXAMINATION
7 BY MR. SCHRIEVER:
8     Q.  Let me follow up real quickly.  In
9 relation to Dr. Larrowe, do you know how often he
10 came to prison or to the jail?
11     A.  It seemed like it was about once a week.
12     Q.  Do you know how long he stayed there?
13     A.  I guess it depended on how many inmates
14 he was scheduled to see.
15     Q.  So you don't know if it was a set
16 schedule or not?
17     A.  No, I don't.
18     Q.  Did he have an office there?
19     A.  No.
20     Q.  Did the nurses have an office there?
21     A.  I believe so.  Wait.  No, they did not
22 have an office.
23     Q.  An exam room?
24     A.  They had an exam room.
25     Q.  Was it separate, away from the general

81

1 population?
2     A.  Yes.
3     Q.  Was it secured as well?
4     A.  It could be, yes.
5     Q.  Were there generally correctional
6 officers in the exam room at any time the inmate was
7 in there?
8     A.  Not necessarily.
9     Q.  What would the circumstances be under
10 which a correctional officer would be in there with
11 an inmate?
12     A.  If the medical staff felt uneasy or if
13 the inmate was agitated.
14     Q.  And if it was necessary for a
15 correctional officer to be there, how would the
16 correctional officers find out that that was
17 requested?
18     A.  From the staff, from the medical staff.
19 They would just ask, "Can you come in here with us,
20 please."
21     Q.  Radio communication?
22     A.  No.
23     Q.  What kind of communication would that
24 be?
25     A.  Just face-to-face, right there.

CROWSON vs WASHINGTON COUNTY
April 16, 2018                                                        Brett Lyman

---

82

1     Q.  They would just come in and ask you.
2  Did you guys have radios that you communicated with?
3     A.  Yes.
4     Q.  Were medical staff on radios as well?
5     A.  They had access to the radios, yes.
6     Q.  What kind of weapon did you have in the
7  jail?
8     A.  We didn't have weapons in the jail.
9     Q.  Did you have an asp or anything?
10    A.  No, nothing.  I had nothing but a
11 flashlight and handcuffs.
12    Q.  How tall are you?
13    A.  Six three.
14    MR. SCHRIEVER:  All right.  Thank you,
15 sir.
16    MR. WIGHT:  Nothing further.
17    MR. MYLAR:  Nothing further.  Read and
18 sign.
19    (Whereupon the taking of this deposition was
20 concluded at 11:20 a.m.)
21              *  *  *
22    Reading copy submitted to Mr. Mylar.
23    Original transcript submitted to
24 Mr. Schriever.
25

---

83

1              C E R T I F I C A T E
2  STATE OF UTAH    )
                    )
3  COUNTY OF        )
4      I HEREBY CERTIFY that I have read the
5  foregoing testimony consisting of 80 pages,
6  numbered from 3 through 82 inclusive, and the same
7  is a true and correct transcription of said
8  testimony except as I have indicated changes on the
9  enclosed errata sheet.
10
11
12
                            BRETT LYMAN
13
14
15
16   Subscribed and sworn to at
17 this        day of              , 2018.
18
19
                            Notary Public
20
21
My Commission Expires:
22
23
24
                            *  *  *
25

---

84

1              C E R T I F I C A T E
2  STATE OF UTAH        )
                        )
3  COUNTY OF SALT LAKE  )
4      THIS IS TO CERTIFY that the deposition of
5  BRETT LYMAN was taken before me, Linda Van Tassell,
6  Registered Diplomate Reporter and Notary Public in
7  and for the State of Utah.
8      That the said witness was by me, before
9  examination, duly sworn to testify the truth, the
10 whole truth, and nothing but the truth in said
11 cause.
12     That the testimony was reported by me and that
13 a full, true, and correct transcription is set
14 forth in the foregoing pages, numbered 3 through 82
15 inclusive.
16     I further certify that I am not of kin or
17 otherwise associated with any of the parties to
18 said cause of action, and that I am not interested
19 in the event thereof.
20     WITNESS MY HAND at Salt Lake City, Utah, this
21 20th day of April, 2018.
22
23                       _Linda Van Tassell_
                         Linda Van Tassell
24                       RDR/RMR/CRR
25

---

April 16, 2018

**0**

**0483** 57:24
**050** 57:17
**0510** 61:4
**0524** 62:19
**0525** 63:17
**0529** 75:11
**0531** 71:25
**0538** 66:5 71:25 72:3
**0539** 64:17
**0540** 72:17
**05401** 73:21

**1**

**1** 33:18 37:18 74:24
**11** 25:15 56:18
**11:20** 82:20
**12** 34:23 65:1,24 68:9,19 72:5
**12-10-66** 6:7
**13** 40:5
**13:30** 72:2
**14** 40:5
**15** 40:5,6
**16** 32:18 40:5 68:5
**16:10** 72:9
**16:10:25** 67:10
**16:25** 72:2
**17** 40:5
**17:48:10** 77:4
**17th** 74:20
**18** 61:5
**18th** 73:10
**19** 40:6
**1998** 7:9 8:25
**1A** 33:13 64:5
**1s** 33:19

**2**

**2** 52:25
**20** 62:24 63:12
**2004** 72:17
**2014** 56:10,17,18 61:5 62:24 63:12 67:8 68:12 72:1,2 74:24 76:21
**2015** 6:21 7:5 11:24

**2018** 7:6
**205B** 72:21 73:23
**24-hour** 65:21
**24/7** 55:9
**25** 67:8 68:12 72:1,2,17 76:21
**25th** 68:11 72:25 73:11,25
**26** 8:4
**27** 64:25 65:2,24 72:22
**29** 73:22
**2:32** 72:17,25

**3**

**3** 65:18
**30** 25:23 26:20 27:16,19
**3:30** 65:22
**3:31:52** 65:17

**4**

**4** 34:23
**40** 9:12 51:22 53:9
**435 632-8622** 3:18
**48** 25:21
**4:10** 67:10 72:9

**5**

**5** 32:18
**50** 25:22
**538** 66:25
**5:00** 77:5
**5:22** 73:21

**6**

**6-17-14** 73:21
**6-25-14** 64:19
**60** 25:22
**6:00** 77:22
**6:17** 73:25
**6:18:14** 63:18
**6:57:33** 63:14

**9**

**98** 6:21

**A**

**A-R-M-A-N-D** 3:14
**a.m.** 65:17,20 72:19,20,25 73:21 82:20
**ABC** 16:3
**ability** 5:10 44:4
**abnormally** 56:4
**abomination** 44:15
**absolutely** 79:1
**academy** 8:14
**accept** 20:5
**accepted** 20:5,13
**access** 22:4 23:18 26:23 36:17,19 40:11 44:1,9 64:8 71:7 82:5
**accurate** 56:19
**accused** 16:15
**act** 53:17
**acting** 56:4
**administered** 36:9
**administrative** 13:16,18 14:1
**adverse** 55:19
**AED** 9:14
**affected** 11:19
**African** 13:5
**afternoon** 67:11 77:6
**agency** 23:5
**agitated** 81:13
**ahead** 13:2 29:21 31:10 41:7
**Alan** 59:2,4
**Alcatraz** 31:21
**alcohol** 40:20 41:2,4 44:9, 11,13 79:6
**alert** 44:4
**allegations** 4:1
**allergies** 22:13
**allowed** 33:7 37:14,19,23 52:16 64:7
**Allred** 59:24 73:22
**alongside** 9:22 10:4
**American** 13:5
**anal** 78:18
**annual** 9:11
**answers** 4:13 69:1
**appearance** 66:10
**appeared** 44:17 75:21

**appropriately** 5:11
**approximate** 53:22
**April** 6:21 7:9
**area** 15:3 27:8 42:4 45:22 78:9
**argue** 4:19
**arm** 28:22
**Armand** 3:10,13
**armpits** 78:23
**arrested** 23:23 24:9,14 33:15
**arrests** 23:5
**asp** 82:9
**assigned** 20:2 25:11 27:10 64:24 70:13 72:20
**assignments** 29:9
**attention** 15:25 44:6 47:16
**attorney** 58:9 64:9
**attorney-client** 57:1
**automatically** 65:6,13
**avoid** 35:14
**aware** 3:22 22:8,10 48:6 49:3,6,9,12,14 53:14 55:3, 7 58:14,17 79:5

**B**

**back** 21:4 23:11 27:1 35:1 37:25 43:7,11 50:19 52:8, 21 60:6 66:5 68:9 69:6,12, 14 71:11 72:8,10 73:4,20 75:23 77:18
**backed** 13:12
**background** 5:17 7:18 8:23 12:4
**bag** 35:8 45:7
**bags** 45:17
**bars** 32:10,12
**base** 45:2,7
**based** 73:8
**basic** 9:10 10:12
**basically** 17:20
**basis** 25:2
**Bates** 60:2
**bed** 26:14
**beds** 27:18
**began** 16:18
**begin** 54:12
**behalf** 3:3
**behavior** 33:15
**belief** 24:21 25:2

**belongs** 37:15

**Bernardino** 7:22

**big** 23:16 32:14 35:7 52:16 54:6

**Bill** 60:7,8 63:18

**Birdman** 31:22

**birth** 6:6

**bit** 7:20 11:2 43:12 68:15

**black** 46:24 47:1

**block** 25:21,22,24 26:18 27:22 28:4,5,6,8,13,14 29:6,16 30:19,21,24 31:5, 6,11,14,22 32:9,25 33:12 34:3,9 35:3 36:10,16,24 37:7,15,25 38:6,12,14 51:5 52:25 54:2 55:12 62:20 63:9 64:25 65:23,24 68:19 72:21,24 73:10,22,23 75:24 78:3,5,11

**blocks** 25:12 29:10 74:8

**bode** 14:2

**body** 68:3 78:13,24

**boisterous** 47:17

**book** 23:6

**booked** 24:23

**booking** 22:16 23:2,7,11, 12,15,19 24:4 25:5,7 29:6, 11 38:9,10,12,17,23 39:17 42:6,7 59:14 75:24

**boots** 14:16

**Borrowman** 58:22

**bother** 15:22

**bottles** 45:11

**bottom** 25:21,23 26:20 28:2,7,12 45:5 66:24

**bottoms** 78:23

**bought** 17:19

**boxes** 27:13

**Brandt** 60:2,3 61:6,16

**bread** 44:14

**break** 5:3 47:3,5

**breakfast** 36:6 75:19

**Brett** 3:2,10,11 66:6

**Brian** 59:21,22 63:14

**bring** 14:6 23:5 40:2 47:16

**bringing** 14:5

**brother** 48:14,15

**brought** 13:10 17:10 34:13,14

**bucket** 45:4,5

**build** 47:21

**building** 8:14

**bunk** 21:4,7 26:18 27:10 37:4 45:22 52:8 65:2,4,10

**bunkmate** 33:3

**bunks** 26:9 32:23 65:3,4

**business** 34:7

**busy** 77:16

**butter** 45:14 46:1 55:23

**button** 27:14 71:12

**buying** 35:23

---

**C**

**California** 7:24 8:1

**call** 32:5 41:20 46:24 48:11 50:6 51:24 52:3,6 64:9

**called** 3:3 4:8 8:15 13:6 25:25 30:25 31:19 75:20

**calling** 16:15 77:15

**Calls** 55:1

**capacity** 78:1,2

**carbine** 9:10

**card** 51:8

**cards** 68:4

**care** 15:21 39:23

**cared** 54:18,19

**career** 17:8

**carpentry** 7:17

**cast** 28:22

**cavity** 78:13,18,25

**cell** 26:18,19 28:5 33:17 38:25 40:16 42:1 43:6 62:25 63:5,19,20 64:6,18 67:21 68:5 69:9 73:22 74:11 75:5 76:1 77:10,24 78:7,8

**cells** 25:20 27:24 28:1 32:10,23 33:8 34:15 35:5 36:24 38:5,8,20,21 45:10 67:25

**CENT** 74:7

**center** 38:16

**central** 74:6,8

**certificates** 8:5

**certification** 9:13

**chance** 13:21 28:18

**change** 49:18,21 64:18 69:15 71:8,11 73:22 77:8

**changed** 11:6 66:2 71:5

**charge** 62:5

**charges** 24:11 33:14

**check** 51:8 78:7

**checked** 30:16,18 63:6 75:25

**checks** 8:23 69:11,14 78:17

**circumstances** 42:22 81:9

**claimed** 13:6

**claiming** 41:14

**clean** 35:4

**clear** 33:7 69:21 76:20

**cleared** 13:9,25

**Clint** 59:24

**close** 73:6

**closed** 26:21

**Closets** 37:12

**clouding** 24:2

**coherent** 69:1

**coincide** 52:22

**collect** 35:6

**college** 7:19,21,22,23 60:6

**combatants** 30:17

**combative** 25:6

**commander** 61:24 62:9, 10,11

**commonplace** 79:24

**communicated** 82:2

**communicating** 29:3 34:11

**communication** 57:1 81:21,23

**Community** 7:23

**complained** 53:1

**complaining** 54:3

**complaint** 17:4

**complaints** 13:10 14:3,4, 21 16:7,25 52:5

**complete** 4:13 8:24

**completely** 12:4

**completes** 23:8

**computer** 20:1,12,17,18 21:10 23:6 42:16 65:7,14 66:3 69:22 73:5

**concern** 66:11

**concluded** 82:20

**concrete** 7:16 37:8

**conditions** 10:9 49:6

**conduct** 34:7

**confidential** 12:6,12 22:18,20

**confinement** 31:19,23 32:3,5

**confirm** 76:24

**confrontation** 18:22,25

**considered** 12:5 62:14

**constantly** 34:8 54:3

**construction** 7:13,14

**contact** 36:22

**context** 60:25

**control** 25:25 27:15 34:9 38:14,15

**conversation** 21:2

**conversations** 71:15,18, 21

**convicted** 24:8,9,13,15

**conviction** 24:19

**convictions** 24:17,19

**cook** 35:25

**cooking** 45:13

**copy** 82:22

**correct** 61:17 63:1,10,15, 24 65:15 67:12,15 76:22, 25

**correction** 11:7

**correctional** 8:7,12 10:22 16:10 18:25 21:11 23:17 34:4,16,18 36:18,21 39:18, 24 40:3,14,17 43:10,13,18 49:15 51:25 53:10 54:23 55:4,11,14 61:21 63:15 71:21 79:5 81:5,10,15,16

**corrections** 9:16 10:24 11:5,9,12,22 23:25 35:6 53:12 54:15 59:11,19,22, 25 60:3,8,11,17 71:16

**correctly** 17:14

**counsel** 4:16 68:11

**count** 51:6,9 68:1,3

**county** 6:20 7:9 8:13 9:4,6 10:15,20 11:4 13:4 14:1 17:19 59:1,6

**couple** 14:8 22:12 30:9 66:8 79:13

**court** 4:18 10:18,23 11:7, 11,13 20:24 66:9 67:19,22 68:2,8,9 69:6,9,11 70:6 72:1,4,6,7 77:16

**courthouse** 10:18 67:24

**courts** 11:11

**CPR** 9:14,20 10:12

**cracked** 46:1

**create** 35:16

**credit** 43:5

**crime** 24:7

**criteria** 43:17

**Crocker** 60:7 63:18

**Crowson** 3:24 6:1 34:1 47:8 48:8,11,16,22 49:7

CROWSON vs WASHINGTON COUNTY
Brett Lyman

April 16, 2018

50:9 51:11 52:23 53:16
54:1,24 55:4,11,15,19,20
56:3,6,18 57:17 61:4 62:19
63:4,17 64:17 71:22 74:11,
22 75:11,18,25 77:24
79:17,22 80:1

**crutches** 28:16,22

**cuff** 34:22 35:7 36:15
52:18

**cutting** 52:5

---

**D**

**date** 6:6 62:24 64:18 67:5,7
70:13,14 74:18 76:21

**dates** 53:22 58:19,20

**day** 26:24 27:3 28:5 33:20,
21,22,23 35:5 36:6 39:25
40:10 51:10 54:13 56:15
63:23 64:8,11 76:4

**day-to-day** 11:13 16:11

**days** 10:25 73:14,15 74:1

**deal** 49:23 50:23

**dealing** 47:15 50:16,19

**dealt** 16:10 24:3 49:19,21
54:24

**decided** 13:16 14:1

**decision** 39:3 43:19 68:20
75:1

**degree** 60:4

**degrees** 8:5

**department** 30:8

**depend** 23:9

**depended** 28:4 29:1,19
39:25 80:13

**depending** 21:2 23:9
26:15 28:9 29:6 30:15
32:24 33:14 36:13 42:22
43:1 50:25

**Depends** 35:22 77:12

**deposition** 3:19 4:6,8 5:7
12:11 56:22 82:19

**Deputy** 75:23

**describe** 31:5,6 47:20
57:11

**description** 25:10 62:20
75:14

**designated** 38:21

**designation** 14:25

**desktop** 37:6

**determining** 43:17

**detox** 38:5,8,21,24 39:4
40:12 42:1 68:19 69:6,8
70:4 74:11 75:2 76:1 77:24

**diabetes** 49:9

**diabetics** 22:12

**dictate** 18:9

**difference** 31:4,8 53:6
62:2 71:25

**differently** 43:12 54:24

**difficult** 14:18

**dinner** 36:7

**direct** 53:15

**directs** 20:14

**dirty** 50:6

**disciplinary** 42:19,25
43:14 48:22 60:14 61:5,14,
19

**discipline** 10:13 42:9,11

**discouraged** 23:24

**discover** 46:4,21

**discovery** 4:8

**discretion** 43:18

**disorders** 28:25

**disposable** 35:12

**district** 10:17

**divided** 25:16,23 26:20

**division** 11:8

**Dixie** 6:16 74:23

**doctor** 80:1

**document** 58:14,18 74:14
77:2

**documents** 57:3,11

**Dolgnar** 59:10,13 75:23

**donuts** 14:9

**door** 32:13 36:14,15 51:7,
11

**doors** 26:22 27:4 32:12
34:22

**dormitory** 21:3 26:6,7,8,
20 27:5 45:1

**drawers** 37:10 45:15

**Dressler** 59:2,4

**drinks** 79:6

**driving** 14:19

**drug** 41:11

**drugs** 40:24 46:9,11,20,21

**duly** 3:4

**duty** 40:4,7

---

**E**

**earlier** 30:23 49:2

**ears** 78:20

**east** 25:25

**eat** 55:24

**educational** 7:18

**eight-gallon** 45:5

**ejaculated** 55:23

**electronically** 17:20,25

**embedded** 37:6

**emergency** 30:6 77:19

**employed** 6:8,10,20,23
9:6 59:1

**employment** 7:8 8:25
12:3 13:3 15:7 16:7

**emptied** 45:6

**encouraged** 23:21

**end** 22:20 30:25 35:5 74:5,
6 77:17,22

**enforcement** 8:16 9:13
23:4

**enter** 21:15,22 65:7

**entered** 42:15 65:8 67:13
69:22 72:1 77:7

**entries** 66:19 71:8 72:3,10

**entry** 70:14 71:5

**environment** 43:2 52:22
53:21 54:12

**equation** 54:16

**escalated** 16:21

**escorted** 36:12 52:14
75:24

**ethic** 14:14

**event** 4:11 62:25 64:18

**events** 6:3 67:14

**evident** 45:21

**exact** 37:21

**exam** 80:23,24 81:6

**EXAMINATION** 3:6 79:11
80:6

**examined** 3:4

**examples** 51:1

**expect** 4:12,25 50:13

**experience** 5:18 46:3
48:20 50:16

**experienced** 29:1

**expert** 29:2 41:15

**explain** 30:1 44:19

**extensive** 8:23 9:9

**extent** 12:3 15:8 22:1
30:15

---

**F**

**F12** 72:4

**face** 51:9

**face-to-face** 81:25

**facial** 47:23

**facility** 32:2

**fact** 69:21 70:17 71:5

**Fair** 49:24

**familiar** 3:24 29:24 57:23,
24 79:14

**family** 19:9

**fear** 50:17,18

**fed** 35:18

**feed** 51:4

**feel** 43:11 50:9 56:3

**feet** 78:23

**fell** 11:11

**felt** 42:10 50:23 53:20
81:12

**female** 26:5

**ferment** 44:24 45:16

**fermenting** 46:3

**fight** 30:5,11

**file** 17:6 20:8

**filed** 12:7 15:21 48:24

**files** 21:10

**filings** 58:13

**filled** 75:2

**find** 53:19 57:4 81:16

**findings** 21:7

**finger** 51:14,18,20

**finish** 7:16

**firearms** 9:9,10

**fired** 13:21,23

**firm** 56:23

**first-aid** 9:14,20,25 10:12

**fitness** 8:22

**five-** 47:5

**five-gallon** 45:4

**flashlight** 82:11

**Flipping** 66:5

**floor** 37:8 39:8

**folded** 35:11

**follow** 5:14,15 80:8

**followups** 30:9

**food** 14:6,7 22:13 35:18,
20,24 52:1 53:13 75:22

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Brett Lyman

**format** 57:23,24 72:12

**forms** 75:2

**found** 21:5 46:10,11 75:25

**foundation** 21:25 29:14, 21 31:10,25 32:16 39:6 41:7 55:1 61:11 69:19 73:17 77:14

**foundational** 41:8

**fourths** 28:10

**framing** 7:16

**frequent** 22:11

**front** 52:16

**fruit** 36:3,7 44:14

**full** 3:8 27:19

**Function** 8:15

---

**G**

**game** 45:1

**games** 19:7

**garbage** 35:7,8 45:7

**general** 26:14,16 28:18 31:12,13 35:19 43:7 56:14 74:4 76:7 80:25

**generally** 39:1 41:16 76:9 81:5

**generate** 71:11

**generated** 65:7,14

**generation** 14:13

**get along** 32:4

**give** 4:12 5:13 19:21,22,23 43:5,6 50:12 51:1 52:20 56:24

**giving** 51:16 69:1

**glass** 26:21 27:4

**Glen** 73:22

**great** 12:10

**grievance** 16:11,18 18:19 19:18,19 20:5

**grievances** 14:21 15:6,9, 15 16:7,9 17:3 20:22 48:24

**group** 44:25

**guess** 16:6,23 24:20 25:9 33:13 39:10,11,12 41:20 46:24 71:6 73:7 80:13

**guy** 35:23,24 45:17

**guys** 22:13 26:23 45:1,10 46:4,10,21 82:2

---

**H**

**hair** 47:22,23

**handcuff** 55:11

**handcuffs** 52:14 64:2 82:11

**handled** 55:4

**happen** 43:9 52:17

**happened** 4:2,3 11:18 21:6 25:3 56:9,15 70:12 76:4,10 78:7

**happening** 23:24 73:18

**Harley-davidson** 7:2,3

**harm** 53:15

**harm's** 53:8

**he'll** 4:22

**head** 47:1 51:6 55:21

**headache** 23:16

**health** 28:8 29:2,3,12

**healthcare** 6:11,13 9:19, 20

**healthy** 54:17

**hear** 17:13

**hearing** 25:4 30:20 31:16, 17 42:24 43:3,4,15 60:13 61:5,9,15,19

**hectic** 77:16

**height** 47:21

**Hepatitis** 49:13,20

**heritage** 13:5

**heroin** 46:24

**Hey** 17:22

**hierarchy** 61:20 62:3

**highest** 62:7

**HIPAA** 9:15

**histories** 22:5

**hold** 61:25

**holding** 51:18,20 67:21,24

**homemade** 44:11,13

**honest** 16:3 46:20

**horrible** 44:16

**hospital** 6:15 74:23

**hour** 28:5 33:20,21 34:6,8 63:5,22 77:10

**hourly** 78:7

**hours** 5:2 8:19,20 9:12 26:22 27:1,3 28:7,11

**housed** 23:10 62:22

**humor** 49:25

**Hurricane** 3:16

**hurt** 28:20 53:11

**husky** 47:22

---

**I**

**ICC** 64:18 65:7 73:21

**ID** 51:8 68:4

**Idaho** 7:2

**idea** 11:17 14:10 30:2 41:16 56:20

**identified** 44:20

**IDHO** 61:16,18

**illegal** 46:9,11,20

**impair** 5:10

**implement** 28:19

**important** 50:20,21,24

**Impressions** 32:1

**incarcerated** 44:10 48:15 56:7

**inches** 32:18,19 34:23

**incidences** 55:18

**incident** 4:4,11 16:14 55:22 56:9 76:6

**include** 78:19

**included** 78:9

**includes** 78:16

**indicating** 66:24

**influence** 39:2,9,19 40:19, 23

**information** 5:17 21:15 23:18 24:4 58:4 63:25

**ingredients** 44:21

**inhouse** 8:14

**initially** 43:20

**initiate** 17:7 18:18 19:18 42:12

**initiated** 48:21

**injuries** 30:15

**inmate** 10:13 13:5 15:11 16:9,15,18 17:2,4,22 18:6, 22 19:17,18 20:2,9 21:2,6 22:8,15 29:15,25 36:16 40:2 41:25 42:9,14,25 53:12,18 55:23,24 61:4,19 63:3 64:18 73:21 75:1,18 78:25 81:6,11,13

**inmate's** 20:9 21:4

**inmates** 13:11 14:6 17:11 22:11 24:22 25:21 27:16 28:9 29:4,22 30:4,10 31:11 32:3,4,24 33:12 36:13 38:24 40:12 43:2 44:8,16 49:3,19,22,23,25 51:7,10, 23 52:1,15 53:9 54:17 68:1 71:17 77:18,19 79:7,25 80:13

**inmates'** 22:5

**inside** 16:10 27:5,7,13 51:12

**installation** 19:16

**instance** 15:10 22:8 52:2

**instances** 22:7

**instruct** 4:22

**instructions** 56:24

**instructor** 9:9

**intake** 23:8 25:24 26:12 31:11 38:3

**interaction** 47:11,13 55:19

**interactions** 55:15

**interested** 27:23 49:16

**interject** 12:2

**Intermountain** 6:11,12,23

**interview** 16:3

**intoxicated** 39:1

**investigation** 13:7,8,15, 18,25 16:20

**involve** 10:8

**involved** 39:14 79:19

**involving** 3:23

**issues** 15:6 28:25 29:12 44:8

**items** 37:20,23

---

**J**

**jail** 5:21 8:18 10:16 22:15 31:1 41:19,20,21,22,24 44:2 46:10,12,13 50:16 59:1,7,12 61:23 62:9,10 74:4,5,6 76:17 80:10 82:7, 8

**jar** 46:1,2

**jars** 45:14

**Jason** 59:16 72:16

**Jay** 60:10

**Jensen** 59:21,22 63:15

**Jerry** 48:16

**job** 5:23 11:24,25 13:13 25:10 54:11

**jobs** 7:5

**Judd** 79:14

**judge** 4:7

**judgment** 24:2

**July** 6:21 62:24 68:11 74:24

**June** 56:10,17,18 61:5 63:12 67:7 68:12,13 72:1, 2,17,25 73:10,11 74:20

76:21
justice 10:18

**K**

keeping 13:21
kind 5:18 7:14 9:7 14:4
  15:25 20:12 38:15 51:10,
  12 52:20 53:11 58:4,6 60:4
  76:6 77:19 81:23 82:6
kiosk 18:1 64:9
kiosks 17:10 19:17
kitchen 35:23
knew 13:24 22:12 45:20
  46:6 49:25 56:3
knowing 49:16
knowledge 5:22 22:14,16
  31:18 40:10 73:18 77:14

**L**

lack 21:24 29:14,20 31:9,
  24 32:15 33:13 39:5 54:25
  61:10 69:18 73:17 77:13,
  14
Lacks 41:6
Larrowe 79:14,17,22 80:9
law 8:16 9:13 23:4 56:23
laws 9:15
lawsuit 3:23 56:12
laying 45:15
learn 50:8
leave 13:16,19 14:1 33:5
  42:23 45:12,14,15 68:4
left 11:13,24,25 13:3 19:14
  20:24 23:2,13 26:2 69:11
  72:6 77:17
legal 58:13
lethargic 75:21
letters 37:20
level 27:17,18 29:7 33:12,
  13,18,19 37:18 52:25 64:4
levels 33:11
lid 35:11 46:1
lieutenant 62:8,12,16
lieutenants 61:22,23
Lighting 7:4
listed 61:6 66:15 69:16
  74:7 75:11
listened 34:10
listening 10:6
live 3:15

lived 8:3 31:22
lives 54:14
living 7:12
location 29:18 64:23
  67:17
lock 34:24
lockdown 30:19,21 31:1,
  5,15 33:8,19 37:19,22
  43:3,5,14 52:25 63:6,9
  64:2,5 73:10 78:25 79:3
lockdowns 33:21
locked 26:22 37:16
log 20:2 58:15 70:1,14 75:4
logs 61:1
long 5:3 6:18 8:3 19:14
  20:16 23:1 39:13 50:1,2,7
  80:12
longer 13:3 43:5
looked 57:4,12,20 58:5,9,
  18
loose 5:15
lose 13:23
losing 15:6
lost 54:9
lot 9:5,14,15,24 10:1 28:18
  29:3,22 34:9 35:24,25
  45:10 46:23 47:11,16
  48:20 49:4,25 50:17
lotion 45:11
loud 52:5,12 75:16
love 54:9
lower 65:4 75:21,23
lunch 19:3 36:7 51:4,5
  52:11
Lyman 3:2,10 47:7 66:6
  79:9

**M**

made 22:8,10 29:9 44:18
  45:8,18 66:18 70:14 71:8
  75:1
main 64:25 65:1,23,24
  72:21
maintain 9:12
make 4:17 12:11 14:4 33:6
  39:3 43:19,25 52:1,16,19
  54:6,14,17 65:8 68:14
  78:14
makes 68:15
making 13:10 17:4 52:5,
  10,11 53:8 69:17 78:17
man 3:23
manage 43:23 53:3,4

management 43:22 53:6,
  7
managing 53:3
manner 20:7 50:4 55:5
map 5:13
marathon 4:25
marked 57:17
marking 12:11
Martin 3:24 47:8,10 71:22
master's 60:4
match 47:1
matrix 37:18,21
matter 23:25
max 25:24 38:14 64:25
  72:21 74:4,5
maximum 26:11 30:24
  31:4
Mcnabb 7:1
meal 51:24
meals 34:12,13,14 51:7
  52:7
means 4:10 20:5 61:8
  62:22 65:25 66:2 69:10,24
  70:3,5,23
meant 61:14 68:14
media 15:25
medical 4:2 10:9 21:1,21
  22:5,8 28:8,13 29:12 30:6,
  8,17,18 39:14,20,22 40:16
  42:8 44:5 49:6 75:7,8,25
  76:11 81:12,18 82:4
medications 5:9 36:9,13,
  15 40:24
Medium 47:21
members 16:22
memories 76:15 78:10
memory 4:11 74:11,22
  76:12,17
mental 28:8,24 29:2,3,12
mention 38:5
mentioned 9:18 16:14
  49:2
menu 35:21 36:2
Merrill 59:18,19
metal 37:6,7
mete 42:25
mezz 72:21 73:23
mind 10:5 42:3
minimal 37:19
minute 34:1 37:25 51:19,
  21 68:10
miserable 54:11,12,14,15

mission 54:20
misspoke 68:13
misunderstand 30:23
modify 71:12
Monday 8:18
money 19:7
month 46:8
months 8:21 23:13
moonshiner 45:19
morning 65:23 75:19
mornings 8:20
mouth 78:19,20
move 30:2 37:25 69:24
  75:1
moved 30:6,14 66:4,19
  72:23 73:4,6 76:1 77:20
movies 31:19 32:11
moving 30:7
multiple 72:3 77:10
Mylar 12:2,10,14 15:2,8,
  12,17,23 16:1,5 21:24
  22:17 29:13,20 31:9,24
  32:15 39:5 41:6 47:3 54:25
  58:8 61:10 63:11,13 66:23
  68:10 69:18 73:16 77:1,13
  80:5 82:17,22

**N**

naked 78:16
named 3:23
necessarily 64:4 67:14
  81:8
needed 26:15 53:20
news 16:3
nicknames 48:4
nigger 13:6 16:16
nights 8:19
normal 13:20
nose 78:21,22
notes 21:22
number 3:17 20:3,9 68:5
numbers 51:6 65:3
nurse 23:6 24:22 25:8
  36:18,21 58:25 59:1
nurses 9:23,25 36:11 40:1,
  7 44:1 80:20

**O**

oath 4:7
object 4:16,19 29:13 73:16
  77:13

**objection** 21:24 29:20
  31:9,24 32:15 39:5 41:6
  54:25 55:3 61:10 69:18
**objections** 4:17
**observation** 40:13,17
  76:2 78:15
**observe** 24:25 55:10,14
  69:2 78:4 79:21
**observed** 29:15 34:4
  42:10 68:22
**observing** 78:1
**obtained** 23:19
**occurred** 53:23 67:14
**odd** 53:9 65:3
**office** 10:25 11:10,12,15
  80:18,20,22
**officer** 6:14 8:8,12,17
  10:22 18:25 19:23,24
  20:13,14 23:17,25 34:4
  36:12,18,21 39:18,24
  40:17 42:25 43:4,10,13,18
  59:5,11,20,22,25 60:3,8,
  11,13,18 61:5,9,15,19,21
  63:14,15,18 66:16 69:17
  73:22 75:12 81:10,15
**officers** 21:11 23:22 25:7
  27:14 34:16,18 40:3,14
  49:16 54:23 55:4,11,15
  71:8,16,21 79:6,25 81:6,16
**official** 78:2,4
**open** 26:10 29:22 32:9
  34:24 46:1
**opportunity** 52:20
**order** 8:18,21 70:12
**organization** 5:14
**organized** 25:17
**orifice** 78:16
**Original** 82:23
**outcome** 13:19
**outcomes** 43:8

P

**p.m.** 65:17 72:9
**painting** 7:16
**pair** 17:22
**pairs** 17:23
**Palomar** 7:23
**paper** 17:9,21,24 19:19
  20:11 47:2
**part** 8:16,17 9:17 11:9 13:7
  17:8 25:9,10 27:4 46:19
  53:7 54:16,19,20 66:22
**past** 24:19

**patrol** 10:25 11:10,14 59:9
**Paul** 59:10
**peanut** 45:14 46:1 55:23
**pending** 13:19 30:19
  31:16 43:3,14
**people** 14:8 21:18,21 24:3,
  12,14,16 25:4,6 26:13
  28:16,24 34:3 38:2 43:22
  50:16 60:20
**people's** 54:14
**perform** 78:24
**period** 78:11
**person** 13:13 23:8 25:7
  29:2 36:20 54:11,14
**personal** 37:14,20,23
  73:17 77:14
**personally** 24:25 68:22
**pertaining** 9:16
**Pete** 59:18,19
**phone** 3:17 17:18 18:7
  51:11,15,23 52:3,6 64:9
**phones** 52:3
**physical** 8:22 18:3
**physically** 65:23 66:4
  73:4,6
**pick** 18:7
**pictures** 37:20
**pie-shaped** 38:15
**piece** 17:9,24 19:19
**pieces** 17:21
**piled** 16:23
**pizzas** 14:9
**place** 5:21 20:6 26:13 38:3
**places** 53:10 66:20
**plaintiff** 3:3
**plastic** 45:17
**play** 19:7
**Pocatello** 7:2
**point** 11:13 22:18 23:7
  60:12
**policy** 54:20 64:3
**population** 26:14,16
  28:18 31:12,14 35:19 43:8
  81:1
**port** 34:22 35:7
**posed** 24:1
**position** 61:25 77:25
**possibility** 36:20
**POST** 9:2
**potent** 45:9
**pre-prepared** 35:24

**prefer** 75:17
**prepare** 56:21
**preserved** 4:18
**press** 27:14
**pretty** 7:4 45:9,21 50:20
**printed** 58:15
**printout** 57:8,18
**printouts** 58:2
**prior** 7:8,11 8:24 19:16
  24:17
**priority** 54:13
**prison** 9:23 21:18 25:13
  41:19,20 46:22 58:15
  80:10
**privy** 22:2
**problems** 29:23
**procedure** 29:17
**procedures** 5:21
**proceedings** 48:22 60:14
**process** 8:9,11,13 19:17
  22:15,16 23:14,19 29:16
  30:13 42:11,20
**processes** 5:21
**product** 58:9
**production** 52:12,16 54:6
**program** 21:16
**promotion** 62:15
**prompted** 13:6
**proper** 20:6,7 50:3
**protected** 12:6
**providing** 79:6
**psychiatric** 28:25
**punishing** 53:2
**punishment** 43:21 53:6
  54:16
**punitive** 31:15
**Purg** 64:25 72:21 74:3,8
**Purgatory** 5:21 8:14
  10:16,22 56:7 76:17
**purpose** 4:17
**pushing** 46:2
**put** 11:14 13:16,18 14:1
  20:4,22 21:6 23:15 28:23
  31:13 39:3 40:15 43:3,7,14
  44:23 45:7,11 51:14 52:13,
  24,25 53:8 60:25 62:15
  65:11 68:1 70:3,6 72:10
**puts** 20:14
**putting** 74:11

Q

**question** 4:16 10:6 16:6
  41:8 43:12 55:2 74:19
**questions** 4:10 5:6,10
  14:25 15:3,18 33:25 69:2
  79:10,13 80:4
**quickly** 80:8

R

**Radio** 81:21
**radios** 82:2,4,5
**raised** 7:25 16:6
**rank** 62:7
**ranking** 62:3
**read** 75:14,16 82:17
**reading** 4:5 82:22
**ready** 14:15,17
**real** 45:19 80:8
**realize** 52:21
**reason** 5:4 11:25 50:18
  78:4
**reasons** 13:3 75:5 77:21
**reassigned** 64:22 66:8
  68:9 69:5 72:5
**reassignment** 68:18
  70:10,16
**reassignments** 66:9 67:2
  68:17
**rec** 26:25
**recall** 10:11 18:17 37:17,
  21 41:3 42:2 49:1 51:14
  55:8,17,18,25 56:1 68:23
  69:4,20 71:13,18,23 79:23
  80:1
**receive** 9:22 35:1 40:18,22
  41:1
**received** 10:1 60:22 63:5
**recertify** 9:13
**Recess** 47:6
**recognize** 40:19,23 41:2
  72:11
**recognizing** 10:9
**recollection** 70:22 74:15
  76:3 79:16
**recommend** 29:17 41:25
  42:4 43:5
**record** 3:9 21:8 51:17 58:8
  61:3 62:18 63:19 64:16
  66:23 68:10,12 69:10,11,
  13
**records** 22:5 56:17,21
  58:5 68:25 73:8

CROWSON vs WASHINGTON COUNTY
Brett Lyman

April 16, 2018

recreation 20:25
refer 48:7 64:22
reference 66:9
referring 4:4 67:21 68:5 74:4
refers 64:21
refresh 74:15 76:3
refuse 43:22
refused 32:4 54:5
regard 3:23 14:22
Regional 6:16 74:23
related 9:19
relation 80:9
relevant 12:4
remember 6:4 14:22 45:8 47:8,10 48:1 52:9 53:22,25 54:2 55:22 61:13 71:14 76:7,9
remove 14:25 22:18
removed 43:2 53:21
report 18:21 19:2 39:20 42:13 69:16,17 71:12
represent 68:24
requested 81:17
requests 17:22
required 34:5 35:4 39:24 44:5
reserve 59:5,9
resign 13:17
respect 50:15,17
respectful 49:24 50:3,9
respond 69:1
responsibility 20:6
restrained 64:1,6
restraints 33:17
retirement 13:22
review 56:21
reviewed 57:19
rice 44:14
Richard 3:24
Riverside 7:22
road 5:13
Robert 60:2,3 61:6
room 26:24 27:15 31:13 32:20 34:9 38:16 64:8,12 80:23,24 81:6
roster 51:9
rotate 28:7,11 60:20
rotation 28:6
rotten 50:7

roughly 77:10
round 45:2
rule 21:7 53:11
rules 43:23
running 36:25 37:2
Ryan 58:22,24

S

Saddleback 7:3
safety 24:2 43:20
San 7:22
sanctions 43:1
sand 45:6
Saturday 8:20
Saturdays 14:8
schedule 28:3 33:6 40:11 80:16
scheduled 80:14
Schriever 3:7 12:9,13 14:24 15:5,11,13,20,24 16:2 47:4 63:12 73:19 74:20 77:3 79:9 80:7 82:14,24
Scouser 60:10
screwed 45:5
seal 12:7 16:13
sealed 15:21 27:5
search 78:13,25
section 18:4 19:11 21:3 28:9 51:12 52:14 53:1 75:20
sections 17:11 25:16,18, 19 26:5 34:6 38:15 45:2 68:2
secured 81:3
security 6:14 10:18,24 11:8,11,14 26:11 30:24 31:4
select 65:10
sense 52:19 65:9 68:14,15
sentenced 24:16
separate 16:8 34:17 38:17 80:25
separated 30:14
separately 67:4
sergeant 62:7,12,15
sergeants 61:21,23
served 43:7 51:7 52:11
service 13:22
set 5:2 19:8 36:1 60:21 80:15

setting 16:10 41:14 51:25
settings 53:10
shackles 64:2
shake 21:4
shampoo 45:11
sheetrock 7:16
sheriff's 10:25 11:10,12, 15
shift 14:8 77:8,18,22
shirt 14:16
short 47:22
shotgun 9:10
show 61:12 75:10,18
shower 64:10
showing 57:16
sick 44:17
side 10:24 11:1,10,12,14, 22 13:12 25:25 59:9
sign 13:17 51:16 82:18
significant 14:22
single 26:18 72:15
sink 37:2,5
sir 82:15
sit 74:10
situation 29:19 34:20 35:14 50:25 52:19 53:5,15, 20
situations 43:13 44:5 49:19
size 46:25
slid 34:21
slide 34:24
slow 68:25 75:22
smell 45:22
smelling 45:23
SOB 50:7
social 60:5
socks 17:23
solitary 31:19,22 32:2,5
Sounds 73:12
Southern 8:1
speak 5:25 25:11
speaker 27:13
special 8:15 60:22
specific 24:19 27:10 29:8 32:3,6 33:25 38:20 48:1 56:15 57:3 71:18 76:12
specifically 6:1 10:11 32:22 39:7 41:10,13,18 46:15 51:14 55:16 57:6 71:23 76:5 77:21 79:18 80:1

specifics 76:8
speculate 46:15
speculation 55:1 77:15
spell 3:13
Spillman 20:19,20,23 21:11,16,22,23 23:20 24:5 42:17,18 57:9,18 58:1,16 65:21 71:1,14 75:4
split 28:10,12
spreading 78:17
staff 13:9 14:3,4,12 16:22 23:8 34:17 35:6 42:7 54:16 62:1,13 65:8,10 71:7 81:12,18 82:4
stands 61:18
start 17:3 44:17,20 45:13
started 17:9 52:5,9
starts 46:1
state 3:8
statement 54:20
station 18:3
status 37:19,22
stayed 80:12
step 43:24 52:21
stepped 51:12 75:19
steps 39:23
stipulate 12:9
stool 37:7
stops 69:10
story 13:12
structure 61:21
struggling 29:16
stuff 11:13 22:13 45:6,9,25
Styrofoam 35:3,9,10
submitted 82:22,23
sugar 44:14
suggest 30:2
suit 12:5
Sundays 14:9
supervising 39:17
supervisor 29:11 30:1 35:22 42:7
surprise 50:8
surprising 50:10
switch 26:23
switched 28:15
sworn 3:4
symptoms 22:9 41:2,4,11
system 20:1,4,12,17,18 23:6 33:12 58:15

CROWSON vs WASHINGTON COUNTY
Brett Lyman

April 16, 2018

**T**

table 45:6
tables 45:1
tail 17:15
taking 82:19
talk 5:20 12:3 18:24 25:4
27:14 50:17 52:18
talked 49:25 50:1,3
talking 9:8 17:2,3 20:16
47:16 51:15 56:14
talks 23:7
tall 82:12
tar 46:24
tattoos 47:24 48:2
telling 29:23
Tellmate 17:10,16,17
18:18 19:17
Tellmates 26:24
temporary 67:17 68:1,8
ten 40:5
ten-minute 47:5
term 31:19 32:3,6,7 33:14
terminated 16:12
test 8:22
testified 3:4
testimony 4:7
testing 8:9
thing 4:12 12:8 15:20 32:2
38:13 63:18 72:15 75:8
things 4:2 9:18,20 10:9
13:9,20 14:11 16:8,11,22
17:3,21 19:5 20:17 41:15
53:25 54:6 56:15 69:2
71:10 77:16,17
Thirty 27:18
thought 5:16 38:12 39:18
44:5 50:22 54:7
threat 24:1 53:15
throw 35:8
Thursday 8:19
tied 14:16
tier 27:2 62:20,21,23 75:21,
23
tiers 25:23
time 4:15,21 5:16 6:22 8:15
10:20,23 13:24 20:24,25
21:1 23:7,13 24:18 25:5,24
26:4 28:10 33:20 40:4,8
41:19,24 43:5,6,7 46:7
49:10 51:5,6 53:18 54:5
60:15 62:25 63:19,20
64:12 65:20,21 66:3,4 67:6

71:2 73:6 78:11 81:6
timeline 58:6,7,10,12
times 10:19 11:3 29:22
30:4 33:2,3 34:10 36:1
43:22 44:16 45:10 46:7,25
49:3 50:18,22 52:17 56:6
58:19,21
timestamp 20:13 65:16
77:4,9
tinfoil 47:2
TOC 62:25
today 4:8 5:14 32:1 74:10
toes 78:22
toilet 36:24 37:5
told 33:6
top 25:21,23 26:21,23 27:4
28:1,7,12 42:3 46:2 55:21
70:7,15,23,24
total 10:19 27:2
tour 31:21
train 5:16
trained 9:16
training 9:2,5,7,9,10,11,
12,22,25 10:1,8,13 40:18,
22 41:1 60:23
trainings 10:2
transcribe 18:9
transcript 82:23
transfer 75:5
transferred 29:18 65:24
73:23
transfers 70:19
transported 74:23
tray 51:8 75:22
trays 34:25 35:1,3,9,10
36:8
treating 79:17,20,22
treatment 4:3
Trucking 7:1
true 54:4
truthful 4:13
Ts 3:11
tube 45:18
tucked 14:16
turn 20:6 52:13
turned 14:10 16:2 52:2,3,4
75:22
TV 26:24
Twenty-five 8:4
two-man 26:9 28:1 32:23
type 12:8 13:13 18:11,12,
14 22:13 34:20 49:19

62:25 64:18
types 19:5 20:17 46:21
typical 35:21 78:24

**U**

Uh-huh 7:10 18:8 30:12
49:5 61:2 64:20 66:17
understand 5:10 11:2
31:4 70:5 73:9
understanding 61:13
uneasy 81:12
unit 17:19 37:3
unwritten 53:11
updates 71:1
upper 62:20,21,22 65:2,3
Utah 3:16 8:3

**V**

Valley 7:22
variety 36:1
vent 45:18
verbally 69:1
versus 16:7
video 17:18,19 19:8
view 53:5
viewed 9:19
violate 57:1
violations 21:8
visible 78:18
visiting 17:19 19:8
visual 78:13,24
vitals 76:1
vomiting 44:17

**W**

wait 22:17 26:14 51:10,18,
20,23 52:1,11 53:9,19
80:21
waited 31:14
waiting 31:15 51:12 52:6
walk 22:14 34:5
walked 45:22
walker 28:21
walkers 28:17
wall 37:7
wander 27:7
wanted 23:23 50:2,6,15
54:5

warm 45:12
warranted 42:10
Washington 13:4 57:17
61:3 62:19 63:17 64:17
75:11
watch 22:9
watched 34:8
water 36:25 37:2
weapon 35:16 82:6
weapons 82:8
week 80:11
weekly 46:12,20
weight 47:21
west 25:25
western 32:11
wheelchair 28:21
white 35:10
WIGHT 74:18 79:12 80:3
82:16
window 32:13,14 45:12
windows 34:21
withdrawal 41:2,5
withdrawals 41:12
Wittwer 59:16
wooden 46:25
wording 65:13 66:24
words 17:14
work 6:14 8:18 10:15
14:14,15,16 23:12,15 42:5
58:9 59:7 78:9
worked 6:25 7:1,2,3 9:23
10:17 11:4,11 23:11 39:13
44:2 59:13 73:9
worker/therapist 60:5
working 14:12
worst 33:14 53:9
wrapped 45:17 47:1
write 17:24 19:18 42:13
write-up 42:14,21,24
writing 17:9,21
written 54:21
wrong 75:25 76:11

**Y**

yard 20:25 26:25
year 6:19 9:12,16 63:11
years 7:19 8:4 9:5 10:20
13:22 23:12 44:25 46:23
47:12
yelling 34:10

CROWSON vs WASHINGTON COUNTY
Brett Lyman

April 16, 2018

**young** 14:11
**younger** 14:12

---

### Z

---

**Zion** 7:3