CROWSON

v

LAROWE

DR. JUDD LAROWE

June 06, 2018



333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

1

1          IN THE UNITED STATES DISTRICT COURT

2                    CENTRAL DIVISION

3

4

5    MARTIN CROWSON,                    )
                                        )           COPY
6          Plaintiff,                   )
                                        )
7          vs.                          )Case No.
                                        )2:15-CV-880-RJS
8    JUDD LAROWE, BRET LYMAN, et al.,)
                                        )Judge Tena
9          Defendant.                   )Campbell
     _____)

10

11

12

13          DEPOSITION OF DR. JUDD LAROWE

14        Taken at the Courtyard Marriott
               185 South 1470 East
15             St. George, Utah

16        On Wednesday, June 6, 2018
                At 9:03 A.M.

17

18

19

20

21

22

23

24

25   Reported by:  J. Elizabeth Robison, RPR, CCR

## Page 2

```
          A P P E A R A N C E S
 1
 2    FOR THE PLAINTIFF:
 3    Ryan J. Schriever, Esq.
      ryan@schrieverlaw.com
 4    SCHRIEVER LAW FIRM
      51 East 800 North
 5    Spanish Fork, Utah  84660
      801.574.0883
 6
      FOR THE DEFENDANT JUDD LAROWE:
 7
      Shawn McGarry, Esq.
 8    smcgarry@kippandchristian.com
      KIPP AND CHRISTIAN
 9    10 Exchange Place, Suite 400
      Salt Lake City, Utah  84111
10
      FOR WASHINGTON COUNTY DEFENDANTS:
11
      Brian Graf, Esq.
12    brian.graf@washco.utah.gov
      WASHINGTON COUNTY ATTORNEY'S OFFICE
13    33 North 100 West
      Suite 200
14    St. George, Utah  84770
      435.986.2610
15
      Frank D. Mylar, Esq.
16    Mylar_law@me.com
      2494 Bengal Boulevard
17    Salt Lake City, Utah  84121
18    ALSO PRESENT:
19    James Kenner
20            EXAMINATION INDEX
21    DR. JUDD LAROWE                     PAGE
22      By Mr. Schriever . . . . . . . . . . .  3
23      By Mr. Mylar . . . . . . . . . . . . . 63
24      By Mr. Schriever . . . . . . . . . . . 70
25
```

## Page 3

```
 1           P R O C E E D I N G S
 2                   * * *
 3           DR. JUDD LAROWE,
 4  having been first duly sworn to testify to the
 5  truth, the whole truth and nothing but the truth,
 6  was examined and testified as follows:
 7                  -oOo-
 8              EXAMINATION
 9  BY MR. SCHRIEVER:
10    Q.  Dr. LaRowe, my name is Ryan Schriever.  I
11  represent an inmate by the name of Martin Crowson.
12      Do you know Mr. Crowson?
13    A.  I do not.
14    Q.  Okay.  We are here to take your deposition
15  today.
16      Have you ever had a deposition taken
17  before?
18    A.  Once, a number of years ago.  I'm not even
19  sure when.
20    Q.  Okay.  What did that case involve?
21    A.  I was asked to be an expert witness in a
22  case where a patient had been on Coumadin and
23  things went awry.
24    Q.  Okay.
25    A.  So...
```

## Page 4

```
 1    Q.  All right.  And that was a number of years
 2  ago?
 3    A.  It was.  Probably at least a decade.
 4    Q.  Okay.  Well, by way of refresher, then --
 5  and I know you've had a chance to talk to
 6  Mr. McGarry, who is an excellent attorney -- but
 7  the deposition is our chance to just find out what
 8  you would be able to testify to if we were to get
 9  to trial.  So you're under oath.  It's the same as
10  being in trial, except there's no judge here.
11  There's no jury, and we're given a little bit more,
12  latitude to just find out things about the case.
13      So I'm going to ask you things about your
14  background, qualifications, what you do with the
15  Department of Corrections, what your practice is,
16  and then any knowledge or memory you have of the
17  specific events related to this case.
18      Does that make sense?
19    A.  Yes, it does.
20    Q.  Okay.  You're answering audibly, which is
21  exactly what we need you to do, because we are
22  making a transcript of the deposition.  And a lot
23  of times in conversation we have speech patterns
24  that make it really casual, like saying "uh-huh" or
25  "huh-uh."  And that requires our court reporter to
```

## Page 5

```
 1  make -- to interpret what you're saying.  So if you
 2  don't say "yes" or "no" to a yes-or-no question, I
 3  might remind you just to say "yes" or "no."
 4    A.  That would be fine.
 5    Q.  Okay.
 6    A.  Thank you.
 7    Q.  All right.  We also -- I don't anticipate
 8  that we'll be too long.  But if you want to take a
 9  break at any point, we can do that.
10    A.  Thank you.
11    Q.  And if I ask you a question that you don't
12  know the answer to or you don't remember, you can
13  tell me that you don't know or you don't remember.
14  That -- those are fine answers.  I may probe around
15  the edges to see if we can jog your memory.  But I
16  -- we need to know what your knowledge is, what
17  your firsthand knowledge is.
18      Does that make sense?
19    A.  Yes, it does.
20    Q.  Thank you.
21      Well, to get started, would you please
22  state your name for the record?
23    A.  My name is Judd LaRowe.
24    Q.  Okay.  And LaRowe is spelled -- how do you
25  spell LaRowe?
```

CROWSON v LAROWE
June 06, 2018
Dr. Judd Larowe

6

1    A.  L-a capital R-o-w-e.
2    Q.  All right.  Judd has two Ds; is that
3 right?
4    A.  It does.  J-u-d-d.
5    Q.  Where do you practice?
6    A.  At 1664 South Dixie Drive, Suite D-102 in
7 St. George, Utah.
8    Q.  Okay.  How long have you been there?
9    A.  Ten years at this location.
10   Q.  What kind of practice do you have there at
11 that location?
12   A.  I have a standard internal medicine
13 practice.  So we deal with heart disease, diabetes,
14 basically whatever walks in the door that happens
15 to someone over the age of 17.
16   Q.  Okay.  Before we get too far down that
17 road -- I want to come back to that, but what is
18 your educational background and training?
19   A.  I went to the University of Minnesota in
20 Minneapolis for medical school for four years.  I
21 did a one-year transitional internship in Grand
22 Rapids, Michigan.  After that, I spent three years
23 as a general medical officer in the United States
24 Navy.  I was stationed with the Marie Corps for the
25 entirety of my tour, which was three years.  I

7

1 spent nine months in Desert Shield and Desert
2 Storm.
3         After that, I did a full internal medicine
4 residency at the University of Washington in
5 Spokane, so that was three years.  At that point, I
6 took a job in Elko, Nevada.  I worked for the Elko
7 General Hospital.  And at the completion of that
8 term, I actually went out in a partnership in Elko
9 for several more years.  I believe it was four more
10 years.
11        And then I was hired by the University of
12 Utah, Department of Cardiology.  They had an
13 extension clinic here in St. George.  So I moved
14 here.  I joined Dr. Alan Skolnick and practiced
15 there for two years.  They then sold the practice
16 to IHC, and I wasn't interested in working for IHC
17 at the time.
18        So at that point, I went out on my own.
19 That was 2001.  Actually, by the time I went out on
20 my own, it was 2002.  So that January.  And I have
21 been a private practitioner since that point in
22 time.  For a brief period, I had another clinic in
23 Mesquite; Mesquite, Nevada.  That was for three
24 years.  After that, I just solely practiced in
25 St. George, Utah.

8

1    Q.  Okay.  As far as specific issues that you
2 deal with on a regular basis -- since I don't
3 necessarily know what all falls under the umbrella
4 of "internal medicine," it sounds pretty broad --
5 I'm just going to ask you specific areas in common
6 practice.  And this is in your private practice I'm
7 referring to.  We'll talk about your involvement
8 with the Department of Corrections in a minute.
9        As far as your private practice goes, do
10 you deal with things like alcohol and drug
11 withdrawal?
12   A.  Not very often in my private practice.
13   Q.  Okay.  How about head trauma or brain
14 injuries?
15   A.  I certainly do.
16   Q.  Okay.
17   A.  Yes.
18   Q.  And you're familiar with the signs and
19 symptoms of brain injuries?
20   A.  I am familiar with the signs and symptoms
21 of brain injuries.
22   Q.  In this case particular, we're talking
23 about encephalopathy.
24        Is that a condition that you're familiar
25 with and treat?

9

1    A.  It is a condition I'm familiar with.
2    Q.  Is that something you treat in your
3 practice?
4    A.  I don't have that many patients that have
5 encephalopathy.  Just due to our population in
6 general in southern Utah, there aren't that many
7 individuals that have it, so the pool is fairly
8 small to draw from.
9    Q.  Okay.  You know, just before we got done,
10 I think I should have asked you that, in preparing
11 for the deposition, what records have you reviewed?
12   A.  I have reviewed the records from DRMC and
13 the records from Washington County.
14   Q.  Okay.  Does that include the log notes of
15 the -- like, the nurse's notes of --
16   A.  It does include those notes.
17   Q.  Okay.  All right.  In your involvement
18 with the prison, when did you become involved with
19 the -- with Purgatory jail?
20   A.  I don't actually remember the exact date.
21 I believe it was 2002, but I'm not positive on the
22 actual start date.
23   Q.  And your job there is medical director; is
24 that correct?
25   A.  I am a -- I'm a private consultant or a

10

1 private contractor. I provide medical care for the
2 inmates in coordination with the medical department
3 at Purgatory. So I'm not actually the medical
4 director. I believe that title falls to Jon
5 Worlton.
6    **Q.  All right.  And is it -- okay.  Private**
7 **contractor.  Let's just talk briefly about what the**
8 **terms of your arrangement with the jail are.**
9        **Are you on a flat fee, or do they pay you**
10 **by hour, or how does it work?**
11    A.  It's a flat fee.
12    **Q.  Do they pay you monthly for that?**
13    A.  They do.
14    **Q.  Is that the same regardless of the amount**
15 **of time you put in working there?**
16    A.  Yes, it is.
17    **Q.  As a private contractor, do you have**
18 **access to their record-keeping systems?**
19    A.  Only when I'm on site.
20    **Q.  No remote access, then?**
21    A.  There is not.
22    **Q.  Do -- how does the -- how do the employees**
23 **at the jail communicate with you?**
24    A.  Several methods.  Either via phone or text
25 or faxes, and they will either fax my office, call

11

1 my office, or call my cell phone.  So I'm available
2 24/7.  And on the rare times when I'm not, I have a
3 nurse practitioner who covers.
4    **Q.  Who's that?**
5    A.  His name is Ryan Borrowman.
6    **Q.  Okay.  I've met Mr. Borrowman.**
7    A.  I imagine you have.
8    **Q.  But I hadn't put two and two together that**
9 **he was working for you now.**
10    A.  He is.
11    **Q.  Okay.  How long has Mr. Borrowman worked**
12 **for you?**
13    A.  Since August of last year.
14    **Q.  All right.  When did you first get to know**
15 **Mr. Borrowman?**
16    A.  When he started working at the Purgatory
17 facility.
18    **Q.  How long has he been a nurse practitioner?**
19    A.  I think three years, but I'm not positive.
20    **Q.  As far as a typical week goes, how much**
21 **time do you spend at the jail?  What's your**
22 **schedule?**
23    A.  Time spent at the jail might be an hour,
24 hour and a half.  But I am in contact with the jail
25 multiple times every day.

12

1    **Q.  Okay.  In 2014, Mr. Borrowman was working**
2 **at the jail as a nurse when this happened.**
3        **Did you have another nurse practitioner or**
4 **a physician's assistant that helped you at that**
5 **time?**
6    A.  I did.  Her name was Amy Benedict.
7    **Q.  Does Amy still work for you?**
8    A.  She does not.
9    **Q.  When did Amy stop working for you?**
10    A.  I believe March of last year.
11    **Q.  Is she a nurse practitioner --**
12    A.  Oh, I'm sorry.
13    **Q.  Oh, go ahead.**
14    A.  Actually, June of last year.
15    **Q.  Is she a nurse practitioner or a**
16 **physician's assistant?**
17    A.  Nurse practitioner.
18    **Q.  Do you know where she is now?**
19    A.  She is working for the Heart of Dixie, a
20 cardiology group in town.
21    **Q.  Do you know if Amy had any involvement**
22 **with Mr. Crowson's case?**
23    A.  None whatsoever.
24    **Q.  Outside of the jail's record-keeping**
25 **system, do you keep any records on inmates?**

13

1    A.  I do not.
2    **Q.  Do you keep any log of phone calls that**
3 **you receive?**
4    A.  I do not.
5    **Q.  If you receive a fax from someone at the**
6 **jail, is that kept anywhere?**
7    A.  If I receive a fax from the jail, I
8 respond to the fax and send it back to them, so
9 that that would be where the record would stay.  I
10 don't keep any independent files.
11    **Q.  All right.  So you, personally, do not**
12 **have any files related to Mr. Crowson at all?**
13    A.  I do not.
14    **Q.  Okay.  Do you have any independent memory**
15 **of these events at all?**
16    A.  I do.
17    **Q.  What do you remember?**
18    A.  The best that I can recall, I remember
19 getting a phone call from Mike Johnson.  And what
20 he relayed to me was that a patient was having some
21 difficulties, as far as confusion, and the vital
22 signs were not very revealing.  They were pretty
23 reasonable at the time.  And I remember -- what I
24 remember independently is that we ordered some
25 blood work, a chest x-ray.  I just wanted to get a

14

1 better feel for what was going on, because his case
2 was not clear-cut.  And we moved him, at that
3 point, into booking for closer observation.
4        And then I also remember a call from Ryan
5 Borrowman, and at that time, the vital signs had
6 changed.  They had gone outside of the normal
7 range.  I believe most specifically the pulse rate
8 had risen.  And at that point, you know, I elected
9 to have him transported to the emergency room.
10       Those are my only recollections of the
11 plaintiff.  I actually don't recall any
12 interactions prior to that or after that.  I'm not
13 even sure I saw him in sick call, so I just don't
14 recall.
15    Q.  Okay.  Do you remember, with Mike Johnson,
16 was it one phone call or --
17    A.  I only recall one phone call on that.
18    Q.  Okay.  As far as evaluating patients, it's
19 true you rely on nurses there in large part when
20 you're not there; right?
21    A.  I do.
22    Q.  In fact, there's no other way to do it, is
23 there?
24    A.  There is not.
25    Q.  They've got to be your eyes and ears?

15

1    A.  They are.
2    Q.  Do you perform any training of the nurses
3 there or the staff?
4    A.  I do not.
5    Q.  Do you have any interactions with Jon
6 Worlton about training?
7    A.  I don't recall that I have.
8    Q.  If someone there were to ask you to come
9 provide training to the staff, is that something
10 that you would be able to do?
11    A.  I would.
12    Q.  Have you ever had any communications with
13 Jon Worlton about this particular case?
14    A.  The only communications I've had was that
15 there would be a case.
16    Q.  Did you speak with him at all about his
17 involvement or lack of involvement?
18    A.  I specifically did not.
19    Q.  Okay.  How about Ryan Borrowman?  Have you
20 spoken with Mr. Borrowman about the case?
21    A.  We have specifically not.  In fact, we
22 discussed not discussing the case.
23    Q.  Okay.  And the same question with Mike
24 Johnson?
25    A.  We have not discussed the case.

16

1    Q.  How often do you have contact with
2 Mr. Johnson?
3    A.  Quite often.  Whenever he works a shift, I
4 will get phone calls.  So I have contact with the
5 nursing staff at Purgatory daily.
6    Q.  All right.  I want to go back to that
7 phone call with Mr. Johnson.
8        You said you ordered blood work?
9    A.  I did.
10    Q.  What were you looking for?
11    A.  Any clues as to what was going on.
12 Anything that would help in the evaluation of the
13 plaintiff.
14    Q.  Okay.
15    A.  So I ordered a CBC, which is a complete
16 blood count.  And a comprehensive metabolic panel,
17 and that looks at a variety of items.  It can give
18 you an idea about whether or not the patient might
19 be acidotic or septic.  It can give you an idea
20 about kidney function, liver function,
21 electrolytes, fasting blood sugar.  So it's quite
22 valuable in assessment.
23    Q.  Okay.  And when you order -- had that
24 ordered, were you looking for anything specific, or
25 were you -- is it just sort of a, "Hey, this is a

17

1 general diagnostic tool that we can use, and if
2 there's clues there, we can follow up on that kind
3 of thing"?
4        And I don't mean to put words in your
5 mouth, but I think you understand where I'm --
6 what the generalization of my question is.
7    A.  I do.  It was a general evaluation,
8 because of the patient's vague complaints.
9    Q.  Okay.
10    A.  I was hoping to get some clue as to where
11 to go next.  Also ordered a chest x-ray.  His
12 oxygen saturation was normal, but it was a little
13 less than I expected for a young individual.  So we
14 ordered a chest x-ray as well.
15    Q.  Okay.  Again, was that just for general
16 diagnosis, or were you looking for something
17 specific?
18    A.  I was looking for perhaps a start of a
19 lower respiratory infection that might explain a
20 lot of the symptoms that he was having.  So that
21 was more targeted at the low-normal oxygen
22 saturation.  So even though the oxygen saturation
23 was normal, once again, I still expect a young man
24 to be a little bit higher than that.  So I thought
25 maybe that would be a clue.

18

1    Q.  Okay.  Did the chest x-ray reveal anything
2 useful to you?
3    A.  No, it did not.
4    Q.  How about the blood work?
5    A.  The patient refused to have blood drawn.
6 So -- and we can't really draw blood unless we have
7 his cooperation in that regard.
8    Q.  Okay.  And how do you know that the
9 patient refused blood draw?
10    A.  I know that he refused the blood draw by
11 the notation in the CorEMR, the charting that was
12 done at the -- at Purgatory.
13    Q.  Do you have that in front of you?
14    A.  I don't know if I can find it.
15    Q.  Well, maybe I can direct you to it.  On
16 the bottom of the page, there's some numbers, and
17 if you'll look at No. '501.
18    A.  I don't see '501 or '50-anything.
19    Q.  Well, all right.
20       Do you have the -- let me show you.
21    A.  Oh, thank you.
22    Q.  I'll show you what's marked as
23 WashingtonCrowson '501.
24       Do you recognize this as the CorEMR notes?
25    A.  I do.

19

1    Q.  Okay.  And if we look here on 6-28-14,
2 this is talking about the CBC, CMP.
3       Is that the blood work that was ordered?
4    A.  It is.
5    Q.  And it says it was attempted --
6    A.  Oh, attempted.
7    Q.  -- without success.
8    A.  Okay.  Okay.  Then I misspoke.  I -- for
9 some reason, I thought that he had declined to have
10 that done.  So my mistake on that.
11    Q.  And -- well, and I don't -- I'm asking.
12 Because if this is the evidence we have, then I
13 want to make sure that you don't have any
14 independent recollection, or if you do, that we're
15 getting it out of you.
16    A.  I'll have to look through the notes again,
17 because I thought that I read that he had declined.
18 But perhaps I did not.
19    Q.  Okay.
20    A.  In fact, I don't believe I've seen that
21 particular.
22    Q.  If you want to take -- if you want to take
23 a minute to look through what you've got and find
24 that, that's fine.  I want to make sure we're being
25 accurate here.

20

1    A.  Thank you.
2       What's the page number on the bottom?
3    Q.  '501.
4    A.  On the bottom?
5    Q.  Forty-four of 44.
6    A.  Let me see if I have that.
7       MR. MYLAR:  '501 is probably our number.
8       MR. SCHRIEVER:  What's that?
9       MR. MYLAR:  '501 is probably our number.
10       MR. SCHRIEVER:  It is.  I didn't know if
11 he had the Bates number or not.
12       THE WITNESS:  I'm not sure where I --
13       MR. SCHRIEVER:
14    Q.  Let me --
15    A.  -- did see that.
16    Q.  Let me read to you what it says, too.
17       Down here further, it says, "Patient not
18 willing to hold still at this time."
19    A.  Yes, sir, I see that.  So I don't --
20    Q.  Maybe reading that -- I don't know.
21    A.  I don't recollect, then, where I got that,
22 the other information.
23    Q.  Okay.  All right.  The -- you also
24 indicated that his vitals at that time were not
25 revealing.

21

1       Have you got that page 40 of 44 --
2    A.  I do.
3    Q.  -- in front of you?
4    A.  I do, actually.
5    Q.  Okay.  On 6-25-14, do you see that entry?
6    A.  Yes, I do.
7    Q.  Blood pressure at 125 over 78?
8    A.  Uh-huh.
9    Q.  Is that within the normal range?
10    A.  I shouldn't have said "uh-huh."  Yes, I do
11 see that.  And that blood pressure is actually
12 textbook perfect, yes.
13    Q.  Okay.  "P," does that stand for pulse?
14    A.  Yes.
15    Q.  That's 58?
16    A.  Yes.
17    Q.  Is that within the normal range?
18    A.  That's actually a little bit lower than
19 the normal range.  Normal range being 60 to 100,
20 but in a young individual, that's not an uncommon
21 finding.
22    Q.  Okay.  The "R" at 20, what does that stand
23 for?
24    A.  Respiratory rate.
25    Q.  Twenty, is that within the normal range?

22

1    A.  It is.
2    Q.  And then the O2 saturation, 90 at 99
3  percent?
4    A.  That's normal.
5    Q.  Okay.  The glucose at 73?
6    A.  That also is normal.
7    Q.  All right.  And then we've got some notes
8  that he's able to verbalize his name, spell last
9  name, unable to remember what kind of work he did
10  prior to being arrested.  And then there's a note
11  that says, "Deputies Lyman and Dolgner" -- Dolgner
12  is spelled D-o-l-g-n-e-r -- "say that the patient's
13  affect is different."
14    Is there any -- anything in there that you
15  are concerned about at that point?
16    A.  Yes, that he's confused, and his affect is
17  different.
18    Q.  Okay.  Now, at this time -- this is a note
19  from Michael Johnson indicating that he had seen
20  Mr. Crowson on June 25th.
21    Do you know if you were contacted at this
22  time?
23    A.  I do not recall that.
24    Q.  Okay.  It indicates that he was referred
25  to Jon Worlton.

23

1    Were you involved in the decision to refer
2  him to Jon Worlton at all?
3    A.  I don't believe that I was.
4    Q.  Okay.
5    A.  But I don't recall either.
6    Q.  Okay.  Down in the next box, this is still
7  June 25th.  It's at 3:23.  "Pupils dilated, but
8  reactive to light."
9    Do you know if Mr. Johnson informed you of
10  that fact?
11    A.  I don't recall being informed of that
12  fact.
13    Q.  Is that something you would be interested
14  in knowing about as the doctor?
15    A.  No.  Being reactive light is an
16  appropriate response.
17    Q.  What about the pupils being dilated?
18    A.  If they're fixed and dilated, that's a
19  different story.
20    Q.  Okay.
21    A.  Yes.
22    Q.  But dilated and reactive to light, is that
23  okay?
24    A.  That is okay.
25    Q.  All right.  And then I don't have any

24

1  notes in here from 6-26 or 6-27.
2    Do you know if you were contacted on
3  either of those days?
4    A.  I don't believe I was contacted.
5    Q.  Okay.
6    A.  If I had been contacted, there should be a
7  note to that effect, and I don't recall being
8  contacted.
9    Q.  All right.  6-28-14, it says, "Patient
10  status:  Staffed with MD."
11    Is that you?
12    A.  That is.
13    Q.  Okay.  To the best of your knowledge, is
14  this the day that you were contacted for the first
15  time?
16    A.  To the best of my knowledge, it is.
17    Q.  Okay.  And this was a phone call with Mike
18  Johnson; correct?
19    A.  Yes.
20    Q.  Not a FaceTime or a Skype or anything like
21  that?
22    A.  No.
23    Q.  Did you speak with Mr. Crowson at all or
24  just Mr. Johnson?
25    A.  Just Mr. Johnson.

25

1    Q.  Is there a day of the week that you go out
2  to the jail?
3    A.  Usually Tuesdays, sometimes Thursdays.
4    Q.  Okay.  During the time period, from
5  6-25-2014 to 7-1-2014, do you know what day you
6  went out to the hosp -- or to the prison, if you
7  did go out to the prison?
8    A.  I don't have a clue.  I don't remember
9  when Tuesday would have fallen in that year.  And
10  in addition, Tuesdays and Thursdays are my current
11  schedule.  I've gone Mondays.  I've gone
12  Wednesdays.  So I'm not even sure on that.
13    Q.  Okay.  No record -- do you have a record
14  of when you went to the jail?
15    A.  I do not.
16    Q.  Do you have a memory of seeing Mr. Crowson
17  at all?
18    A.  I don't recall ever seeing Mr. Crowson,
19  either during this time frame or any other time
20  frame.
21    Q.  Okay.
22    A.  I may have.  I just have no recollection
23  of it.
24    Q.  When you do see a patient, do you record
25  it in the CorEMR?

**26**

1    A.  I do.  There is a note for each visit that
2 I perform.
3    **Q.  Okay.  So if you had seen Mr. Crowson,**
4 **then your name would appear here, in that third**
5 **column; is that correct?**
6    A.  I have no idea on where it would occur.
7    **Q.  Okay.**
8    A.  So they have an electronic medical record,
9 and I enter in my visits.  Where it would appear or
10 not appear, I don't have a clue.
11    **Q.  All right.  Have you seen anything in the**
12 **records, that you've reviewed, that would indicate**
13 **that you did, personally, see Mr. Crowson?**
14    A.  I have seen no records of my personal
15 evaluation of Mr. Crowson.
16    **Q.  Okay.  On 6-28-14, Mr. Johnson noted that,**
17 **"The BP," I assume that's blood pressure, "is**
18 **elevated at this time and reported to MD."**
19    A.  I'm sorry.  What day?
20    **Q.  On 6-28-14, at 2:07 P.M.**
21    A.  I don't recall that.  So...
22    **Q.  Okay.**
23    A.  It certainly could have happened.  I don't
24 recall.
25    **Q.  What's -- in terms of what you would have**

**27**

1 **been looking for, what would be the significance of**
2 **elevated blood pressure?**
3    A.  Agitation can cause an elevation in blood
4 pressure, certainly.  I didn't mean to say "um."
5 Any change in vital signs can be important.  But
6 patients, oftentimes, will have an elevation in
7 blood pressure if they're under stress, if they're
8 agitated.  So there are any number of things that
9 can contribute to that finding.
10    **Q.  Okay.  If a patient is exhibiting symptoms**
11 **of being dazed and confused, not oriented, over a**
12 **period of three days, is that something that is**
13 **concerning?**
14       MR. MCGARRY:  Objection.  Incomplete
15 hypothetical.  You may answer.
16    A.  We see a lot of -- a lot of patients that
17 have these very same symptoms.  Unfortunately, it
18 is one of the terrible side effects of some of the
19 drug use that we see.  You know, many patients can
20 start up normal, and they start using -- you know,
21 the worst drug we see is methamphetamines.  And
22 they can develop psychoses.  And we see that on a
23 routine basis.  So this is not something that is an
24 isolated event.
25    **Q.  Okay.**

**28**

1    A.  We deal with this quite routinely.
2    **Q.  All right.  Let's talk about**
3 **methamphetamine withdrawals.**
4       **If a med -- person who's addicted to**
5 **methamphetamine goes off of the drug, how long does**
6 **it take for that to get out of their system?**
7       MR. MCGARRY:  Object to the form.  Go
8 ahead.
9    A.  Usually 72 hours.  Sometimes a little
10 longer.
11    **Q.  Okay.  As far as these symptoms that you**
12 **called "psychoses" go, is that associated with**
13 **methamphetamine withdrawals?**
14       MR. MCGARRY:  Same objection.
15    A.  A lot of things are connected with
16 withdrawals.  People will be confused quite often
17 during the withdrawal stage.  They can be agitated.
18 They can have a multitude of symptoms, including
19 hypertension, diaphoresis, tachypnea, tachycardia.
20    **Q.  What's diaphoresis?**
21    A.  Sweating.
22    **Q.  And the second one, the tachy --**
23    A.  Tachypnea is rapid respiratory rate, and
24 tachycardia is rapid pulse rate.
25    **Q.  Right.  How long do those symptoms last in**

**29**

1 a person who's withdrawing from specifically
2 methamphetamine?
3    A.  Fairly short in duration.
4    **Q.  Would it be common for them to start two**
5 **weeks after the person stops using the drug?**
6    A.  No.  It would be uncommon.  Unfortunately,
7 there are times when inmates can have access to
8 some of these products, even despite being
9 incarcerated.
10    **Q.  Sure.  Have you seen anything in the**
11 **records that would indicate to you that Mr. Crowson**
12 **had access to any drugs?**
13    A.  That wouldn't be something I would be
14 involved in.  I would not have access to any of
15 that information, whether he did or whether he
16 didn't.
17    **Q.  Were you aware that he had been in**
18 **solitary confinement for an extended period of time**
19 **directly before he was moved to booking for --**
20       MR. MYLAR:  Objection.  Misstates facts.
21 Those facts are not in the record.
22    **Q.  Are you aware of that -- whether that's a**
23 **fact?**
24    A.  I have no idea on that.
25    **Q.  Okay.  How about heroin?  Is -- are the**

30

1 withdrawal symptoms from heroin similar to what
2 they are from methamphetamine?
3       MR. MCGARRY:  Object as to form.
4    A.  The withdrawal symptoms to heroin, once
5 again, very nonspecific: Nausea, diaphoresis,
6 tachycardia, tachypnea, elevated blood pressure.
7 And those might last longer than methamphetamine.
8 The half-life for heroin is going to be a little
9 longer.
10    Q.  Okay.  And when you say a little bit
11 longer, what's the time period, do you think?
12    A.  I don't know.  I couldn't give you a
13 precise opinion on that.
14    Q.  What about alcohol withdrawal symptoms?
15    A.  They can last longer.  Usually, the time
16 of onset is within 72 hours of cessation.  But
17 especially when you're talking about delirium
18 tremens, that can go on for days and days.
19    Q.  Can it go on for weeks?
20    A.  Not weeks.
21    Q.  Can it start weeks after?
22    A.  No, it cannot.
23    Q.  And by "delirium tremens," what do you
24 mean by that?
25    A.  The DTs, the typical symptoms:  Visual

31

1 hallucinations, auditory hallucinations, tactile.
2 I won't call them hallucinations.  But you can have
3 odd tactile sensations, confusion, agitation.  And
4 then pretty much the same symptoms as we've
5 discussed with the others.
6    Q.  Would not knowing what kind of work you
7 had done prior to incarceration be a delirium
8 tremens?
9    A.  That's a pretty --
10       MR. MCGARRY:  Object to form.
11    A.  -- nonspecific --
12       MR. MCGARRY:  Sorry, Judd.
13    A.  Oh.
14       MR. MCGARRY:  Object to form.  Go ahead.
15    A.  Okay.  That's a pretty nonspecific
16 complaint.  So that could be part of that.
17    Q.  Okay.  Do you recall receiving any
18 information from Mike Johnson that's not contained
19 in these notes?
20    A.  I don't.
21    Q.  As you reviewed these notes, did you see
22 anything in there that you thought would be
23 specific, as it relates to a delirium tremens?
24    A.  No, I did not.  These symptoms are
25 nonspecific.  There are a lot of different disease

32

1 states that these could be present in.
2    Q.  Are they consistent with encephalopathy?
3    A.  They could be.
4    Q.  Now, you reviewed the records from Dixie
5 Regional Medical Center; is that correct?
6    A.  I did.
7    Q.  Did you agree with the diagnosis of toxic
8 metabolic encephalopathy?
9       MR. MYLAR:  Objection.  Lack of found --
10 lack of foundation.
11    A.  Without examining the patient, and just
12 based on my review of the records, I would agree.
13 That's a pretty nonspecific clinical diagnosis, so
14 it would cover a broad range of possibilities.  And
15 it would be an appropriate diagnosis from what I
16 reviewed.
17    Q.  Okay.  Did -- having reviewed those
18 records from Dixie Regional Medical Center, do you
19 have an opinion as to what Mr. Crowson's condition
20 or diagnosis would have been during the time he was
21 in Purgatory jail?
22       MR. MYLAR:  Objection.  Lack of
23 foundation.
24       MR. MCGARRY:  Join.  Go ahead.
25    A.  Would you restate that, please?

33

1    Q.  I will try.  I -- that's a fair -- that's
2 a fair request that I try to restate that.
3       Given all the information you reviewed,
4 which I believe -- well, let's see here.
5       All the information you reviewed is the
6 CorEMR notes and the Dixie Regional Medical Center
7 notes; correct?
8    A.  Correct.
9    Q.  You haven't reviewed anything outside of
10 those?
11    A.  I have not.
12    Q.  Okay.  So having reviewed those records,
13 do you have an opinion as to what the appropriate
14 diagnosis for Mr. Crowson was, during the time he
15 was in Purgatory jail, from 6-25-2014 to 7-1-2014?
16    A.  Yes, I do.
17    Q.  What's that?
18    A.  Well, fortunately, I have 20/20 hindsight,
19 and I can say it would be metabolic encephalopathy.
20    Q.  Okay.  When you are diagnosing a patient
21 with metabolic encephalopathy, what are the
22 symptoms that you're looking for?
23    A.  Confusion is one of the large ones.  There
24 also is a physical finding called asterixis, which
25 is very typical if you're dealing with hepatic

CROWSON v LAROWE
June 06, 2018                                                          Dr. Judd Larowe

34

1 encephalopathy.  Specifically, there is a finding
2 of fetor hepaticus.  The breath smells fruity,
3 yeah, oftentimes in these individuals.  Sometimes
4 there will be jaundice.  They can be quite agitated
5 as well.  But once again, those fall under many
6 subheadings.  But those are the things you might
7 typically see in that case.
8     Q.   Okay.  If you suspect that somebody has
9 metabolic encephalopathy, what's the appropriate
10 course of treatment?
11    A.   The appropriate course of treatment in
12 that case, several things.  One, you treat the
13 agitation.  Number two, you also would give them
14 either neomycin or lactulose.  Those help reduce
15 ammonia levels.  Typically, you'd give them
16 thiamine, because anyone with hepatic
17 encephalopathy is usually thiamine deficient.
18 They're also usually deficient in other vitamins,
19 so we typically give them a multi-vitamin.  We give
20 them thiamine.  You would treat them with lactulose
21 or neomycin.  You would treat their agitation as
22 well.  You know, those are the main things --
23    Q.   Okay.
24    A.   -- that you would use.
25    Q.   What diagnostic tools do you have

35

1 available to you to diagnose metabolic
2 encephalopathy?
3     A.   Once again, the blood work.  You can
4 sometimes get a clue.  If the acid base balance is
5 out of the norm, that can be reflected in a
6 comprehensive metabolic panel.  An arterial blood
7 gas would also tell you some of those items.  An
8 ammonia level.  Although, an ammonia level needs to
9 be drawn arterially to get the best product.  So an
10 arterial draw is something that generally only
11 takes place in the hospital.
12    Q.   Okay.  How about an MRI?
13    A.   I would not say that that's useful.
14    Q.   Okay.  How soon should a person be treated
15 when they have metabolic encephalopathy?
16         MR. MCGARRY:  Object to form.
17    A.   You would like to treat that person when
18 you first realize that that's going on.
19    Q.   Why is that?
20    A.   Quicker recovery.
21    Q.   Okay.  Can encephalopathy cause permanent
22 damage?
23         MR. MCGARRY:  Object to the form.
24         MR. MYLAR:  Object.  Also --
25    A.   Permanent?

36

1         MR. MYLAR:  -- lack of foundation.
2     Q.   Permanent injury to the brain?
3         MR. MCGARRY:  Same objections.
4         MR. MYLAR:  Same objection.
5     A.   On that, I -- I'm not sure I can speak to
6 that.  I don't believe so.
7     Q.   If a patient has encephalopathy, it
8 wouldn't be appropriate to wait seven or eight days
9 to treat them, would it?
10         MR. MCGARRY:  Object to form.  Foundation.
11 Speculation.
12         MR. MYLAR:  I join on those objections.
13         MR. MCGARRY:  You may answer.  Sorry.
14         THE WITNESS:  Okay.  On.
15         MR. MCGARRY:  You were waiting for me to
16 add some more?
17         THE WITNESS:  Yes, I was.
18         MR. MCGARRY:  Incomplete hypothetical.
19 Sorry.  If you want to critique my lawyering, just
20 feel free, Doctor.
21         THE WITNESS:  Am I paying you hourly?
22         MR. MCGARRY:  Apparently, you're not
23 getting your money's worth maybe.
24         THE WITNESS:  Once again, could you
25 restate the question?

37

1         MR. SCHRIEVER:  Yeah.  Well, in fact, why
2 don't we just have it read back.  Then the
3 objections are on the record.
4         THE WITNESS:  All right.  Thank you.
5         (Question read by the reporter.)
6         THE WITNESS:  No.  You would want to treat
7 the patient as soon as you realize what the
8 diagnosis is.
9         MR. SCHRIEVER:
10    Q.   All right.  Now, I'll represent to you,
11 Dr. LaRowe, that when I -- when we deposed Ryan
12 Borrowman --
13    A.   Yes.
14    Q.   -- I'll -- I'm paraphrasing, obviously.
15 So we'll just note the objection on the record
16 already.
17         He didn't have any difficulty identifying
18 Mr. Crowson's symptoms as serious enough to
19 recommend to you that Mr. Crowson be transported?
20    A.   Correct.
21    Q.   Did anything Mr. Johnson ever tell you
22 give you an indication that he -- that Mr. Johnson
23 thought Mr. Crowson's symptoms were significant
24 enough to be transported?
25    A.   No.  And our policy -- and I -- the

38

1 nursing staff and myself are all on board with
2 this -- is: You know, the patient comes first.
3 Whatever we need to do to make sure we protect the
4 patient. So no. If Mike had felt that the patient
5 needed to be transported or thought there was even
6 a question, we would have transported him at that
7 time.
8     Q. Okay.
9     A. I'm not going to keep someone in the jail
10 when the appropriate course of action is to have
11 them seen in the emergency room.
12     Q. Which makes your ability to rely on
13 Mr. Johnson critical; isn't that true?
14     A. It does. It does.
15     Q. Outside of the -- I know you don't keep
16 notes of -- or records outside the jail.
17         Do you have any procedures or protocols
18 for following up on patients, who you know have
19 been having some sort of symptoms, like being dazed
20 and confused?
21         MR. MCGARRY: Let me just ask for a
22 clarification.
23         MR. SCHRIEVER: Yeah.
24         MR. MCGARRY: You mean -- so a patient who
25 is still an inmate, when you say "following up,"

39

1 not somebody who's been transferred to the
2 emergency department or been released from the
3 jail, but is sill incarcerated?
4         MR. SCHRIEVER: Correct, and I can make it
5 more specific.
6     Q. For example, in this case, Mr. Johnson --
7 the records indicate that he contacted you on June
8 28th.
9         Do you have any kind of tickler system or
10 policies or procedures where on June 29th you would
11 call and say, "Hey, what's going on with Inmate
12 Crowson?"
13     A. I don't. Mr. Crowson was transported to
14 booking or moved from wherever he was before to the
15 booking area, which is immediately adjacent to
16 medical. And when they are moved to booking,
17 medical will do rounds on them every shift, and I
18 believe the deputies check on them every 30
19 minutes. And so there's pretty close observation.
20 So that ensures good follow-up. And then if
21 something occurs during their rounds or if they're
22 notified by a deputy, they would give me a call.
23     Q. Okay. Now, I'm not necessarily familiar
24 with hospital protocol or the way hospitals work.
25         But you have worked in a hospital; right?

40

1     A. Correct.
2     Q. When you have patients under your care in
3 a hospital, is there a -- is there a time period in
4 which the doctor is going to say, "All right. I
5 need to check up on this patient," or is there --
6 how did that work?
7         MR. MCGARRY: Object to form. Incomplete
8 hypothetical.
9         MR. MYLAR: Join.
10     A. In a hospitalized patient, you would round
11 on them daily. That's a minimum.
12     Q. Okay. And that's the doctor is going to
13 round on them daily?
14     A. Correct.
15     Q. And then the nurses are there in addition
16 to that; right?
17     A. Correct.
18     Q. In the jail system, that's different?
19     A. It's not a hospital.
20     Q. Right. But the purpose of putting him in
21 booking was so that he could be under observation;
22 right?
23     A. Correct.
24     Q. And so the nurses are there checking on
25 him once per shift at a minimum?

41

1     A. I believe so, yes.
2     Q. Okay. But there's no procedure for a
3 doctor or a nurse practitioner or a physician's
4 assistant to round on those inmates daily; correct?
5     A. No. There is no provision for that.
6     Q. Okay. Okay. On June 29th, 2014, the note
7 from 7:48 A.M. indicates a heart rate elevated at
8 140. And again, there's a note here that says,
9 "Staffed patient status with MD."
10         Do you recall having a second call with
11 Mr. Johnson on June 29th?
12     A. I did recall, after reading the notes,
13 yes. And then it -- I did re -- recall that, yes.
14     Q. Okay. And this protocol is Ativan two
15 milligrams IM. What does that mean?
16     A. Intromuscularly.
17     Q. Okay. Means give a shot?
18     A. Yes, it does.
19     Q. Why Ativan at that point?
20     A. Ativan has a rapid onset, so I was hoping
21 we'd get a quick response for him. And you know,
22 his symptoms at that time with the agitation, I
23 thought the benzodiazepine would help.
24     Q. And that's for the liver, the
25 benzodiazepine; correct?

42

1    A.   So is Ativan.  They're both in the same
2 family.
3    **Q.   Are they used to treat alcohol withdrawal**
4 **symptoms?**
5    A.   They are.
6    **Q.   Are they used to treat heroin or**
7 **methamphetamine withdrawal symptoms?**
8    A.   They can be, yes.
9    **Q.   What was the reason that you prescribed**
10 **them?**
11    A.   It sounded like he was having symptoms
12 that would be consistent with withdrawal, and it's
13 a good drug generally for agitation.  For example,
14 oftentimes, we'll also have patients with
15 psychosis, once again, from meth, and
16 benzodiazepine can calm them down quite a bit.
17    **Q.   How soon would you expect to see a re -- a**
18 **positive reaction to the Ativan and the**
19 **benzodiazepine treatment in a person suffering from**
20 **alcohol withdrawals?**
21    A.   That can be difficult.  You know,
22 sometimes with alcohol withdrawal, for a medication
23 like Ativan, I've given it hourly.  But I was -- my
24 plan in this case was that the Ativan would help
25 with the initial symptoms and give us time to get

43

1 him started on the Librium and allow that to kick
2 in.
3    **Q.   What's the time frame you expect them to**
4 **have a response to that?**
5    A.   That can be difficult, especially with
6 alcohol withdrawal.  Some people, it takes a lot of
7 benzodiazepine to achieve a response.  And then
8 other cases, they'll have a response quite rapidly.
9 So that is -- there is a huge amount of
10 variability.
11    **Q.   Okay.  And the patients that have the**
12 **response rapidly, is that within minutes?**
13    A.   No.  It would probably be within 30
14 minutes to an hour --
15    **Q.   Okay.**
16    A.   -- with a rapid-acting medication like
17 Ativan.  Possibly longer with Librium.
18    **Q.   Okay.  Would you expect to take more than**
19 **a day to have a response?**
20    A.   It can.  It can, but I would hope there
21 would be some improvement.
22    **Q.   How about two days?**
23    A.   You know, once again, in some individuals,
24 it takes a lot.  But two days, I would hope to have
25 seen a response.

44

1    **Q.   Okay.  Now, on the 29th, were you aware**
2 **that Mr. Crowson had been in booking since the**
3 **25th?**
4    A.   I think the only time I -- I'm not
5 positive when -- of that time frame.  I'm not
6 positive that I knew.
7    **Q.   Okay.**
8    A.   I -- let me restate that.  I didn't know
9 at that time how long he had been in booking.
10    **Q.   Okay.  And we already talked about**
11 **earlier, but you did not know that he was up in A**
12 **block --**
13    A.   I did not.  The first --
14    **Q.   -- before that?**
15    A.   I thought he was -- when I thought he was
16 in booking was when I received the call from Mike
17 Johnson.
18    **Q.   All right.  Down there at the note from**
19 **6-29-2014 at 3:36 P.M., it's Mr. Johnson's update**
20 **on his visit with Mr. Crowson at that time.**
21       **Were you provided information about that**
22 **visit?**
23    A.   I don't recall.  I don't recall on that.
24    **Q.   Okay.  How about June 30th?**
25       **There's no note there.  Do you have any**

45

1 **recollection of being provided information about**
2 **Mr. Crowson on June 30th?**
3    A.   I don't.
4    **Q.   And then July 1st, 2014, Ryan Borrowman's**
5 **note indicates he was sent to the ER for more**
6 **in-depth evaluation.**
7       **Is that something he discussed with you?**
8    A.   It is.
9    **Q.   You didn't have any objection to doing**
10 **that; right?**
11    A.   Of course not.
12    **Q.   And if Mr. Johnson, on June 25th, 2014,**
13 **would have recommended that, you would have had no**
14 **objection to that either; correct?**
15    A.   They are my eyes and ears.
16    **Q.   Are you aware of any standards or criteria**
17 **for diagnosing alcohol withdrawal symptoms?**
18    A.   Yes.
19    **Q.   What standards are you aware of?**
20    A.   Oh, we look for agitation.  Once again,
21 hallucination, verbal and auditory confusion.
22 Usually, you're going to have the tachycardia.  So
23 those are kind of the standard things that are
24 looked for.
25    **Q.   All right.  Anything in these notes or**

46

1 anything in your recollection from speaking with
2 Mr. Johnson that Mr. Crowson was agitated or
3 suffering from agitation?
4     A.   Well, I think the confused part, yes.  And
5 if you look at the note on the 29th, he actually
6 looked like he was doing better, 9:43 at that time.
7 So yeah, these symptoms are vague and fit a number
8 of diagnostic criteria.  But yeah, he -- I would
9 agree with that, the confusion and that.
10    Q.   Okay.  And I want to break this down a
11 little bit, because you say you agree.  But I'm not
12 sure what we're agreeing with.
13    A.   I'm sorry.
14    Q.   I want to break this down a little bit
15 more.
16    A.   Yes.
17    Q.   When you use the term "agitation" in
18 relation to alcohol withdrawal symptoms, describe
19 that for me.  What does that look like?
20    A.   Oh, it can be a variety of findings.
21 Anywhere from being violent and aggressive to not
22 knowing where you're at, what you're doing, not
23 having a recollection of things that have occurred.
24 You know, the classic seeing spiders on the wall
25 sort of thing.  Patients can be terribly

47

1 uncooperative during these times.  So that's what I
2 would consider to fall under that heading.
3     Q.   Okay.  And that's all under the heading of
4 agitation?
5     A.   Yes.
6     Q.   Okay.  Like -- and let me -- I'm just
7 asking this.  I'm not meaning to argue with you.
8 But like, you said, "Seeing spiders on the wall."
9          That -- I would consider that a visual
10 hallucination, but does that still fall under the
11 rubric of agitation?
12    A.   I think it's semantics really --
13    Q.   Okay.
14    A.   -- at that point.  I mean, agitation is a
15 very broad term.
16    Q.   Okay.  And then the hallucinations
17 visually, you gave me the example of spiders
18 climbing on the wall?
19    A.   That's kind of the classic one.  Pink
20 elephants or whatever else you want to -- you want
21 to describe.  But I've had people think they were
22 ice fishing --
23    Q.   Okay.
24    A.   -- when I would evaluate them.  So it can
25 be pretty wild.

48

1     Q.   All right.  How about auditory
2 hallucinations?
3     A.   Happens too, yes.
4     Q.   Okay.  Confusions -- or confusion?
5     A.   Pretty typical with withdrawal symptoms,
6 yes, but once again, not specific.
7     Q.   Okay.  And then tachycardia, that's
8 increased heart rate?
9     A.   Anything that causes stress to the system
10 can cause tachycardia, so there are -- there's a
11 huge number of items that fall under that.  But
12 being agitated definitely can cause tachycardia.
13    Q.   Okay.  All right.  I'm going to go through
14 these, and we're -- I want to try to create a
15 checklist of the symptoms that Mr. Crowson was --
16    A.   Yes, sir.
17    Q.   -- exhibiting, to your knowledge.
18         He was confused; correct?
19    A.   Correct.
20    Q.   He wasn't aware of -- he didn't remember
21 things?
22         MR. MCGARRY:  Excuse me just a moment.
23 Ryan, when you say to his knowledge, just so I
24 don't have to make continuing objections, you mean
25 based upon whatever knowledge he has now, after

49

1 reviewing the medical record?
2         MR. SCHRIEVER:  Yeah, and speaking with
3 Mr. Johnson.
4         MR. MCGARRY:  All right.  Fair enough.
5         THE WITNESS:  Repeat --
6         MR. MCGARRY:  And speaking with
7 Mr. Borrowman?
8         MR. SCHRIEVER:  Mr. Borrowman as well --
9         MR. MCGARRY:  All right.
10        MR. SCHRIEVER:  -- yes.
11        MR. MCGARRY:  Sorry.
12        MR. SCHRIEVER:
13    Q.   So he did exhibit some symptoms of
14 confusion; correct?
15    A.   Correct.
16    Q.   Then he was known to be dazed and confused
17 while serving breakfast, and he was unable to
18 remember what kind of work he did prior to being
19 arrested.  I'm just scanning through here.  He was
20 disoriented, and he gave one-word answers to
21 questions.
22         Anything else that you see in there that
23 would be a symptom of confusion?
24    A.   Not that I see in there.
25    Q.   Okay.  On 6-29, it says he didn't remember

50

1 the last five days.
2        Would that be -- that would be a symptom
3 of confusion as well; correct?
4     A.   I would agree.
5     Q.   Okay.  Anything else?
6     A.   Not that I'm aware of.
7     Q.   Okay.  Do you see anything in there that
8 indicates he was violent or aggressive?
9     A.   I did not see anything in there, other
10 than -- the only possible indication was that he
11 wouldn't hold still for the blood draw.  But I
12 don't know -- that's not characterized in detail.
13 So I don't know what transpired there.
14    Q.   Okay.  On 6-28, it says he was
15 noncompliant with taking deep breaths.
16       Does that -- is that a symptom that you're
17 -- that's important in any way?
18    A.   Well, it would go along with confusion.
19    Q.   Okay.  Any indication of any auditory
20 hallucinations that you're aware of?
21    A.   No, not that I'm aware of.
22    Q.   Okay.  How about visual hallucinations?
23    A.   Not that I'm aware of.
24    Q.   How about tachycardia?
25    A.   On the 29th, his pulse rate was up to 140.

51

1 And I -- I'm not positive, when Ryan Borrowman
2 called me, if there were those types of vital
3 signs, tachycardia or any pulse rate issues.  I
4 just don't recall.  But yeah, the tachycardia on --
5 let me be specific -- the 6-29-14 at 7:48, that
6 could certainly be related to that.
7     Q.   Okay.
8     A.   I guess he was tachycardic also on the
9 28th, looking at the records.
10    Q.   Okay.  Did the blood work reveal anything
11 to you that was helpful?
12    A.   We didn't get blood work.
13    Q.   Oh, that's right.  You didn't, did you?
14    A.   No.  No.
15    Q.   That's right.  So I guess the answer is
16 no?
17    A.   Correct.
18    Q.   Okay.  Did Mr. Johnson provide any
19 indication to you or say anything to you that --
20 about a source for any suspected alcohol or drugs
21 from Mr. Crowson?
22    A.   No.  He didn't.  We did speak about that,
23 be -- because it wouldn't be the first time.  You
24 know, the inmates have been known to brew their
25 own.  I assume it's not the tastiest, but it's --

52

1 you know, it's not impossible to do.  So that was
2 part of the differential I was wondering about,
3 whether or not he might have gotten into something.
4     Q.   As far as investigating that, to see if he
5 had gotten into something, is there anything that
6 you could do to determine that?
7     A.   Possibly a drug screen.  But it -- you
8 know, either urine or blood possibly would have
9 been useful.  It depends at the time of drug use,
10 even with alcohol, obviously.  So that might have
11 been useful.  So I would leave my answer with that.
12    Q.   Okay.
13    A.   Possibly.
14    Q.   Do you know any specific reason why no
15 blood or urine was tested for drugs or alcohol?
16    A.   I don't have a specific reason why.  I
17 didn't order them.
18    Q.   Okay.  One of the doctors at Dixie
19 Regional Medical notes -- wondered about the
20 Librium as being a complicating factor with the
21 metabolic encephalopathy.
22       Do you recall reading about that?
23    A.   I do recall reading it.  I took a
24 different interpretation there.
25    Q.   Okay.  Tell me what that is.

53

1     A.   My interpretation was that because
2 Mr. Crowson had not been on it long enough, he
3 wouldn't have developed a tolerance or an addiction
4 to it.  So there was no need to taper off of the
5 medication.  And you know, even an alcoholic -- or
6 even in hepatic encephalopathy, I certainly have
7 used Ativan in the hospital setting for these
8 individuals.  Ativan, benzodiazepine is in the same
9 family.
10       And in fact, in review of his previous
11 admission to the hospital, they had used Ativan on
12 him as well.  So the Librium really had aided in
13 some of his confusion, just as a potential side
14 effect.  But I've used benzodiazepine a lot of
15 times on patients with hepatic encephalopathy.  So
16 I don't think it really had any impact on his case.
17    Q.   Does -- the side effect of Ativan, does it
18 increase mental awareness?
19    A.   No, it does not.
20    Q.   Does it decrease confusion?
21    A.   It can decrease agitation, and in the case
22 of alcohol withdrawal, it can decrease confusion.
23    Q.   Okay.  Outside of alcohol withdrawal
24 symptoms, what is Ativan used to treat?
25    A.   Agitation, anxiety.  Those are the two big

**54**

1 ones, I would say.
2    Q.  Librium, the same?
3    A.  Yes.  Yes.  They all fall in the same
4 purview.  Some people also use it for insomnia.
5    Q.  How long was Mr. Crowson on Librium?
6    A.  I thought three days, but let me refresh
7 my memory.
8    Q.  Okay.
9    A.  It looks like we started him on the 29th,
10 so three days.
11    Q.  Okay.  Anything to indicate that he was
12 given a dose of Librium on the 30th?
13    A.  I believe there's a record on that, but
14 I'd have to refer to the medication distribution.
15    Q.  Let's do that.
16    A.  Do you know what page that would be?
17    Q.  I'll have to look for it as well.  Let me
18 find it.
19    A.  Oh, here it is, page 24 of 44.
20       And what date specifically were you
21 asking?
22    Q.  Well, just -- let's just see if we can --
23 what does it tell us as far as when he was given
24 Librium?
25    A.  I see that he was given a dose on

**55**

1 6-29-2014 at 3:39.  All right.  Actually, I'm a
2 little confused on that.  It says, "IM Ativan given
3 in lieu of Librium at that time."
4    Q.  Okay.
5    A.  And I don't know why that would be.
6 Sometimes it depends on what we have in stock, as
7 far as what the pharmacy has delivered.  And if
8 it's on a weekend, sometimes, we -- you know, we're
9 not going to be able to get medication.  So it is
10 appropriate to substitute one for the other.
11    Q.  All right.  And then do you have pages --
12 let's see.  That's 24 of 44.
13       Do you have pages 25 and 26?
14    A.  Yes, there we are.
15    Q.  What does that show?
16    A.  It shows 6-29 at 6:05 P.M. Librium.  6-30
17 at 6:34 A.M., received Librium.  6-30 at 10:52
18 P.M., he refused the Librium.  7-1 at 5:45,
19 received the Librium.  And then after that, he was
20 sent -- I believe that's when he was transported.
21    Q.  All right.
22       MR. SCHRIEVER:  Let's go off the record
23 for just a second.
24       (A break was taken.)
25       MR. SCHRIEVER: All right.  Back on the

**56**

1 record.
2    Q.  Dr. LaRowe, before we took the break, you
3 had handed me a couple of pages that we didn't have
4 in the book.  And I'm not saying I don't have them,
5 period.  I just didn't have them in my book here.
6       But these are pages 25 and 26 of 44 from
7 the CorEMR records.  And they show Librium, or at
8 least they purport to show Librium being
9 administered.
10       Is that your understanding of what they're
11 -- of what they show?
12       MR. MCGARRY:  Well, they show -- I mean,
13 you just mean just the first three lines; right?
14       MR. SCHRIEVER:  Right, on 6-29.
15       MR. MCGARRY:  Or the first four --
16       MR. SCHRIEVER:  -- and then --
17       MR. MCGARRY:  One of them says "refused,"
18 but the first four total?
19       MR. SCHRIEVER:  Right.
20       MR. MCGARRY:  Okay.
21       THE WITNESS:  That would be correct.
22       MR. SCHRIEVER:
23    Q.  Okay.  Who is Joshua Billings?
24    A.  He was another nurse out at the Purgatory
25 Correctional Facility.

**57**

1    Q.  Okay.  Do these notes provide you any
2 additional insight into Martin Crowson's condition
3 at that time?
4    A.  The -- with the exception of the fact that
5 he refused medication on 6-30 at 10:52 P.M., the
6 other times it shows that he was compliant.  As far
7 as why he refused, I could only speculate.
8    Q.  All right.  I'll give those back to you.
9    A.  Thank you.
10    Q.  Let me ask you about the role of the nurse
11 in providing healthcare at the jail.
12       What -- can you describe for me in your
13 words what the role of the nurse is?
14    A.  I will try.  The nursing staff will do
15 rounds in respective compartments in the jail,
16 whether it's A block, whatever.  Inmates, that are
17 on prescription medications, will come to med pass.
18 So at that point, the nursing staff will interact
19 with the inmates and provide them with medications,
20 or they may decide not to come for their
21 medications or whatever.
22       And part of the job also is to ensure that
23 the inmate actually takes their medication.  For
24 example, sometimes inmates will cheat the
25 medication.  They'll store it in their mouth, spit

CROWSON v LAROWE
June 06, 2018
Dr. Judd Larowe

58

1 it out later, and it can be used as a kind of
2 currency, give it to another inmate or that sort of
3 thing. So they try and ensure that those things
4 don't happen.
5       In addition, inmates can declare what's
6 called a "medical emergency," where they will ask
7 for a nurse to come and visit them and, you know,
8 evaluate them for specific complaints. Inmates
9 also can contact the nursing staff via the kite
10 system, where you'll send a request. As an
11 example, a patient might have a sore throat or
12 symptoms of a urinary tract infection or those
13 sorts of things. So they can request a medical
14 evaluation there.
15      The medical staff will also do intake
16 histories when an individual comes into prison. So
17 part of the booking process, I believe, is that the
18 nursing staff will go over a checklist of questions
19 and try and verify any prescriptions the patient
20 states that they're on, try and get an idea of past
21 medical history issues, current medications,
22 current medical status, any complaints. They also
23 will try and review any notes from the ER.
24 Oftentimes, patients are sent to the emergency room
25 for clearance before they are sent to the prison.

59

1 So they get a medical clearance in the ER, and so
2 the nursing staff will oftentimes evaluate that
3 also.
4       Then we coordinate a list for sick call,
5 you know, for example, on Tuesdays. And they'll
6 review, try and get any pertinent information
7 collected for me when I come in, or if there are
8 things we want to do before I see them in sick
9 call, you know, order blood work, get x-ray
10 testing, get that type of information before I see
11 them. We'll also review any requests for
12 consultative care. For example, an inmate might
13 have come in, who'd had a fracture or something,
14 requiring orthopaedic follow-up, those sorts of
15 things. And the nursing staff also will coordinate
16 care with me by calling me on any specific
17 questions on patients.
18      There are a number of medications also
19 that are medications that we typically wouldn't
20 think of as medications of abuse, but have been
21 used in that role, particularly in correctional
22 facilities. So we try and sift through the
23 medications that an individual is on, to make sure
24 that we're not providing them with something that
25 might be abused or cause harm or be passed to

60

1 someone else and cause harm, too. So we'll try and
2 scrutinize. Just because they come in for a
3 prescription for drug A doesn't mean we are going
4 to provide drug A, if it might potentially cause
5 harm to them or harm to others if they were to get
6 ahold of it. So...
7    Q. Okay.
8    A. It -- that is, you know, to the best of my
9 ability, their role.
10   Q. Okay. What about diagnosis? Do they play
11 a role in diagnosis?
12   A. They play a role in diagnosis quite often.
13 I mean, they will give me the symptomatology, the
14 past medical history, and the patient complaints.
15 They're actually quite good with their exams. I
16 mean, they -- it's been a continuous process for
17 them, seeing these patients day in and day out.
18      So ailments like upper respiratory
19 infections are pretty common for us to deal with,
20 allergy-type symptoms, those sorts of things. So a
21 lot of it is delivering the symptomatology to me.
22 And then at that point, I'll develop a care plan,
23 oftentimes with their insight as well.
24   Q. Do they ever offer you opinions and say,
25 "Hey, I think this person has X, Y and Z. These

61

1 are his symptoms"?
2    A. That's hard to say. I think any of us
3 would do that. You know, a mother coming in with
4 her child would say, "Looks like he has a sore
5 throat, you know." And they certainly have the
6 experience. So they might help out in that way,
7 yes.
8    Q. Okay. In fact, you rely on them to help
9 you out in that way, don't you?
10   A. Absolutely. We have a great corps there,
11 so we've been working together for, gosh, 15 years.
12   Q. Okay. Now, Mr. Crowson's symptoms?
13   A. Yes.
14   Q. Vague; right?
15   A. Correct.
16   Q. You've used that word several times?
17   A. Yes.
18   Q. So there are several things it could have
19 been?
20   A. Yes.
21   Q. And when you were talking with
22 Mr. Johnson, to a large extent, you were relying on
23 his knowledge and experience to provide you insight
24 as to Mr. Crowson's condition; correct?
25   A. Correct.

62

1    Q.  And then the same with Mr. Borrowman?
2    A.  Correct.
3    Q.  And because of the nature of the
4  situation, you don't have a choice but to rely on
5  them, do you?
6    A.  I don't, no.
7    Q.  When you're looking at the CorEMR records,
8  are you able to see the entries from prior dates?
9        And I'm talking about at the prison.  If
10  you're at the prison, looking on the computer
11  system, can you look at entries from prior dates?
12    A.  I can look at that, yes.
13       MR. SCHRIEVER:  Okay.  All right.  I don't
14  have any other questions for you, Dr. LaRowe.
15  Thank you.
16       THE WITNESS:  Thank you.
17       MR. MYLAR:  I just have a few.  Can I
18  switch with you, so --
19       MR. SCHRIEVER:  Yeah, for sure.
20       MR. MYLAR:  -- it might be easier for the
21  reporter?
22       (Off the record.)
23 ///
24 ///
25 ///

63

1             -oOo-
2        EXAMINATION
3  BY MR. MYLAR:
4    Q.  Hi, Dr. LaRowe.  How are you doing?
5    A.  I'm doing well.  Thank you.
6    Q.  Just have a couple questions, just to
7  clarify a couple of things.
8        You were asked by counsel on June 26th and
9  27th that you did not appear -- it did not appear
10  in the records that you talked to anyone at the
11  jail on those days; is that correct?
12    A.  I believe that is correct.
13    Q.  And if, in fact, the jail is putting him
14  on close watch, the medical area in the booking,
15  and there's -- and he's stable and his vital signs
16  continue to be stable, would there be any reason
17  for a nurse or anyone to call you?
18    A.  I, typically, would not be called.
19    Q.  All right.  And I think you had alluded to
20  this, that you've at least heard of or had some
21  experience of inmates getting certain kinds of
22  drugs or home brew while they're in the jail.
23        Has that been your experience sometimes in
24  the past?
25    A.  Correct.

64

1    Q.  And do you have any knowledge or
2  understanding of whether -- or have heard of
3  whether inmates have ever shared their medications
4  with other inmates?
5    A.  It's a common concern.
6    Q.  And --
7    A.  I've had a number of inmates that have
8  transferred their medication to another inmate.
9    Q.  Okay.  And do they do those medications in
10  different ways and so on?  Are you aware of any
11  that they might --
12       MR. SCHRIEVER:  Objection.  Form.
13    A.  I'm sorry?
14    Q.  I agree.  The form is terrible.
15        Do they just ingest it?  Do they try to
16  shoot it?  Do they snort it?  Do you know how --
17  what kinds of things that the inmates will do with
18  that other medication?
19    A.  Injection is usually not an option.
20    Q.  Right.
21    A.  So I have had inmates that have crushed
22  certain medications and snorted it, and otherwise,
23  it's just ingesting.
24    Q.  Okay.  All right.  And can that have an
25  effect, a negative effect, on an inmate?

65

1    A.  Of course it can.
2    Q.  And can it have even the kind of symptoms
3  that we saw here with Mr. Crowson?
4       MR. SCHRIEVER:  Objection.  Form.
5  Foundation.  Go ahead.
6    A.  It would depend on the medication,
7  certainly.
8    Q.  Sure.
9    A.  But yes.
10    Q.  All right.  And isn't it true that if a --
11  if an inmate comes into the jail and they've been
12  in before, because of different drug use or
13  different things like that, and they've had a
14  history of at least a few years of using illegal
15  drugs, do those present a little bit more difficult
16  presentation to you, as a physician, in terms of
17  trying to deal with and treat an inmate like that?
18    A.  It would, because there are so many
19  variables involved, especially if you're talking
20  about an individual that has experimented with a
21  number of different medications or drugs in the
22  past.
23    Q.  Uh-huh.  Okay.  All right.  And would they
24  be more at risk for some unusual thing happening
25  potentially?  Can that -- or can that -- can

66

1 something unusual happen, in terms of their health,
2 because of their long-term use of illegal drugs?
3      A.   If they've had long-term use of
4 medications, there are several things that can
5 happen.  Most of us have a fair amount of tolerance
6 to a variety of circumstances, whether --
7      Q.   Uh-huh.
8      A.   -- it's taking a drug or other insults,
9 having a fever or those sorts of things.  But some
10 people have less -- I'm searching for the right
11 word -- less leeway.  For example, a patient, who
12 has borderline dementia, takes a medication.  And
13 their dementia will be unmasked --
14     Q.   Uh-huh.
15     A.   -- because they just don't have the
16 leeway --
17     Q.   Uh-huh.
18     A.   -- that one of us would have.  So if
19 there -- if someone has had previous insults, you
20 might then unmask other problems, that you might
21 not otherwise see for years down the road.
22     Q.   Okay.  In this case, there seem to be at
23 least some thought of the jail staff that they
24 thought that he was withdrawing.  When you --
25 looking back as to what you only knew then, not

67

1 what you know now, were those reasonable thoughts
2 and information that they might think he's
3 withdrawing, based upon the records?
4      A.   It could have been.  You know, that was
5 certainly one of the top options in the
6 differential.
7      Q.   Okay.  All right.  And if someone just
8 starts to exhibit some symptoms of withdrawal in a
9 jail, that's not the time necessarily to send them
10 right off to the hospital, is it?
11     A.   We deal with withdrawal all the time in
12 the prison setting.  And in fact, the emergency
13 room will send these patients to us, you know, when
14 it -- when their symptoms become such -- I'll use
15 alcohol withdrawal as a specific one.  Because it's
16 the one we see most commonly, and it's easy to
17 state clearly.  But when their symptoms become such
18 that you think they're on the verge of DTs or even
19 if they go into delirium tremens, that can be a
20 life-threatening event.  And that's when we send
21 them back.
22          Otherwise, we deal with a lot of their
23 symptoms at the time with what we have available.
24 And usually, it's a Librium taper.  They will have
25 the tachycardia, the nausea, the diaphoresis.

68

1 They'll go through those symptoms.  But as long as
2 they don't exhibit seizure activity, delirium
3 tremens, those clear-cut things, we're going to
4 manage them in the facility and do it all the time.
5 The hospital wants nothing do with this.
6      Q.   Okay.
7      A.   So...
8      Q.   And someone can be in withdrawals and not
9 show any DTs; is that correct, too?
10     A.   Oh, correct.  DTs are at the end of the
11 spectrum --
12     Q.   Uh-huh.
13     A.   -- of withdrawing.  That definitely can be
14 life threatening.
15     Q.   Well, when an inmate goes to the
16 hospital -- let's say before they're an inmate.
17          When they're just being arrested and they
18 go straight to the hospital and they're released to
19 the jail, is that really any different than a
20 hospital releasing them just to go home?
21          MR. MCGARRY:  Object to form.
22          MR. SCHRIEVER:  Join.
23     A.   It is different.  In this case, there are
24 times when the hospital might actually keep the
25 patient, if they were going to go home --

69

1      Q.   Uh-huh.
2      A.   -- or send them to a rehabilitation
3 facility or something like that.
4      Q.   Uh-huh.
5      A.   But they will send them to us.  So our --
6 they're going to expect more care out of us.
7      Q.   Uh-huh.  Okay.  All right.  But they don't
8 say that in their release at all, do they?
9      A.   They do not.
10     Q.   They just say that he's released from the
11 hospital?
12     A.   Correct.
13     Q.   All right.  And do you know if Mr. Crowson
14 went to the hospital in this case?
15     A.   I don't know that.
16     Q.   Okay.  And based upon the information that
17 you had in this case, you did not see any reason to
18 transfer Mr. Crowson to the hospital, until you got
19 the information on July 1st; is that correct?
20     A.   Correct.
21          MR. MYLAR:  All right.  I don't have any
22 further questions.
23          MR. MCGARRY:  Any questions?
24          MR. GRAF:  No.
25          MR. MCGARRY:  No questions here.

70

1      MR. SCHRIEVER:  A couple follow-up
2  questions.
3      THE WITNESS:  Yes, sir.
4          -oOo-
5       EXAMINATION
6  BY MR. SCHRIEVER:
7   **Q.  Mr. Mylar asked you about the options for**
8  **differential diagnosis, and let's break this down a**
9  **little bit.**
10      **Differential diagnosis means what?**
11   A.  Well, let's call it your "usual suspect."
12  What are your -- what are the most likely
13  conditions that would go along with these symptoms?
14   **Q.  Okay.  And in this case, the usual**
15  **suspects, you said one of the top was withdrawal?**
16   A.  Yes.
17   **Q.  Okay.  Context is important there, though,**
18  **isn't it?**
19   A.  It is.
20   **Q.  Because outside the prison, withdrawal**
21  **isn't one of the top suspects, is it?**
22   A.  No, it's not.
23   **Q.  In fact, when he went to the hospital and**
24  **was treated at the hospital, they didn't consider**
25  **withdrawal, did they?**

71

1      MR. MYLAR:  Objection.  Lack of
2  foundation.
3   **Q.  Based on your review of the records?**
4      MR. McGARRY:  Join.
5   A.  I don't know that.  I don't know that.
6  They had the advantage in reviewing the record of
7  having laboratory studies to review, too.
8   **Q.  Right.**
9   A.  So...
10      For example, they had ammonia studies that
11  they could do arterially there; correct?
12   A.  Yes.  Absolutely.
13   **Q.  So -- and if a person comes in off the**
14  **street in the hospital -- and you've had experience**
15  **in a hospital, so this is -- I think is a fair**
16  **question -- not knowing what they do for work, not**
17  **responding to -- with multiple words to questions,**
18  **appearing dazed and confused, you're going to start**
19  **looking at insults to the brain in some way as the**
20  **top suspect, wouldn't you?**
21   A.  I would actually still look at drug use.
22   **Q.  Okay.  And what would you do to look at**
23  **the drug use?**
24   A.  Well, I would do a tox screen.  I'd review
25  previous records, you know.  If the individual's

72

1  been seen at the facility before, you could gather
2  a lot of data from that.  Breathalyzer possibly
3  could be used, too, in that case.  There are
4  certain -- you can't test for huffing, so there's
5  no blood tests for those sorts of things.  So yeah,
6  you could eliminate certain groups with the correct
7  testing.
8   **Q.  And if you were working at the hospital,**
9  **that would be the standard of care; correct?**
10   A.  Working in the hospital emergency room
11  setting, I would expect it would be.
12   **Q.  Okay.  And is there a different standard**
13  **of care in a jail?**
14   A.  It's not a hospital.  It's not an
15  emergency room.
16   **Q.  Okay.**
17   A.  So I would expect there would be a
18  difference.
19   **Q.  So no tox screens at the jail?**
20   A.  You know, I can't recall that I've done
21  one.  It would have to be sent out, because there
22  is no lab at the facility itself.
23   **Q.  You'd agree with me, in the hospital**
24  **setting, that tox screen is important, because when**
25  **you're dealing with a differential diagnosis, it's**

73

1  useful to eliminate --
2   A.  It is.
3   **Q.  -- certain causes, potential causes?**
4   A.  I would agree with you.
5   **Q.  Okay.  That was not done in Mr. Crowson's**
6  **case at the jail, though; right?**
7   A.  No.
8   **Q.  Okay.  And you'd agree, wouldn't you, that**
9  **one of the reasons that drugs and alcohol was a**
10  **suspected cause was because he was in prison or in**
11  **jail?**
12   A.  That is a population we take care of.
13   **Q.  In your interactions with Mr. Johnson, was**
14  **it your impression that Mr. Johnson thought the top**
15  **suspect was drug or alcohol withdrawal?**
16   A.  It was a consideration, but it was --
17  there was always a question of what else might be
18  going on with him.  And that's one of the reasons
19  we moved him to the booking, to keep an eye.
20  Because it was not clear-cut.  You know, the other
21  things that we had to look at.
22      You know, at some point, psychosis has to
23  start somewhere.  You know, you have to have that
24  initial event.  So you always wonder about someone
25  that might have had previous drug use, because we

74

1  see so much psychiatric ailments, as a result of
2  that. They have to -- they have to start
3  somewhere. So that was certainly one issue that we
4  thought about.
5        Infection also is something that you worry
6  about with confusion. So I would have dearly loved
7  to have had the CBC to look at that. We did check
8  the chest x-ray. No signs or symptoms of a urinary
9  tract infection. So you know, there were a number
10  of things we were looking at. It was not
11  clear-cut.
12      **Q.  Okay. What indications did you see there**
13  **wasn't any sign of a urinary tract infection?**
14      A.  Well, typically, in a male, they're pretty
15  aware of that. You know, that's why STDs are
16  detected more easily in men. And women can have an
17  STD that they're not aware of at all for awhile.
18  And I have seen a number of female patients with
19  urinary tract infections that have gone to the
20  point of sepsis before it's ever recognized.
21      **Q.  So let's go -- let's just do this real**
22  **quickly.**
23          **When you're dealing with differential**
24  **diagnosis, the first step, rather than determining**
25  **what the cause of the symptoms is, is to eliminate**

76

1      A.  No. If there's an -- if there's a thought
2  that we need to transfer them, we always err on the
3  side of transporting.
4      **Q.  And Mr. Borrowman did?**
5      A.  He did.
6      **Q.  Have you spoken with either of them, or do**
7  **you have any knowledge as to why they viewed this**
8  **situation so differently?**
9      A.  I have not. On review of the records,
10  even in Ryan Borrowman's case, I didn't see the
11  vital signs there. I -- it was more of a gestalt
12  on his part, I think, that the patient was doing
13  poorly. There may have been vital signs recorded;
14  I just didn't see them. But if he's going to tell
15  me the patient needs to go, I'm sending him.
16      **Q.  Do you know what the results of the chest**
17  **x-ray were?**
18      A.  They were negative, I believe, in that
19  there was no pathologic process noted.
20      **Q.  No signs of infection either; right?**
21      A.  No, there was not.
22      **Q.  Okay. You talked about -- with**
23  **Mr. Mylar's questions, you talked about seizures,**
24  **seizure activity, being a sign of withdrawal; is**
25  **that correct?**

75

1  other causes; right?
2        **So you've got a checklist, and your**
3  **checklist was alcohol withdrawals, infections,**
4  **urinary tract infections, respiratory issues.**
5          **What else am I -- what else am I missing?**
6      A.  Possibly psychosis.
7      **Q.  Okay. Did encephalopathy ever make it**
8  **onto the radar?**
9      A.  It did not. It did not.
10      **Q.  Okay. That's in large part because it**
11  **didn't get onto Mr. Johnson's radar to be conveyed**
12  **to you; right?**
13      A.  Well, also, we didn't have -- I didn't
14  have at my disposal the previous admissions. And
15  in fact, from reviewing the chart, I think this was
16  the first time he had been diagnosed with hepatic
17  encephalopathy. I'd -- you know, he'd come in with
18  a mult -- on review of previous hospitalizations,
19  he'd come in with a number of other things, you
20  know, and actually been in the ICU and whatnot.
21  But maybe I missed it, but I didn't see hepatic
22  encephalopathy noted before.
23      **Q.  Mr. Johnson didn't give you any indication**
24  **he thought Mr. Crowson should be transferred to the**
25  **ER, did he?**

77

1      A.  It can be, yes.
2      **Q.  No indication of seizure activity with**
3  **Mr. Crowson; right?**
4      A.  There was none noted.
5      **Q.  Okay. What is the jail policy as to when**
6  **a patient should be transported to an emergency**
7  **room?**
8      A.  I'm not aware of any set policy. There
9  may be. I'm not aware of one. It, usually, is
10  based on a discussion between the nursing staff and
11  myself.
12      **Q.  Okay.**
13      A.  Our unwritten policy, you know, is protect
14  the patient, protect our license.
15      **Q.  What role did Mr. Crowson's prior drug use**
16  **play in his encephalopathy?**
17          MR. MCGARRY:  Object to form.
18      A.  It could have played a huge role in his
19  hepatic encephalopathy. You're not going to
20  develop hepatic encephalopathy de novo. You have
21  to have injured your liver to the point where it's
22  in a tenuous situation, where one more insult can
23  tip you over the edge where your body is not
24  able -- where your liver is not able to eliminate
25  the ammonia, which is typically what we see go.

---

**78**

1     And that can happen in various
2 circumstances.  For example, IV drug users, you
3 know, you always have to consider the possibility
4 of hepatitis C or hepatitis B.  Genetic things like
5 sclerosing cholangitis, injury to the liver based
6 on alcoholic consumption or alcoholic cirrhosis,
7 nonalcoholic steatohepatitis or NASH syndrome.  So
8 usually, there has to be an injury, either
9 infectious, toxic, like alcohol, or genetic.  Those
10 are the typical ones that we'll see.
11     Q.  All right.  Hepatitis C, potential
12 contributing factor?
13     A.  Of course, yes.
14     Q.  Are you aware that Mr. Crowson was
15 diagnosed with hepatitis C?
16     A.  I was not, and on his intake form, he --
17 on review, in my 20/20 hindsight, he -- I believe
18 he did not note that to the staff.
19     Q.  Any indication from Mr. Johnson that he
20 was aware that he had hepatitis C?
21     A.  I don't recall that.
22     Q.  Any indication from Mr. Johnson's notes or
23 from your conversation with him that there was the
24 possibility of a prior insult to the liver that
25 could lead to hepatic encephalopathy?

---

**79**

1     A.  Not that I recall.
2     Q.  If a tox screen had been done and drugs
3 and alcohol were eliminated as causes of this, what
4 would your next step have been?
5     MR. MCGARRY:  Objection.  Object to form.
6 Calls for speculation.
7     MR. MYLAR:  Join.
8     THE WITNESS:  I probably would have done
9 the same thing.  I would have watched, you know, as
10 long as the vital signs were stable.  Because we do
11 see confusion and agitation very commonly out
12 there.  So I think the next step -- now, this is
13 purely speculative, you know, and so I can only
14 speak to what we've done in the past.  I would have
15 continued observation, continued gathering vital
16 signs and trying to get more information.  Might
17 have had him evaluated by mental health people out
18 there, might have considered, "Gosh, is this an
19 individual where we should look at using one of the
20 psychotropic drugs?  You know, is this the
21 beginning of his psychosis or schizophrenic-like
22 ailment?"  I don't know.
23     MR. SCHRIEVER:
24     Q.  How many days is it reasonable to keep a
25 person in a dazed, confused state without

---

**80**

1 investigating those other potential causes?
2     MR. MCGARRY:  Object to form.  Incomplete
3 hypothetical.
4     MR. MYLAR:  And also calls for
5 speculation.  I join in those.
6     A.  That one -- that one's hard to say.  I
7 think it depends on findings while you're observing
8 them.  If they're safe, in that they're taking
9 nourishment, they're drinking water, they're not
10 harming themselves, I think those all play a role.
11 If they're stable, in that their situation is not
12 deteriorating, I think it's fine to continue to
13 watch and gather information.
14     Q.  Okay.  Let me give you a -- I'll represent
15 to you what a note says, and you can use this.  And
16 then I'll give you a question after.
17     A.  Okay.
18     Q.  My representation is that one of the notes
19 says that a deputy gave Mr. Crowson his clothes and
20 told him to get dressed.  Mr. Crowson put his
21 underwear on his head.
22     A.  Okay.
23     Q.  Is that something that would be -- that
24 you would look at to determine whether or not
25 there's a serious issue happening?

---

**81**

1     MR. MCGARRY:  Object to form.
2     MR. MYLAR:  Objection.  Also calls for
3 speculation.  Also lack of foundation.
4     A.  That's not an unusual occurrence.  We deal
5 with a lot of psychological illness there.  In
6 today's day and age, the prison systems house the
7 mentally ill.  They can't help but commit a crime
8 when they're on the outside.  So we see that type
9 of thing a fair amount.
10     Q.  Okay.  And if a nurse asked him to take
11 deep breaths and he was unable to follow that
12 simple of an instruction, is that a serious
13 symptom?
14     MR. MCGARRY:  Same objections.
15     MR. MYLAR:  Join.
16     A.  Once again, it is related to his degree of
17 confusion.  We've had people weaponize excrement in
18 the prison.  So I -- if you're going to throw a
19 bomb, an excrement bomb, you know, that's fairly
20 serious.  But we don't send them to the hospital
21 for that.
22     Q.  Okay.  But my question was:  Inability to
23 follow simple instructions, such as take a deep
24 breath?
25     A.  These people don't follow those

82

1 instructions either.  We see that all the time.
2 It's not uncommon.
3 **Q.  In a hospital setting, those would be**
4 **viewed differently, though; correct?**
5 A.  They would be.  They would be.  It's a
6 tough situation, because we have individuals that
7 are noncompliant.  Oftentimes, there is the issue
8 of secondary gain through their actions, and it
9 makes the whole medical evaluation process that
10 much more difficult.
11 MR. SCHRIEVER:  All right.  Thank you,
12 Dr. LaRowe.  I don't have anything else.
13 MR. MYLAR:  I don't have any questions.
14 MR. MCGARRY:  We'd like the opportunity to
15 review and sign.  If you'll send it to me, I'll get
16 it to Dr. LaRowe.
17 MR. MYLAR:  And I would like a electronic
18 version, as well as a minuscript.
19 MR. MCGARRY:  Send me everything.  Just
20 anything you can bill for to make up for those
21 thousand burpies you missed today.
22 (The deposition concluded at 11:00 A.M.)
23
24
25

83

```
1              CERTIFICATE OF DEPONENT
2  PAGE     LINE     CHANGE          REASON
3       _____
4       _____
5       _____
6       _____
7       _____
8       _____
9       _____
10      _____
11      _____
12      _____
13      _____
14      _____
15                 *****
16     I, DR. JUDD LAROWE, deponent herein, do hereby
    certify and declare under penalty of perjury the
17  within and foregoing transcription to be my
    deposition in said action; that I have read,
18  corrected and do hereby affix my signature to said
    deposition.
19
              _____
20
                   Deponent
21
     Subscribed and sworn to before me this _____
22  day of _____, 2018.
23
24    _____
25     Notary Public
```

84

```
1              REPORTER'S CERTIFICATE
2
3  STATE OF UTAH      )
                      )  ss
4  COUNTY OF WASHINGTON )
5
6      I, J. ELIZABETH ROBISON, Registered
   Professional Reporter, Washington County, State of
7  Utah, do hereby certify:
8      That I reported the taking of the
   deposition of the witness, DR. JUDD LAROWE,
9  commencing on Wednesday, June 6, 2018, at the hour
   of 9:03 A.M.
10
11     That prior to being examined, the witness
   was by me duly sworn to testify to the truth, the
   whole truth, and nothing but the truth.
12
13     That I thereafter transcribed my said
   shorthand notes into typewriting and that the
   typewritten transcript of said deposition is a
14 complete, true and accurate transcription of my
   said shorthand notes taken at said time.
15
16     I further certify that I am not a relative
   or employee of an attorney or counsel of any of the
17 parties, nor a relative or employee of any attorney
   or counsel involved in said action, nor a person
18 financially interested in the action.
19     IN WITNESS WHEREOF, I have hereunto set my
   hand in my office in the County of Washington,
20 State of Utah, this          day of
2018.
21
22
   _____
23     J. Elizabeth Robison, RPR, CCR
24
25
```

**-**

**-ooo-** 3:7 63:1 70:4

**1**

**100** 21:19
**10:52** 55:17 57:5
**11:00** 82:22
**125** 21:7
**140** 41:8 50:25
**15** 61:11
**1664** 6:6
**17** 6:15
**1st** 45:4 69:19

**2**

**20** 21:22
**20/20** 33:18 78:17
**2001** 7:19
**2002** 7:20 9:21
**2014** 12:1 41:6 45:4,12
**24** 54:19 55:12
**24/7** 11:2
**25** 55:13 56:6
**25th** 22:20 23:7 44:3 45:12
**26** 55:13 56:6
**26th** 63:8
**27th** 63:9
**28th** 39:8 51:9
**29th** 39:10 41:6,11 44:1
  46:5 50:25 54:9
**2:07** 26:20

**3**

**30** 39:18 43:13
**30th** 44:24 45:2 54:12
**3:23** 23:7
**3:36** 44:19
**3:39** 55:1

**4**

**40** 21:1
**44** 20:5 21:1 54:19 55:12
  56:6

**5**

**50-anything** 18:18
**501** 18:17,18,23 20:3,7,9
**58** 21:15
**5:45** 55:18

**6**

**6-25-14** 21:5
**6-25-2014** 25:5 33:15
**6-26** 24:1
**6-27** 24:1
**6-28** 50:14
**6-28-14** 19:1 24:9 26:16,20
**6-29** 49:25 55:16 56:14
**6-29-14** 51:5
**6-29-2014** 44:19 55:1
**6-30** 55:16,17 57:5
**60** 21:19
**6:05** 55:16
**6:34** 55:17

**7**

**7-1** 55:18
**7-1-2014** 25:5 33:15
**72** 28:9 30:16
**73** 22:5
**78** 21:7
**7:48** 41:7 51:5

**9**

**90** 22:2
**99** 22:2
**9:43** 46:6

**A**

**A.M.** 41:7 55:17 82:22
**ability** 38:12 60:9
**Absolutely** 61:10 71:12
**abuse** 59:20
**abused** 59:25
**access** 10:18,20 29:7,12,
  14
**accurate** 19:25
**achieve** 43:7

**acid** 35:4
**acidotic** 16:19
**action** 38:10
**actions** 82:8
**activity** 68:2 76:24 77:2
**actual** 9:22
**add** 36:16
**addicted** 28:4
**addiction** 53:3
**addition** 25:10 40:15 58:5
**additional** 57:2
**adjacent** 39:15
**administered** 56:9
**admission** 53:11
**admissions** 75:14
**advantage** 71:6
**affect** 22:13,16
**age** 6:15 81:6
**aggressive** 46:21 50:8
**agitated** 27:8 28:17 34:4
  46:2 48:12
**agitation** 27:3 31:3 34:13,
  21 41:22 42:13 45:20 46:3,
  17 47:4,11,14 53:21,25
  79:11
**agree** 32:7,12 46:9,11 50:4
  64:14 72:23 73:4,8
**agreeing** 46:12
**ahead** 12:13 28:8 31:14
  32:24 65:5
**ahold** 60:6
**aided** 53:12
**ailment** 79:22
**ailments** 60:18 74:1
**Alan** 7:14
**alcohol** 8:10 30:14 42:3,
  20,22 43:6 45:17 46:18
  51:20 52:10,15 53:22,23
  67:15 73:9,15 75:3 78:9
  79:3
**alcoholic** 53:5 78:6
**allergy-type** 60:20
**alluded** 63:19
**ammonia** 34:15 35:8
  71:10 77:25
**amount** 10:14 43:9 66:5
  81:9
**Amy** 12:6,7,9,21
**answering** 4:20
**answers** 5:14 49:20
**anticipate** 5:7

**anxiety** 53:25
**Apparently** 36:22
**appearing** 71:18
**area** 39:15 63:14
**areas** 8:5
**argue** 47:7
**arrangement** 10:8
**arrested** 22:10 49:19
  68:17
**arterial** 35:6,10
**arterially** 35:9 71:11
**assessment** 16:22
**assistant** 12:4,16 41:4
**assume** 26:17 51:25
**asterixis** 33:24
**Ativan** 41:14,19,20 42:1,
  18,23,24 43:17 53:7,8,11,
  17,24 55:2
**attempted** 19:5,6
**attorney** 4:6
**audibly** 4:20
**auditory** 31:1 45:21 48:1
  50:19
**August** 11:13
**aware** 29:17,22 44:1
  45:16,19 48:20 50:6,20,21,
  23 64:10 74:15,17 77:8,9
  78:14,20
**awareness** 53:18
**awhile** 74:17
**awry** 3:23

**B**

**back** 6:17 13:8 16:6 37:2
  55:25 57:8 66:25 67:21
**background** 4:14 6:18
**balance** 35:4
**base** 35:4
**based** 32:12 48:25 67:3
  69:16 71:3 77:10 78:5
**basically** 6:14
**basis** 8:2 27:23
**Bates** 20:11
**beginning** 79:21
**Benedict** 12:6
**benzodiazepine** 41:23,25
  42:16,19 43:7 53:8,14
**big** 53:25
**bill** 82:20
**Billings** 56:23

**bit** 4:11 17:24 21:18 30:10 42:16 46:11,14 65:15 70:9

**block** 44:12 57:16

**blood** 13:25 16:8,16,21 18:4,5,6,9,10 19:3 21:7,11 26:17 27:2,3,7 30:6 35:3,6 50:11 51:10,12 52:8,15 59:9 72:5

**board** 38:1

**body** 77:23

**bomb** 81:19

**book** 56:4,5

**booking** 14:3 29:19 39:14, 15,16 40:21 44:2,9,16 58:17 63:14 73:19

**borderline** 66:12

**Borrowman** 11:5,6,11,15 12:1 14:5 15:19,20 37:12 49:7,8 51:1 62:1 76:4

**Borrowman's** 45:4 76:10

**bottom** 18:16 20:2,4

**box** 23:6

**BP** 26:17

**brain** 8:13,19,21 36:2 71:19

**break** 5:9 46:10,14 55:24 56:2 70:8

**breakfast** 49:17

**breath** 34:2 81:24

**Breathalyzer** 72:2

**breaths** 50:15 81:11

**brew** 51:24 63:22

**briefly** 10:7

**broad** 8:4 32:14 47:15

**burpies** 82:21

---

**C**

**call** 10:25 11:1 13:19 14:4, 13,16,17 16:7 24:17 31:2 39:11,22 41:10 44:16 59:4, 9 63:17 70:11

**called** 28:12 33:24 51:2 58:6 63:18

**calling** 59:16

**calls** 13:2 16:4 79:6 80:4 81:2

**calm** 42:16

**capital** 6:1

**cardiology** 7:12 12:20

**care** 10:1 40:2 59:12,16 60:22 69:6 72:9,13 73:12

**case** 3:20,22 4:12,17 8:22 12:22 14:1 15:13,15,20,22,

25 34:7,12 39:6 42:24 53:16,21 66:22 68:23 69:14,17 70:14 72:3 73:6 76:10

**cases** 43:8

**casual** 4:24

**CBC** 16:15 19:2 74:7

**cell** 11:1

**Center** 32:5,18 33:6

**cessation** 30:16

**chance** 4:5,7

**change** 27:5

**changed** 14:6

**characterized** 50:12

**chart** 75:15

**charting** 18:11

**cheat** 57:24

**check** 39:18 40:5 74:7

**checking** 40:24

**checklist** 48:15 58:18 75:2,3

**chest** 13:25 17:11,14 18:1 74:8 76:16

**child** 61:4

**choice** 62:4

**cholangitis** 78:5

**circumstances** 66:6 78:2

**cirrhosis** 78:6

**clarification** 38:22

**clarify** 63:7

**classic** 46:24 47:19

**clear-cut** 14:2 68:3 73:20 74:11

**clearance** 58:25 59:1

**climbing** 47:18

**clinic** 7:13,22

**clinical** 32:13

**close** 39:19 63:14

**closer** 14:3

**clothes** 80:19

**clue** 17:10,25 25:8 26:10 35:4

**clues** 16:11 17:2

**CMP** 19:2

**collected** 59:7

**column** 26:5

**commit** 81:7

**common** 8:5 29:4 60:19 64:5

**commonly** 67:16 79:11

**communicate** 10:23

**communications** 15:12, 14

**compartments** 57:15

**complaint** 31:16

**complaints** 17:8 58:8,22 60:14

**complete** 16:15

**completion** 7:7

**compliant** 57:6

**complicating** 52:20

**comprehensive** 16:16 35:6

**computer** 62:10

**concern** 64:5

**concerned** 22:15

**concluded** 82:22

**condition** 8:24 9:1 32:19 57:2 61:24

**conditions** 70:13

**confinement** 29:18

**confused** 22:16 27:11 28:16 38:20 46:4 48:18 49:16 55:2 71:18 79:25

**confusion** 13:21 31:3 33:23 45:21 46:9 48:4 49:14,23 50:3,18 53:13,20, 22 74:6 79:11 81:17

**Confusions** 48:4

**connected** 28:15

**consideration** 73:16

**considered** 79:18

**consistent** 32:2 42:12

**consultant** 9:25

**consultative** 59:12

**consumption** 78:6

**contact** 11:24 16:1,4 58:9

**contacted** 22:21 24:2,4,6, 8,14 39:7

**contained** 31:18

**Context** 70:17

**continue** 63:16 80:12

**continued** 79:15

**continuing** 48:24

**continuous** 60:16

**contractor** 10:1,7,17

**contribute** 27:9

**contributing** 78:12

**conversation** 4:23 78:23

**conveyed** 75:11

**cooperation** 18:7

**coordinate** 59:4,15

**coordination** 10:2

**Coremr** 18:11,24 25:25 33:6 56:7 62:7

**corps** 6:24 61:10

**correct** 9:24 24:18 26:5 32:5 33:7,8 37:20 39:4 40:1,14,17,23 41:4,25 45:14 48:11,19 49:14,15 50:3 51:17 56:21 61:15,24, 25 62:2 63:11,25 68:9, 10 69:12,19,20 71:11 72:6, 9 76:25 82:4

**correctional** 56:25 59:21

**Corrections** 4:15 8:8

**Coumadin** 3:22

**counsel** 4:25

**count** 16:16

**County** 9:13

**couple** 56:3 63:6,7 70:1

**court** 4:25

**cover** 32:14

**covers** 11:3

**create** 48:14

**crime** 81:7

**criteria** 45:16 46:8

**critical** 38:13

**critique** 36:19

**Crowson** 3:11,12 13:12 22:20 24:23 25:16,18 26:3, 13,15 29:11 33:14 37:19 39:12,13 44:2,20 45:2 46:2 48:15 51:21 53:2 54:5 65:3 69:13,18 75:24 77:3 78:14 80:19,20

**Crowson's** 12:22 32:19 37:18,23 57:2 61:12,24 73:5 77:15

**crushed** 64:21

**currency** 6:2

**current** 25:10 58:21,22

---

**D**

**D-102** 6:6

**D-O-L-G-N-E-R** 22:12

**daily** 16:5 40:11,13 41:4

**damage** 35:22

**data** 72:2

**date** 9:20,22 54:20

**dates** 62:8,11

**day** 11:25 24:14 25:1,5 26:19 43:19 60:17 81:6

**days** 24:3 27:12 30:18 36:8 43:22,24 50:1 54:6,10 63:11 79:24

**dazed** 27:11 38:19 49:16 71:18 79:25

**de** 77:20

**deal** 6:13 8:2,10 28:1 60:19 65:17 67:11,22 81:4

**dealing** 33:25 72:25 74:23

**dearly** 74:6

**decade** 4:3

**decide** 57:20

**decision** 23:1

**declare** 58:5

**declined** 19:9,17

**decrease** 53:20,21,22

**deep** 50:15 81:11,23

**deficient** 34:17,18

**degree** 81:16

**delirium** 30:17,23 31:7,23 67:19 68:2

**delivered** 55:7

**delivering** 60:21

**dementia** 66:12,13

**department** 4:15 7:12 8:8 10:2 39:2

**depend** 65:6

**depends** 52:9 55:6 80:7

**deposed** 37:11

**deposition** 3:14,16 4:7,22 9:11 82:22

**deputies** 22:11 39:18

**deputy** 39:22 80:19

**describe** 46:18 47:21 57:12

**Desert** 7:1

**detail** 50:12

**detected** 74:16

**deteriorating** 80:12

**determine** 52:6 80:24

**determining** 74:24

**develop** 27:22 60:22 77:20

**developed** 53:3

**diabetes** 6:13

**diagnose** 35:1

**diagnosed** 75:16 78:15

**diagnosing** 33:20 45:17

**diagnosis** 17:16 32:7,13, 15,20 33:14 37:8 60:10,11, 12 70:8,10 72:25 74:24

**diagnostic** 17:1 34:25 46:8

**diaphoresis** 28:19,20 30:5 67:25

**difference** 72:18

**differential** 52:2 67:6 70:8,10 72:25 74:23

**differently** 76:8 82:4

**difficult** 42:21 43:5 65:15 82:10

**difficulties** 13:21

**difficulty** 37:17

**dilated** 23:7,17,18,22

**direct** 18:15

**directly** 29:19

**director** 9:23 10:4

**discussed** 15:22,25 31:5 45:7

**discussing** 15:22

**discussion** 77:10

**disease** 6:13 31:25

**disoriented** 49:20

**disposal** 75:14

**distribution** 54:14

**Dixie** 6:6 12:19 32:4,18 33:6 52:18

**doctor** 23:14 36:20 40:4, 12 41:3

**doctors** 52:18

**Dolgner** 22:11

**door** 6:14

**dose** 54:12,25

**draw** 9:8 18:6,9,10 35:10 50:11

**drawn** 18:5 35:9

**dressed** 80:20

**drinking** 80:9

**Drive** 6:6

**DRMC** 9:12

**drug** 8:10 27:19,21 28:5 29:5 42:13 52:7,9 60:3,4 65:12 66:8 71:21,23 73:15, 25 77:15 78:2

**drugs** 29:12 51:20 52:15 63:22 65:15,21 66:2 73:9 79:2,20

**Ds** 6:2

**DTS** 30:25 67:18 68:9,10

**due** 9:5

**duly** 3:4

**duration** 29:3

**E**

**earlier** 44:11

**ears** 14:25 45:15

**easier** 62:20

**easily** 74:16

**easy** 67:16

**edge** 77:23

**edges** 5:15

**educational** 6:18

**effect** 24:7 53:14,17 64:25

**effects** 27:18

**elected** 14:8

**electrolytes** 16:21

**electronic** 26:8 82:17

**elephants** 47:20

**elevated** 26:18 27:2 30:6 41:7

**elevation** 27:3,6

**eliminate** 72:6 73:1 74:25 77:24

**eliminated** 79:3

**Elko** 7:6,8

**emergency** 14:9 38:11 39:2 58:6,24 67:12 72:10, 15 77:6

**employees** 10:22

**encephalopathy** 8:23 9:5 32:2,8 33:19,21 34:1,9,17 35:2,15,21 36:7 52:21 53:6,15 75:7,17,22 77:16, 19,20 78:25

**end** 68:10

**ensure** 57:22 58:3

**ensures** 39:20

**enter** 26:9

**entirety** 6:25

**entries** 62:8,11

**entry** 21:5

**ER** 45:5 58:23 59:1 75:25

**err** 76:2

**evaluate** 47:24 58:8 59:2

**evaluated** 79:17

**evaluating** 14:18

**evaluation** 16:12 17:7 26:15 45:6 58:14 82:9

**event** 27:24 67:20 73:24

**events** 4:17 13:15

**evidence** 19:12

**exact** 9:20

**EXAMINATION** 3:8 63:2 70:5

**examined** 3:6

**examining** 32:11

**exams** 60:15

**excellent** 4:6

**exception** 57:4

**excrement** 81:17,19

**Excuse** 48:22

**exhibit** 49:13 67:8 68:2

**exhibiting** 27:10 48:17

**expect** 17:23 42:17 43:3, 18 69:6 72:11,17

**expected** 17:13

**experience** 61:6,23 63:21, 23 71:14

**experimented** 65:20

**expert** 3:21

**explain** 17:19

**extended** 29:18

**extension** 7:13

**extent** 61:22

**eye** 73:19

**eyes** 14:25 45:15

**F**

**Facetime** 24:20

**facilities** 59:22

**facility** 11:17 56:25 68:4 69:3 72:1,22

**fact** 14:22 15:21 19:20 23:10,12 29:23 37:1 53:10 57:4 61:8 63:13 67:12 70:23 75:15

**factor** 52:20 78:12

**facts** 29:20,21

**fair** 33:1,2 49:4 66:5 71:15 81:9

**fairly** 9:7 29:3 81:19

**fall** 34:5 47:2,10 48:11 54:3

**fallen** 25:9

**falls** 8:3 10:4

**familiar** 8:18,20,24 9:1 39:23

**family** 42:2 53:9

**fasting** 16:21

**fax** 10:25 13:5,7,8

**faxes** 10:25

**fee** 10:9,11

**feel** 14:1 36:20

**felt** 38:4
**female** 74:18
**fetor** 34:2
**fever** 66:9
**files** 13:10,12
**find** 4:7,12 18:14 19:23 54:18
**finding** 21:21 27:9 33:24 34:1
**findings** 46:20 80:7
**fine** 5:4,14 19:24 80:12
**firsthand** 5:17
**fishing** 47:22
**fit** 46:7
**fixed** 23:18
**flat** 10:9,11
**follow** 17:2 81:11,23,25
**follow-up** 39:20 59:14 70:1
**form** 28:7 30:3 31:10,14 35:16,23 36:10 40:7 64:12, 14 65:4 68:21 77:17 78:16 79:5 80:2 81:1
**fortunately** 33:18
**Forty-four** 20:5
**found** 32:9
**foundation** 32:10,23 36:1, 10 65:5 71:2 81:3
**fracture** 59:13
**frame** 25:19,20 43:3 44:5
**free** 36:20
**front** 18:13 21:3
**fruity** 34:2
**full** 7:3
**function** 16:20

**G**

**gain** 82:8
**gas** 35:7
**gather** 72:1 80:13
**gathering** 79:15
**gave** 47:17 49:20 80:19
**general** 6:23 7:7 9:6 17:1, 7,15
**generalization** 17:6
**generally** 35:10 42:13
**genetic** 78:4,9
**George** 6:7 7:13,25
**gestalt** 76:11
**give** 16:17,19 30:12 34:13,

15,19 37:22 39:22 41:17 42:25 57:8 58:2 60:13 75:23 80:14,16
**glucose** 22:5
**good** 39:20 42:13 60:15
**gosh** 61:11 79:18
**GRAF** 69:24
**Grand** 6:21
**great** 61:10
**group** 12:20
**groups** 72:6
**guess** 51:8,15

**H**

**half** 11:24
**half-life** 30:8
**hallucination** 45:21 47:10
**hallucinations** 31:1,2 47:16 48:2 50:20,22
**handed** 56:3
**happen** 58:4 66:1,5 78:1
**happened** 12:2 26:23
**happening** 65:24 80:25
**hard** 61:2 80:6
**harm** 59:25 60:1,5
**harming** 80:10
**head** 8:13 80:21
**heading** 47:2,3
**health** 66:1 79:17
**healthcare** 57:11
**heard** 63:20 64:2
**heart** 6:13 12:19 41:7 48:8
**helped** 12:4
**helpful** 51:11
**hepatic** 33:25 34:16 53:6, 15 75:16,21 77:19,20 78:25
**hepaticus** 34:2
**hepatitis** 78:4,11,15,20
**heroin** 29:25 30:1,4,8 42:6
**Hey** 16:25 39:11 60:25
**higher** 17:24
**hindsight** 33:18 78:17
**hired** 7:11
**histories** 58:16
**history** 58:21 60:14 65:14
**hold** 20:18 50:11
**home** 63:22 68:20,25
**hope** 43:20,24

**hoping** 17:10 41:20
**hosp** 25:6
**hospital** 7:7 35:11 39:24, 25 40:3,19 53:7,11 67:10 68:5,16,18,20,24 69:11,14, 18 70:23,24 71:14,15 72:8, 10,14,23 81:20 82:3
**hospitalizations** 75:18
**hospitalized** 40:10
**hospitals** 39:24
**hour** 10:10 11:23,24 43:14
**hourly** 36:21 42:23
**hours** 28:9 30:16
**house** 81:6
**huffing** 72:4
**huge** 43:9 48:11 77:18
**huh-uh** 4:25
**hypertension** 28:19
**hypothetical** 27:15 36:18 40:8 80:3

**I**

**ice** 47:22
**ICU** 75:20
**idea** 16:18,19 26:6 29:24 58:20
**identifying** 37:17
**IHC** 7:16
**ill** 81:7
**illegal** 65:14 66:2
**illness** 81:5
**IM** 41:15 55:2
**imagine** 11:7
**immediately** 39:15
**impact** 53:16
**important** 27:5 50:17 70:17 72:24
**impossible** 52:1
**impression** 73:14
**improvement** 43:21
**in-depth** 45:6
**Inability** 81:22
**incarcerated** 29:9 39:3
**incarceration** 31:7
**include** 9:14,16
**including** 28:18
**Incomplete** 27:14 36:18 40:7 80:2
**increase** 53:18
**increased** 48:8

**independent** 13:10,14 19:14
**independently** 13:24
**indicating** 22:19
**indication** 37:22 50:10,19 51:19 75:23 77:2 78:19,22
**indications** 74:12
**individual** 17:13 21:20 58:16 59:23 65:20 79:19
**individual's** 71:25
**individuals** 9:7 34:3 43:23 53:8 82:6
**infection** 17:19 58:12 74:5,9,13 76:20
**infections** 60:19 74:19 75:3,4
**infectious** 78:9
**information** 20:22 29:15 31:18 33:3,5 44:21 45:1 59:6,10 67:2 69:16,19 79:16 80:13
**informed** 23:9,11
**ingest** 64:15
**ingesting** 64:23
**initial** 42:25 73:24
**Injection** 64:19
**injured** 77:21
**injuries** 8:14,19,21
**injury** 36:2 78:5,8
**inmate** 3:11 38:25 39:11 57:23 58:2 59:12 64:8,25 65:11,17 68:15,16
**inmates** 10:2 12:25 29:7 41:4 51:24 57:16,19,24 58:5,8 63:21 64:3,4,7,17, 21
**insight** 57:2 60:23 61:23
**insomnia** 54:4
**instruction** 81:12
**instructions** 81:23 82:1
**insult** 77:22 78:24
**insults** 66:8,19 71:19
**intake** 58:15 78:16
**interact** 57:18
**interactions** 14:12 15:5 73:13
**interested** 7:16 23:13
**internal** 6:12 7:3 8:4
**internship** 6:21
**interpret** 5:1
**interpretation** 52:24 53:1
**Intromuscularly** 41:16

June 06, 2018

**investigating** 52:4 80:1
**involve** 3:20
**involved** 9:18 23:1 29:14 65:19
**involvement** 8:7 9:17 12:21 15:17
**isolated** 27:24
**issue** 74:3 80:25 82:7
**issues** 8:1 51:3 58:21 75:4
**items** 16:17 35:7 48:11
**IV** 78:2

**J**

**J-U-D-D** 6:4
**jail** 9:19 10:8,23 11:21,23, 24 12:2 13:6,7 25:2,14 32:21 33:15 38:9,16 39:3 40:18 57:11,15 63:11,13, 22 65:11 66:23 67:9 68:19 72:13,19 73:6,11 77:5
**jail's** 12:24
**January** 7:20
**jaundice** 34:4
**job** 7:6 9:23 57:22
**jog** 5:15
**Johnson** 13:19 14:15 15:24 16:2,7 22:19 23:9 24:18,24,25 26:16 31:18 37:21,22 38:13 39:6 41:11 44:17 45:12 46:2 49:3 51:18 61:22 73:13,14 75:23 78:19
**Johnson's** 44:19 75:11 78:22
**join** 32:24 36:12 40:9 68:22 71:4 79:7 80:5 81:15
**joined** 7:14
**Jon** 10:4 15:5,13 22:25 23:2
**Joshua** 56:23
**Judd** 3:5 5:23 6:2 31:12
**judge** 4:10
**July** 45:4 69:19
**June** 12:14 22:20 23:7 39:7,10 41:6,11 44:24 45:2,12 63:8
**jury** 4:11

**K**

**kick** 43:1
**kidney** 16:20
**kind** 6:10 17:2 22:9 31:6 39:9 45:23 47:19 49:18

58:1 65:2
**kinds** 63:21 64:17
**kite** 58:9
**knew** 44:6 66:25
**knowing** 23:14 31:6 46:22 71:16
**knowledge** 4:16 5:16,17 24:13,16 48:17,23,25 61:23 64:1 76:7

**L**

**L-A** 6:1
**lab** 72:22
**laboratory** 71:7
**lack** 15:17 32:9,10,22 36:1 71:1 81:3
**lactulose** 34:14,20
**large** 14:19 33:23 61:22 75:10
**Larowe** 3:3,10 5:23,24,25 37:11 56:2 62:14 63:4 82:12,16
**latitude** 4:12
**lawyering** 36:19
**lead** 78:25
**leave** 52:11
**leeway** 66:11,16
**level** 35:8
**levels** 34:15
**Librium** 43:1,17 52:20 53:12 54:2,5,12,24 55:3, 16,17,18,19 56:7,8 67:24
**license** 77:14
**lieu** 55:3
**life** 68:14
**life-threatening** 67:20
**light** 23:8,15,22
**lines** 56:13
**list** 59:4
**liver** 16:20 41:24 77:21,24 78:5,24
**location** 6:9,11
**log** 9:14 13:2
**long** 5:8 6:8 11:11,18 28:5, 25 44:9 53:2 54:5 68:1 79:10
**long-term** 66:2,3
**longer** 28:10 30:7,9,11,15 43:17
**looked** 45:24 46:6
**lot** 4:22 17:20 27:16 28:15 31:25 43:6,24 53:14 60:21

67:22 72:2 81:5
**loved** 74:6
**low-normal** 17:21
**lower** 17:19 21:18
**Lyman** 22:11

**M**

**main** 34:22
**make** 4:18,24 5:1,18 19:13, 24 38:3 39:4 48:24 59:23 75:7 82:20
**makes** 38:12 82:9
**making** 4:22
**male** 74:14
**man** 17:23
**manage** 68:4
**March** 12:10
**Marie** 6:24
**marked** 18:22
**Martin** 3:11 57:2
**Mcgarry** 4:6 27:14 28:7,14 30:3 31:10,12,14 32:24 35:16,23 36:3,10,13,15,18, 22 38:21,24 40:7 48:22 49:4,6,9,11 56:12,15,17,20 68:21 69:23,25 71:4 77:17 79:5 80:2 81:1,14 82:14,19
**MD** 24:10 26:18 41:9
**meaning** 47:7
**means** 41:17 70:10
**med** 28:4 57:17
**medical** 6:20,23 9:23 10:1, 2,3 26:8 32:5,18 33:6 39:16,17 49:1 52:19 58:6, 13,15,21,22 59:1 60:14 63:14 82:9
**medication** 42:22 43:16 53:5 54:14 55:9 57:5,23,25 64:8,18 65:6 66:12
**medications** 57:17,19,21 58:21 59:18,19,20,23 64:3, 9,22 65:21 66:4
**medicine** 6:12 7:3 8:4
**memory** 4:16 5:15 13:14 25:16 54:7
**men** 74:16
**mental** 53:18 79:17
**mentally** 81:7
**Mesquite** 7:23
**met** 11:6
**metabolic** 16:16 32:8 33:19,21 34:9 35:1,6,15 52:21

**meth** 42:15
**methamphetamine** 28:3, 5,13 29:2 30:2,7 42:7
**methamphetamines** 27:21
**methods** 10:24
**Michael** 22:19
**Michigan** 6:22
**Mike** 13:19 14:15 15:23 24:17 31:18 38:4 44:16
**milligrams** 41:15
**minimum** 40:11,25
**Minneapolis** 6:20
**Minnesota** 6:19
**minuscript** 82:18
**minute** 8:8 19:23
**minutes** 39:19 43:12,14
**missed** 75:21 82:21
**missing** 75:5
**misspoke** 19:8
**Misstates** 29:20
**mistake** 19:10
**moment** 48:22
**Mondays** 25:11
**money's** 36:23
**monthly** 10:12
**months** 7:1
**mother** 61:3
**mouth** 17:5 57:25
**moved** 7:13 14:2 29:19 39:14,16 73:19
**MRI** 35:12
**mult** 75:18
**multi-vitamin** 34:19
**multiple** 11:25 71:17
**multitude** 28:18
**Mylar** 20:7,9 29:20 32:9,22 35:24 36:1,4,12 40:9 62:17,20 63:3 69:21 70:7 71:1 79:7 80:4 81:2,15 82:13,17
**Mylar's** 76:23

**N**

**NASH** 78:7
**nature** 62:3
**nausea** 30:5 67:25
**Navy** 6:24
**necessarily** 8:3 39:23 67:9

June 06, 2018

needed 38:5
negative 64:25 76:18
neomycin 34:14,21
Nevada 7:6,23
nonalcoholic 78:7
noncompliant 50:15 82:7
nonspecific 30:5 31:11, 15,25 32:13
norm 35:5
normal 14:6 17:12,23 21:9,17,19,25 22:4,6 27:20
notation 18:11
note 22:10,18 24:7 26:1 37:15 41:6,8 44:18,25 45:5 46:5 78:18 80:15
noted 26:16 75:22 76:19 77:4
notes 9:14,15,16 18:24 19:16 22:7 24:1 31:19,21 33:6,7 38:16 41:12 45:25 52:19 57:1 58:23 78:22 80:18
notified 39:22
nourishment 80:9
novo 77:20
number 3:18 4:1 20:2,7,9, 11 27:8 34:13 46:7 48:11 59:18 64:7 65:21 74:9,18 75:19
numbers 18:16
nurse 11:3,18 12:2,3,11, 15,17 41:3 56:24 57:10,13 58:7 63:17 81:10
nurse's 9:15
nurses 14:19 15:2 40:15, 24
nursing 16:5 38:1 57:14, 18 58:9,18 59:2,15 77:10

O

O2 22:2
oath 4:9
Object 28:7 30:3 31:10,14 35:16,23,24 36:10 40:7 68:21 77:17 79:5 80:2 81:1
objection 27:14 28:14 29:20 32:9,22 36:4 37:15 45:9,14 64:12 65:4 71:1 79:5 81:2
objections 36:3,12 37:3 48:24 81:14
observation 14:3 39:19 40:21 79:15
observing 80:7

occur 26:6
occurred 46:23
occurrence 81:4
occurs 39:21
odd 31:3
offer 60:24
office 10:25 11:1
officer 6:23
oftentimes 27:6 34:3 42:14 58:24 59:2 60:23 82:7
one's 80:6
one-word 49:20
one-year 6:21
onset 30:16 41:20
opinion 30:13 32:19 33:13
opinions 60:24
opportunity 82:14
option 64:19
options 67:5 70:7
order 16:23 52:17 59:9
ordered 13:24 16:8,15,24 17:11,14 19:3
oriented 27:11
orthopaedic 59:14
oxygen 17:12,21,22

P

P.M. 26:20 44:19 55:16,18 57:5
pages 55:11,13 56:3,6
panel 16:16 35:6
paraphrasing 37:14
part 14:19 31:16 46:4 52:2 57:22 58:17 75:10 76:12
partnership 7:8
pass 57:17
passed 59:25
past 58:20 60:14 63:24 65:22 79:14
pathologic 76:19
patient 3:22 13:20 16:18 18:5,9 20:17 24:9 25:24 27:10 32:11 33:20 36:7 37:7 38:2,4,24 40:5,10 41:9 58:11,19 60:14 66:11 68:25 76:12,15 77:6,14
patient's 17:8 22:12
patients 9:4 14:18 27:6, 16,19 38:18 40:2 42:14 43:11 46:25 53:15 58:24 59:17 60:17 67:13 74:18

patterns 4:23
pay 10:9,12
paying 36:21
people 28:16 43:6 47:21 54:4 66:10 79:17 81:17,25
percent 22:3
perfect 21:12
perform 15:2 26:2
period 7:22 25:4 27:12 29:18 30:11 40:3 56:5
permanent 35:21,25 36:2
person 28:4 29:1,5 35:14, 17 42:19 60:25 71:13 79:25
personal 26:14
personally 13:11 26:13
pertinent 59:6
pharmacy 55:7
phone 10:24 11:1 13:2,19 14:16,17 16:4,7 24:17
physical 33:24
physician 66:16
physician's 12:4,16 41:3
Pink 47:19
place 35:11
plaintiff 14:11 16:13
plan 42:24 60:22
play 60:10,12 77:16 80:10
played 77:18
point 5:9 7:5,18,21 14:3,8 22:15 41:19 47:14 57:18 60:22 73:22 74:20 77:21
policies 39:10
policy 37:25 77:5,8,13
pool 9:7
poorly 76:13
population 9:5 73:12
positive 9:21 11:19 42:18 44:5,6 51:1
possibilities 32:14
possibility 78:3,24
possibly 43:17 52:7,8,13 72:2 75:6
potential 53:13 73:3 78:11 80:1
potentially 60:4 65:25
practice 4:15 6:5,10,13 7:15 8:6,9,12 9:3
practiced 7:14,24
practitioner 7:21 11:3,18 12:3,11,15,17 41:3

precise 30:13
preparing 9:10
prescribed 42:9
prescription 57:17 60:3
prescriptions 58:19
present 32:1 65:15
presentation 65:16
pressure 21:7,11 26:17 27:2,4,7 30:6
pretty 8:4 13:22 31:4,9,15 32:13 39:19 47:25 48:5 60:19 74:14
previous 53:10 66:19 71:25 73:25 75:14,18
prior 14:12 22:10 31:7 49:18 62:8,11 77:15 78:24
prison 9:18 25:6,7 58:16, 25 62:9,10 67:12 70:20 73:10 81:6,18
private 7:21 8:6,9,12 9:25 10:1,6,17
probe 5:14
problems 66:20
procedure 41:2
procedures 38:17 39:10
process 58:17 60:16 76:19 82:9
product 35:9
products 29:8
protect 38:3 77:13,14
protocol 39:24 41:14
protocols 38:17
provide 10:1 15:9 51:18 57:1,19 60:4 61:23
provided 44:21 45:1
providing 57:11 59:24
provision 41:5
psychiatric 74:1
psychological 81:5
psychoses 27:22 28:12
psychosis 42:15 73:22 75:6 79:21
psychotropic 79:20
pulse 14:7 21:13 28:24 50:25 51:3
pupils 23:7,17
purely 79:13
Purgatory 9:19 10:3 11:16 16:5 18:12 32:21 33:15 56:24
purport 56:8
purpose 40:20

**purview** 54:4
**put** 10:15 11:8 17:4 80:20
**putting** 40:20 63:13

**Q**

**qualifications** 4:14
**question** 5:2,11 15:23
17:6 36:25 37:5 38:6 71:16
73:17 80:16 81:22
**questions** 49:21 58:18
59:17 62:14 63:6 69:22,23,
25 70:2 71:17 76:23 82:13
**quick** 41:21
**Quicker** 35:20
**quickly** 74:22

**R**

**R-O-W-E** 6:1
**radar** 75:8,11
**range** 14:7 21:9,17,19,25
32:14
**rapid** 28:23,24 41:20
**rapid-acting** 43:16
**rapidly** 43:8,12
**Rapids** 6:22
**rare** 11:2
**rate** 14:7 21:24 28:23,24
41:7 48:8 50:25 51:3
**reaction** 42:18
**reactive** 23:8,15,22
**read** 19:17 20:16 37:2,5
**reading** 20:20 41:12
52:22,23
**real** 74:21
**realize** 35:18 37:7
**reason** 19:9 42:9 52:14,16
63:16 69:17
**reasonable** 13:23 67:1
79:24
**reasons** 73:9,18
**recall** 13:18 14:11,14,17
15:7 22:23 23:5,11 24:7
25:18 26:21,24 31:17
41:10,12,13 44:23 51:4
52:22,23 72:20 78:21 79:1
**receive** 13:3,5,7
**received** 44:16 55:17,19
**receiving** 31:17
**recognize** 18:24
**recognized** 74:20

**recollect** 20:21
**recollection** 19:14 25:22
45:1 46:1,23
**recollections** 14:10
**recommend** 37:19
**recommended** 45:13
**record** 5:22 13:9 25:13,24
26:8 29:21 37:3,15 49:1
54:13 55:22 56:1 62:22
71:6
**record-keeping** 10:18
12:24
**recorded** 76:13
**records** 9:11,12,13 12:25
26:12,14 29:11 32:4,12,18
33:12 38:16 39:7 51:9 56:7
62:7 63:10 67:3 71:3,25
76:9
**recovery** 35:20
**reduce** 34:14
**refer** 23:1 54:14
**referred** 22:24
**referring** 8:7
**reflected** 35:5
**refresh** 54:6
**refresher** 4:4
**refused** 18:5,9,10 55:18
56:17 57:5,7
**regard** 18:7
**Regional** 32:5,18 33:6
52:19
**regular** 8:2
**rehabilitation** 69:2
**related** 4:17 13:12 51:6
81:16
**relates** 31:23
**relation** 46:18
**relayed** 13:20
**release** 69:8
**released** 39:2 68:18 69:10
**releasing** 68:20
**rely** 14:19 38:12 61:8 62:4
**relying** 61:22
**remember** 5:12,13 9:20
13:17,18,23,24 14:4,15
22:9 25:8 48:20 49:18,25
**remind** 5:3
**remote** 10:20
**Repeat** 49:5
**reported** 26:18
**reporter** 4:25 37:5 62:21
**represent** 3:11 37:10
80:14

**representation** 80:18
**request** 33:2 58:10,13
**requests** 59:11
**requires** 4:25
**requiring** 59:14
**residency** 7:4
**respective** 57:15
**respiratory** 17:19 21:24
28:23 60:18 75:4
**respond** 13:8
**responding** 71:17
**response** 23:16 41:21
43:4,7,8,12,19,25
**restate** 32:25 33:2 36:25
44:8
**result** 74:1
**results** 76:16
**reveal** 18:1 51:10
**revealing** 13:22 20:25
**review** 32:12 53:10 58:23
59:6,11 71:3,7,24 75:18
76:9 78:17 82:15
**reviewed** 9:11,12 26:12
31:21 32:4,16,17 33:3,5,9,
12
**reviewing** 49:1 71:6 75:15
**risen** 14:8
**risk** 65:24
**road** 6:17 66:21
**role** 57:10,13 59:21 60:9,
11,12 77:15,18 80:10
**room** 14:9 38:11 58:24
67:13 72:10,15 77:7
**round** 40:10,13 41:4
**rounds** 39:17,21 57:15
**routine** 27:23
**routinely** 28:1
**rubric** 47:11
**Ryan** 3:10 11:5 14:4 15:19
37:11 45:4 48:23 51:1
76:10

**S**

**safe** 80:8
**saturation** 17:12,22 22:2
**scanning** 49:19
**schedule** 11:22 25:11
**schizophrenic-like** 79:21
**school** 6:20
**Schriever** 3:9,10 20:8,10,
13 37:1,9 38:23 39:4 49:2,
8,10,12 55:22,25 56:14,16,

19,22 62:13,19 64:12 65:4
68:22 70:1,6 79:23 82:11
**sclerosing** 78:5
**screen** 52:7 71:24 72:24
79:2
**screens** 72:19
**scrutinize** 60:2
**searching** 66:10
**secondary** 82:8
**seizure** 68:2 76:24 77:2
**seizures** 76:23
**semantics** 47:12
**send** 13:8 58:10 67:9,13,
20 69:2,5 81:20 82:15,19
**sending** 76:15
**sensations** 31:3
**sense** 4:18 5:18
**sepsis** 74:20
**septic** 16:19
**serving** 49:17
**set** 77:8
**setting** 53:7 67:12 72:11,
24 82:3
**shared** 64:3
**Shield** 7:1
**shift** 16:3 39:17 40:25
**shoot** 64:16
**short** 29:3
**shot** 41:17
**show** 18:20,22 55:15 56:7,
8,11,12 68:9
**shows** 55:16 57:6
**sick** 14:13 59:4,8
**side** 27:18 53:13,17 76:3
**sift** 59:22
**sign** 74:13 76:24 82:15
**significance** 27:1
**significant** 37:23
**signs** 8:18,20 13:22 14:5
27:5 51:3 63:15 74:8
76:11,13,20 79:10,16
**sill** 39:3
**similar** 30:1
**simple** 81:12,23
**sir** 20:19 48:16 70:3
**site** 10:19
**situation** 62:4 76:8 77:22
80:11 82:6
**Skolnick** 7:14
**Skype** 24:20

**small** 9:8

**smells** 34:2

**snort** 64:16

**snorted** 64:22

**sold** 7:15

**solely** 7:24

**solitary** 29:18

**sore** 58:11 61:4

**sort** 16:25 38:19 46:25 58:2

**sorts** 58:13 59:14 60:20 66:9 72:5

**sounded** 42:11

**sounds** 8:4

**source** 51:20

**South** 6:6

**southern** 9:6

**speak** 15:16 24:23 36:5 51:22 79:14

**speaking** 46:1 49:2,6

**specific** 4:17 8:1,5 16:24 17:17 31:23 39:5 48:6 51:5 52:14,16 58:8 59:16 67:15

**specifically** 14:7 15:18,21 29:1 34:1 54:20

**spectrum** 68:11

**speculate** 57:7

**speculation** 36:11 79:6 80:5 81:3

**speculative** 79:13

**speech** 4:23

**spell** 5:25 22:8

**spelled** 5:24 22:12

**spend** 11:21

**spent** 6:22 7:1 11:23

**spiders** 46:24 47:8,17

**spit** 57:25

**Spokane** 7:5

**spoken** 15:20 76:6

**St** 6:7 7:13,25

**stable** 63:15,16 79:10 80:11

**staff** 15:3,9 16:5 38:1 57:14,18 58:9,15,18 59:2, 15 66:23 77:10 78:18

**Staffed** 24:10 41:9

**stage** 28:17

**stand** 21:13,22

**standard** 6:12 45:23 72:9, 12

**standards** 45:16,19

**start** 9:22 17:18 27:20 29:4 30:21 71:18 73:23 74:2

**started** 5:21 11:16 43:1 54:9

**starts** 67:8

**state** 5:22 67:17 79:25

**states** 6:23 32:1 58:20

**stationed** 6:24

**status** 24:10 41:9 58:22

**stay** 13:9

**STD** 74:17

**STDS** 74:15

**steatohepatitis** 78:7

**step** 74:24 79:4,12

**stock** 55:6

**stop** 12:9

**stops** 29:5

**store** 57:25

**Storm** 7:2

**story** 23:19

**straight** 68:18

**street** 71:14

**stress** 27:7 48:9

**studies** 71:7,10

**subheadings** 34:6

**substitute** 55:10

**success** 19:7

**suffering** 42:19 46:3

**sugar** 16:21

**Suite** 6:6

**suspect** 34:8 70:11 71:20 73:15

**suspected** 51:20 73:10

**suspects** 70:15,21

**Sweating** 28:21

**switch** 62:18

**sworn** 3:4

**symptom** 49:23 50:2,16 81:13

**symptomatology** 60:13, 21

**symptoms** 8:19,20 17:20 27:10,17 28:11,18,25 30:1, 4,14,25 31:4,24 33:22 37:18,23 38:19 41:22 42:4, 7,11,25 45:17 46:7,18 48:5,15 49:13 53:24 58:12 60:20 61:1,12 65:2 67:8, 14,17,23 68:1 70:13 74:8, 25

**syndrome** 78:7

**system** 12:25 28:6 39:9 40:18 48:9 58:10 62:11

**systems** 10:18 81:6

---

## T

**tachy** 28:22

**tachycardia** 28:19,24 30:6 45:22 48:7,10,12 50:24 51:3,4 67:25

**tachycardic** 51:8

**tachypnea** 28:19,23 30:6

**tactile** 31:1,3

**takes** 35:11 43:6,24 57:23 66:12

**taking** 50:15 66:8 80:8

**talk** 4:5 8:7 10:7 28:2

**talked** 44:10 63:10 76:22, 23

**talking** 8:22 19:2 30:17 61:21 62:9 65:19

**taper** 53:4 67:24

**targeted** 17:21

**tastiest** 51:25

**Ten** 6:9

**tenuous** 77:22

**term** 7:8 46:17 47:15

**terms** 10:8 26:25 65:16 66:1

**terrible** 27:18 64:14

**terribly** 46:25

**test** 72:4

**tested** 52:15

**testified** 3:6

**testify** 3:4 4:8

**testing** 59:10 72:7

**tests** 72:5

**text** 10:24

**textbook** 21:12

**thiamine** 34:16,17,20

**thing** 17:3 46:25 58:3 65:24 79:9 81:9

**things** 3:23 4:12,13 8:10 27:8 28:15 34:6,12,22 45:23 46:23 48:21 58:3,13 59:8,15 60:20 61:18 63:7 64:17 65:13 66:4,9 68:3 72:5 73:21 74:10 75:19 78:4

**thought** 17:24 19:9,17 31:22 37:23 38:5 41:23 44:15 54:6 66:23,24 73:14 74:4 75:24 76:1

**thoughts** 67:1

**thousand** 82:21

**threatening** 68:14

**throat** 58:11 61:5

**throw** 81:18

**Thursdays** 25:3,10

**tickler** 39:9

**time** 7:17,19,22 10:15 11:21,23 12:5 13:23 14:5 20:18,24 22:18,22 24:15 25:4,19 26:18 29:18 30:11, 15 32:20 33:14 38:7 40:3 41:22 42:25 43:3 44:4,5,9, 20 46:6 51:23 52:9 55:3 57:3 67:9,11,23 68:4 75:16 82:1

**times** 4:23 11:2,25 29:7 47:1 53:15 57:6 61:16 68:24

**tip** 77:23

**title** 10:4

**today** 3:15 82:21

**today's** 81:6

**told** 80:20

**tolerance** 53:3 66:5

**tool** 17:1

**tools** 34:25

**top** 67:5 70:15,21 71:20 73:14

**total** 56:18

**tough** 82:6

**tour** 6:25

**town** 12:20

**tox** 71:24 72:19,24 79:2

**toxic** 32:7 78:9

**tract** 58:12 74:9,13,19 75:4

**training** 6:18 15:2,6,9

**transcript** 4:22

**transfer** 69:18 76:2

**transferred** 39:1 64:8 75:24

**transitional** 6:21

**transpired** 50:13

**transported** 14:9 37:19,24 38:5,6 39:13 55:20 77:6

**transporting** 76:3

**trauma** 8:13

**treat** 8:25 9:2 34:12,20,21 35:17 36:9 37:6 42:3,6 53:24 65:17

**treated** 35:14 70:24

**treatment** 34:10,11 42:19

June 06, 2018

**tremens**  30:18,23 31:8,23 67:19 68:3
**trial**  4:9,10
**true**  14:19 38:13 65:10
**truth**  3:5
**Tuesday**  25:9
**Tuesdays**  25:3,10 59:5
**Twenty**  21:25
**type**  59:10 81:8
**types**  51:2
**typical**  11:20 30:25 33:25 48:5 78:10
**typically**  34:7,15,19 59:19 63:18 74:14 77:25

---

**U**

**uh-huh**  4:24 21:8,10 65:23 66:7,14,17 68:12 69:1,4,7
**umbrella**  8:3
**unable**  22:9 49:17 81:11
**uncommon**  21:20 29:6 82:2
**uncooperative**  47:1
**understand**  17:5
**understanding**  56:10 64:2
**underwear**  80:21
**United**  6:23
**University**  6:19 7:4,11
**unmask**  66:20
**unmasked**  66:13
**unusual**  65:24 66:1 81:4
**unwritten**  77:13
**update**  44:19
**upper**  60:18
**urinary**  58:12 74:8,13,19 75:4
**urine**  52:8,15
**users**  78:2
**usual**  70:11,14
**Utah**  6:7 7:12,25 9:6

---

**V**

**vague**  17:8 46:7 61:14
**valuable**  16:22
**variability**  43:10
**variables**  65:19
**variety**  16:17 46:20 66:6
**verbal**  45:21

**verbalize**  22:8
**verge**  67:18
**verify**  58:19
**version**  82:18
**viewed**  76:7 82:4
**violent**  46:21 50:8
**visit**  26:1 44:20,22 58:7
**visits**  26:9
**visual**  30:25 47:9 50:22
**visually**  47:17
**vital**  13:21 14:5 27:5 51:2 63:15 76:11,13 79:10,15
**vitals**  20:24
**vitamins**  34:18

---

**W**

**wait**  36:8
**waiting**  36:15
**walks**  6:14
**wall**  46:24 47:8,18
**wanted**  13:25
**Washington**  7:4 9:13
**Washingtoncrowson**  18:23
**watch**  63:14 80:13
**watched**  79:9
**water**  80:9
**ways**  64:10
**weaponize**  81:17
**Wednesdays**  25:12
**week**  11:20 25:1
**weekend**  55:8
**weeks**  29:5 30:19,20,21
**whatnot**  75:20
**whatsoever**  12:23
**who'd**  59:13
**wild**  47:25
**withdrawal**  8:11 28:17 30:1,4,14 42:3,7,12,22 43:6 45:17 46:18 48:5 53:22,23 67:8,11,15 70:15, 20,25 73:15 76:24
**withdrawals**  28:3,13,16 42:20 68:8 75:3
**withdrawing**  29:1 66:24 67:3 68:13
**women**  74:16
**wondered**  52:19
**wondering**  52:2
**word**  61:16 66:11

**words**  17:4 57:13 71:17
**work**  10:10 12:7 13:25 16:8 18:4 19:3 22:9 31:6 35:3 39:24 40:6 49:18 51:10,12 59:9 71:16
**worked**  7:6 11:11 39:25
**working**  7:16 10:15 11:9, 16 12:1,9,19 61:11 72:8,10
**works**  16:3
**Worlton**  10:5 15:6,13 22:25 23:2
**worry**  74:5
**worst**  27:21
**worth**  36:23

---

**X**

**x-ray**  13:25 17:11,14 18:1 59:9 74:8 76:17

---

**Y**

**year**  11:13 12:10,14 25:9
**years**  3:18 4:1 6:9,20,22, 25 7:5,9,10,15,24 11:19 61:11 65:14 66:21
**yes-or-no**  5:2
**young**  17:13,23 21:20