CROWSON

vs

WASHINGTON COUNTY

JON WORLTON

April 16, 2018





333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

1

```
1          IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
3                      *   *   *
4   MARTIN CROWSON,          )
                             )
5          Plaintiff,        )
                             )   Case No. 2:15-cv-00880
6      vs.                   )
                             )   Deposition of:
7   WASHINGTON COUNTY,       )
    et al.,                  )   JON WORLTON
8                            )
           Defendants.       )     COPY
9                            )
                      *   *   *
10
11
12
13                   April 16, 2018
14                    12:40 p.m.
15
16        WASHINGTON COUNTY TREASURER OFFICE
             197 East Tabernacle Street
17               St. George, Utah
18
19                   *   *   *
20             Linda Van Tassell
21       - Registered Diplomate Reporter -
           Certified Realtime Reporter
22
23
24
25
```

**Page 2**

A P P E A R A N C E S

For the Plaintiff:      Ryan J. Schriever
                        SCHRIEVER LAW FIRM
                        51 East 800 North
                        Spanish Fork, Utah  84660

For the Defendant       Frank D. Mylar
Washington County:      MYLAR LAW, PC
                        2494 Bengal Boulevard
                        Salt Lake City, Utah  84121

For the Defendant       Gary T. Wight
Larrowe:                KIPP & CHRISTIAN
                        10 Exchange Place, 4th Floor
                        Salt Lake City, Utah  84111

Also Present:           Brian Graf

                    *   *   *

                    I N D E X

EXAMINATION                                    PAGE

By Mr. Schriever                                  3

By Mr. Wight                                     50

**Page 3**

P R O C E E D I N G S

                 JON WORLTON,

called as a witness on behalf of the plaintiff,
being duly sworn, was examined and testified as
follows:

                 EXAMINATION
BY MR. SCHRIEVER:
    Q.  Would you please state your full name
for the record.
    A.  Jon Worlton.
    Q.  How do you spell Jon?
    A.  J-o-n.
    Q.  And Worlton?
    A.  W-o-r-l-t-o-n.
    Q.  What's your date of birth?
    A.  8-5-66.
    Q.  Where do you currently reside?
    A.  St. George.
    Q.  And what's your current phone number?
    A.  435 --
        MR. MYLAR:  I'm going to object.  You
can get his work phone number but --
        MR. SCHRIEVER:  Work phone number is
fine.
        MR. MYLAR:  I don't want anyone who

**Page 4**

works in law enforcement to have to give their
personal phone number out.
        THE WITNESS:  Thank you.
    A.  (435) 656-6646.
    Q.  What is your job?
    A.  I am the health services administrator
at the Washington County Jail.
    Q.  Okay.
    A.  I also take care of mental health
problems and concerns.
    Q.  Okay.  Have you ever had a deposition
taken before?
    A.  Yes.
    Q.  How many times?
    A.  One time prior.
    Q.  When was that?
    A.  Ten years.
    Q.  Do you know what the case was, who was
involved in the case?
    A.  As far as --
    Q.  As far as parties?
    A.  The case name was Boyett.
    Q.  How do you spell that?
    A.  B-o-y-e-t-t.
    Q.  Was that down here in Washington County?

**Page 5**

    A.  Yes.
    Q.  Were you named in your official capacity
at that time or was it -- let me back up.  That's a
bad question.  Was it a prison case as well?
    A.  Yes.
    Q.  Do you know what the resolution of that
case was?
    A.  I don't.  I think it was dismissed but
I'm not positive about that.
    Q.  The deposition, just by way of reminder,
is an opportunity for us to ask you questions under
oath about your memory of the events and facts as
you know them.  If you don't have memory or if you
don't know what happened, you can tell me that.
    A.  Okay.
    Q.  I don't know is a perfectly fine answer.
I may ask follow-up questions to try to jog your
memory on some things but I'm not trying to harass
you if I do that.  We're just trying to find out
what you know and what you may be able to testify to
if you were called to court.  Does that make sense?
    A.  Uh-huh.
    Q.  Along those same lines, I am really just
after the facts.  If I ask you a question that calls
for you to speculate or guess, just tell me that and

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Jon Worlton

**6**

1  we'll try to rephrase it so that it's not you
2  filling in the blanks, so it's actually factual
3  answers.
4      A.  Okay.
5      Q.  I don't anticipate your deposition will
6  be very long but, if you need to take a break for
7  any reason at any time, that's fine as well.  Just
8  let us know and we can take a break.
9      A.  Okay.
10     Q.  Have you reviewed any documents in
11  preparation for your deposition?
12     A.  Yes, I have.
13     Q.  What have you reviewed?
14     A.  I went back and looked at the medical
15  record that's involved in this case.
16     Q.  Anything else?
17     A.  I reviewed the schedule, so just looking
18  at who was working and the days that were in
19  question or seemed to be.
20     Q.  And the medical record, what does that
21  look like that you reviewed?
22     A.  What do you mean by that?
23     Q.  Well, I don't know because I'm trying to
24  use your words.
25     A.  We used an electronic record keeping

**7**

1  system.  It's essentially a client, so our patient's
2  chart.  It's subdivided and there are a number of
3  different ways.
4      Q.  Does it look like a table or a
5  spreadsheet?
6      A.  It's a web-based program.
7      Q.  Have you seen it printed off?
8      A.  Yes, I have.  It does not look anything
9  like that but that's the information.
10     Q.  I'm looking here, and we'll identify it
11  for sake of the record, Washington Crowson 0501.
12  What you looked at does not look like this?
13     A.  Well, the physical look does not.  The
14  information is the same.
15     Q.  The information you looked at is the
16  information contained on documents like this?
17     A.  Correct.
18     Q.  Okay.  I want to get the schedule just
19  to look at who was working that day.
20     A.  Uh-huh.
21     Q.  Did you look at nurses that were working
22  that day?
23     A.  Yes.
24     Q.  What about correctional officers?
25     A.  No.

**8**

1      Q.  What date range did you look at?
2      A.  I don't remember.  It was June 2014.
3      Q.  The medical record, when you pull that
4  up, can you pull it up by inmate's name?
5      A.  Yes.
6      Q.  And did it have -- for example, this
7  page that we looked at had an entry for March 11,
8  2013 all the way down to November 6, 2014.  Is it
9  all of the dates that that inmate was seen as a
10  patient during their time at Purgatory?
11     A.  Yes.
12     Q.  Do you see any records from other
13  facilities such as the Draper prison or anything
14  like that?
15     A.  No.
16     Q.  Not Gunnison either?
17     A.  No.  Unless we -- well, we request
18  records but not usually from the two state prisons.
19     Q.  When we request records, where do you
20  records?
21     A.  Whenever somebody has been in treatment
22  so if they've been seen, for example, at the
23  volunteer clinic here in town, we would call them
24  and ask for a copy of their records and that would
25  be scanned into a document section of the medical

**9**

1  record.
2      Q.  Do you see anywhere in Mr. Crowson's
3  file where there had been medical records requested
4  from another facility?
5      A.  I did not look at the document section
6  of the file, so I didn't see that.  I don't
7  remember.
8      Q.  In the printouts that we have like I
9  showed you, would the document requests show up in
10  those tables?
11     A.  No, it wouldn't show up in -- not
12  necessarily.  Sometimes a nurse will document in
13  their chart notes that they've requested records.
14  Sometimes not.  So I don't know that it would
15  necessarily show up in the chart.
16     Q.  What's the name of the program that you
17  guys use to keep track of medical treatment?
18     A.  CorEMR.  Cor for correctional and then
19  EMR for electronic medical record.
20     Q.  When you pull up CorEMR, what does the
21  front page of that look like?
22     A.  Physically or --
23     Q.  Yeah.  On the computer screen.
24     A.  Well, the initial screen is just a login
25  screen so it's password protected and all those

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Jon Worlton

10

1  kinds of things.  And then the screen after that we
2  refer to as a dashboard.  It just contains a number
3  of different things that you can follow.  Has a
4  place for you to search for patient names, pull up a
5  specific patient chart.
6      **Q.  Is there anyone at the jail other than**
7  **yourself and the nurses who have access to CorEMR?**
8      A.  One other.  We have a unit coordinator
9  who schedules medical appointments and those kinds
10 of things.  She would have access to it as well.
11     **Q.  What's her name?**
12     A.  Liz.  Elizabeth Jimenez.
13     **Q.  Does she schedule outside medical**
14 **appointments?**
15     A.  Uh-huh.
16     **Q.  Is that yes?**
17     A.  Yes.
18     **Q.  That's the other thing I forgot to**
19 **mention it's so easy for us to say uh-huh or**
20 **uh-uh.  That requires our court reporter to make an**
21 **interpretation as to what we're saying.**
22     A.  Okay.
23     **Q.  So yes or no.  If I remind you, I'm not**
24 **trying to be rude, I'm just trying to make a clear**
25 **record.  Does Liz also schedule inmate appointments**

11

1  **for inside the correctional facility?**
2      A.  Yes.  The way that those appointments
3  work, at least today, is we have -- the program is
4  called TellMate.  It's an electronic system that the
5  inmates have access to in the housing units.  They
6  fill out a request for medical services on that and
7  Liz transfers those written requests from that
8  system into the medical system.  At the moment they
9  don't talk and so she essentially does a cut and
10 paste.
11     **Q.  I want to talk about your job and get**
12 **sort of an overview of what it entails.**
13     A.  Okay.
14     **Q.  First let's talk about your background.**
15 **What's your education?**
16     A.  I'm a social worker.  I have a master's
17 degree in social work.  I also have a clinical
18 license, licensed clinical social worker.
19     **Q.  How long have you worked for the jail?**
20     A.  Eighteen-ish years.
21     **Q.  You mentioned that part of your job is**
22 **clinical and that you see inmates with mental or**
23 **psychological issues.**
24     A.  Correct.
25     **Q.  And I've used two words there, mental or**

12

1  psychological.
2      A.  Okay.
3      **Q.  Do you view them differently or is there**
4  **a distinction between those two?**
5      A.  I use them interchangeably.
6      **Q.  Okay.  Then I will also use them**
7  **interchangeably.**
8      A.  Okay.
9      **Q.  How much of your time is spent in**
10 **clinical practice at the jail?**
11     A.  Half to three quarters.  Depends on the
12 workflow, I guess, and the people and the requests
13 in the jail.
14     **Q.  It's my understanding, correct me if I'm**
15 **wrong, that you are not licensed to prescribe**
16 **medication; is that correct?**
17     A.  That's correct.
18     **Q.  You provide counseling services.**
19     A.  That's correct.
20     **Q.  And you also provide referrals to**
21 **medical professionals where you've thought**
22 **prescription intervention might be appropriate?**
23     A.  That's correct.
24     **Q.  Do you deal with alcohol withdrawal**
25 **patients?**

13

1      A.  Yes.
2      **Q.  Patients who are withdrawing from other**
3  **types of drugs?**
4      A.  Yes.
5      **Q.  What percentage of your clinical time is**
6  **spent with those type of people?**
7      A.  Probably a good part, 70 percent,
8  perhaps.  At this point in my career I work
9  primarily in booking which is where those folks are
10 so whether it's dealing directly with that or just
11 needing to be aware that those issues may be
12 impacting what I'm seeing is a significant part.
13     **Q.  And you work in booking.  That means**
14 **you're one of the first people that people may see**
15 **when they come into the jail, right?**
16     A.  The nurses would see them earlier than I
17 do.
18     **Q.  Okay.**
19     A.  Just because there's one of me and
20 several nurses and more shifts.  But, yeah, in terms
21 of interacting with them for mental health problems
22 and concerns, I would be one of the first.
23     **Q.  What is the booking process when an**
24 **inmate comes to jail?**
25     A.  Do you want the corrections piece of

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Jon Worlton

14

1  that or the health services part of that?
2      Q.  I want to talk specifically about the
3  health services but if you know something about the
4  correctional aspect of it I would like you to share
5  that with me as well.
6      A.  I don't know a lot about that.  There
7  are probably people more qualified to talk about
8  that than I am.  In short, if somebody is brought in
9  by an arresting agency, our staff interacts with
10  them and places them in prebooking where the
11  exchange of custody takes place.  They search the
12  inmate in, take custody of him and then there's
13  paperwork that goes along with that and then they're
14  housed in one of our intake cells.
15      Q.  Okay.  When you say, "our staff
16  interacts with them," did you mean specifically
17  general staff or do you --
18      A.  Sheriff's office staff.
19      Q.  And then is it a matter of course that
20  every incoming inmate is seen by either yourself or
21  a nurse?
22      A.  Every inmate should be seen by a nurse
23  as they're coming into the jail.  We try to make
24  that happen as quickly as we can.  Often in
25  prebooking when they're just arriving, sometimes

15

1  because of staffing issues we're not able to do
2  that, but I would say within the first hour of
3  arrival that most are seen by a nurse.  If the nurse
4  in their screening determines that there is need for
5  mental health screening or mental health services,
6  then they'll refer to me.
7      Q.  Is that policy the same or different for
8  people who are coming back?  For example, somebody
9  coming back on a parole violation or probation
10  violation.
11      A.  It would be the same.
12      Q.  In this case Mr. Crowson was brought
13  into the jail on June 11, 2014.
14      A.  Uh-huh.
15      Q.  I did not see any consent forms or
16  waiver forms for that particular date but I'll
17  represent to you there are waiver forms from other
18  dates.  In reviewing the records for Mr. Crowson did
19  you see whether there was a waiver that he filled
20  out or signed on July 11, 2014?
21      A.  I'm not sure what you're referring to as
22  far as a waiver goes.
23      Q.  I'll show you what I'm talking about
24  here.  The title is Utah Department of Corrections
25  Clinical Services Bureau Informed Refusal.

16

1          MR. MYLAR:  Okay.  Can I just interject
2  here?
3          MR. SCHRIEVER:  Yes.
4          MR. MYLAR:  It says these are department
5  of corrections.  This isn't a document that we gave
6  you.
7          MR. SCHRIEVER:  This would have come
8  from another prison facility.
9          MR. MYLAR:  Yeah.
10      Q.  Okay.  Do you guys have a form that
11  looks like this?
12      A.  That looks to be a form that we have
13  somebody fill out if they refuse treatment.  The
14  doctor recommends that, "You ought to take whatever
15  prescription or you ought to do something," they
16  say, "We don't want to do it," we have a form
17  similar to that.
18      Q.  Do you have a form that people fill out
19  when they come in, for example, if you want to take
20  a medical history and they don't want that, would
21  they fill that out?
22      A.  We don't have a form like that that we
23  use.  Usually if that were to happen we would likely
24  document that on the intake form itself.  And then
25  in part of that form there are places where the

17

1  nurse can document observations and information from
2  like a probable cause statement or those kinds of
3  things.  It just gives us information.  If they
4  refuse to answer specific questions about their
5  medical history I would say it would be documented
6  there.
7      Q.  And that would be part of the intake
8  form?
9      A.  Correct.
10      Q.  Is there anywhere else that it's
11  recorded other than the intake form?
12      A.  It may be documented in the chart notes.
13  That would be just a difference in the individual
14  nurse's practice.
15      Q.  So not a uniform policy as to how to
16  handle that.
17      A.  Right.  Mostly I would expect it would
18  be on the medical intake form.
19      Q.  What is the purpose of the meeting
20  with -- I'll call them medical professionals,
21  meaning you or the nurses, but the medical
22  professional meeting with the inmate in the first
23  hour of booking?
24      A.  It's a screening to determine whether
25  there are obvious medical problems or concerns that

CROWSON vs WASHINGTON COUNTY

April 16, 2018                                                          Jon Worlton

---

18

1   need to be dealt with right then.  That would
2   include gathering information about medication,
3   those kinds of things.
4        Q.  Is there any way to say how long that
5   typically takes to do?
6        A.  Five minutes to maybe 15 at the most.  I
7   think it's usually a very short interview.
8        Q.  Is there a part of that process by which
9   the inmate is asked to give a medical history?
10       A.  Yes.
11       Q.  And what's the medical history question
12  or questions?
13       A.  I would need to look at the form.  I
14  don't use that particular form enough to remember it
15  by memory.
16       Q.  Do you ask inmates about recent
17  hospitalizations?
18       A.  I believe so but I would need to look at
19  the form again to be sure but I believe that there
20  is a question about that.
21       Q.  When you said the form, you mean intake
22  form?
23       A.  Uh-huh.
24       Q.  Is that yes?
25       A.  Yes.  Sorry.

---

19

1        Q.  Did you review the intake form for
2   Martin Crowson in June of 2014?
3        A.  Yes, I believe I did.  I don't remember
4   for sure.
5        Q.  When did you review those documents?
6        A.  It would have been last week.
7        Q.  As you sit here today was there anything
8   that stood out in your mind on that form that
9   grabbed your attention?  Was there anything
10  significant?
11       A.  There was not.
12       Q.  We talked a little bit about your
13  clinical practice and I'm not saying we're not going
14  to come back to that but I want to ask you about the
15  other 50 to 25 percent of it, depending on your work
16  flow.  What are your other job responsibilities at
17  the jail?
18       A.  As a health services administrator?
19       Q.  Yes.
20       A.  I do the scheduling for our nursing
21  staff.  I conduct performance evaluations and
22  reviews.  I coordinate with the medical director,
23  Dr. Larrowe.  I coordinate with dentists, with our
24  health unit coordinator, I handle inmate complaints
25  and grievances.

---

20

1        Q.  What is the role of the medical
2   director?
3        A.  Well, it's just like it sounds.  He
4   would be responsible for the medical services in
5   creating treatment plans and making sure that they
6   have been followed as he intended them to, those
7   kinds of things.
8        Q.  Does he have an office at the jail?
9        A.  No.  Well, he has an exam room where he
10  comes out that I suppose would double as an office.
11  It's a workstation where he does his charting and
12  then does his exams there.
13       Q.  Does he have a set schedule to come out
14  to the jail?
15       A.  Yes.
16       Q.  What is his schedule?
17       A.  Let's see, I believe he's coming out
18  Tuesdays and Thursdays.  That again depends on the
19  need.  There are some weeks that he comes once a
20  week on one of those days.
21       Q.  Okay.  Is there a time when he comes?
22       A.  Usually between seven and eight in the
23  morning.
24       Q.  Okay.  And how long does he stay?
25       A.  Again that depends on the number of

---

21

1   people on sick call.  Anywhere from an hour to an
2   hour and a half.
3        Q.  All right.  And then I imagine it's
4   important that he maintain his availability by phone
5   if there's an emergency?
6        A.  That's correct.  He is available 24/7
7   by contract, either he or one of his staff, usually
8   it's a mid level practitioner, a PA or a nurse
9   practitioner.
10       Q.  Are you familiar with the CIWA
11  guidelines for alcohol and drug symptoms?
12       A.  I'm familiar with that protocol or that
13  form.  I know of it.  I couldn't tell you a great
14  deal about it other than its intended use is for
15  people withdrawing from alcohol.  It's a
16  standardized protocol, as I understand it, for
17  looking at symptoms and being able to determine
18  where somebody is at in the withdrawal process.
19       Q.  CIWA, that's not something you
20  personally use in your practice.
21       A.  No.
22       Q.  Do you know if the nurses use it?
23       A.  No, we don't use that as part of it.
24       Q.  You do not use it?
25       A.  No.

---

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Jon Worlton

22

1    Q.  Let me ask you just more generally
2    background type stuff.  How much supervision do you
3    have over what the nurses do and what protocols they
4    follow?
5        A.  That's I guess a divided responsibility,
6    really.  But in terms of direct medical oversight,
7    determining how they practice, that's something that
8    the doctor is responsible for.  To make sure that
9    they're following the doctor's orders and following
10   policy and procedure, those kinds of things, that's
11   something that I do.  If the two cross, then I
12   consult with Dr. Larrowe.
13       Q.  Do you know what protocol the nurses use
14   to determine how to treat somebody for alcohol
15   withdrawal symptoms?
16       A.  Yes.  What they look at specifically for
17   alcohol withdrawal, they monitor vital signs and
18   heart rate.  If there's a cutoff specifically to
19   somebody's heart rate, they cross a specific
20   threshold, they begin a withdrawal protocol.
21       Q.  Do you have an understanding as to
22   whether they look at anything other than vital signs
23   or heart rate?
24       A.  Yeah.  Look at I'm sure the individual's
25   mental status, their physical presentation.  For

23

1    example, are they sweating, are they nauseated, are
2    they hallucinating, those kinds of things, those
3    type of symptoms.  They look at those as well.
4        Q.  Is it true in your experience that
5    alcohol withdrawal symptoms usually start within 48
6    to 72 hours of the last drug taken?
7        A.  That's my understanding.
8        Q.  Is it also your understanding that those
9    symptoms usually peak within 24 to 36 hours after
10   onset?
11       A.  That's my understanding.
12       Q.  Let's talk about mental health issues
13   for a second.
14       A.  Okay.
15       Q.  Mr. Crowson was diagnosed with
16   encephalopathy.  Is that a brain condition that
17   you're familiar with?
18       A.  It is not.
19       Q.  So you don't know what the signs or
20   symptoms of encephalopathy are?
21       A.  No.
22       Q.  If you're presented with a patient who
23   has marked cognitive deficits, how do you determine
24   whether they need to be hospitalized or whether you
25   would recommend hospitalization?

24

1        A.  How do I determine that?
2        Q.  Yeah.
3        A.  Well, that's a really broad question.
4    Can you be more specific?
5        Q.  Sure.
6        A.  There's lots of reasons an inmate may
7    have cognitive deficits or cognitive decline so I --
8        Q.  And what I want to get at is where is
9    the line?  At what point do you say that's a person
10   that needs to be hospitalized?  Let me back up.  We
11   can ask it in smaller chunks, how's that?
12       A.  Okay.  That's fine.
13       Q.  I don't want to be unfair to you.  Is
14   there a policy or procedure in place at the jail
15   whereby a person with decreased mentation or change
16   in mental status should be referred to you for
17   evaluation?
18       A.  There's a practice.  I would need to
19   look at the policy to see how that reads but there's
20   certainly a practice and there's certainly a way
21   that we train both corrections staff as well as
22   nursing staff that if they're concerned or they have
23   worries they can refer them to a mental health
24   person.
25       Q.  Okay.  What is the practice?  What did

25

1    you see?
2        A.  Well, if they have cause for concern
3    they may make a referral to either mental health or
4    to the medical staff.
5        Q.  So it could be you or it could be to
6    Dr. Larrowe?
7        A.  It would usually be a nurse because the
8    nurses are there 24/7.
9        Q.  And then do you know what the nurses are
10   trained to look for as far as deciding whether a
11   person should be hospitalized?
12       A.  I don't know that I could outline that
13   specifically for you.  Certainly they're going to
14   look at vital signs and they're going to look at the
15   presenting condition and try to understand the
16   background of what's happening for this person.  Is
17   this a sudden onset kind of thing.  Are the vital
18   signs indicating that there's some physical
19   distress, those kinds of things.  They would use all
20   of that in making some determination, communicating
21   with Dr. Larrowe and that.
22       Q.  Okay.  And I want to be fair to you
23   because I understand that you sort of have a split
24   responsibility here.  One as the administrator and
25   two as the mental health professional.

CROWSON vs WASHINGTON COUNTY
April 16, 2018                                                    Jon Worlton

26

1    A.  Right.
2    Q.  And I understand that Dr. Larrowe has
3  some supervision over that as well.
4    A.  Correct.
5    Q.  Seriously, I'm only asking for what
6  you're aware of or what you know.
7    A.  Right.
8    Q.  In June of 2014 were you ever called or
9  asked to evaluate Martin Crowson?
10    A.  I seem to remember by going over the
11  notes that Mike Johnson had put something in his
12  chart note that he referred him to me and I remember
13  there being a concern about him but that's about all
14  I know.
15    Q.  Do you remember any specifics?
16    A.  I don't.
17    Q.  Is there any note that you actually saw
18  him?
19    A.  There is not.
20    Q.  When that referral comes in, what does
21  that look like?  He puts it in his note.
22    A.  Uh-huh.
23    Q.  Is there a way that you become notified
24  that he made that referral?
25    A.  Often that's done verbally.  What we try

27

1  to do is to also get that in a task.  In the medical
2  record there's also a place where you can enter
3  tasks.  That's one of the ways that we communicate
4  with one another.  So it could have been done either
5  way.
6    Q.  Okay.  Did you review the tasks related
7  to Martin Crowson's case?
8    A.  I did.
9    Q.  Did you see any tasks in there related
10  to referral?
11    A.  I did not.
12    Q.  Would that have been Michael Johnson's
13  responsibility to put that in the task?
14    A.  Yes.  Based on that note that I
15  reviewed.
16    Q.  If it's not put in the task would you
17  ever receive notice in another way that that had
18  been put into the note?
19    A.  Verbally.  If it wasn't communicated
20  verbally or if it wasn't included in the task, I
21  wouldn't have necessarily known.  I will take that
22  back.  I try to review who is in booking and I may
23  have come across the information that way.
24    Q.  Do you have a specific memory as you sit
25  here today that you came across information that

28

1  way?
2    A.  What I remember -- and I don't remember
3  a great deal.  What I remember is that Mike told me
4  that there was some concerns.  What my memory says
5  is that he was mostly concerned that he had gotten
6  involved in some drugs or homemade alcohol on the
7  block or something and he asked me to take a look at
8  him.
9    Q.  Okay.  Did he say anything to you to
10  indicate why he thought that he may have got into
11  some homemade alcohol or some drugs in the block?
12    A.  Not that I remember.
13    Q.  Do you remember Mike telling you
14  anything specific about his symptoms?
15    A.  I really don't other than he seemed to
16  be confused and was just a little different than
17  what he usually was.
18    Q.  Are you aware of whether he showed any
19  signs of increased heart rate?
20    A.  I'm not aware.
21    Q.  How about any signs of increased or
22  decreased blood pressure?
23    A.  I don't know.  I didn't look at that
24  part of the chart.
25    Q.  Are you aware of whether he was having

29

1  any tremors?
2    A.  I'm not.
3    Q.  Having any sweating or anything like
4  that?
5    A.  I'm not aware.
6    Q.  Sitting here today, you wouldn't be
7  comfortable saying whether he was demonstrating
8  signs of alcohol withdrawal, correct?
9    A.  That's correct.
10    Q.  And the same for drug withdrawal, you
11  wouldn't be comfortable saying whether he had any
12  signs or symptoms of drug withdrawal.
13    A.  No.
14    Q.  And I understand there's probably a
15  difference between how a layman or health
16  professional such as yourself would address a
17  complaint of brain injury versus how a doctor would
18  address it but I want to see -- I want to make sure
19  that I understand what you would do because I'm
20  going to ask Dr. Larrowe what he would do in a month
21  and a half.
22    As a mental health professional, would
23  it be important for you to gain a history, a medical
24  history of a person who exhibited signs of a brain
25  injury?

30

1    A.  Let me answer that two ways.  If I had
2  concerns that somebody had recently experienced a
3  brain injury or they were undergoing that, it's well
4  outside my expertise as a mental health person.
5    Q.  Okay.  Is there any type of physical
6  examination that you would perform to determine
7  whether or not a person who's explained decreased
8  mentation or significant change in mental status,
9  whether they had suffered a brain injury?
10    A.  Not that I'm familiar with, no.
11    Q.  Anything in their eyes or --
12    A.  No.
13    Q.  How about a clinical examination such as
14  questioning them about orientation, things like
15  that?
16    A.  Sure.  In my practice I'm mostly
17  interested in history, is there a history of brain
18  injury.  I wouldn't normally be looking for somebody
19  who was recently screened for a brain injury that
20  happened say in the last 24 hours or that kind of
21  thing.  Does that answer your question?
22    Q.  Well, it helps me understand where
23  you're coming from.
24    A.  Okay.
25    Q.  So in that regard it's helpful.  In any

31

1  event, you didn't see Marvin Crowson during June
2  2014, correct?
3    A.  I did not, no.
4    Q.  You had seen him earlier in January of
5  2014, do you recall that?
6    A.  I reviewed the notes.  I don't recall
7  the visit.
8    Q.  Do you recall Mr. Crowson?
9    A.  Vaguely.
10    Q.  Do you recall what he looked like?
11    A.  I couldn't pick him out of a picture, I
12  don't believe.
13    Q.  Do you have any recollection, to your
14  recollection, of him?
15    A.  I would be guessing maybe in his forties
16  or something of that nature, a little older, but
17  that's about it.  I don't remember a lot about him.
18    Q.  Do you know whether he was white or
19  black or Hispanic?
20    A.  I believe he was Caucasian.
21    Q.  And reviewing your notes didn't refresh
22  your recollection as to your visit with him in
23  January of 2014?
24    A.  I remember having the visit.  I don't
25  remember a lot about it.  That was what, four years

32

1  ago now.
2    Q.  You may have seen one or two people
3  between now and then.
4    A.  A few.
5    Q.  How long has Michael Johnson worked at
6  the jail?
7    A.  I don't know.  Ten years or longer.
8    Q.  What type of nurse is he -- LPN, RN?
9    A.  He's an RN.
10    Q.  Has he had any disciplinary action taken
11  against him?
12    A.  Not that I can recall.
13    Q.  Any complaints that you've received
14  about the care that he provides?
15    A.  I'm sure there has been.  Most of the
16  nurses have received some complaint or another.
17    Q.  Have any of those complaints ever been
18  brought up to any type of disciplinary action?
19    A.  You know, I don't know, to be honest
20  with you.  In our method of discipline, I guess
21  documentation of performance lists level one
22  coachings, level two coachings, level three.
23    Level one is simply coaching, sit down
24  and say this thing happened and it needs to be
25  corrected and there's no consequence.  I wouldn't

33

1  consider that to be a disciplinary kind of thing as
2  much as just a correction.
3    Level two and above would have
4  consequences attached to them in some way.  And, to
5  my knowledge, I've never written Mike up for a level
6  two disciplinary problem.
7    Q.  Would that be your job to do that?
8    A.  Yes.
9    Q.  What about Ryan Borrowman, have you ever
10  used a level two or above with Ryan Borrowman?
11    A.  There are.
12    Q.  What kinds of things has he been
13  corrected for?
14    THE WITNESS:  How much --
15    MR. MYLAR:  Yeah.
16    THE WITNESS:  I have a question about
17  that.
18    MR. MYLAR:  Yeah.  I need to mark this
19  as confidential if you're going to be asking
20  questions about that.  Do you need to talk to me
21  about anything beforehand?  Otherwise, it will be
22  protected, the information that will be in this
23  deposition for this period in terms of his personnel
24  record.
25    MR. SCHRIEVER:  Do you guys want to take

34

1   a break?
2        (Recess.)
3        C O N F I D E N T I A L
4        Q.   Has Ryan Borrowman ever been disciplined
5   at level two or higher?
6        A.   Yes, he has.
7        Q.   What was that in regard to?
8        THE WITNESS:  Again, I'm not sure what I
9   can say.
10       MR. MYLAR:  Well, if you have any
11   personal knowledge that he was disciplined.
12       A.   I'm aware that there was a level three
13   coaching which is I guess the highest level of
14   coaching within our system.  That was not something
15   that I did and so I don't -- I can't give you a lot
16   of information about that.  It was an internal
17   affairs kind of thing.
18       Q.   Okay.  Did it have anything to do with
19   his job performance as a nurse?
20       A.   No.
21       Q.   Okay.  So some violation of county
22   policy that did not have to do with his job as a
23   nurse.
24       A.   That's correct.
25       Q.   Okay.  Did it involve anything to do
         C O N F I D E N T I A L

35

1   with his involvement with Martin Crowson in any way?
2        A.   No.
3        Q.   Did it have to do with untruthfulness or
4   dishonesty?
5        A.   No.
6        Q.   Did it involve the commission of a
7   crime?
8        A.   Yes.
9        Q.   What was the nature of the crime?
10       THE WITNESS:  Am I --
11       MR. MYLAR:  This will be considered
12   confidential.
13       THE WITNESS:  Okay.
14       A.   My understanding was that it was some
15   form of a domestic related incident.  I don't know
16   how that was resolved and I don't know specifically
17   what the formal charges were.
18       Q.   Okay.  In your review of the records
19   were there any nurses involved with Martin Crowson
20   in June of 2014 other than Mike Johnson and Ryan
21   Borrowman?
22       A.   Yes.
23       Q.   Who else?
24       A.   Josh Billings.
25       Q.   What was Mr. Billings' involvement with
         C O N F I D E N T I A L

36

1   Martin Crowson?
2        A.   He's an RN as well.  He would have been
3   working the night shift.
4        Q.   Was there anything in the notes that you
5   saw that stood out as far as observations of
6   Mr. Billings?
7        MR. MYLAR:  I guess we can go off
8   confidential.
9        E N D  C O N F I D E N T I A L
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
         C O N F I D E N T I A L

37

1        A.   Can you ask that question again?
2        Q.   Sure.  I'll represent to you the notes
3   seem to me, and I'm just giving you my version of
4   it -- not for the sake of asking the question, just
5   to give you some context for the question.  My
6   review of the notes seems to indicate that Mike
7   Johnson was the one who offered the most notation
8   about Mr. Crowson's condition.
9        A.   Right.
10       Q.   And then Ryan Borrowman seemed to be the
11   first person who said he wished to transport this
12   guy to the hospital.
13       A.   Right.
14       Q.   What was Josh Billings' role there, to
15   your memory?
16       A.   He would have been -- like I said, he
17   would have been working the night shift, I believe,
18   and would have been responsible for looking in,
19   monitoring him during his shift.
20       Q.   Okay.  Do you recall anything in the
21   notes that Mr. Billings observed that is relevant to
22   Mr. Crowson's condition during that time period?
23       A.   I don't.
24       Q.   Other than those three nurses, anyone
25   else involved from the medical staff?

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Jon Worlton

38

1    A.   It's those three as far as I'm aware.
2    Q.   There's also a reference or two made to
3    some type of communication with Dr. Larrowe.  If
4    Dr. Larrowe had come out to the prison to see
5    Mr. Crowson, would those look different?
6         MR. MYLAR:  Objection.  Speculation.  Go
7    ahead.
8    A.   I'm not sure.
9         MR. WIGHT:  Vague.
10   Q.   So on this particular table, I
11   understand this is a little bit different than what
12   you see in the computer, but it has a field where
13   the person who entered the note is indicated.
14   A.   Uh-huh.
15   Q.   Does Dr. Larrowe have access to that
16   system as well?
17   A.   Yes.
18   Q.   So if Dr. Larrowe makes an entry into
19   CorEMR it would show up that he was the one who put
20   the note in.
21   A.   Correct.
22   Q.   Did you see in your review of the
23   records any indication that Dr. Larrowe had
24   personally seen Mr. Crowson in June 2014?
25   A.   No indication that I saw.

39

1    Q.   Do you have personal knowledge as to
2    whether Dr. Larrowe saw Mr. Crowson during June of
3    2014?
4    A.   My understanding is that that was all
5    done via telephone consultation.
6    Q.   Okay.  Have you spoken with Mike Johnson
7    about the events that give rise to this lawsuit?
8         MR. MYLAR:  Let me just say you should
9    not include instances where I was present, where
10   there was attorney-client conversation.  If I'm
11   present it was attorney-client privilege so don't
12   include those in what he's asking you.
13   A.   So, yes, we've had conversations that a
14   lawsuit had been initiated or filed or however you
15   say that.
16   Q.   Did he say anything about his
17   observations of Mr. Crowson during that time?
18   A.   I don't remember.  I'm sorry.
19   Q.   Same question with Ryan Borrowman.  Have
20   you had conversations outside the presence of
21   counsel with Ryan Borrowman about this case?
22   A.   No, not specifically about this case.
23   Q.   How about Josh Billings?
24   A.   No.
25   Q.   In your review of the records, is there

40

1    any indication that anyone had taken any medical
2    history of Mr. Crowson?
3    A.   It looked like Ryan Borrowman was the
4    one that did the intake and I would have expected
5    that there was some medical history gathered there.
6    Q.   Are you aware that Mr. Crowson had been
7    hospitalized recently before his incarceration in
8    June of 2014?
9    A.   I had heard that that was the case.  I
10   don't know the details of that.
11   Q.   Who did you hear that from?
12   A.   I don't remember.
13   Q.   Did you see anything in your review of
14   the records to indicate that that was something that
15   anyone at the prison had asked about?
16        MR. MYLAR:  Just for clarification, are
17   you asking if he knew about that when Crowson was at
18   the jail?
19        MR. SCHRIEVER:  That would be a good
20   question, too.  Let me ask that one.
21   A.   Okay.
22   Q.   Did you know about that prior
23   hospitalization while Mr. Crowson was at the jail?
24   A.   Not to my recollection, no.
25   Q.   Are you aware of anyone at the jail who

41

1    knew about that hospitalization?
2    A.   I'm not.
3    Q.   Did you see anything in the record to
4    indicate there was a note of prior hospitalization
5    anywhere Mr. Crowson's CorEMR records?
6    A.   Not the records that I looked at, no.
7    Q.   Are there any records that exist that
8    you didn't look at?
9    A.   The one I'm talking about is when I went
10   back and looked through some things last week.  I
11   did not look at the document section of our record
12   which is essentially a place where we scan records
13   that we would have received say from the hospital or
14   from another doctor's office or that kind of thing.
15   Q.   Aside from records from outside
16   facilities, is there anything else that goes in that
17   document section?
18   A.   Miscellaneous things that we scan.  If
19   we send a letter, for example, or we have people
20   sign a release for information.  It's kind of a
21   miscellaneous place where we have to still use paper
22   and we scan that into the record.
23   Q.   Is the intake form part of CorEMR?
24   A.   It is.
25   Q.   Do you know if it's part of any other

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Jon Worlton

42

1    computer system at the jail?  In other words, does
2    it get uploaded to Spillman or anything like that?
3         A.  No.  Spillman and CorEMR are connected
4    one way.  In other words, when somebody is booked
5    into jail, the records come from Spillman to CorEMR
6    where the chart's automatically generated and
7    created.  CorEMR does not give information back to
8    Spillman.
9         Q.  When is the first time you reviewed
10   Mr. Crowson's records in CorEMR for June 2014?
11        A.  Likely would have been in the early part
12   of 2015 when -- I think that's the time when we got
13   the initial service or notification of the lawsuit.
14        Q.  Did you see anything in the CorEMR
15   records to indicate that Mr. Crowson had any kind of
16   liver or kidney disease?
17        A.  Not that I recall.
18        Q.  Do you know what the requirements are to
19   put somebody in the detox cell?  In other words, to
20   go to the detox cell, how is that decision made?
21        A.  It's a decision made by the nursing
22   staff, probably in consultation with security.  In
23   other words, if there's some security concerns that
24   they shouldn't be there then other arrangements
25   would be made but primarily it would be a nursing

43

1    staff decision.
2         Q.  Okay.  Did the jail have a written
3    policies or procedures manual for the medical staff?
4         A.  Yes.
5         Q.  What's the title of that?
6         A.  I would have to look.  Health services
7    or something of that nature.
8         Q.  Health services?
9         A.  Health services, something like that.
10        Q.  Policies and procedures, something like
11   that?
12        A.  Something like that.
13        Q.  We'd like to request that.  I just want
14   to make sure I know how to identify it.
15        A.  I can find it.  I couldn't tell you the
16   specific title and where.
17        Q.  Is it just one book or are there more
18   than one, depending on the circumstances?
19        A.  It's a section of the policies, all
20   electronic at this point.
21        Q.  Do you know if it's posted publicly?
22        A.  I don't.  I would suspect that it's not.
23        Q.  Is it specific enough that if you're a
24   nursing staff you can look at it and say, okay, if
25   we're going to put somebody into the detox cell,

44

1    here's the procedure we follow?
2         A.  No.
3         Q.  Would it contain a policy or procedure
4    as to determining the likelihood that someone has,
5    an inmate has received some type of alcohol or drug
6    substance while they're in the jail?
7         A.  I'm not sure what the question is.
8         Q.  I'm going to go back and give an
9    explanation because I'm having a hard time framing
10   this question.  Mr. Crowson was in lockdown from
11   June 17th to June 25th and then he was transferred
12   to the detox cell.  Sometime in that period it
13   sounds like Mike Johnson or somebody made a decision
14   to put him in detox.
15        A.  Uh-huh.
16        Q.  So I'm wondering if the policies and
17   procedures manual provides guidance to somebody in
18   Mike Johnson's position to say if you're going to
19   put somebody in detox, find out what kind of
20   substance they were on or get a history from them of
21   what they've received or where they've been,
22   anything like that.
23        A.  I don't believe there would have been
24   specific instructions or anything like that,
25   checklist or something like that, no.

45

1         Q.  If Mike Johnson had had access to the
2    inmate's records so that he would have known where
3    in the jail Mr. Crowson had been, could he look at
4    those Stillman records?
5         A.  Yes.
6         Q.  Do you have access to the Stillman
7    records?
8         A.  Uh-huh.
9         Q.  Is there a policy and procedure for how
10   often the nursing staff should check on somebody who
11   is in the detox cell?
12        A.  I'm not sure if it's a written policy.
13   There's a practice that they should be checked on at
14   a minimum once per shift.
15        Q.  Once every eight hours?
16        A.  Twelve.
17        Q.  Twelve hours?
18        A.  Uh-huh.
19        Q.  So two times per day at a minimum?
20        A.  Correct.
21        Q.  For example, Josh Billings was on the
22   night shift.  Was he to wake the person and check on
23   them or just physically observe them?
24        A.  Physically observe them.  Usually that
25   should have been done at the beginning of a shift so

46

1    most people are awake at seven or so in the evening,
2    seven or eight.
3        Q.   Did you go in the detox cell general
4    population for things like meals, time outside of
5    the cell, things like that?
6        A.   No.
7        Q.   Are they allowed out of the detox cell?
8        A.   Depends on how long somebody is there.
9    You know, if they're there for a period of time they
10   should be allowed out to shower and those kinds of
11   things.  There's not really like a day room or that
12   kind of thing for them to use but to shower and get
13   cleaned up.
14       Q.   Do they have contact with other inmates
15   when they're in the detox cell?
16       A.   Yes.
17       Q.   And do you know the circumstances that
18   they have contact the other inmates?
19       A.   Well, the detox cells are -- we're a
20   small jail so there's typically three cells that are
21   designated for detox and they usually house more
22   than one inmate at a time so in that respect they
23   would have contact with others.
24       Q.   Mike Johnson had made a note to refer
25   Mr. Crowson to you from a mental evaluation.

47

1        A.   Uh-huh.
2        Q.   Do you know why that fell through the
3    cracks?
4        A.   I don't know --
5            MR. MYLAR:  Objection.  Assumes facts
6    not in evidence in this deposition.
7            MR. SCHRIEVER:  Let me ask it a
8    different way.
9        Q.   Do you know why you didn't see him?
10       A.   I don't remember.  I can tell you what I
11   think but I don't remember for sure.
12       Q.   Well, with the caveat that you don't
13   remember, tell me what you think.
14           MR. MYLAR:  Objection.  Speculation.
15   Lack of foundation.  Go ahead.
16       A.   At any given time I have probably more
17   people that I can see during a given day than I can
18   get to.  My understanding, at least what I recall is
19   that Mike was believing there was some detox or that
20   he got into some drugs or those kind of things.
21   From a mental health standpoint there's not a lot
22   that I can do for somebody in that condition until
23   they sober up or until they clear from whatever
24   drug-induced problem they're experiencing, so I
25   would have prioritized that differently.

48

1        Q.   And by prioritized differently
2    meaning --
3        A.   What I believed, what I knew is that the
4    nursing staff would be monitoring and watching that
5    and I felt comfortable giving it some time to see if
6    whatever problem was going on would clear with the
7    passage of time.
8        Q.   How much time is appropriate in that
9    type of situation?
10       A.   That varies a great deal.  Sometimes
11   people clear up from drug-induced problems very
12   quickly, in 24 hours, and sometimes it's a week or
13   longer.
14       Q.   Not having reviewed the records, do you
15   see anything to indicate that between June 25th and
16   July 1, 2014 Mr. Crowson was having any type of
17   drug-induced withdrawal problem?
18           MR. MYLAR:  Objection.  Calls for
19   speculation and lack of foundation.
20           THE WITNESS:  Am I good to answer?
21           MR. MYLAR:  Go ahead.
22       A.   Okay.  It seemed to me that that was the
23   working hypothesis, if you will, of the nursing
24   staff.
25       Q.   Right.  And my question is just a little

49

1    bit different.  Looking at the records, do you see
2    anything that would substantiate that he was
3    experiencing a drug withdrawal?
4            MR. MYLAR:  Again, objection.  Lack of
5    foundation.  Calls for speculation.  You can answer.
6        A.   So do I see anything in the record that
7    indicates that that would have been the case?
8        Q.   That that was the case, yeah, suffering
9    from drug withdrawals or alcohol withdrawals.
10       A.   What I saw in the record is the abrupt
11   change in mental status.  At least what I understand
12   is the suspicion that that's what had happened.  And
13   then going along with the mental status, what I
14   understood is that he was hallucinating and that it
15   was a different mental status, which is not unusual
16   for somebody who is withdrawing from drugs or
17   alcohol.
18       Q.   Any other symptoms, like change in heart
19   rate?
20       A.   Sure.
21       Q.   Change in blood pressure?
22       A.   Yeah, heart rate is the one that the
23   nurses pay closest attention to.
24           MR. SCHRIEVER:  All right.  I don't have
25   any further questions for you.

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Jon Worlton

50

```
1              EXAMINATION
2  BY MR. WIGHT:
3     Q.  I represent Dr. Larrowe.  I'm Gary
4  Wight, by the way.  I don't think I introduced
5  myself.  You were asked some questions about
6  conversations you'd had regarding Mr. Crowson.  Have
7  you told us everything you can remember about those
8  conversations other than with your counsel?
9     A.  Did I have conversations with
10 Mr. Crowson?
11    Q.  No.  Conversations about him with other
12 people at the jail.
13    A.  To the best of my knowledge.  I mean I
14 know that -- I know that staff have been named.
15 We've had conversation about the fact that there's a
16 lawsuit going on.  I couldn't give you the
17 particulars of what those conversations were.
18         MR. WIGHT:  Okay.  No other questions.
19 Thank you.
20         MR. MYLAR:  I don't have any questions.
21 I would like him to read and sign the deposition.
22    (Whereupon the taking of this deposition was
23 concluded at 2:00 p.m.)
24              *  *  *
25    Reading copy submitted to Washington County
```

51

```
1  Sheriff's Office, 750 South 5600 West, Hurricane,
2  Utah  84737.  Attention: Jon Worlton.
3     Original transcript submitted to
4  Mr. Schriever.
```

52

```
1           C E R T I F I C A T E
2  STATE OF UTAH   )
                   )
3  COUNTY OF       )
4     I HEREBY CERTIFY that I have read the
5  foregoing testimony consisting of 49 pages,
6  numbered from 3 through 51 inclusive, and the same
7  is a true and correct transcription of said
8  testimony except as I have indicated changes on the
9  enclosed errata sheet.
10
11
12
                   JON WORLTON
13
14
15
16   Subscribed and sworn to at
17 this        day of              , 2018.
18
19
                   Notary Public
20
21
   My Commission Expires:
22
23
24
              *   *   *
25
```

53

```
1           C E R T I F I C A T E
2  STATE OF UTAH      )
                      )
3  COUNTY OF SALT LAKE  )
4     THIS IS TO CERTIFY that the deposition of JON
5  WORLTON was taken before me, Linda Van Tassell,
6  Registered Diplomate Reporter and Notary Public in
7  and for the State of Utah.
8     That the said witness was by me, before
9  examination, duly sworn to testify the truth, the
10 whole truth, and nothing but the truth in said
11 cause.
12    That the testimony was reported by me and that
13 a full, true, and correct transcription is set
14 forth in the foregoing pages, numbered 3 through 51
15 inclusive.
16    I further certify that I am not of kin or
17 otherwise associated with any of the parties to
18 said cause of action, and that I am not interested
19 in the event thereof.
20    WITNESS MY HAND at Salt Lake City, Utah, this
21 20th day of April, 2018.
22
23
              Linda Van Tassell
24            RDR/RMR/CRR
25
```

CROWSON vs WASHINGTON COUNTY
Jon Worlton

April 16, 2018

## 0

**0501** 7:11

## 1

**1** 48:16
**11** 8:7 15:13,20
**15** 18:6
**17th** 44:11

## 2

**2013** 8:8
**2014** 8:2,8 15:13,20 19:2
  26:8 31:2,5,23 35:20 38:24
  39:3 40:8 42:10 48:16
**2015** 42:12
**24** 23:9 30:20 48:12
**24/7** 21:6 25:8
**25** 19:15
**25th** 44:11 48:15
**2:00** 50:23

## 3

**36** 23:9

## 4

**435** 3:20
**435 656-6646** 4:4
**48** 23:5

## 5

**50** 19:15

## 6

**6** 8:8

## 7

**70** 13:7
**72** 23:6

## 8

**8-5-66** 3:16

## A

**abrupt** 49:10
**access** 10:7,10 11:5 38:15
  45:1,6
**action** 32:10,18
**address** 29:16,18
**administrator** 4:6 19:18
  25:24
**affairs** 34:17
**agency** 14:9
**ahead** 38:7 47:15 48:21
**alcohol** 12:24 21:11,15
  22:14,17 23:5 28:6,11 29:8
  44:5 49:9,17
**allowed** 46:7,10
**answers** 6:3
**anticipate** 6:5
**appointments** 10:9,14,25
  11:2
**arrangements** 42:24
**arresting** 14:9
**arrival** 15:3
**arriving** 14:25
**aspect** 14:4
**Assumes** 47:5
**attached** 33:4
**attention** 19:9 49:23
**attorney-client** 39:10,11
**automatically** 42:6
**availability** 21:4
**awake** 46:1
**aware** 13:11 26:6 28:18,
  20,25 29:5 34:12 38:1
  40:6,25

## B

**B-O-Y-E-T-T** 4:24
**back** 5:3 6:14 15:8,9 19:14
  24:10 27:22 41:10 42:7
  44:8
**background** 11:14 22:2
  25:16
**bad** 5:4
**Based** 27:14
**begin** 22:20
**beginning** 45:25
**behalf** 3:3
**believed** 48:3
**believing** 47:19

**Billings** 35:24 36:6 37:21
  39:23 45:21
**Billings'** 35:25 37:14
**birth** 3:15
**bit** 19:12 38:11 49:1
**black** 31:19
**blanks** 6:2
**block** 28:7,11
**blood** 28:22 49:21
**book** 43:17
**booked** 42:4
**booking** 13:9,13,23 17:23
  27:22
**Borrowman** 33:9,10 34:4
  35:21 37:10 39:19,21 40:3
**Boyett** 4:22
**brain** 23:16 29:17,24 30:3,
  9,17,19
**break** 6:6,8 34:1
**broad** 24:3
**brought** 14:8 15:12 32:18
**Bureau** 15:25

## C

**call** 8:23 17:20 21:1
**called** 3:3 5:21 11:4 26:8
**calls** 5:24 48:18 49:5
**capacity** 5:2
**care** 4:9 32:14
**career** 13:8
**case** 4:18,19,22 5:4,7 6:15
  15:12 27:7 39:21,22 40:9
  49:7,8
**Caucasian** 31:20
**caveat** 47:12
**cell** 42:19,20 43:25 44:12
  45:11 46:3,5,7,15
**cells** 14:14 46:19,20
**change** 24:15 30:8 49:11,
  18,21
**charges** 35:17
**chart** 7:2 9:13,15 10:5
  17:12 26:12 28:24
**chart's** 42:6
**charting** 20:11
**check** 45:10,22
**checked** 45:13
**checklist** 44:25
**chunks** 24:11
**circumstances** 43:18
  46:17

**CIWA** 21:10,19
**clarification** 40:16
**cleaned** 46:13
**clear** 10:24 47:23 48:6,11
**client** 7:1
**clinic** 8:23
**clinical** 11:17,18,22 12:10
  13:5 15:25 19:13 30:13
**closest** 49:23
**coaching** 32:23 34:13,14
**coachings** 32:22
**cognitive** 23:23 24:7
**comfortable** 29:7,11 48:5
**commission** 35:6
**communicate** 27:3
**communicated** 27:19
**communicating** 25:20
**communication** 38:3
**complaint** 29:17 32:16
**complaints** 19:24 32:13,
  17
**computer** 9:23 38:12 42:1
**concern** 25:2 26:13
**concerned** 24:22 28:5
**concerns** 4:10 13:22
  17:25 28:4 30:2 42:23
**concluded** 50:23
**condition** 23:16 25:15
  37:8,22 47:22
**conduct** 19:21
**confidential** 33:19 35:12
  36:8
**confused** 28:16
**connected** 42:3
**consent** 15:15
**consequence** 32:25
**consequences** 33:4
**considered** 35:11
**consult** 22:12
**consultation** 39:5 42:22
**contact** 46:14,18,23
**contained** 7:16
**context** 37:5
**contract** 21:7
**conversation** 39:10 50:15
**conversations** 39:13,20
  50:6,8,9,11,17
**coordinate** 19:22,23
**coordinator** 10:8 19:24
**copy** 8:24 50:25

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Jon Worlton

**Cor** 9:18

**Coremr** 9:18,20 10:7 38:19 41:5,23 42:3,5,7,10,14

**correct** 7:17 11:24 12:14, 16,17,19,23 17:9 21:6 26:4 29:8,9 31:2 34:24 38:21 45:20

**corrected** 32:25 33:13

**correction** 33:2

**correctional** 7:24 9:18 11:1 14:4

**corrections** 13:25 15:24 16:5 24:21

**counsel** 39:21 50:8

**counseling** 12:18

**county** 4:7,25 34:21 50:25

**court** 5:21 10:20

**cracks** 47:3

**created** 42:7

**creating** 20:5

**crime** 35:7,9

**cross** 22:11,19

**Crowson** 7:11 15:12,18 19:2 23:15 26:9 31:1,8 35:1,19 36:1 38:5,24 39:2, 17 40:2,6,17,23 42:15 44:10 45:3 46:25 48:16 50:6,10

**Crowson's** 9:2 27:7 37:8, 22 41:5 42:10

**current** 3:19

**custody** 14:11,12

**cut** 11:9

**cutoff** 22:18

---

**D**

**dashboard** 10:2

**date** 3:15 8:1 15:16

**dates** 8:9 15:18

**day** 7:19,22 45:19 46:11 47:17

**days** 6:18 20:20

**deal** 12:24 21:14 28:3 48:10

**dealing** 13:10

**dealt** 18:1

**deciding** 25:10

**decision** 42:20,21 43:1 44:13

**decline** 24:7

**decreased** 24:15 28:22 30:7

**deficits** 23:23 24:7

**degree** 11:17

**demonstrating** 29:7

**dentists** 19:23

**department** 15:24 16:4

**depending** 19:15 43:18

**depends** 12:11 20:18,25 46:8

**deposition** 4:11 5:10 6:5, 11 33:23 47:6 50:21,22

**designated** 46:21

**details** 40:10

**determination** 25:20

**determine** 17:24 21:17 22:14 23:23 24:1 30:6

**determines** 15:4

**determining** 22:7 44:4

**detox** 42:19,20 43:25 44:12,14,19 45:11 46:3,7, 15,19,21 47:19

**diagnosed** 23:15

**difference** 17:13 29:15

**differently** 12:3 47:25 48:1

**direct** 22:6

**directly** 13:10

**director** 19:22 20:2

**disciplinary** 32:10,18 33:1,6

**discipline** 32:20

**disciplined** 34:4,11

**disease** 42:16

**dishonesty** 35:4

**dismissed** 5:8

**distinction** 12:4

**distress** 25:19

**divided** 22:5

**doctor** 16:14 22:8 29:17

**doctor's** 22:9 41:14

**document** 8:25 9:5,9,12 16:5,24 17:1 41:11,17

**documentation** 32:21

**documented** 17:5,12

**documents** 6:10 7:16 19:5

**domestic** 35:15

**double** 20:10

**Draper** 8:13

**drug** 21:11 23:6 29:10,12 44:5 49:3,9

**drug-induced** 47:24 48:11,17

**drugs** 13:3 28:6,11 47:20 49:16

**duly** 3:4

---

**E**

**earlier** 13:16 31:4

**early** 42:11

**easy** 10:19

**education** 11:15

**Eighteen-ish** 11:20

**electronic** 6:25 9:19 11:4 43:20

**Elizabeth** 10:12

**emergency** 21:5

**EMR** 9:19

**encephalopathy** 23:16, 20

**enforcement** 4:1

**entails** 11:12

**enter** 27:2

**entered** 38:13

**entry** 8:7 38:18

**essentially** 7:1 11:9 41:12

**evaluate** 26:9

**evaluation** 24:17 46:25

**evaluations** 19:21

**evening** 46:1

**event** 31:1

**events** 5:12 39:7

**evidence** 47:6

**exam** 20:9

**examination** 3:6 30:6,13 50:1

**examined** 3:4

**exams** 20:12

**exchange** 14:11

**exhibited** 29:24

**exist** 41:7

**expect** 17:17

**expected** 40:4

**experience** 23:4

**experienced** 30:2

**experiencing** 47:24 49:3

**expertise** 30:4

**explained** 30:7

**explanation** 44:9

**eyes** 30:11

---

**F**

**facilities** 8:13 41:16

**facility** 9:4 11:1 16:8

**fact** 50:15

**facts** 5:12,24 47:5

**factual** 6:2

**fair** 25:22

**familiar** 21:10,12 23:17 30:10

**fell** 47:2

**felt** 48:5

**field** 38:12

**file** 9:3,6

**filed** 39:14

**fill** 11:6 16:13,18,21

**filled** 15:19

**filling** 6:2

**find** 5:19 43:15 44:19

**fine** 3:24 5:16 6:7 24:12

**flow** 19:16

**folks** 13:9

**follow** 10:3 22:4 44:1

**follow-up** 5:17

**forgot** 10:18

**form** 16:10,12,16,18,22,24, 25 17:8,11,18 18:13,14,19, 21,22 19:1,8 21:13 35:15 41:23

**formal** 35:17

**forms** 15:15,16,17

**forties** 31:15

**foundation** 47:15 48:19 49:5

**framing** 44:9

**front** 9:21

**full** 3:8

---

**G**

**gain** 29:23

**Gary** 50:3

**gathered** 40:5

**gathering** 18:2

**gave** 16:5

**general** 14:17 46:3

**generally** 22:1

**generated** 42:6

**George** 3:18

CROWSON vs WASHINGTON COUNTY
Jon Worlton

April 16, 2018

**give** 4:1 18:9 34:15 37:5 39:7 42:7 44:8 50:16
**giving** 37:3 48:5
**good** 13:7 40:19 48:20
**grabbed** 19:9
**great** 21:13 28:3 48:10
**grievances** 19:25
**guess** 5:25 12:12 22:5 32:20 34:13 36:7
**guessing** 31:15
**guidance** 44:17
**guidelines** 21:11
**Gunnison** 8:16
**guy** 37:12
**guys** 9:17 16:10 33:25

**H**

**half** 12:11 21:2 29:21
**hallucinating** 23:2 49:14
**handle** 17:16 19:24
**happen** 14:24 16:23
**happened** 5:14 30:20 32:24 49:12
**happening** 25:16
**harass** 5:18
**hard** 44:9
**health** 4:6,9 13:21 14:1,3 15:5 19:18,24 23:12 24:23 25:3,25 29:15,22 30:4 43:6,8,9 47:21
**hear** 40:11
**heard** 40:9
**heart** 22:18,19,23 28:19 49:18,22
**helpful** 30:25
**helps** 30:22
**higher** 34:5
**highest** 34:13
**Hispanic** 31:19
**history** 16:20 17:5 18:9,11 29:23,24 30:17 40:2,5 44:20
**homemade** 28:6,11
**honest** 32:19
**hospital** 37:12 41:13
**hospitalization** 23:25 40:23 41:1,4
**hospitalizations** 18:17
**hospitalized** 23:24 24:10 25:11 40:7

**hour** 15:2 17:23 21:1,2
**hours** 23:6,9 30:20 45:15, 17 48:12
**house** 46:21
**housed** 14:14
**housing** 11:5
**how's** 24:11
**hypothesis** 48:23

**I**

**identify** 7:10 43:14
**imagine** 21:3
**impacting** 13:12
**important** 21:4 29:23
**incarceration** 40:7
**incident** 35:15
**include** 18:2 39:9,12
**included** 27:20
**incoming** 14:20
**increased** 28:19,21
**indicating** 25:18
**indication** 38:23,25 40:1
**individual** 17:13
**individual's** 22:24
**information** 7:9,14,15,16 17:1,3 18:2 27:23,25 33:22 34:16 41:20 42:7
**Informed** 15:25
**initial** 9:24 42:13
**initiated** 39:14
**injury** 29:17,25 30:3,9,18, 19
**inmate** 8:9 10:25 13:24 14:12,20,22 17:22 18:9 19:24 24:6 44:5 46:22
**inmate's** 8:4 45:2
**inmates** 11:5,22 18:16 46:14,18
**inside** 11:1
**instances** 39:9
**instructions** 44:24
**intake** 14:14 16:24 17:7, 11,18 18:21 19:1 40:4 41:23
**intended** 20:6 21:14
**interacting** 13:21
**interacts** 14:9,16
**interchangeably** 12:5,7
**interested** 30:17
**interject** 16:1

**internal** 34:16
**interpretation** 10:21
**intervention** 12:22
**interview** 18:7
**introduced** 50:4
**involve** 34:25 35:6
**involved** 4:19 6:15 28:6 35:19 37:25
**involvement** 35:1,25
**issues** 11:23 13:11 15:1 23:12

**J**

**J-O-N** 3:12
**jail** 4:7 10:6 11:19 12:10,13 13:15,24 14:23 15:13 19:17 20:8,14 24:14 32:6 40:18,23,25 42:1,5 43:2 44:6 45:3 46:20 50:12
**January** 31:4,23
**Jimenez** 10:12
**job** 4:5 11:11,21 19:16 33:7 34:19,22
**jog** 5:17
**Johnson** 26:11 32:5 35:20 37:7 39:6 44:13 45:1 46:24
**Johnson's** 27:12 44:18
**Jon** 3:2,10,11
**Josh** 35:24 37:14 39:23 45:21
**July** 15:20 48:16
**June** 8:2 15:13 19:2 26:8 31:1 35:20 38:24 39:2 40:8 42:10 44:11 48:15

**K**

**keeping** 6:25
**kidney** 42:16
**kind** 25:17 30:20 33:1 34:17 41:14,20 42:15 44:19 46:12 47:20
**kinds** 10:1,9 17:2 18:3 20:7 22:10 23:2 25:19 33:12 46:10
**knew** 40:17 41:1 48:3
**knowledge** 33:5 34:11 39:1 50:13

**L**

**lack** 47:15 48:19 49:4
**Larrowe** 19:23 22:12 25:6, 21 26:2 29:20 38:3,4,15,

18,23 39:2 50:3
**law** 4:1
**lawsuit** 39:7,14 42:13 50:16
**layman** 29:15
**letter** 41:19
**level** 21:8 32:21,22,23 33:3,5,10 34:5,12,13
**license** 11:18
**licensed** 11:18 12:15
**likelihood** 44:4
**lines** 5:23
**lists** 32:21
**liver** 42:16
**Liz** 10:12,25 11:7
**lockdown** 44:10
**login** 9:24
**long** 6:6 11:19 18:4 20:24 32:5 46:8
**longer** 32:7 48:13
**looked** 6:14 7:12,15 8:7 31:10 40:3 41:6,10
**lot** 14:6 31:17,25 34:15 47:21
**lots** 24:6
**LPN** 32:8

**M**

**made** 26:24 38:2 42:20,21, 25 44:13 46:24
**maintain** 21:4
**make** 5:21 10:20,24 14:23 22:8 25:3 29:18 43:14
**makes** 38:18
**making** 20:5 25:20
**manual** 43:3 44:17
**March** 8:7
**mark** 33:18
**marked** 23:23
**Martin** 19:2 26:9 27:7 35:1, 19 36:1
**Marvin** 31:1
**master's** 11:16
**matter** 14:19
**meals** 46:4
**meaning** 17:21 48:2
**means** 11:3
**medical** 6:14,20 8:3,25 9:3,17,19 10:9,13 11:6,8 12:21 16:20 17:5,18,20,21, 25 18:9,11 19:22 20:1,4

April 16, 2018

22:6 25:4 27:1 29:23 37:25 40:1,5 43:3
**medication** 12:16 18:2
**meeting** 17:19,22
**memory** 5:12,13,18 18:15 27:24 28:4 37:15
**mental** 4:9 11:22,25 13:21 15:5 22:25 23:12 24:16,23 25:3,25 29:22 30:4,8 46:25 47:21 49:11,13,15
**mentation** 24:15 30:8
**mention** 10:19
**mentioned** 11:21
**method** 32:20
**Michael** 27:12 32:5
**mid** 21:8
**Mike** 26:11 28:3,13 33:5 35:20 37:6 39:6 44:13,18 45:1 46:24 47:19
**mind** 19:8
**minimum** 45:14,19
**minutes** 18:6
**miscellaneous** 41:18,21
**moment** 11:8
**monitor** 22:17
**monitoring** 37:19 48:4
**month** 29:20
**morning** 20:23
**MYLAR** 3:21,25 16:1,4,9 33:15,18 34:10 35:11 36:7 38:6 39:8 40:16 47:5,14 48:18,21 49:4 50:20

**N**

**named** 5:2 50:14
**names** 10:4
**nature** 31:16 35:9 43:7
**nauseated** 23:1
**necessarily** 9:12,15 27:21
**needing** 13:11
**night** 36:3 37:17 45:22
**notation** 37:7
**note** 26:12,17,21 27:14,18 38:13,20 41:4 46:24
**notes** 9:13 17:12 26:11 31:6,21 36:4 37:2,6,21
**notice** 27:17
**notification** 42:13
**notified** 26:23
**November** 8:8
**number** 3:19,22,23 4:2 7:2 10:2 20:25

**nurse** 9:12 14:21,22 15:3 17:1 21:8 25:7 32:8 34:19, 23
**nurse's** 17:14
**nurses** 7:21 10:7 13:16,20 17:21 21:22 22:3,13 25:8,9 32:16 35:19 37:24 49:23
**nursing** 19:20 24:22 42:21,25 43:24 45:10 48:4, 23

**O**

**oath** 5:12
**object** 3:21
**objection** 38:6 47:5,14 48:18 49:4
**observations** 17:1 36:5 39:17
**observe** 45:23,24
**observed** 37:21
**obvious** 17:25
**offered** 37:7
**office** 14:18 20:8,10 41:14
**officers** 7:24
**official** 5:2
**older** 31:16
**onset** 23:10 25:17
**opportunity** 5:11
**orders** 22:9
**orientation** 30:14
**outline** 25:12
**oversight** 22:6
**overview** 11:12

**P**

**p.m.** 50:23
**PA** 21:8
**paper** 41:21
**paperwork** 14:13
**parole** 15:9
**part** 11:21 13:7,12 14:1 16:25 17:7 18:8 21:23 28:24 41:23,25 42:11
**particulars** 50:17
**parties** 4:21
**passage** 48:7
**password** 9:25
**paste** 11:10
**patient** 8:10 10:4,5 23:22
**patient's** 7:1

**patients** 12:25 13:2
**pay** 49:23
**peak** 23:9
**people** 12:12 13:6,14 14:7 15:8 16:18 21:1,15 32:2 41:19 46:1 47:17 48:11 50:12
**percent** 13:7 19:15
**percentage** 13:5
**perfectly** 5:16
**perform** 30:6
**performance** 19:21 32:21 34:19
**period** 33:23 37:22 44:12 46:9
**person** 24:9,15,24 25:11, 16 29:24 30:4,7 37:11 38:13 45:22
**personal** 4:2 34:11 39:1
**personally** 21:20 38:24
**personnel** 33:23
**phone** 3:19,22,23 4:2 21:4
**physical** 7:13 22:25 25:18 30:5
**physically** 9:22 45:23,24
**pick** 31:11
**picture** 31:11
**piece** 13:25
**place** 10:4 14:11 24:14 27:2 41:12,21
**places** 14:10 16:25
**plaintiff** 3:3
**plans** 20:5
**point** 13:8 24:9 43:20
**policies** 43:3,10,19 44:16
**policy** 15:7 17:15 22:10 24:14,19 34:22 44:3 45:9, 12
**population** 46:4
**position** 44:18
**positive** 5:9
**posted** 43:21
**practice** 12:10 17:14 19:13 21:20 22:7 24:18,20, 25 30:16 45:13
**practitioner** 21:8,9
**prebooking** 14:10,25
**preparation** 6:11
**prescribe** 12:15
**prescription** 12:22 16:15
**presence** 39:20

**present** 39:9,11
**presentation** 22:25
**presented** 23:22
**presenting** 25:15
**pressure** 28:22 49:21
**primarily** 13:9 42:25
**printed** 7:7
**printouts** 9:8
**prior** 4:15 40:22 41:4
**prioritized** 47:25 48:1
**prison** 5:4 8:13 16:8 38:4 40:15
**prisons** 8:18
**privilege** 39:11
**probable** 17:2
**probation** 15:9
**problem** 33:6 47:24 48:6, 17
**problems** 4:10 13:21 17:25 48:11
**procedure** 22:10 24:14 44:1,3 45:9
**procedures** 43:3,10 44:17
**process** 13:23 18:8 21:18
**professional** 17:22 25:25 29:16,22
**professionals** 12:21 17:20
**program** 7:6 9:16 11:3
**protected** 9:25 33:22
**protocol** 21:12,16 22:13, 20
**protocols** 22:3
**provide** 12:18,20
**psychological** 11:23 12:1
**publicly** 43:21
**pull** 8:3,4 9:20 10:4
**Purgatory** 8:10
**purpose** 17:19
**put** 26:11 27:13,16,18 38:19 42:19 43:25 44:14, 19
**puts** 26:21

**Q**

**qualified** 14:7
**quarters** 12:11
**question** 5:4,24 6:19 18:11,20 24:3 30:21 33:16 37:1,4,5 39:19 40:20 44:7, 10 48:25

CROWSON vs WASHINGTON COUNTY
Jon Worlton

April 16, 2018

**questioning** 30:14
**questions** 5:11,17 17:4 18:12 33:20 49:25 50:5,18, 20
**quickly** 14:24 48:12

---

**R**

**range** 8:1
**rate** 22:18,19,23 28:19 49:19,22
**read** 50:21
**Reading** 50:25
**reads** 24:19
**reason** 6:7
**reasons** 24:6
**recall** 31:5,6,8,10 32:12 37:20 42:17 47:18
**receive** 27:17
**received** 32:13,16 41:13 44:5,21
**recent** 18:16
**recently** 30:2,19 40:7
**Recess** 34:2
**recollection** 31:13,14,22 40:24
**recommend** 23:25
**recommends** 16:14
**record** 3:9 6:15,20,25 7:11 8:3 9:1,19 10:25 27:2 33:24 41:3,11,22 49:6,10
**recorded** 17:11
**records** 8:12,18,19,20,24 9:3,13 15:18 35:18 38:23 39:25 40:14 41:5,6,7,12,15 42:5,10,15 45:2,4,7 48:14 49:1
**refer** 10:2 15:6 24:23 46:24
**reference** 38:2
**referral** 25:3 26:20,24 27:10
**referrals** 12:20
**referred** 24:16 26:12
**referring** 15:21
**refresh** 31:21
**Refusal** 15:25
**refuse** 16:13 17:4
**regard** 30:25 34:7
**related** 27:6,9 35:15
**release** 41:20
**relevant** 37:21
**remember** 8:2 9:7 18:14 19:3 26:10,12,15 28:2,3,

12,13 31:17,24,25 39:18 40:12 47:10,11,13 50:7
**remind** 10:23
**reminder** 5:10
**rephrase** 6:1
**reporter** 10:20
**represent** 15:17 37:2 50:3
**request** 8:17,19 11:6 43:13
**requested** 9:3,13
**requests** 9:9 11:7 12:12
**requirements** 42:18
**requires** 10:20
**reside** 3:17
**resolution** 5:6
**resolved** 35:16
**respect** 46:22
**responsibilities** 19:16
**responsibility** 22:5 25:24 27:13
**responsible** 20:4 22:8 37:18
**review** 19:1,5 27:6,22 35:18 37:6 38:22 39:25 40:13
**reviewed** 6:10,13,17,21 27:15 31:6 42:9 48:14
**reviewing** 15:18 31:21
**reviews** 19:22
**rise** 39:7
**RN** 32:8,9 36:2
**role** 20:1 37:14
**room** 20:9 46:11
**rude** 10:24
**Ryan** 33:9,10 34:4 35:20 37:10 39:19,21 40:3

---

**S**

**sake** 7:11 37:4
**scan** 41:12,18,22
**scanned** 8:25
**schedule** 6:17 7:18 10:13, 25 20:13,16
**schedules** 10:9
**scheduling** 19:20
**SCHRIEVER** 3:7,23 16:3, 7 33:25 40:19 47:7 49:24
**screen** 9:23,24,25 10:1
**screened** 30:19
**screening** 15:4,5 17:24

**search** 10:4 14:11
**section** 8:25 9:5 41:11,17 43:19
**security** 42:22,23
**send** 41:19
**sense** 5:21
**service** 42:13
**services** 4:6 11:6 12:18 14:1,3 15:5,25 19:18 20:4 43:6,8,9
**set** 20:13
**share** 14:4
**Sheriff's** 14:18
**shift** 36:3 37:17,19 45:14, 22,25
**shifts** 13:20
**short** 14:8 18:7
**show** 9:9,11,15 15:23 38:19
**showed** 9:9 28:18
**shower** 46:10,12
**sick** 21:1
**sign** 41:20 50:21
**signed** 15:20
**significant** 13:12 19:10 30:8
**signs** 22:17,22 23:19 25:14,18 28:19,21 29:8,12, 24
**similar** 16:17
**simply** 32:23
**sit** 19:7 27:24 32:23
**Sitting** 29:6
**situation** 48:9
**small** 46:20
**smaller** 24:11
**sober** 47:23
**social** 11:16,17,18
**somebody's** 22:19
**sort** 11:12 25:23
**sounds** 20:3 44:13
**specific** 10:5 17:4 22:19 24:4 27:24 28:14 43:16,23 44:24
**specifically** 14:2,16 22:16,18 25:13 35:16 39:22
**specifics** 26:15
**speculate** 5:25
**speculation** 38:6 47:14 48:19 49:5

**spell** 3:11 4:23
**spent** 12:9 13:6
**Spillman** 42:2,3,5,8
**split** 25:23
**spoken** 39:6
**spreadsheet** 7:5
**St** 3:18
**staff** 14:9,15,17,18 19:21 21:7 24:21,22 25:4 37:25 42:22 43:1,3,24 45:10 48:4,24 50:14
**staffing** 15:1
**standardized** 21:16
**standpoint** 47:21
**start** 23:5
**state** 3:8 8:18
**statement** 17:2
**status** 22:25 24:16 30:8 49:11,13,15
**stay** 20:24
**Stillman** 45:4,6
**stood** 19:8 36:5
**stuff** 22:2
**subdivided** 7:2
**submitted** 50:25
**substance** 44:6,20
**substantiate** 49:2
**sudden** 25:17
**suffered** 30:9
**suffering** 49:8
**supervision** 22:2 26:3
**suppose** 20:10
**suspect** 43:22
**suspicion** 49:12
**sweating** 23:1 29:3
**sworn** 3:4
**symptoms** 21:11,17 22:15 23:3,5,9,20 28:14 29:12 49:18
**system** 7:1 11:4,8 34:14 38:16 42:1

---

**T**

**table** 7:4 38:10
**tables** 9:10
**takes** 14:11 18:5
**taking** 50:22
**talk** 11:9,11,14 14:2,7 23:12 33:20
**talked** 19:12

---

CROWSON vs WASHINGTON COUNTY
April 16, 2018
Jon Worlton

**talking** 15:23 41:9
**task** 27:1,13,16,20
**tasks** 27:3,6,9
**telephone** 39:5
**telling** 28:13
**Tellmate** 11:4
**Ten** 4:17 32:7
**terms** 13:20 22:6 33:23
**testified** 3:4
**testify** 5:20
**thing** 10:18 25:17 30:21 32:24 33:1 34:17 41:14 46:12
**things** 5:18 10:1,3,10 17:3 18:3 20:7 22:10 23:2 25:19 30:14 33:12 41:10,18 46:4, 5,11 47:20
**thought** 12:21 28:10
**threshold** 22:20
**Thursdays** 20:18
**time** 4:15 5:3 6:7 8:10 12:9 13:5 20:21 37:22 39:17 42:9,12 44:9 46:4,9,22 47:16 48:5,7,8
**times** 4:14 45:19
**title** 15:24 43:5,16
**today** 11:3 19:7 27:25 29:6
**told** 28:3 50:7
**town** 8:23
**track** 9:17
**train** 24:21
**trained** 25:10
**transferred** 44:11
**transfers** 11:7
**transport** 37:11
**treat** 22:14
**treatment** 8:21 9:17 16:13 20:5
**tremors** 29:1
**true** 23:4
**Tuesdays** 20:18
**Twelve** 45:16,17
**type** 13:6 22:2 23:3 30:5 32:8,18 38:3 44:5 48:9,16
**types** 13:3
**typically** 18:5 46:20

**U**

**uh-huh** 5:22 7:20 10:15,19 15:14 18:23 26:22 38:14 44:15 45:8,18 47:1

**uh-uh** 10:20
**undergoing** 30:3
**understand** 21:16 25:15, 23 26:2 29:14,19 30:22 38:11 49:11
**understanding** 12:14 22:21 23:7,8,11 35:14 39:4 47:18
**understood** 49:14
**unfair** 24:13
**uniform** 17:15
**unit** 10:8 19:24
**units** 11:5
**untruthfulness** 35:3
**unusual** 49:15
**uploaded** 42:2
**Utah** 15:24

**V**

**Vague** 38:9
**Vaguely** 31:9
**varies** 48:10
**verbally** 26:25 27:19,20
**version** 37:3
**versus** 29:17
**view** 12:3
**violation** 15:9,10 34:21
**visit** 31:7,22,24
**vital** 22:17,22 25:14,17
**volunteer** 8:23

**W**

**W-O-R-L-T-O-N** 3:14
**waiver** 15:16,17,19,22
**wake** 45:22
**Washington** 4:7,25 7:11 50:25
**watching** 48:4
**ways** 7:3 27:3 30:1
**web-based** 7:6
**week** 19:6 20:20 41:10 48:12
**weeks** 20:19
**white** 31:18
**Wight** 38:9 50:2,4,18
**wished** 37:11
**withdrawal** 12:24 21:18 22:15,17,20 23:5 29:8,10, 12 48:17 49:3

**withdrawals** 49:9
**withdrawing** 13:2 21:15 49:16
**wondering** 44:16
**words** 6:24 11:25 42:1,4, 19,23
**work** 3:22,23 11:3,17 13:8, 13 19:15
**worked** 11:19 32:5
**worker** 11:16,18
**workflow** 12:12
**working** 6:18 7:19,21 36:3 37:17 48:23
**works** 4:1
**workstation** 20:11
**Worlton** 3:2,10,13
**worries** 24:23
**written** 11:7 33:5 43:2 45:12
**wrong** 12:15

**Y**

**years** 4:17 11:20 31:25 32:7