CROWSON

vs

WASHINGTON COUNTY

MICHAEL T. JOHNSON

April 17, 2018





333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2      FOR THE DISTRICT OF UTAH, CENTRAL DIVISION
 3                      *   *   *
 4   MARTIN CROWSON,        )
                            )
 5         Plaintiff,       )
                            )   Case No. 2:15-cv-00880
 6      vs.                 )
                            )   Deposition of:
 7   WASHINGTON COUNTY,     )
     et al.,                )   MICHAEL T. JOHNSON
 8                          )
           Defendants.      )
 9
                        *   *   *
10

11
                        COPY
12
                    April 17, 2018
13
                       9:00 a.m.
14

15
           WASHINGTON COUNTY TREASURER OFFICE
16             197 East Tabernacle Street
                   St. George, Utah
17

18

19                      *   *   *

20              Linda Van Tassell
           - Registered Diplomate Reporter -
21            Certified Realtime Reporter

22

23

24

25
```

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

---

**Page 2**

```
              A P P E A R A N C E S
 1
 2   For the Plaintiff:    Ryan J. Schriever
                           SCHRIEVER LAW FIRM
 3                         51 East 800 North
                           Spanish Fork, Utah  84660
 4
     For the Defendant     Frank D. Mylar
 5   Washington County:    MYLAR LAW, PC
                           2494 Bengal Boulevard
 6                         Salt Lake City, Utah  84121
 7   For the Defendant     Gary T. Wight
     Larrowe:              KIPP & CHRISTIAN
 8                         10 Exchange Place, 4th Floor
                           Salt Lake City, Utah  84111
 9
     Also Present:         Brian Graf
10
                           *  *  *
11
                      I N D E X
12
     EXAMINATION                              PAGE
13
     By Mr. Schriever                            3
14
     By Mr. Wight                              110
15
     By Mr. Schriever                          118
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

1              P R O C E E D I N G S
2          MICHAEL T. JOHNSON,
3   called as a witness on behalf of the plaintiff,
4   being duly sworn, was examined and testified as
5   follows:
6              EXAMINATION
7   BY MR. SCHRIEVER:
8       Q.   Would you please state your full name
9   for the record.
10      A.   Michael Todd Johnson.
11      Q.   Mr. Johnson -- may I call you Michael or
12   Mike?
13      A.   Mike's fine.
14      Q.   Mike, have you ever had a deposition
15   taken before?
16      A.   Yes.
17      Q.   How long ago?
18      A.   About 20 years.
19      Q.   What was that in relation to?
20      A.   I was an EMT in the coal mines where I
21   worked in my twenties and had an accident occur and
22   there were some manufactures, lawyers and everything
23   to try to determine what led up to that accident.
24      Q.   Where did you work in the coal mines?
25      A.   Central Utah.

---

**Page 4**

1       Q.   In Price?
2       A.   Emery County.  Wilberg Mine.
3       Q.   By way of reminder then, a deposition is
4   an informal court proceeding where you're under oath
5   and it is our chance to find out from you what you
6   would testify to or what you would be able to
7   testify to at court, so it's a question and answer
8   format.  What I'm after is just your memory of the
9   facts and events, does that make sense?
10      A.   Uh-huh.
11      Q.   As long as you're saying uh-huh, let me
12   say we are making a record of everything that is
13   said.  When you say uh-huh or uh-uh or nod your
14   head, it requires Linda to make an interpretation so
15   if you do that I will ask you to just clarify
16   whether that was yes or no.
17      A.   Okay.
18      Q.   And it's not because I'm rude -- maybe
19   you might think there's other reasons I'm rude but
20   that's not one of them.
21      A.   Okay.
22      Q.   If I ask you a question that you don't
23   understand or you don't feel like you could answer
24   completely or honestly, would you let me know that
25   as well so I can rephrase it?

---

**Page 5**

1       A.   Yes.
2       Q.   We're not here to try to trick you.
3   We're literally just after what your testimony would
4   be, does that make sense?
5       A.   Yes.
6       Q.   If you need a break at any time, let me
7   know.  We can do that, too.
8       A.   Okay.
9       Q.   I anticipate your deposition will go
10   about two hours.
11      A.   Okay.
12      Q.   That always depends on how much you say
13   and how many questions I ask, so there's some
14   variation there.  I want to ask you generally some
15   questions about your background, education, where
16   you came from, what you do at the jail, the jail
17   processes and procedures and then I'll ask you more
18   specific questions about your interactions with
19   Mr. Crowson, all right?
20      A.   Okay.
21      Q.   Where do you currently live?
22      A.   Hurricane, Utah.
23      Q.   How long have you been there?
24      A.   Probably about six years.
25      Q.   How long have you worked for the

---

6

1  **Purgatory jail?**
2       A.  Going on 14 years.
3       **Q.  Have you always been a nurse there?**
4       A.  Yes.
5       **Q.  What is your educational background?**
6       A.  Registered nurse.  Associate degree from
7  College of Eastern Utah.
8       **Q.  How long ago did you receive your**
9  **associate's degree?**
10      A.  I think it was 1997.
11      **Q.  Where have you worked as a nurse other**
12  **than Purgatory jail?**
13      A.  Intermountain Healthcare, various home
14  health and hospice agencies.  The hospital for
15  Intermountain Healthcare also.  Right now I've got a
16  part-time job with Red Cliffs Regional in
17  conjunction with the jail.  I work full time at the
18  jail.
19      **Q.  Did you work at Dixie Regional?  Is that**
20  **the hospital for Intermountain Healthcare?**
21      A.  Yes.
22      **Q.  How long did you work as a home health**
23  **and hospice nurse?**
24      A.  It's varied over the last 14 years on
25  and off.

7

1       **Q.  Part-time jobs?**
2       A.  Yes.
3       **Q.  In addition to Purgatory?**
4       A.  Well, part time and full time.
5       **Q.  Have you been employed consistently with**
6  **Purgatory for the last 14 years?**
7       A.  Yes.
8       **Q.  And in addition to that at times you had**
9  **a full-time job as a hospice nurse as well?**
10      A.  Yes.  Prior to that just -- yeah, part
11  time mostly, but full time with the jail.
12      **Q.  As a hospice nurse you're dealing with**
13  **end-of-life care?**
14      A.  Yes.
15      **Q.  For Dixie Regional what kind of**
16  **departments have you worked in?**
17      A.  Med/surge, emergency room, ICU.
18      **Q.  When did you work there at Dixie**
19  **Regional?**
20      A.  It was right after I first came down
21  here.  It's been about 17 years ago.  I worked there
22  for about five years and then got a better job,
23  moved on.
24      **Q.  By better job was that the Purgatory**
25  **jail job?**

8

1       A.  Not at first.  It was a nursing home.
2       **Q.  You're currently working at Red Cliffs**
3  **as well?**
4       A.  Part time, yeah.
5       **Q.  What do you do at Red Cliffs?**
6       A.  Charge nurse.  Take care of up to 25
7  patients at a time.  Oversee some aides, make sure
8  they're doing their duties.
9       **Q.  I'm not familiar with Red Cliffs.  Is it**
10  **a hospital or a facility type place?**
11      A.  It's a facility, nursing home, rehab and
12  long-term care.
13      **Q.  All right.  Help me understand.  The**
14  **registered nurse designation, I may have a**
15  **misunderstanding of what it is.  My understanding is**
16  **it requires a bachelor's degree.  Is that not**
17  **accurate?**
18      A.  Not when I went to school.  It was an
19  associate's degree.  You could go on and get your
20  bachelor's but I haven't done that.
21      **Q.  Have you ever been disciplined as**
22  **a nurse as far as employment goes?**
23      A.  No.
24      **Q.  Ever had your license suspended or**
25  **revoked?**

9

1       A.  No.
2       **Q.  Who often do you have to renew your**
3  **license?**
4       A.  Every other year.
5       **Q.  Is there a teaching and education**
6  **requirement to go with that?**
7       A.  In Utah, if you're working full time,
8  that's considered your continuing education.  I do a
9  lot of training, though, especially out at the jail.
10  Every other year they have a national conference for
11  correctional nursing that I've gone to several times
12  over that period of time.
13      **Q.  Okay.**
14      A.  Other trainings include like with the
15  hospital there was always ongoing training with
16  different tasks, different aspects of it.
17      **Q.  You've done training but it's not**
18  **required for your license.**
19      A.  No, not in the state of Utah.
20      **Q.  The national corrections, do you belong**
21  **to a group that's the National Correctional Nursing**
22  **Association or something along those lines?**
23      A.  I had a membership at one time.  It's
24  lapsed now, but, yeah.
25      **Q.  Are those the trainings you've gone to?**

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

10

1    A.  Yes.
2        Q.  **What types of things do they cover in**
3    **those trainings?**
4        A.  There's a lot of various things.  We
5    have doctors, psychologists, other nurses over a
6    five-day period do different types of classes
7    involving what to watch out for when someone is
8    having a medical emergency, how to respond, how to
9    interact with the patients, coworkers, that kind of
10   thing.
11       Q.  **And when was the last time you went to**
12   **one of those meetings?**
13       A.  It was last year or the year before,
14   probably two years now.
15       Q.  **In your experience is there a difference**
16   **between nursing in a correctional facility versus**
17   **nursing in say a hospital?**
18       A.  Yes.  It's a different setting for sure.
19       Q.  **Can you explain to me some of the**
20   **differences in your mind?**
21       A.  The clientele, for sure.  It's a
22   different type of clientele.  You have to be
23   escorted wherever you're at.  Whenever you have an
24   interaction with a patient or an inmate you have a
25   deputy or security there to make sure everything is

11

1    okay.
2        We do a lot of clinical stuff out there.
3    We have a doctor that comes out, both a county and a
4    state doctor that comes out once a week that we do
5    clinics with.
6        We also do a task list on a daily basis.
7    They'll put requests in for things that they are
8    having issues with of medical concerns and we see on
9    average probably a dozen to 20 different patients a
10   day that we take care of that way.
11       Also there's a booking area where we
12   have to assess patients when they first come in to
13   make sure if they have any medical issues or
14   medications or anything we're aware of it and we try
15   to coordinate everything between doctors and
16   therapists.
17       We have two therapists out there that
18   are licensed.  They take care of all the mental
19   health issues.  They're licensed.  They're not
20   psychologists but they're licensed some way.  I
21   don't know.  I'm not familiar with what or how but
22   it's busy.
23       That's a lot of differences between --
24   hospitals usually give them five patients a day,
25   five to eight patients a day.  You're working with a

12

1    bunch of other nurses and different administration
2    where you take care of those things.
3        Q.  **So the workload is greater at the**
4    **prison, or at the jail?**
5        A.  It varies.  Sometimes yes, sometimes no.
6        Q.  **What are your typical shifts there?**
7        A.  I usually work day shift.  It's three
8    shifts on.  They're either 12, sometimes 12 to 14
9    hours per day, just depending on 40-hour workweek,
10   how that fills in.  So it's three on, two off, three
11   on, two off, then three on and seven days off and
12   it's a rotating schedule.  It just stays the same
13   that way.
14       Q.  **Okay.  The 12 to 20 patients that you**
15   **see a day, is that in addition to the new inmates**
16   **coming in to be booked?**
17       A.  Yes.
18       Q.  **What is a typical amount of time that**
19   **you spend with those 12 to 20?**
20       A.  Well, we have them brought down.  They
21   submit their request the day before.  They're
22   brought down that morning.  We usually spend
23   anywhere between five to ten minutes with each
24   patient, depending on what's going on.  Sometimes a
25   little bit more if there's more of a concern we have

13

1    to call the doctor right away about or anything like
2    that.
3        Q.  **Do you coordinate with their private**
4    **doctors outside of the prison?**
5        A.  Yeah.  Well, Dr. Larrowe is our medical
6    director.  He's designated that.  He has a contract,
7    I believe, with the county for that so he's the
8    medical director.  We also coordinate with the state
9    medical doctor that comes down once a week.
10       Q.  **Who's that?**
11       A.  Dr. Burnham.
12       Q.  **He comes down once a week, every week?**
13       A.  Uh-huh.  Yes.
14       MR. WIGHT:  Spell the last name.
15       THE WITNESS:  B-u-r-n-h-a-m, I believe.
16       Q.  **What's his first name?**
17       A.  I don't know.
18       Q.  **Doctor?**
19       A.  Doctor.
20       Q.  **How long has he been coming down once a**
21   **week?**
22       A.  At least the last five, six years, I
23   believe.
24       Q.  **Does he stay there the entire day?**
25       A.  He stays there probably up to about two

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

---

**14**

1  hours. He comes down and visits clinical. State
2  inmates will put their requests in and they're seen
3  specifically by him. County inmates are seen by
4  Dr. Larrowe.
5      **Q. And there's no overlapping between the**
6  **county and the state?**
7      A. No.
8      **Q. If a county inmate has an emergency**
9  **while Dr. Burnham is there, would Dr. Burnham see**
10  **him or would he have to be referred to Dr. Larrowe?**
11     A. No. We would call Dr. Larrowe directly.
12     **Q. In the case of Martin Crowson, I assume**
13  **he was a county inmate?**
14     A. I believe so, yes.
15     **Q. Dr. Larrowe would have been the doctor**
16  **who --**
17     A. Yes.
18     **Q. How often does Dr. Larrowe come?**
19     A. Once a week he does his clinical.
20     **Q. How long is he here, typically?**
21     A. Usually two to three hours. Depends on
22  the workload, how many patients put in to see him.
23     **Q. Is there a specific day of the week he**
24  **comes?**
25     A. It's been the last while on either

---

**15**

1  Tuesday or Thursday, depending on his schedule with
2  his other stuff.
3      **Q. Okay. What do you do when Dr. Larrowe**
4  **is not on site but you need a doctor's input?**
5      A. We call him directly. We have an access
6  line to him directly through a cell phone we use at
7  the jail. Also, if we need to call his office, his
8  clinic or his own cell phone, he's available to us
9  24/7 that way. If he's not, he usually designates
10  one of his nurse practitioners to be on call for him
11  if he's out of town or not available.
12     **Q. What types of medical issues do you deal**
13  **with?**
14     A. It's a broad range. Everything from a
15  head cold to an assault in the jail or someone
16  having a heart attack. It covers everything.
17     **Q. So whatever medical issue comes up --**
18     A. We're the first ones that deal with it.
19     **Q. When you're on shift how many nurses are**
20  **on shift?**
21     A. Monday through Thursday we usually have
22  two. Back then, it varied a little bit. We've had
23  ongoing issues with staffing, like any other place.
24  I think Monday through Thursday we try and have two
25  nurses on and Friday, Saturday, Sunday it's usually

---

**16**

1  just one nurse.
2      **Q. Okay. And I'll represent to you in my**
3  **review of the records from this time period is that**
4  **there were three nurses noted in the records -- you,**
5  **Ryan Borrowman and Josh Billings.**
6      A. Okay.
7      **Q. Do you know if there were any other**
8  **nurses employed by the jail at that time?**
9      A. No. I'm not involved in those things.
10     **Q. Do you have a memory of who else was**
11  **employed at that time?**
12     A. That sounds about right. Are you
13  talking about all of the nurses that are employed
14  there or just the ones that would be there at that
15  time?
16     **Q. Right. Just June 2014.**
17     A. It would be me and Josh and Ryan. I
18  think that's correct.
19     **Q. Dr. Larrowe was the doctor at that time**
20  **as well?**
21     A. Yes.
22     **Q. What are your responsibilities in**
23  **booking?**
24     A. There's a prebooking area and a booking
25  area. We usually try to see them in prebooking when

---

**17**

1  they're first brought in by the arresting officers.
2  We go down and we ask them anywhere between half a
3  dozen to a dozen different questions, depending on
4  their circumstances. Whether they're detoxing off
5  some substance, whether they're having medical
6  issues, if they're on medications, do they have
7  allergies to medications, have they recently been in
8  a hospital, are they in pain at this time, any
9  chance they can be pregnant. We try to cover a
10  broad spectrum where we at least get an idea if
11  they've got anything going on.
12     **Q. How many of those do you see on a**
13  **typical day?**
14     A. It varies a lot. Some days we don't see
15  a lot during a shift, maybe two or three. Other
16  days there could be upwards of a dozen come in at
17  any given time to be booked in.
18     **Q. All right. So between seeing inmates**
19  **for medical issues and visiting with new inmates in**
20  **booking, what other job responsibilities do you**
21  **have?**
22     A. Those are the main ones. We try to make
23  rounds down through the blocks, stay in touch with
24  the officers, make sure if they notice anything
25  going on in their duties while they're feeding or

---

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

18

1  doing cell checks.  They do cell checks every hour
2  through the blocks so we kind of coordinate with
3  them.  We also coordinate medical appointments at
4  times.  We have to help with scheduling there.
5  We're doing a ton of charting or trying to to make
6  sure everything is in place.  That's pretty well it.
7      Q.  When you say medical appointments, do
8  you mean outside medical appointments?
9      A.  Sometimes we have to coordinate those,
10  yes, because we'll have people going to get x-rays
11  or see other providers that they've been referred
12  to.
13      Q.  What do you have to do to coordinate
14  with an outside facility for an appointment?
15      A.  We usually just try to give them a call,
16  see if there's any appointments available.  We have
17  a unit coordinator also that's there through the
18  week that helps us a lot with that.  We refer to her
19  a lot.
20      Q.  Is that Elizabeth Jimenez?
21      A.  Yes.
22      Q.  Do you arrange transport for inmates to
23  go to outside facilities?
24      A.  Usually Elizabeth does that.  We try to
25  just coordinate through her to get everything

19

1  scheduled appropriately.  There's also a dentist
2  that comes out once a week so we're involved in that
3  a little bit just to make sure patients get down
4  there and fill out the paperwork they need.
5      Q.  All right.  The charting you do, is that
6  done in CorEMR?
7      A.  Yes.
8      Q.  Is there anywhere else that you do
9  charting?
10      A.  No.
11      Q.  Any paper charts?
12      A.  No.
13      Q.  Paper files?
14      A.  No.
15      Q.  Paper medical records?
16      A.  No, not at that time, I don't believe
17  so.  We've had CorEMR for a long time out there.
18      Q.  Do you have access to Spillman?
19      A.  I've got access to put entries in
20  through whatever password I've got and usually that
21  entails basically just dietary things, if I order
22  certain -- like a diabetic would have a diet
23  specific to them, vegetarian stuff, just to
24  coordinate with the kitchen.  To put in actual
25  Spillman entries for inmates like the deputies do, I

20

1  don't have access to.
2      Q.  Do you look at entries that are put in
3  Spillman?
4      A.  Yeah, I believe so.  I could.
5      Q.  You don't seem confident in that.
6      A.  Well, I don't deal in that much.  I deal
7  with the medical aspect.  If there's a medical
8  clearance I have to put in for somebody that like
9  comes in pregnant, they need a bottom bunk, a p.m.
10  snack, extra blanket, that's just normal procedure
11  to do that.  I don't look through Spillman to check
12  on entries, no.
13      Q.  Okay.  Does the jail have a manual that
14  they give to you that has policies or procedures?
15      A.  There's policies and procedures in
16  place.  There's not a manual we're given.  It's just
17  there at the nursing -- our part of it's there at
18  the nursing station.
19      Q.  Is it a booklet?  Was it a --
20      A.  It's a big -- I believe now -- there's a
21  lot of policies and procedures.
22      Q.  Do you know what the booklet is called?
23      A.  No.
24      Q.  Is it a binder?
25      A.  It's a binder.

21

1      Q.  And it's there at the nursing station?
2      A.  I believe so.
3      Q.  Okay.  What is the nursing station?
4      A.  It's the medical area.  There's an
5  office set apart where we have two exam rooms,
6  medical area to put the medication carts, keep them
7  locked up.  There's a dental office that's included
8  in there with one of the exam rooms and there's an
9  office space where we've got computers where we can
10  bring people down, assess them, take care of their
11  needs.
12      Q.  Is there also a correctional officer
13  there with you?
14      A.  Yes.
15      Q.  Is there somebody assigned specifically
16  to be a correctional officer for the medical
17  department?
18      A.  No.
19      Q.  Let me go through and I want to try to
20  get an idea how your time is spent on a typical
21  shift.  You mentioned 12 to 20 patients.
22      A.  Yeah.  That put in a request on a daily
23  basis.
24      Q.  And that would be five to ten minutes?
25      A.  Yeah.

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

---

22

1     Q.   So that could be three and a half to
2  four hours in your day; is that right?
3     A.   Usually a little quicker than that
4  because most of the requests that come in they're
5  not that involved.  It's like we're following up
6  checking blood pressures on patients that have
7  issues within those concerns, head colds, various
8  aspects of that.  I would say a normal time to do
9  those kind of tasks is usually about two hours at
10  the most.  But it will vary, too, it just depends on
11  what's been put in.
12     Q.   Okay.  So two hours to maybe three
13  hours?
14     A.   Yeah, maybe.
15     Q.   And then the booking aspect of it, how
16  long does that take on a typical day?
17     A.   I'm in and out of there all day, so it
18  varies.  I couldn't tell you.  I don't know.
19     Q.   How long does it take typically to get
20  through one of those interviews?
21     A.   Usually about maybe two minutes.
22     Q.   Okay.  But then you have to walk down
23  there, right?
24     A.   Yeah.
25     Q.   So there's time involved with that.

---

23

1     A.   It just takes a few seconds.  The
2  medical office is just off of the area to go into
3  booking or right next to it.
4     Q.   Okay.  So would ten minutes be a fair
5  estimate of the time you get the call to get down
6  there and do it?
7     A.   That would be fair.  Probably five to
8  ten minutes.  Sometimes I can't go right into
9  booking.  I'm right in the middle of removing a
10  dressing or something else.
11     Q.   Sure.  Okay.  So that would be on a busy
12  day with 12 new bookings, that would be a couple of
13  hours.  On other days it might not be any time at
14  all if there's no bookings.
15     A.   That's correct.
16     Q.   Okay.  What else do you do.  Charting?
17     A.   That pretty well takes care of my day.
18     Q.   That takes care of your day?
19     A.   Yeah.  Charting.  If there's any
20  emergencies at the jail we respond immediately.
21  There's altercations at times between inmates.
22  There will be times when an inmate has to be
23  restrained or moved from one area to the other that
24  they call medical there to make sure that's covered
25  if there's any injuries, anything going on medically

---

24

1  that we can address it or at least be involved in
2  it.
3     Q.   It's important to have somebody on call
4  there with medical training then?
5     A.   Uh-huh.
6     Q.   Is that a yes?
7     A.   Yes.
8     Q.   Is the rest of the shift you're on call
9  or are you doing other activities?
10     A.   I'm making rounds through the blocks.
11     Q.   Making rounds?
12     A.   Usually contacting doctors, following up
13  on any other appointments.  If Liz isn't there, then
14  we try to cover if there's anything come in on phone
15  calls from family members or whatever else.
16     Q.   Do you ever have any downtime?
17     A.   There is sometimes, yeah.
18     Q.   You hear stories of the residents in the
19  hospitals where they go sleep in a closet and then
20  they're constantly woken up.  Is there times when
21  you're standing around waiting for the medical
22  people --
23     A.   No.
24     Q.   Are there times like that where you're
25  sleeping in the closet and you've go out and --

---

25

1     A.   No.
2     Q.   Are you a certified correctional
3  officer?
4     A.   No.
5     Q.   Have you been through POST training?
6     A.   No.
7     Q.   Do you have good relationships with the
8  correctional officers that are there?
9     A.   Yes.
10     Q.   How about Brett Lyman, did you know
11  Brett Lyman?
12     A.   Yes.
13     Q.   Deputy Dolgnar?
14     A.   Yes.
15     Q.   How would you describe your relationship
16  with Mr. Lyman?
17     A.   Good.  Good working relationship.
18     Q.   Did you have a sense as to whether the
19  inmates liked Mr. Lyman?
20         MR. MYLAR:  Objection.  Calls for a
21  mental impression and also lack of foundation and
22  also calls for speculation.
23     Q.   You can still answer if you know.
24         MR. MYLAR:  If you know.
25     A.   No.

---

26

1    Q.  You don't know?
2    A.  No.
3    Q.  Same question with Deputy Dolgnar?
4        MR. MYLAR:  Same objection.  Calls for
5    mental impression.  Calls for speculation.  He lacks
6    personal knowledge of those interactions and there's
7    no foundation.
8    A.  No, I don't.
9    Q.  Are you aware of any staff who had
10   complaints about Mr. Lyman?
11   A.  No.
12   Q.  Earlier you mentioned that there were
13   two people there who have training or who are
14   licensed to perform mental health.
15   A.  There are now.  At that time I think it
16   was just Jon Worlton.
17   Q.  Now there's two.
18   A.  Now there's two, yeah.
19   Q.  You don't know what Mr. Worlton's
20   training is, though?
21   A.  I couldn't tell you specifically.  I
22   know he's a licensed therapist but I don't know the
23   proper terminology for it.
24   Q.  What is his relation to you and the
25   medical department?

27

1    A.  He's my supervisor and he's also over --
2    at that time he was over mental health for all of
3    the patients.
4    Q.  Is he no longer over mental health?
5    A.  He still is, yeah.  He works now with
6    another therapist to coordinate, split the work a
7    little bit, the workload.
8    Q.  I want to make sure that when we use the
9    term "mental health" that we're talking about the
10   same thing.  What would you put under the umbrella
11   of mental health?
12   A.  Anyone that's on those kind of
13   medications, that would come in with medications
14   like for depression, anxiety, those kind of things,
15   we refer them immediately.  That's why we do the
16   screening in prebooking.  There's not a lot of
17   facilities in this area to take care of the mentally
18   ill so a lot of them come to jail.  They either get
19   trespassed or run into problems with the law and so
20   we've tried to make sure that we address those
21   issues for them.  It's easier to manage them in jail
22   if they're on their medications consistently.
23   Q.  Is it just medications that triggers
24   that?
25   A.  Not necessarily.  It depends.  Jon, with

28

1    what he does, he is constantly busy trying to make
2    sure that the stress levels and things that are
3    going on in the jail there are times when people get
4    upset, agitated, anxious, they need to talk to
5    somebody, that's the therapist's role in the jail to
6    try to handle those and we coordinate back and
7    forth.  If there's something going on that we need
8    to watch out for, not just when he's not there, then
9    we can refer back to him.
10   Q.  How often do you interact with
11   Mr. Worlton on a daily basis?
12   A.  Quite a bit.  When he's there we're
13   constantly taking care of everybody.  I refer to him
14   a lot with patients if there's any kind of issue I
15   think he needs to be involved in.
16   Q.  Okay.
17   A.  As my supervisor I also let him know if
18   there's any kind of emergency that's happened,
19   anything like that.
20   Q.  How do you refer inmates to him?
21   A.  Usually -- well, it varies.  There's a
22   task list that we can submit to him over the
23   computer.  I talk to him personally about it.
24   Q.  Okay.  Those are two separate ways to --
25   A.  Those are a couple.  Sometimes we call

29

1    him on the phone if he's not there.
2    Q.  Okay.
3    A.  He's available to us on call.
4    Q.  So the task list would be in CorEMR?
5    A.  Yes.
6    Q.  And then you see him several times
7    throughout the day as well --
8    A.  Yes.
9    Q.  -- so you can verbally tell him,
10   "There's an inmate here that needs your attention."
11   A.  Yes.
12   Q.  Is there any way to follow up with him
13   to find out if he has met with the inmate?
14   A.  I'm typically busy enough that if I
15   refer to him he'll let me know if there's anything
16   else he needs me to do on my end of that, but not
17   typically, I don't follow up on what he does.
18   Q.  Is there a way for him to enter in
19   CorEMR if he's done that?
20   A.  Yes.  We all have access to the medical
21   chart for each patient, so notes from medical and
22   mental health people are all entered in there.
23   Q.  Are you required to document every
24   meeting in CorEMR?
25   A.  Not required.  It's a good practice and

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

---

30

1  we all try to do that but it depends on the day,
2  too, as far as how busy or if we can pass on to the
3  next shift verbally.
4      **Q.  What type of information do you put into**
5  **CorEMR?**
6      A.  Vital signs, anything that's going on
7  that I can see as far as objectively what's going
8  on.  What they state a lot of times will go into the
9  record, the subjective information.  We need that as
10  much as to objective to determine what's going on
11  with them, whether they're having pain or any kind
12  of medical issue.
13      **Q.  Why is that important?**
14      A.  It just makes the record complete.  We
15  get both their end of it and then objective and then
16  a lot of times it's referred to the doctor or to
17  Jon.
18      **Q.  As far as your responsibilities in**
19  **nursing, do you feel it's important to get medical**
20  **history from people?**
21      A.  That's the reason we do the intakes,
22  yeah.  We try to in that little break of time we try
23  to get that.  Sometimes they're pretty compliant
24  with that, sometimes they're not.  Sometimes they
25  say, "Aw, leave me alone.  I don't want to talk to

---

31

1  you."  Later they'll have issues come up that they
2  can put in as a request.
3      **Q.  Okay.  Is that the booking process that**
4  **you're talking about?**
5      A.  Yes.
6      **Q.  Does that get included into Spillman or**
7  **into CorEMR?**
8      A.  CorEMR.
9      **Q.  When you meet with an inmate in the exam**
10  **room, do you have access to the CorEMR records to**
11  **look at?**
12      A.  Yes.
13      **Q.  Is that your practice to look at CorEMR**
14  **records?**
15      A.  Yes.
16      **Q.  If you had to go out to a cell to visit**
17  **with an inmate, do you have access to the CorEMR**
18  **records in the cell?**
19      A.  I usually write everything down on like
20  a pad or whatever.  Most of the time, if they've got
21  a medical issue, we bring them to medical because
22  with HIPAA regulations it's more of a private area.
23  We don't talk about anything out in the corridors or
24  the cell blocks.  That's just regulation.  That's
25  the law.

---

32

1      **Q.  Is there ever a situation where you meet**
2  **with an inmate out in the corridor or in the cell**
3  **block?**
4      A.  On occasion, yeah.  If they get pulled
5  out from the cell block in their interaction with
6  the deputy, sometimes they'll have us come down,
7  say, "Hey, this guy is not acting right or this guy
8  is having problems.  Can you come down to see if we
9  need to move him or what we need to do with him."
10  So on occasion there is, yeah.
11      **Q.  What training do you have in regard to**
12  **recognizing brain injuries?**
13      A.  As an RN.  Just what I've been through
14  at school and through experience.
15      **Q.  What would you list off as the things**
16  **you're looking for to identify brain injury?**
17      A.  There's neuro checks, neurological
18  assessment.  Usually check their eyes, their
19  movement, their speech, their cognitive, whether
20  they're processing, either slow or fast, or if
21  they're having some kind of a manic episode.  We
22  check their grips.  With neurological assessment you
23  go kind of head to toe.  Have them stick their
24  tongue out, wiggle it back and forth, check their
25  eyes, see if they're dilated, pinpoints, if they can

---

33

1  move their eyes, track with their eyes, if they can
2  answer questions, if they can speak clearly enough.
3  Those are all assessment tools to do that with.
4      **Q.  Okay.  And what are the different causes**
5  **of a brain injury?**
6      MR. MYLAR:  Objection.  Lack of
7  foundation.  You can go ahead and answer.
8      A.  Trauma.  There's multiple things that
9  can cause brain injury.
10      **Q.  I'm making you do the work.  I'll list**
11  **them off for you, how's that?**
12      A.  Okay.
13      **Q.  Is trauma a cause of brain injury?**
14      A.  Yes.
15      **Q.  Heart attack?**
16      A.  Yes.
17      **Q.  Stroke?**
18      A.  Yes.  Can be.
19      **Q.  Kidney disease?**
20      A.  Can be.
21      **Q.  Liver issues?**
22      A.  I don't know on that one.
23      **Q.  Infection?**
24      A.  Can be.
25      **Q.  Alcohol withdrawal?**

---

34

1     A.  Yes.
2         Q.  Drug withdrawal?
3     A.  Yes.
4         Q.  Encephalopathy, that's not really the
5     cause of brain injury.  That's more a description of
6     what's happening with the brain, am I right on that?
7     A.  I believe so, yes.
8         Q.  There's swelling in the brain?
9     A.  Yes.
10        Q.  Encephalitis?
11    A.  I'm not sure.  I'd have to look it up.
12        Q.  When you do a neurological assessment
13    you mentioned asking questions --
14    A.  Uh-huh.
15        Q.  -- about where they are.
16    A.  Where they are, if they know what day it
17    is, if they know what time it is.
18        Q.  What they've done.
19    A.  What they've done.  What kind of job if
20    they've been working.  You ask multiple, their
21    family members, where they live.
22        Q.  When you look at their eyes, what are
23    you looking for there?
24    A.  You're looking to see if it's reactive
25    to light.  That's the first thing we do is use a

35

1     flashlight to see if they're dilated to the point
2     where they stay fixed.  We try to do the tracking,
3     have them move, just follow my finger as I go up and
4     down or side to side, make sure they're making eye
5     contact with me or if they drift off.
6         Q.  You talked about processing.  That would
7     be like if you asked them a question and they lose
8     track of their train of thought or --
9     A.  Or it's like a word salad where they
10    don't make any sense with the answer.
11        Q.  Speech is either slurred or slow?
12    A.  Yes.
13        Q.  Manic, you're referring to their mood or
14    affect on that?
15    A.  Mood and affect does play into that,
16    too.
17        Q.  What do you mean by manic?
18    A.  Well, I mean like if they are very
19    agitated, upset over something that's not that big
20    of an issue.  Sometimes they will get carried into
21    an extreme state where they go off on it.  That's
22    usually when a deputy is then pulled out to talk to
23    them, try to calm them down, de-escalate them.
24        Q.  All right.  If you have a patient who is
25    exhibiting several symptoms or signs of a brain

36

1     injury, what are the criteria that you look at to
2     determine whether they should be hospitalized?
3     A.  Usually we take them up to medical
4     observation, get them out of the area they're in.
5     We do vital signs, we do neuro checks, like I
6     mentioned, call the doctor, let him know what those
7     are, tell him what we're seeing.  From there we wait
8     for a doctor's order to see if they want to send
9     them or if they want to keep them and observe them
10    for a while.
11        Q.  You say a while.  How long are we
12    talking about?
13    A.  It depends on the doctor.  Depends on
14    what he would give us as feedback.  Sometimes he'll
15    say, "Well, go ahead and send them and get them
16    evaluated immediately."  Other times it will be,
17    "Just keep them under observation.  Let's do vital
18    signs, make sure -- see if they come out of it."
19        Q.  Is it ever your call to determine
20    whether they go to emergency?
21    A.  No.  I always check with the doctor.
22        Q.  If the doctor doesn't order it, then
23    they stay in observation?
24    A.  Yes, most of the time.
25        Q.  As far as treatment for brain injuries,

37

1     are you guys equipped at Purgatory jail to treat
2     people with brain injuries?
3     A.  What do you mean by treatment?
4         Q.  Well --
5     A.  Could you clarify that?
6         Q.  Sure.  Can you draw blood and do blood
7     counts?
8     A.  If we're ordered to do so, yes.
9         Q.  But only if you're ordered.
10    A.  Yes.
11        Q.  Can you do MRI imaging?
12    A.  No.
13        Q.  CAT scan?
14    A.  No.
15        Q.  Can you do intravenous medication?
16    A.  If it's ordered by the doctor.  We have
17    supplies to do that if we need to.
18        Q.  If you do a blood panel, is that
19    processed there onsite?
20    A.  No.  We send it out.
21        Q.  How long does it take to get that back?
22    A.  Usually a day.  Depending on what's
23    ordered.
24        Q.  If somebody is exhibiting signs of a
25    brain injury, is that an issue where timing is of

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

38

1    the essence for inmates?
2        A.  It can be.  Depends on the severity.
3        Q.  And how do you determine severity?
4        A.  Do all the assessments I just mentioned,
5    get it off to the doctor immediately, call him and
6    make sure he's aware of what's going on.
7        Q.  In the 14 years you've been there, how
8    many times have you sent somebody off to the
9    emergency room because of a brain injury?
10       A.  That's hard to say.  Specific to a brain
11   injury -- we've had concussions that have been
12   diagnosed and we've sent them off.  It has to do
13   with a doctor's order.  If the doctor orders us to
14   send them, we send them.
15       Q.  Do you guys follow any specific criteria
16   for determining the severity of a brain injury?
17       A.  Could you clarify that?  I'm not sure
18   what you're asking.
19       Q.  Are there any guides or written
20   policies --
21       A.  Not that I'm aware of.
22       Q.  -- where you give a score or numerical
23   value to the severity of a brain injury?
24       A.  There's a few scores we can use like a
25   Glasgow Coma Scale and just -- like I say, when we

39

1    call the doc he'll tell us to check them that way or
2    make sure what's going on here.  A lot times we send
3    them.
4        Q.  If you call a doctor, is that recorded
5    in CorEMR?
6        A.  Do you mean recorded like we chart it in
7    CorEMR?
8        Q.  Yes.
9        A.  I do, yes.
10       Q.  When the doctor's orders come back is
11   that also charted in CorEMR?
12       A.  Yes.
13       Q.  How long does it take Dr. Larrowe to
14   respond, typically?
15       A.  He's usually pretty quick.  We call
16   him -- like I say, we've got access to them 24-7 or
17   whoever he designates is on call and we're able to
18   call him directly.
19       Q.  Is there ever a circumstance where you
20   suspect somebody may have a brain injury but you do
21   not call Dr. Larrowe?
22       A.  No.
23       Q.  Your practice is to always call
24   Dr. Larrowe.
25       A.  Yes.

40

1        Q.  Is that because brain injuries are
2    serious?
3        A.  Brain injuries are serious, yeah.
4        Q.  And time is of the essence in treating
5    them, right?
6        A.  Can be, yes.
7        Q.  Can be, what do you mean by that?
8        A.  I just mean depending on -- I don't
9    diagnose.  I'm not -- that's not my field.  The
10   doctor diagnoses.  I just assess and I pass that
11   information on.
12       Q.  Okay.  I'm going to switch here a little
13   bit to alcohol withdrawal.
14       A.  Okay.
15       Q.  What do you do to assess whether someone
16   is suffering from alcohol withdrawal?
17       A.  Cognitive is important, neurological, if
18   they can ambulate, eat, talk without having any
19   problems.  Vital signs are important.  Heart rate is
20   very important.  Shakes, a lot of times they'll have
21   symptoms of shakes, especially with alcoholics, so
22   we try to watch those carefully.
23       Q.  Heart rate, what does heart rate tell
24   you?
25       A.  If it's elevated, it's usually -- they

41

1    can be symptomatic of a patient having either a
2    seizure.  And most of the time with alcohol, DTs or
3    delirium tremens, that's the main thing we worry
4    about is a seizure.
5        Q.  Delirium tremens, is that when they have
6    the shakes?
7        A.  At times, yeah.  Not always.
8        Q.  If you had delirium tremens and elevated
9    heart rate then you're at risk for seizure?
10       A.  That's the risk they have, yeah.  It can
11   be risk for it.
12       Q.  As far as other symptoms of delirium
13   tremens, how do you know if someone is having that?
14       A.  You monitor their vital signs, their
15   cognitive.  Like I say, if they can eat, ambulate,
16   they usually have problems with that if they're
17   having those issues.
18       Q.  Elevated blood pressure?
19       A.  Sometimes, yes.
20       Q.  Decrease in blood pressure?
21       A.  Can be, yeah.
22       Q.  Is it your understanding that alcohol
23   withdrawals typically begin 48 to 72 hours after the
24   person last had alcohol?
25       A.  They can have them quicker than that.

42

1  I've seen them have them quicker than that.  Just
2  depends.  Depends on the person.
3      Q.  Is it your understanding that the
4  symptoms of alcohol withdrawal typically peak within
5  24 to 36 hours?
6      A.  Most of the time.
7      Q.  All right.  I want to ask you about
8  Mr. Crowson.  Do you have a memory of him?
9      A.  I didn't when this was first -- when I
10  was first served.  I had to go back and look at the
11  documentation and see.
12     Q.  What documentation did you look at?
13     A.  My notes.
14     Q.  Those are notes in CorEMR?
15     A.  Uh-huh.
16     Q.  Did you have any other notes?
17     A.  Pardon me?
18     Q.  Do you have any other notes?
19     A.  No.
20     Q.  Do you now recall Mr. Crowson?
21     A.  Somewhat, yeah.  The name is familiar
22  because he's been in and out of the jail a few
23  times.
24     Q.  Do you know what he looks like?
25     A.  No.

43

1      Q.  You don't have a picture of him in your
2  mind?
3      A.  No.
4      Q.  When was the last time you reviewed your
5  records?
6      A.  Last week.
7      Q.  Have you reviewed any other documents in
8  preparation for your deposition?
9      A.  No.
10     Q.  I'm looking at page 475.  At the top it
11  says WCSO CorEMR, Crowson, Martin Richard.
12     A.  Yes, I recognize that.
13     Q.  Across the top we've got booking number,
14  form name and another heading form item, item
15  response, interviewer and interview date.  Do you
16  recognize these as the CorEMR records --
17     A.  Yes.
18     Q.  -- for Mr. Crowson?
19     A.  Yes.
20     Q.  The interviewer, is that the person who
21  makes the entry into CorEMR?
22     A.  Yes.
23     Q.  Is there any way to change that after
24  the fact?
25     A.  Not to my knowledge.

44

1      Q.  Once an entry has been made, can it be
2  edited?
3      A.  Not that I know of.  I don't know.
4      Q.  You've never edited anything there?
5      A.  No.
6      Q.  If there's a change, you notice
7  something that needs to be recorded differently, do
8  you just do a separate entry?
9      A.  Yes.
10     Q.  Okay.  The interview date, is there any
11  way to change that date after it's been entered?
12     A.  Not that I'm aware of.
13     Q.  Okay.  I'm going to flip here to 481
14  where it starts with the booking number 136931.  The
15  date on this is June 25, 2014 at 7:15 a.m. and
16  you're listed as the interviewer.  Here in the item
17  response form it says, "Confused.  Different affect
18  than is normally displayed."
19     A.  Okay.
20     Q.  As you sit here right now, do you know
21  how you knew it was different than normal?
22     A.  From the deputies.  When they report
23  they say he's acting different than he normally
24  does.
25     Q.  I'll represent to you there are notes in

45

1  here that indicate that you had seen Mr. Crowson
2  during the other times when he had been in jail
3  earlier.
4      A.  Probably.
5      Q.  Did you know enough about him to know
6  whether his affect was different?
7      A.  Could you clarify that?  I'm not sure
8  what you're asking.
9      Q.  Sure.  So what you're saying on June 25
10  2014, based on your prior answers did you know
11  enough about him to be able to determine
12  independently of the deputies whether or not his
13  affect was different?
14     A.  The way I remember Mr. Crowson after
15  reviewing my notes was that he was pretty outgoing.
16  When I saw him this day he was very quiet, confused,
17  a little bit more dazed.  That's what the deputies
18  reported also.
19     Q.  Did you have any particular feelings of
20  like or dislike toward Mr. Crowson?
21     A.  No.
22     Q.  All right.  You've got down here listed
23  on the next line, "Rationale for medical housing,"
24  and you put "Patient safety ET."  What's ET?
25     A.  And.

46

1    Q.  What does that stand for?
2    A.  And a-n-d.
3    Q.  "Patient safety and further eval with
4  J. Worlton."
5    A.  Yes.
6    Q.  At that point you recognized that there
7  was a mental health issue happening?
8    A.  There was some kind of issue happening.
9  That's why I recommended him to Jon Worlton.  Like
10  the note says, he's acting a little bit different
11  toward the deputies.  And the way I remember
12  Mr. Crowson, he was more outgoing, not quiet,
13  reserved.  Outgoing, interactive.
14    Q.  Okay.  I want to skip down here to this
15  line.  "Booking staff," Q, does that stand for
16  question?
17    A.  No.  It stands for every.
18    Q.  "Booking staff every 30 minutes."  That
19  means you wanted them to look at him every 30
20  minutes?
21    A.  They do cell checks every 30 minutes in
22  booking on each individual.
23    Q.  Is this a detox cell we're referring to?
24    A.  It's every cell in booking.  They check
25  every 30 minutes.

47

1    Q.  Do you know if he was specifically put
2  into the detox cell?
3    A.  I don't.
4    Q.  Okay.  "Medical staff at shift."
5    A.  Every shift.
6    Q.  That means --
7    A.  At least once.  Most of the time we're
8  in and out of booking several times because of
9  people that get brought in.
10    Q.  So medical staff is going to check on
11  him at least twice a day.
12    A.  At least once a day.  That's what this
13  is indicating.  At least once a shift, I should say.
14    Q.  So two shifts a day would be twice a
15  day.
16    A.  Yes.
17    Q.  And then down here, "Collaboration with
18  M.D. and HSA."  What's HSA?
19    A.  I'm not sure what that is.
20    Q.  "Refer for further eval with SW."
21  What's SW?
22    A.  Social worker, I believe.
23    Q.  Okay.  So at that point you at least
24  recognized there was an issue that needed to be
25  dealt with?

48

1    A.  Yes.
2    Q.  Did you also recognize that it was an
3  issue that was outside the scope of what you were
4  comfortable doing on your own?
5    A.  Yes.
6    Q.  The entry on page 483 is for an earlier
7  incarceration that's dated 12-28, 2011, and this one
8  was for a detox observation.
9    A.  Okay.
10    Q.  You have a choice, don't you?  You can
11  put them in for detox observation or you can put
12  them in for mental health observation?
13    A.  Yes.
14    Q.  And those are two separate things.
15    A.  Yes.
16    Q.  And on June 25, 2014, if you had thought
17  it was detox, you could have put him in for detox
18  observation, correct?
19    A.  Yes.
20    Q.  But you didn't.  You put him in for
21  mental health observation.
22    A.  That was my first exam.
23    Q.  All right.  487, right here in the
24  middle of the page, do you recognize what type of
25  entry that is in CorEMR?  See this middle box right

49

1  here?  Do you recognize what type of entry that is?
2    A.  Looks like daily vital sign checks.
3    Q.  Down here in the middle there's a box
4  priority 1 equals high, 5 equals low.  What is the
5  purpose of that box?
6    A.  Mostly tasks or things that we do or
7  schedule for patients.  Number 1 is just part of our
8  daily routine, get them done.  The reason we would
9  use a 5 would be like a diabetic check.  It happens
10  periodically throughout the day.  The top priority
11  is to get the number 1s done while we're doing our
12  task list.
13    Q.  So again we're speaking everything in
14  the number 1 then.
15    A.  Pretty much, yeah.  It's all priority.
16    Q.  Okay.  As I look through these pages,
17  497 to 500, I see that there is an appointment
18  scheduled 6-28, one for 6-29, one for 6-30, and then
19  July 1st.  There wasn't one for 6-26, 6-27 or 7-31.
20  Do you have an explanation why there weren't
21  appointments scheduled for those three days?
22    A.  I don't know.  I wasn't working.
23    Q.  What days were you working?
24    A.  I worked the 25th, the 28th, the 29th
25  and the 30th.

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

---

50

1    Q.   Okay.  Do you know who was working the
2  26th and 27th?
3    A.   No.  I don't recall.
4    Q.   How about the 31st?
5       MR. MYLAR:  31st of June?
6       MR. SCHRIEVER:  Of July.  There isn't a
7  31st of June, is there?
8       MR. MYLAR:  No.
9       MR. SCHRIEVER:  Thank you, Frank.  I
10  appreciate that.
11    Q.   We won't worry about the 31st then.  You
12  were off on the 26th?
13    A.   And the 27th.
14    Q.   And the 27th.
15    A.   Yes.
16    Q.   So whoever was on that day would have
17  been responsible for Mr. Crowson, correct?
18    A.   Yes.
19    Q.   In booking for medical observation, do
20  you know what their schedule is throughout the day?
21    A.   Can you repeat that?
22    Q.   Do you know what the schedule is for the
23  inmates who are left in the booking cells for
24  medical observation?
25    A.   Schedule with who, the deputies or --

---

51

1    Q.   Do they get out for meals with the
2  general population?
3    A.   In booking?
4    Q.   Yes.
5    A.   No.
6    Q.   Do they get out to shower?
7    A.   Yes.
8    Q.   Shave?
9    A.   I assume they would, yeah.
10    Q.   Do they get out to the open area where
11  they can go socialize?
12    A.   Not that I'm aware of.
13    Q.   In your review of the records, have you
14  seen any indication that Mr. Crowson was visited by
15  a jail nurse on June 26th or June 27th?
16    A.   I didn't do the work, so I don't know.
17    Q.   I'm asking about your review of the
18  records.  Have you seen anything that he was?
19       MR. MYLAR:  Objection.  Lack of
20  foundation.
21    Q.   You can answer yes or no if you've seen
22  it.
23    A.   No.  I don't know.  When I'm not working
24  there, I don't review nurses' notes.  I take care of
25  my own.

---

52

1    Q.   Okay.  When you looked at the records
2  here in CorEMR did you pull them up using
3  Mr. Crowson's name or did you pull them up using
4  entries that you made for that time period or a
5  different way?  How did you do it?
6    A.   Pulled them up using Mr. Crowson's name
7  and I just looked at my own to review.
8    Q.   You didn't look at anything written by
9  Mr. Borrowman or anyone else?
10    A.   No.
11    Q.   Are you familiar with the CIWA-AR
12  standards for alcohol withdrawal symptoms?
13    A.   No.
14    Q.   Is that something you've learned about
15  or discussed at National Correctional Nursing
16  Association?
17    A.   I've heard of it and I've probably
18  attended training on it before but I don't remember
19  right now.
20    Q.   Nothing you recall?
21    A.   No.
22    Q.   Is that no?
23    A.   No.
24    Q.   That's the worst way to ask that
25  question.  Do you follow the CIWA-AR standards for

---

53

1  rating alcohol withdrawal symptoms?
2    A.   We follow what we've been trained to do
3  by Dr. Larrowe in the jail.  Right now I couldn't
4  tell you what those are.
5    Q.   Okay.  What do you do to rate the
6  severity of alcohol withdrawal symptoms in jail as
7  you've been trained?
8    A.   We do an initial assessment.  We would
9  take vital signs, we'll check neuros, we'll check if
10  there's any signs or symptoms of delirium tremens,
11  shakes, cognitive issues, anything that would seem
12  to be abnormal.
13    Q.   Okay.  I'm going to ask you some
14  questions and I want you to tell me if that's the
15  function of the nurse in the jail or if it's the
16  function of someone, okay?  I'm going to ask you
17  questions specifically about evaluating potential
18  brain injuries.
19       First off, you'd agree if you're
20  diagnosing a brain injury it would be a good idea to
21  find out if a person is having headache or head
22  pain, correct?
23       MR. MYLAR:  Objection.  Lack of
24  foundation.  He's already testified he doesn't
25  diagnose.

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

---

54

1    A.   I don't diagnose.  I do assessments.
2    Q.   Okay.  That's fair to use the right
3  words.  When you're assessing someone -- well, let
4  me ask you this.  Let me back up.  As far as it
5  goes, the inmates are in prison.  They don't have
6  the option to seek medical care from someone of
7  their own choosing.  They rely on you to provide
8  that, right?
9    A.   Yes.
10   Q.   Unless they happen to have their
11  emergent symptoms during the three hours that
12  Dr. Larrowe is there during the week.  You're their
13  guy, right?
14   A.   Or unless they don't want to be treated
15  at all.  They have that option.  That's their right.
16  A lot of inmates don't want us to have anything to
17  do with them.
18   Q.   Any indication in this case Mr. Crowson
19  was refusing or denying treatment?
20   A.   No.
21   Q.   He was not making sense, right?
22   A.   I can't speak for anybody else that took
23  care of him but not with me.
24   Q.   When he was brought to your attention on
25  June 25, 2014 he wasn't making any sense, was he?

---

55

1    A.   No.  He was dazed and confused.
2    Q.   At that point you're his connection to
3  medical care.
4    A.   Yes.
5    Q.   You're his only option, his only route.
6    A.   Yes.
7    Q.   So if he's got a brain injury, it's
8  going to be important that if you get information
9  it's necessary to convey that to Dr. Larrowe,
10  correct?
11       MR. MYLAR:  Objection.  Incomplete
12  hypothetical, facts that haven't been admitted into
13  evidence.
14   A.   At that time I didn't know he had a
15  brain injury.
16   Q.   Right.
17   A.   I wasn't diagnosing him.  I was
18  assessing him.  We didn't know what he was doing one
19  way or the other.
20   Q.   Right.  But you recognize that you're
21  the only gateway he has to medical treatment in that
22  situation, right?
23   A.   Yes.
24   Q.   So if you're not assessing him for brain
25  injury, who is?

---

56

1    A.   I was assessing for any abnormalities.
2  I didn't go down there thinking that he had a brain
3  injury.  If I remember right per the documentation,
4  Mr. Crowson was there two weeks prior to my seeing
5  him.
6    Q.   Yeah.
7    A.   So if he had any detox stuff that he was
8  going through in intake, per se, he would have
9  already been through that process and got cleared
10  down to general population and he was in general
11  population when I saw him so I wasn't assessing him
12  specifically for brain injury.  I was assessing him
13  for any kind of abnormalities that might warrant
14  taking him out of general population and putting him
15  in med observation.  That was my assessment.
16   Q.   By abnormalities, what's your thought
17  process at that point?
18   A.   Any cognitive issues, unable to process.
19  Depending on what the deputies are seeing because
20  they deal with him more during day than medical does
21  on a day-to-day basis, all of that is included in
22  there.
23   Q.   And you're referring to Jon Worlton
24  instead of Dr. Larrowe.  Why did you make that
25  decision?

---

57

1    A.   I referred him to both people.
2    Q.   It says in the record you referred him
3  to Dr. Larrowe.
4    A.   I referred him to Jon Worlton to start
5  with because he's my supervisor and because that's
6  the common practice to make sure he knows who's up
7  in booking.  If we didn't know Mr. Crowson had a
8  mental health issue or a physiological issue,
9  typically we do have Jon Worlton see anybody we have
10  in booking to make sure there's not a mental health
11  issue involved.
12   Q.   You mean psychological issue.
13   A.   Or psychological issue, yes.
14   Q.   Did you ask Mr. Crowson if he had a
15  headache?
16   A.   I don't recall.  I'm sure I would have
17  asked him in a typical assessment, "Do you have any
18  pain?  Are you hurting anywhere?  Is there anything
19  else going on with you?"
20   Q.   And he wasn't able to respond to those
21  types of questions.
22   A.   The way I remember and the way I charted
23  was that his cognitive wasn't totally alert and
24  oriented to where he was at or what was going on
25  around him.  That's what the deputies noticed also

---

58

1    and that's why he was brought up to med observation.
2         Q.  He wasn't able to follow simple
3    instructions, right?
4         A.  He was able to walk up the hallway to
5    the booking area.
6         Q.  Would it surprise you if earlier Deputy
7    Lyman had told him to come to breakfast and he
8    turned around and walked back upstairs?
9         A.  Would it have surprised me?
10        Q.  Yeah.  Based on what you knew.  If he
11   wasn't able to follow that instruction.
12             MR. MYLAR:  Objection.  Mischaracterizes
13   the prior record and testimony in this case.
14        A.  I don't know.
15        Q.  How about if someone brought him clothes
16   to get dressed and he put his underwear on his head,
17   would that surprise you?
18             MR. MYLAR:  Objection.  Calls for
19   speculation.  Lack of foundation.
20        A.  I don't know what you're asking, would
21   that surprise me.
22        Q.  I'm asking was he able to follow simple
23   instructions?
24        A.  All I know is when I go the there and
25   was assessing him, he was able to follow the

59

1    instruction, "You're going to come down to booking.
2    We're going to house you down there for a while so
3    we can watch you, make sure you're okay."
4         Q.  And he was dazed and confused.
5         A.  His cognitive was a little bit off,
6    yeah.
7         Q.  He wasn't able to say what he did for
8    work before he was arrested.
9         A.  I believe that was charted, yeah, that
10   he wasn't able to remember what he did for work.
11        Q.  And I'll represent to you that one of
12   the records of the deputies states that he gave him
13   clothes, told him to get dressed and he put his
14   underwear on his head.  Would that surprise you if
15   he was unable to follow that simple instruction of
16   get dressed?
17             MR. MYLAR:  Objection.  Mischaracterizes
18   the evidence and lack of foundation.
19        A.  I didn't hear anything about that so I
20   don't know.
21        Q.  Okay.  On June 25, 2014 did you take his
22   vital signs?
23        A.  Yes.
24        Q.  And his blood pressure was within normal
25   range, correct?

60

1         A.  I'd have to see the chart.  As I recall,
2    his vital signs were up and down throughout that
3    time period.
4         Q.  Look at page 503.  So we've got on
5    6-29-14 blood pressure 131/86, that's normal, right?
6         A.  That's within parameters, yeah.
7         Q.  Pulse rate 55, that's also normal?
8         A.  That's a little low.  The usual pulse
9    runs between 60 to 100 is what we kind of go by.
10   That's a little low.
11        Q.  On 6-28, blood pressure of 153/140.
12        A.  Yes.
13        Q.  The bottom number there is really out of
14   whack, right?
15        A.  Which bottom number?  On the diastolic?
16        Q.  Diastolic.
17        A.  It's elevated, yes.
18        Q.  Systolic also a little bit high?
19        A.  Yeah.
20        Q.  And sitting pulse rate is a little bit
21   high?
22        A.  Yes.
23        Q.  Just outside normal range?
24        A.  Yes.
25        Q.  And then the bottom one goes over onto

61

1    page 504 as well.  This is 6-25.
2         A.  So this blood pressure here.
3         Q.  Right.  125/78, that's normal?
4         A.  That's normal.
5         Q.  That's the first day that you saw him.
6    Pulse rate of 58?
7         A.  Little low.
8         Q.  Tiny bit low?
9         A.  Uh-huh.
10        Q.  On that first day anything about the --
11   so 6-25, anything about the blood pressure or the
12   heart rate that caused alarm for you?
13        A.  6-25?
14        Q.  Yeah.
15        A.  Oh, right here.
16        Q.  Yeah.
17        A.  Not really, no, normal blood pressure.
18   The heart rate was a little low but, like I said 60
19   to 100 is the typical parameter we use.  Some people
20   do run a little bit low on their heart rate.  It
21   varies throughout the day.  Heart rate and blood
22   pressure can vary throughout the day depending on
23   what a person is doing or not doing or if they're
24   stressed or anything else going on.
25        Q.  At that point were you aware that

62

1  Mr. Crowson had been in lockdown for at least seven
2  days?
3      A.  No.
4          MR. MYLAR:  How much longer are you
5  going to go?  I just wonder if we could take a
6  break.
7      (Recess.)
8      Q.  Before we went off the record we were
9  having a discussion about diagnosing or assessing
10  for brain injuries.  In that policy or procedures
11  manual is there anything in there that says, "Hey,
12  if you get somebody with decreased mental status or
13  changed mental status you should go through this
14  list of evaluations to see if they have a brain
15  injury."
16      A.  Not that I'm aware of.
17      Q.  No policy at all.
18      A.  I don't know.
19      Q.  Okay.  Have you ever been through any
20  training with Dr. Larrowe where he said, "If you've
21  got a patient with changed mental status, I want you
22  to go through these criteria to determine if there's
23  a brain injury."
24      A.  No.
25      Q.  Ever had discussion with Dr. Larrowe

63

1  anything about that?
2      A.  No.
3      Q.  In your training as a nurse, are you
4  trained to recognize the signs and symptoms of a
5  brain injury?
6      A.  I believe so, yes.
7      Q.  Why do you believe that?
8      A.  I've been trained as a nurse.  Yeah, I
9  would say yes.
10          MR. MYLAR:  Objection.  Asked and
11  answered previously in the deposition.
12      Q.  I'm just trying to get back to this
13  discussion we were having about diagnosing or
14  assessing or evaluating.  I want to make sure that
15  I'm using terms that fit within the scope of what
16  you do as a nurse.
17      A.  Okay.
18      Q.  If somebody presents to you with
19  decreased mentation or changed mental status, is
20  brain injury one of the things that comes into your
21  mind as a possibility?
22      A.  One of the things, yes.
23      Q.  What else comes into your mind?
24      A.  Stroke, ingested some kind of substance,
25  could be related to a UTI, that would cause

64

1  confusion.  There's probably half a dozen different
2  things that can add up to those kind of symptoms.
3      Q.  Do males get UTIs?
4      A.  Yes.
5          MR. MYLAR:  Could we just for the record
6  say what UTI is.
7      Q.  Yeah.
8      A.  Urinary tract infection.
9      Q.  So you've got a list of things that come
10  into your mind as possible causes of this change in
11  mental status?
12      A.  Yes.
13      Q.  Is it part of your training to then go
14  about recommending ways of differentiating between
15  the things so that you know what you're dealing
16  with?
17      A.  Usually with an assessment like this at
18  the jail, we're taking a broad spectrum.  It
19  could be a urinary tract infection, it could be
20  brain damage, it could be a stroke, it could be
21  cardiac issues, it could be detoxing, they ingested
22  something down in the blocks which does happen on
23  occasion with inmates that he would be detoxing
24  from.
25      For one specific thing, no, I don't just

65

1  focus on one specific thing.  You have to look at
2  the whole picture and then observe them for a while,
3  do vital signs, do neuro checks more on a -- what am
4  I trying to say?  Not just immediately say, "Oh,
5  this is a brain injury."  You have to wait and see
6  how the patient does over a period of time and then
7  reassess as you go along to make sure what you're
8  looking at.
9      Q.  If somebody has encephalopathy and their
10  brain is swelling, how long should you let them sit
11  there for observation?
12      A.  To my knowledge, if somebody had
13  encephalopathy and their brain was swelling, their
14  vital signs would be really low or really high,
15  they'd be more extreme, that would be something that
16  we would immediately want to get out of the jail
17  into a facility to be diagnosed or assessed with.
18      Q.  Okay.  In this particular case you know
19  that he was dazed and confused.
20      A.  Cognitive was off.
21      Q.  You also noted that his blood pressure
22  was normal and --
23      A.  It varied throughout -- even throughout
24  the day it varied.
25      Q.  And I'm speaking to June 25th.

66

1    A.  Okay.
2       Q.  So that one day it was within normal
3    range and his resting heart rate was a little low?
4       A.  Yes.
5       Q.  Did you do anything else to assess him
6    on that day?
7       A.  Checked on him frequently through the
8    day.  The deputies were checking on him every 30
9    minutes, making sure that he was responsive.
10       Q.  They made sure he was responsive?
11       A.  Yes.
12       Q.  Are they trained to determine whether or
13    not he's in cognitive decline?
14       A.  They're trained to notice if he doesn't
15    respond or if he's not verbally responsive or if
16    he's having respiratory issues.  We try to go over
17    with them, kind of get an idea how fast he's
18    breathing.  If he's breathing a little faster or a
19    slower to what you would think he should be, then
20    you let us know and we'll take care of it.
21       Q.  If he had been unconscious, would he
22    have been sent to the emergency room?
23       A.  If he had been unresponsive, yes, he
24    would have been sent to the emergency room.
25       Q.  Is that the line then?

67

1       A.  It's not necessarily a line.  It varies.
2    There's a lot of reasons to send somebody to an
3    emergency room.  If they're bleeding out, if they've
4    got a cognitive issue where they aren't responsive
5    or we can't get them to respond we will attempt to
6    before we send them out, of course.  But then, if
7    that's not happening, we'll call the doctor, the
8    doctor will give us an order whether to send him out
9    or not.
10       Q.  Okay.  And he wasn't bleeding out or
11    anything like that?
12       A.  No.  So I try to stay away from -- all
13    I'm trying to state is some symptoms of things that
14    are within the possibility of the issues he was
15    having but maybe more extreme.  We find out sort of
16    how you make those judgment calls as to when to call
17    the doctor and what information to convey to the
18    doctor.  Does that make sense?
19       Q.  Yes.  So if he was unconscious and not
20    responsive, would you call the doctor first before
21    sending him to the emergency room?
22       A.  I would have tried to get him to respond
23    first.
24       Q.  Okay.  You've also got access to the
25    sheriff's deputies there.  Is there anything they

68

1    can do on an emergency basis to help out with,
2    hypothetically?
3       A.  If someone goes into a crisis like that,
4    we do use the deputies to help us out, whether it's
5    to roll them over, start CPR, do any of those things
6    that would be entailed as far as emergency care.
7       Q.  So the easy call is if somebody is not
8    breathing or not responsive, then that requires
9    immediate care.
10       A.  Yes.
11       Q.  Is it a more difficult call if they're
12    dazed and confused?
13       A.  If he would have -- let me think how to
14    word that.  It is a difficult call because you have
15    to observe more.  You have to take vital signs, you
16    have to monitor them and then give that information
17    to the doctor so he could make a diagnosis.
18       Q.  If a person is dazed and confused, is
19    that always a situation that requires a call to a
20    doctor?
21       A.  Not always.  Sometimes we'll observe
22    them and just see what happens to them and then call
23    the doctor later.
24       Q.  If they're dazed and confused for 24
25    hours, does that justify calling a doctor?

69

1       A.  It depends on who -- for me, I would
2    call the doctor if he was that way for 24 hours,
3    yes.
4       Q.  Okay.  I'm assuming that would be the
5    same answer for 48, 72, 86 and --
6       A.  Yes.
7       Q.  Every day.
8       A.  Yes.
9       Q.  Every new day that he's still dazed and
10    confused is another day that the doctor should be
11    called.
12       A.  Yes.  Or made aware of the situation to
13    see if we need to do further observation or further
14    vital signs or whatever.
15       Q.  Okay.  If he's unable to follow simple
16    instructions like get dressed, that's another reason
17    that a doctor should be contacted, correct?
18       A.  Not necessarily.  I'm not sure what
19    you're asking me there.
20       Q.  Okay.  Well --
21       A.  Just because somebody doesn't want to
22    get dressed doesn't mean I'm going to call the
23    doctor.
24       Q.  Hypothetically, if the deputy takes a
25    stack of clothes in to him and he says, "Get

70

1  dressed," and he puts his underwear on his head and
2  it's not a joke, this is really what he did.
3      A.  In a jail there's a lot of times that
4  can be a joke so we have to observe them for a
5  while.
6      Q.  How many times would he have to put his
7  underwear on his head?
8      A.  I'm not sure what you're trying to ask
9  me.
10      Q.  Well, let me give you the -- I'll just
11  represent to you this is my statement of the facts.
12      A.  Right.
13      Q.  So say you've got a deputy who calls him
14  down for breakfast, he doesn't follow instructions.
15  This is a deputy that doesn't necessarily like him
16  but he sends him in to medical but he's concerned
17  because he's acting differently.  Then you observe
18  him and you say, "Based on what the deputy told me,
19  he's not acting normally."
20      There's another deputy who puts in the
21  system, "I gave him his clothes and he put his
22  underwear on his head and he's not responding
23  normally to questions."  He's not able to put
24  together more than a one-word answer and sometimes
25  they don't make sense, those symptoms, day two does

71

1  the doctor get called or day one?
2      MR. MYLAR:  Objection.  Misstates facts
3  in the record.
4      A.  I was not privy --
5      MR. MYLAR:  And let me also add lack of
6  foundation as well in the objection.
7      A.  I was not privy to what the deputies
8  were observing or not observing.  When they called
9  me they said he's acting differently than what he
10  normally does.  When I talked to him there were
11  parts of his answers that didn't jibe.  He couldn't
12  remember what he was doing or what kind of work he
13  was doing prior to coming to jail and so he was
14  moved to medical observation and we observed him
15  from there.  I didn't take into account whether he
16  was putting underwear on his head or not.  I was
17  just dealing with what was in front of me at that
18  time.
19      Q.  You recognize the only way that
20  information gets to Dr. Larrowe is if you convey it
21  to him, right?
22      A.  Which information are we talking about?
23      Q.  Any of the information about Mr. Crowson
24  at all.
25      A.  I wouldn't tell him about whether he's

72

1  putting underwear on his head or not.  I would tell
2  him what I'm seeing or what I'm assessing, not what
3  anybody else would say.
4      Q.  Okay.  So you have access to the
5  Spillman records.  You have access to the deputies
6  who talked to him.  You spend a good part of your
7  day --
8      A.  I don't use the Spillman records to put
9  entries in.  I don't review Spillman records.
10      Q.  Okay.  But you could look at them if you
11  wanted to.
12      A.  I wouldn't have any reason to.
13      Q.  You did communicate with the deputies in
14  this case, right?  Both Lyman and Dolgnar?
15      A.  Yes.  When they called me down and said
16  he's acting differently and seems to be confused and
17  when I talked to him I agreed with that and we took
18  him down to medical.
19      Q.  And you agreed that the only way that
20  information gets to Dr. Larrowe is if you convey it
21  to Dr. Larrowe somehow.
22      A.  We're usually the ones that call him for
23  any kind of medical condition that a patient might
24  be having.
25      Q.  No one else is going to call Dr. Larrowe

73

1  on that, are they?
2      A.  It's usually gone through medical to get
3  ahold of Dr. Larrowe.
4      Q.  And Mr. Crowson, assuming he was able,
5  couldn't call Dr. Larrowe directly, could he?
6      A.  No.
7      Q.  When you were working at Dixie Regional
8  Medical Center one of the important things you would
9  do as a nurse is take medical history of a patient,
10  right?
11      A.  Yes.
12      Q.  Hypothetically, you're in the emergency
13  room and a patient comes in with a situation, an
14  emergent situation.  Do you take a new history of
15  that patient or do you rely on a history that was
16  given two weeks prior?
17      MR. MYLAR:  Objection.  Lack of
18  foundation.  Also incomplete hypothetical and the
19  hypothetical has no relationship to the facts in
20  this case.  Go ahead.
21      A.  And you understand this is in a jail
22  setting.  I didn't view this patient's intake when
23  he came in two weeks prior so I don't know.
24      Q.  And on 6-25-14 you didn't look at his
25  intake either, did you?

74

1      A.  6-25-14?
2      Q.  Yeah.
3      A.  I don't recall if I did or not.
4      Q.  Would that be your common practice to go
5  back and look at the intake to see if there was a
6  medical issue that was raised during the intake?
7      A.  Could be, yes.  I don't recall if I did
8  or not.
9      Q.  How often do you do that?
10     A.  How often do I do what?
11     Q.  Look back at the intake questions.
12     A.  On a daily basis.  Most of the time.
13     Q.  A high percentage of the time?
14     A.  What are you asking me?
15     Q.  I mean --
16     A.  That's part of the assessment to look
17  back and see, okay, when he came in, did he have any
18  issues then and were they comparable to what he's
19  doing now.
20     Q.  Okay.  So that's something you do
21  regularly then?
22     A.  Yes.
23     Q.  All right.  You don't know if that's
24  something you did in this case.
25     A.  I can't recall.  I don't recall if I did

75

1  or not.
2      Q.  Looking at 478 to 479, and I'll mark
3  these here for easier reference for you, all of the
4  ones from 6-11-14.  Go ahead and look through those.
5  The first question I'm going to ask you is whether
6  you recall looking at that information on 6-25-14.
7      A.  No, I don't recall looking at this.
8      Q.  Anything in there you saw that would
9  cause you any alarm as to this inmate's condition at
10  the time that he was brought in on intake?
11     A.  No.
12     Q.  They asked about neurological problems
13  and the response was "None of the above."  Is that a
14  multiple choice question that they're given?
15     A.  I didn't do his intake so I can't tell
16  you what was said one way or the other.
17     Q.  Is it a standard form that's filled out
18  or a standard questionnaire?
19     A.  It's a form that we use but I didn't do
20  his intake so I can't tell you what his neurological
21  problems were then.  I wasn't there.
22     Q.  Okay.  When you're doing an intake form
23  and the category is neurological problems, what are
24  the questions that are asked, that you ask of the
25  incoming inmate?

76

1      A.  Neurological is more of an assessment.
2  I mean you can ask -- we do ask them on occasion,
3  "Do you have any neurological problems?"  Most of
4  the inmates wouldn't even understand what that is.
5  So, instead of that, in my case I usually ask or I
6  usually assess them while they're talking.  If
7  they're able to be cognitive and talk to me and make
8  sense, that's one neurological check.
9      There's times when I'll ask them to grip
10  my fingers.  If there's any kind of suspicion that
11  they might have deficits, I will go ahead and do
12  that.
13     Q.  If there is an issue that's raised, how
14  do you note that in your intake record?
15     A.  As I said, if the grips were equal or
16  not equal, I'd write that in there.
17     Q.  Okay.
18     A.  If they weren't able to talk to me and
19  make sense, I'd write that in there.
20     Q.  All right.  Based on your understanding
21  of how the intake process works, "none of the above"
22  doesn't really make sense as an answer?
23     A.  I have no idea why that was put there.
24  I didn't do the intake.
25     Q.  Okay.  How long does it take to enter

77

1  the information from the intake into CorEMR?
2      A.  A couple of minutes, two to five
3  minutes, depending on what you need to put in.  If
4  there's more to put in, it would take a little bit
5  longer on that.
6      Q.  Look at page 533.  I'll represent to you
7  that it's from Spillman.  Are you familiar with this
8  type of an entry in Spillman?
9      A.  I don't put medical appointments in
10  Spillman.  Usually it's just medical clearances for
11  whether they need a bottom bunk or a different type
12  of dietary need.
13     Q.  Have you seen any records of a medical
14  appointment Mr. Crowson had on June 14, 2014?
15     A.  No.
16     Q.  I think that's page 501.  I've marked
17  here along the side of this so you can see all of
18  the dates in June 25 through July 1st of 2014.  The
19  last one is Ryan Borrowman's so I'm going to ask you
20  about these first ones.
21     Here on June 25, 2005 -- excuse me, June
22  25, 2014, the two entries there.  The first one,
23  "The patient was noted to be confused while serving
24  breakfast."  So that was a fact that you knew about,
25  correct?

78

1      A.   That's what I was told.
2      Q.   You also knew that he had been
3  incarcerated two weeks?
4      A.   Uh-huh.
5      Q.   You noted his blood pressure.  What's
6  the R 20?
7      A.   Respiration.
8      Q.   Twenty respirations per minute?
9      A.   Uh-huh.  Yes.
10     Q.   Afebrile, what does that mean?
11     A.   Means he wasn't running a temperature at
12  the time.
13     Q.   02 sat 99 percent?
14     A.   That's his oxygen saturation.  We
15  register whenever we do vitals to see if they're
16  getting enough oxygen out to their extremities.
17     Q.   Is that normal?
18     A.   Yes, within normal range.
19     Q.   Glucose was checked at 73.
20     A.   Yes.
21     Q.   Is that to rule out some kind of
22  diabetic or hypoglycemic --
23     A.   Yes.
24     Q.   Is 73 normal?
25     A.   Usually, if you get below 70, it's a

79

1  parameter that we take a hard look at.  Usually
2  between 70 and 150 is kind of what we go by.
3      Q.   Okay.  Patient was able to verbalize his
4  name?
5      A.   Yes.
6      Q.   He was able to spell his last name?
7      A.   Yes.
8      Q.   He was unable to remember what kind of
9  work he did prior to being arrested?
10     A.   Yes.  That's what he said.
11     Q.   And you note here that Deputy Lyman and
12  Dolgnar told you that his affect was different.
13     A.   Yes.
14     Q.   Were you there when his breakfast tray
15  was given to him?
16     A.   Yes.  I encouraged him to eat.
17     Q.   And then you referred him to J. Worlton
18  for further evaluation.
19     A.   That is Jon Worlton, yeah.
20     Q.   Down here is a separate entry but it's
21  the same date.  "Patient's pupils dilated but
22  reactive to light."
23     A.   Yes.
24     Q.   Why is there a separate entry there?
25     A.   I was probably checking on him in the

80

1  afternoon.  It was a different time.
2      Q.   So the Bates stamp on the first one 7:13
3  a.m. and then a date stamp of 3:23 p.m. on the
4  second one.  Any reason you did not do the vitals
5  again in the afternoon?
6      A.   Any reason not to?
7      Q.   Or any reason to.
8      A.   He was alert and oriented.  Otherwise, I
9  would have done another vital sign check.
10     Q.   So is it your testimony then that --
11     A.   I was doing the neuro check.  This is
12  part of the neuro check, so I was rechecking his
13  neuros to make sure he was okay.
14     Q.   Okay.  Pupils dilated, is that normal or
15  abnormal?
16     A.   It depends on the light, too.  If it
17  reacts to light, he's under observation so we're
18  watching him closely.
19     Q.   Okay.  And then you went off shift the
20  26th and 27th.
21     A.   Yes.
22     Q.   And then there are no entries on those
23  days.
24     A.   Doesn't appear to be.
25     Q.   You came back on the 28th.

81

1      A.   Yes.
2      Q.   And noted that he was confused,
3  disoriented and only gave one-word answers to
4  questions.
5      A.   Uh-huh.  Yes, I did.
6      Q.   Was that the same or different than when
7  you saw him on June 25th?
8      A.   It was progressed more.  At least he was
9  making a little more sense with his answers to
10  questions.  It wasn't just one-word answers.  He was
11  able to spell his name.  At that time his blood
12  pressure was also elevated and I reported that to a
13  doctor.
14     Q.   Sent for chest x-ray to rule out any
15  lung issues.
16     A.   When the doc responded back to me he
17  wanted to draw some blood, continue to monitor
18  closely, order chest x-ray to rule out any lung
19  issues.  I attempted to draw blood on the patient
20  but due to the scarring that he had on his arms and
21  he just wouldn't hold still, so I kept a close eye
22  on him and noted that he was continually confused
23  and disorientation at the time.
24     Q.   What other options did you have?
25     A.   What do you mean by other options?

82

1    Q.  Wouldn't you have sent him to the
2  emergency room at that point?
3    A.  Not without a doctor's order.  I
4  reported back I believe it says here.  His lung
5  sounds were good.  He was doing okay breathing but
6  he wouldn't take any deep breaths.  His vital signs
7  were actually better with his blood pressure.  He
8  had an elevated heart rate still so we were
9  continuing to monitor him.
10    Q.  Now you're looking at the entry dated
11  June 20, 2014 at 4:24 p.m.
12    A.  That's correct.  That's just before the
13  end of my shift.
14    Q.  At this point he's been under medical
15  observation for three days and you told him to
16  breathe deep and he said he would, but he didn't.
17    A.  No.
18    Q.  Why didn't you recommend that
19  Dr. Larrowe send him to the emergency room at that
20  point?
21    MR. MYLAR:  I'm going to object as to
22  vagueness, recommend.  I'm not sure what you mean by
23  that.
24    A.  Yeah.  Like I stated, it was the end of
25  the shift, it was close to the end of the shift.  I

83

1  probably gave report to the next nurse and that was
2  what we did.
3    Q.  If that was your kid, would you want him
4  to go to the hospital?
5    MR. MYLAR:  Objection.  Incomplete
6  hypothetical.  Calls for speculation.
7    A.  We were continuing just to monitor him,
8  keep track of him at that time.
9    Q.  Okay.  If that was your kid who has been
10  dazed and confused for three days you would send him
11  to the hospital, wouldn't you?
12    MR. MYLAR:  Objection.  No foundation.
13  Calls for speculation and incomplete hypothetical.
14    A.  I don't know if I would.  I don't know.
15    Q.  If that was your wife who had been dazed
16  and confused for three days --
17    A.  If it was the same situation and he was
18  under medical care and in jail, I would trust them
19  to take care of him.
20    Q.  I'm not asking in jail.  I'm asking
21  about real people outside of jail.  If that was your
22  wife --
23    A.  This is a different situation than
24  outside of jail.
25    Q.  Why is it different?

84

1    A.  I'm not sure what you're getting at as
2  far as different.
3    Q.  I'm saying the fact of the matter is
4  inmates don't get the same care as people on the
5  outside, do they?
6    MR. MYLAR:  Objection.  Argumentative.
7    MR. WIGHT:  Go ahead.
8    A.  Ask me the question again, please.
9    MR. MYLAR:  Also object on vagueness.
10    A.  I'm not sure what you're getting at.
11    Q.  If this was somebody that you knew and
12  cared about, you would not be satisfied with that
13  care.
14    MR. MYLAR:  Objection.  Again incomplete
15  hypothetical.  Calls for speculation.
16    A.  Again, I don't know what you're trying
17  to ask me.
18    Q.  I'm asking you based on the symptoms.
19    A.  You said just a few minutes ago that
20  inmates don't get the same care.  It's a different
21  setting in the jail.  It's not different in the care
22  they get.  It's just a different setting.  We had
23  orders from the doc to observe this patient, make
24  sure if there was anything else going on and that's
25  what we were doing.

85

1    Q.  And that's what you were doing?
2    A.  Yeah.
3    Q.  And the fact that he had been dazed and
4  confused for three days and couldn't follow a simple
5  instruction like take a deep breath, that didn't
6  cause any alarm bells to go off?
7    MR. MYLAR:  Objection.  Lack of
8  foundation.  We don't have knowledge of three days.
9  He's already admitted he's not there.
10    MR. SCHRIEVER:  So this is the third
11  day.  He was there on the third day.
12    A.  I was there for my shift, yes, and
13  during my shift we were monitoring him.  If he at
14  any time would have had more of an issue other than
15  just dazed and confused then, yes, if the doctor
16  would have ordered it we would have sent him out to
17  the ER.  I can't answer for any of the other time
18  that I wasn't there.
19    Q.  And I'm not asking you to second guess
20  what the doctor did or did not order.
21    A.  I'm not saying I am.  I'm just saying I
22  can only answer your questions according to what I
23  charted and what I was there for.  Three days dazed
24  and confused, you're trying to lump that into a
25  whole three days that I wasn't there that whole

86

1   three days.  I was only there for my shifts.
2        Q.  So did it matter at all to you then
3   what's going on during the two days you weren't
4   there?
5        A.  I charted it and I reported it to the
6   doctor.
7        Q.  Okay.  At that point are you making the
8   assumption that it hadn't been going on consistently
9   for --
10       A.  I'm not assuming anything.
11       Q.  As a nurse who is charged with the
12   healthcare of that patient, shouldn't you be
13   assuming it's important to know whether he had been
14   dazed and confused for three solid days at that
15   point?
16       MR. MYLAR:  Objection.  Lack of
17   foundation.
18       A.  I'm still not sure what you're trying to
19   ask me.  You're trying to ask me to speculate.  I
20   can't speculate on the other time I wasn't there.
21       Q.  Let me ask you this.  Was it important
22   or was it not important to you -- it's not
23   speculating.
24       A.  In my mind --
25       MR. MYLAR:  Wait, wait, wait.  Excuse

87

1   me.  I'm going to object on vagueness.  I don't know
2   what you're talking about.
3        A.  I don't either.
4        Q.  Was it important to you to know that
5   he'd been dazed and confused for three days or was
6   that not important for you to know?
7        MR. MYLAR:  Objection.  Assumes facts
8   not in evidence.
9        A.  I don't understand what you're trying to
10   ask me with that question.
11       Q.  It's not a hard question.  Was it
12   important or not?
13       MR. MYLAR:  Objection.  Argumentative.
14   It's a hard question because I don't understand what
15   you're asking.
16       A.  I'm not sure what you're asking.
17       Q.  As a nurse you'd agree that it's
18   important to know a person's medical history, right?
19       A.  As far as I can, right.
20       Q.  If a person had been dazed and confused
21   for three days, it would be important for you to
22   know that, wouldn't it?
23       MR. MYLAR:  Objection.  Calls for
24   incomplete hypothetical and it calls for
25   speculation.

88

1        A.  Again, I'm not sure what you're trying
2   to get at.  What's your question?  I'm sorry.
3        Q.  How many days would a person have to be
4   dazed and confused before it was important to you to
5   know that as a nurse?
6        A.  It was important to me to take good care
7   of him every day that I saw him and I think my
8   charting reflects that because a doctor was notified
9   and we did keep him under observation, watched him
10   closely.  If he was, say, detoxing off something, if
11   he had ingested something down in the block, which
12   is a possibility, that's one of the things we were
13   considering, then we would watch him over a period
14   of a few days to try to let him -- not knowing any
15   idea what he might have taken or not taken, we would
16   observe him, watch him closely, watch his vital
17   signs.  He could be dazed and confused more than a
18   couple or three days if he's detoxing off something.
19   That does happen.
20       Q.  By that point on the 28th you still
21   didn't think he was detoxing, did you?
22       A.  I had no idea whether if was detoxing or
23   not.  We were observing him.  That's one of the
24   possibilities we were considering.
25       Q.  Are you aware of any guidelines that say

89

1   if a patient is put into a medical observation cell
2   under lock and key, 23 out of 24 hours a day, that
3   at some point you send them out to a hospital if
4   they're not improving?
5        MR. MYLAR:  Objection.  Incomplete
6   hypothetical.  Lack of foundation and calls for
7   speculation.
8        A.  I don't know of any guideline like that.
9        Q.  At any point you did not send him out to
10   a hospital, right?
11       A.  At that point.
12       Q.  Well, you didn't at any point.  Ryan
13   Borrowman sent him to the hospital, right?
14       A.  Correct.
15       Q.  And you never recommended to Dr. Larrowe
16   that he be sent out to a hospital?
17       A.  Dr. Larrowe was notified as charted and
18   then we treated him per Dr. Larrowe's order.
19       Q.  When you have those conversations with
20   Dr. Larrowe, Dr. Larrowe doesn't come out to the
21   jail to see the inmate, does he?
22       A.  He didn't that time, no.
23       Q.  So the only information he has is what
24   you tell him.
25       A.  That's correct.

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

90

1    Q.  So if there's a situation where the
2  inmate should be sent to a hospital, the only way
3  Dr. Larrowe is going to know that is if you tell
4  him, right?
5        MR. MYLAR:  Objection.  Incomplete
6  hypothetical.  Lack of foundation.  Calls for
7  speculation.
8    A.  I don't know what you're getting at.
9    Q.  How is it Dr. Larrowe sends them to a
10  hospital unless you tell him?
11        MR. MYLAR:  Objection.  Calls for a
12  mental impression on Dr. Larrowe and calls for
13  speculation and lack of foundation of my client.
14    A.  For the time I'm there that's the only
15  time I can speak for.  For the other two days or
16  whatever when he was there, I can't talk for that.
17  I don't know.
18    Q.  When you're there, the only way
19  Dr. Larrowe would know whether to send a patient to
20  a hospital is if you tell him, right?
21    A.  I don't tell Dr. Larrowe to send anybody
22  to a hospital.  I give him what we're observing and
23  he makes that determination.
24    Q.  You never recall where you said to
25  Dr. Larrowe, "Hey, I think this guy should go to a

91

1  hospital."  Am I understanding that correctly?
2    A.  There was never a call.
3    Q.  You've never had a call to Dr. Larrowe
4  where you said, "Hey, I think we should send this
5  guy to the hospital."
6    A.  If I thought at this point he needed to
7  go, I would have given the information that I had to
8  Dr. Larrowe and let him make that determination.
9    Q.  Would you have made a recommendation --
10  let me back up.  Is it within your ability to make a
11  direct recommendation to Dr. Larrowe that he send an
12  inmate to the emergency room?
13    A.  Within my ability?
14    Q.  Yes.
15    A.  That would mean I would diagnose the
16  patient and I wouldn't diagnose the patient.  I
17  would just give him what I was observing and what
18  information I had and let him determine that.
19    Q.  Is it within your ability to call
20  Dr. Larrowe and recommend that you take a blood draw
21  from the inmate?
22    A.  I would give him information that I'm
23  seeing and let him determine if a blood draw was
24  needed.
25    Q.  Would Dr. Larrowe ever ask you, "Hey,

92

1  what do you think we should do in this situation?"
2    A.  Dr. Larrowe would ask me, "What else are
3  you seeing?  Is there anything else you can tell me
4  about this patient that I need to know?"
5    Q.  Does Dr. Larrowe keep any, that you're
6  aware of, notes or records of inmates outside of
7  CorEMR?
8        MR. MYLAR:  I'm sorry, restate.
9    Q.  Are you aware whether Dr. Larrowe keeps
10  any notes or records outside of CorEMR?
11    A.  I don't know.
12    Q.  Are you aware of whether Dr. Larrowe has
13  remote access to CorEMR?
14    A.  I don't know.
15    Q.  Are you aware whether Dr. Larrowe has
16  access to Spillman outside of the prison?
17    A.  I don't know.
18    Q.  Are you married?
19    A.  No.
20    Q.  Do you have children?
21    A.  Yes.
22    Q.  Earlier we were talking about -- I was
23  asking you what you would do with your children and
24  you explained to me --
25    A.  You were asking me what?

93

1    Q.  If you would send your children to the
2  hospital under the same or similar fact pattern and
3  you mentioned that it's different.  Is it different
4  because these people are incarcerated?
5    A.  No.  What I meant by different is if my
6  child was with me and was going through that, I
7  would take him to get medical care.  You're asking
8  me as a nurse, when I'm in a jail taking care of a
9  patient -- what I understand you're asking me is do
10  you take good care of this patient?  Do you do
11  everything you can to make sure that everything is
12  done so that if they need medical attention outside
13  of the jail, they can get that.  My answer to that
14  is yes.
15    Q.  Okay.
16    A.  And in this instance I did everything I
17  could and gave all the observations and all the
18  information to Dr. Larrowe.
19    Q.  All right.
20    A.  At that time we continued to monitor the
21  patient closely.
22    Q.  So if that was the situation with your
23  children, you would take them to get medical care.
24        MR. MYLAR:  Objection.  Similarity.
25    Q.  I'm trying to understand similarity.

CROWSON vs WASHINGTON COUNTY
April 17, 2018                                                    Michael T. Johnson

94

1      A.  I'm trying to understand yours, too.
2      Q.  So the similarity you're seeing is that
3  you would want your children to have medical care
4  and you believe that Mr. Crowson was receiving
5  medical care, so that's the same thing.
6      A.  You're asking me if I had my child in
7  this situation, would I take them to get medical
8  care.
9      Q.  That's the first question.
10     A.  Yes, I would.
11     Q.  Okay.
12     A.  Mr. Crowson was getting medical
13 attention in the jail with everything that we could
14 provide.  We had him under observation.  That's as
15 far as we were going right then per the doctor's
16 order, monitor closely.
17     Q.  And there's no guidelines to say how
18 many days you should monitor a person in those
19 situations.
20     A.  No.
21     Q.  Have you discussed this case with Ryan
22 Borrowman in any way?
23     A.  No.
24     Q.  Do you know what changed on July 1st
25 that someone decided to send him to the hospital?

95

1      A.  I wasn't there.  No, I don't know.
2      Q.  On June 2, 2014, a decision was made to
3  administer Mr. Crowson Ativan.
4      A.  Yes.
5      Q.  What information did you give
6  Dr. Larrowe that caused him to prescribe Ativan?
7      A.  I'd have to see the note.
8      Q.  6-29.
9      A.  When I came in that morning it was
10 charted that his heart rate was elevated again at
11 140 and two noted DTs occurring.  He was probably
12 shaking, having some other issues as far as
13 cognitive.
14     Q.  DT meaning --
15     A.  Delirium tremens, sorry.  And so at that
16 time I called Dr. Larrowe and, like you said, we'd
17 been observing him for several days -- not several
18 but three or four and at that time Dr. Larrowe
19 ordered that we give him Ativan 2 milligrams IM
20 injection, intramuscular and start him on librium
21 protocol.  Continue to monitor patient closely and
22 that patient tolerated the IM injection well.  That
23 was at 7:00 in the morning.  Two hours later at 9:00
24 heart rate was 72, his oxygen saturation was 98
25 percent, which is all within normal.  His heart rate

96

1  is actually improved.  His respirations are 20.
2  Sleeping quietly at this time.  No signs or symptoms
3  of distress or discomfort noted.
4      Q.  Okay.  Isn't that an alcohol withdrawal
5  treatment?
6      A.  It's used for that, yeah.
7      Q.  Is it used for other things?
8      A.  He could be coming off some other kind
9  of substance, too.  With a heart rate where it's
10 been continuing moving back and forth for the last
11 three or four days, sometimes we do follow that if
12 we do get that kind of an order.
13     Q.  Either alcohol or substance at that
14 point.
15     A.  That's what was assumed by Dr. Larrowe.
16     Q.  When you first brought him in, you
17 didn't bring him in with the assumption he was
18 detoxing, right?
19     A.  We brought him in that it could be that
20 he was detoxing, along with other things.  We were
21 trying to look at every aspect.
22     Q.  But you were not aware at that point
23 that he had been in lockdown for at least a week.
24     A.  I had no reason for lockdown at all.
25     Q.  However, on June 29th you were aware

97

1  that he had been under medical observation in what's
2  essentially lockdown for at least four days, right?
3      A.  Lockdown, you mean his time in booking?
4      Q.  He's not out in the general population.
5  He doesn't have access to other people.  He's in the
6  booking area in a cell 24 hours a day.
7      A.  Every 30 minutes there's a guard
8  checking on him.  Medical staff is in there
9  periodically throughout the shift.  He is fed.  It
10 would have been noted if he was not eating or not
11 drinking.  Those kind of things would have been
12 noted.
13     Q.  Where would he have gotten a substance?
14     MR. MYLAR:  Objection.  Calls for
15 speculation.
16     A.  I have no idea.
17     Q.  Isn't it important before you start
18 medicating somebody for withdrawals to look for
19 substance.
20     MR. MYLAR:  Objection.  Calls for
21 speculation.  Lack of foundation.
22     A.  If they're symptomatic with the
23 information that we've had over a few days then we
24 would submit that to the doctor and he orders that
25 then, yeah, that's what we do.

98

1    Q.   Did you take a history to try to figure
2  out where he would have gotten a substance from when
3  he was in booking?
4    A.   History from where?
5    Q.   Let's start with him.
6    A.   He wasn't really answering a lot of
7  questions at that time cognitively wise.  It does
8  occur at the jail at times where substances get
9  smuggled in and get down the block.  It does happen.
10  That's one thing we were considering that might be
11  what he was going through.
12    Q.   What changed between 6-25 and 6-29 that
13  caused Dr. Larrowe to think that it was withdrawals?
14    MR. MYLAR:  Objection.  Calls for mental
15  impressions of Dr. Larrowe and I also object on lack
16  of foundation per this witness.
17    Q.   Did you tell Dr. Larrowe you thought it
18  was withdrawal symptoms?
19    A.   No.
20    Q.   Did you think it was withdrawal
21  symptoms?
22    A.   I considered it as far as maybe half a
23  dozen other different things.
24    Q.   Okay.  So maybe not a full-fledged
25  diagnosis but that's at least your thinking along

99

1  the lines of diagnosis, right?
2    MR. MYLAR:  Objection.  Lack of
3  foundation as to being able to diagnose.
4    A.   As an RN I'm required to do critical
5  thinking to try to figure out what might be going
6  on.  I don't diagnose.  I just give information to
7  the doctor.
8    Q.   Would you agree that the way you view a
9  problem influences the way the doctor receives the
10  information?
11    MR. MYLAR:  Objection.  Calls for mental
12  impression of the doctor.  Also lack of foundation.
13  Also calls for speculation.
14    A.   Again I'm not diagnosing.  I'm giving
15  what information I can give the doctor so he can
16  diagnose what's going on.
17    Q.   Is there any room to disagree with
18  Dr. Larrowe for you?
19    MR. MYLAR:  Objection.  Calls again for
20  mental impression of Dr. Larrowe.  Also calls for
21  speculation and lack of foundation.
22    A.   That's not my job to disagree with him.
23    Q.   In other words, if Dr. Larrowe said,
24  "Let's put this guy on withdrawal protocol," you
25  would not think it your place to say, "But, Doctor,

100

1  he's been in lockdown for 11 days and the only
2  people he had access to are prison guards."
3    A.   I wasn't aware he was in lockdown for 11
4  days.  All I know is from the time he came into my
5  care to when he wasn't in my care.  That was a span
6  of four days, three or four days.
7    Q.   All right.  You wouldn't think it your
8  place to say, "I don't think this is alcohol
9  withdrawal or drug withdrawal," to Dr. Larrowe.
10    A.   No, I wouldn't.
11    Q.   It doesn't matter what protocol he gives
12  you, whether it makes sense to you or not, you just
13  follow that protocol?
14    MR. MYLAR:  Objection.  Incomplete
15  hypothetical.  Lack of foundation and calls for
16  speculation.
17    A.   When he gives me an order to follow, to
18  do something, then I will follow it.
19    Q.   Okay.  In your judgment, how many days
20  should an inmate follow alcohol withdrawal protocol?
21    MR. MYLAR:  Objection.  Lack of
22  foundation.
23    A.   In cases in the past at the jail it can
24  be up to two, three days, four days before a person
25  totally detoxes, whether it's alcohol, heroin or

101

1  methamphetamine.  It can be a longer period.
2  Depends on the individual.  Everybody is a little
3  bit different that way.
4    Q.   DTs, the delirium tremens that you noted
5  on the 29th, do you remember how those manifested?
6    A.   Not specifically.  He would have had the
7  shakes.  He would have maybe been sweating.  Vital
8  signs are off again.  He's a little confused after
9  that amount of time.
10    Q.   If he was sweaty, you would note that,
11  wouldn't you?
12    A.   Perhaps; perhaps not.
13    Q.   Would you consider that to be an
14  important symptom?
15    A.   If it was happening in this case.
16    Q.   Delirium tremens would also be different
17  from person to person, right?
18    A.   Yes.
19    Q.   It can be very severe shakes?
20    A.   Yes.
21    Q.   It can also be so mild you would have to
22  touch his fingertip to see if they're shaking,
23  right?
24    A.   You would have to do a neuro check,
25  check his vital signs, maybe do a manual pulse.

102

1    Q.  You don't remember how his delirium
2  tremens manifested.
3    A.  I don't recall exactly.
4    Q.  What are the contraindications for
5  librium?
6       MR. MYLAR:  Objection.  Lack of
7  foundation.
8    A.  I don't prescribe so I don't know.
9    Q.  Do you know the contraindications for
10  Ativan?
11    A.  Not specifically, no.
12    Q.  Did Dr. Larrowe ask you about any of the
13  contraindications for Ativan or librium?
14    A.  No.
15    Q.  Did Dr. Larrowe ask you for the history
16  of where the patient had been for the last 11 days?
17    A.  He asked me for a history of what we
18  were doing since he's under observation.
19    Q.  Did he ask you for a history of whether
20  he had had access to other inmates in general
21  population where he could have received any kind of
22  smuggled drug or alcohol?
23    A.  Did he ask me that?
24    Q.  Yes.
25    A.  No, he didn't ask me that.

103

1    Q.  Did he ask you whether you thought it
2  would be a good idea to send him to the emergency
3  room?
4    A.  No.
5    Q.  Did he ask you if he was exhibiting any
6  symptoms that you didn't expressly tell him?
7    A.  Could you repeat that question?
8    Q.  Yeah.  Did he ask you any followup
9  questions?
10    A.  Such as.
11    Q.  What else is going on?
12    A.  No.
13    Q.  Did you give him the information that's
14  contained in that note?
15    A.  Yes.
16    Q.  Did he ask you for any other
17  information?
18    A.  No, not that I recall.
19    Q.  Did he ask for any video or photographs
20  of the patient?
21    A.  No.
22    Q.  Did he ask you if Jon Worlton had had a
23  chance to meet with Mr. Crowson?
24    A.  No.
25    Q.  On 6-29 you also noted, "Patient states

104

1  he does not remember the last five days."
2    A.  Yes.
3    Q.  Short-term memory loss, is that
4  something you would look at if you were suspecting a
5  brain injury?
6    A.  That was his subjective information so I
7  don't know if he truly could remember the last five
8  days or not.  But I explained to him he had been
9  housed in booking and I didn't know what was going
10  on with him.
11    Q.  Right here you've got "Patient more
12  A&O."
13    A.  Alert and oriented.
14    Q.  He was able to verbalize more than just
15  one-word answers?
16    A.  Yes.
17    Q.  What's VS stable?
18    A.  Vital signs stable.
19    Q.  And you explained to him that he had
20  been housed in booking?
21    A.  In medical, yes.
22    Q.  And the very last line indicates he
23  agreed to take medications as ordered; is that
24  right?
25    A.  It says, "Patient verbalized

105

1  understanding," that's what VU is, verbalized
2  understanding, "and contracts to take meds as
3  ordered."
4    Q.  And he was compliant?
5    A.  Yes.
6    Q.  Was he ever combative with you?
7    A.  No.
8    Q.  He never refused treatment?
9    A.  No.
10    Q.  July 1st, "Physical movement delayed,"
11  did you note that as well?
12    A.  No.  I wasn't there that day.
13    Q.  Any other days.
14    A.  No.
15    Q.  Mr. Borrowman also noted, "Patient still
16  struggles with focusing on the interviewer and will
17  lose his train of thought."  During your visit to
18  Mr. Crowson is that something you also observed?
19    A.  No.
20    Q.  Page 492, this is the medication for
21  librium.  I want to make sure I'm understanding it
22  correctly.  This is three capsules by mouth b.i.d.
23  What's b.i.d?
24    A.  Twice daily.
25    Q.  Twenty-five milligrams?

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

106

1    A.  Yes.  That's the strength of each
2  capsule.
3       Q.  So that's twice daily, 150 milligrams
4  per day.  Is that the way that we're supposed to
5  read that?
6       A.  Twice daily would be 75 milligrams -- 75
7  milligrams twice daily, total 150, yeah.
8       Q.  Down here the number of doses, six.
9       A.  That's the usual tapered dose.  It drops
10  down from three to two and on through a period of
11  nine to 12 days.
12      Q.  Okay.  And the number of doses received
13  down here, does that mean there were three doses
14  received?
15      A.  That's what it looks like, yes.
16      Q.  How do you tell when those doses were
17  administered?
18      A.  It's recorded in the CorEMR chart under
19  the medical record.
20      Q.  Who administers those doses?
21      A.  Whichever nurse is passing meds during
22  that time period.
23      Q.  Does anyone other than a nurse ever
24  touch those meds?
25      A.  No.

107

1       Q.  Page 502, a category called scanned
2  documents.  It looks like July 3, 2014 there were
3  some documents downloaded by Elizabeth Jimenez and
4  they were medical records from Dixie Regional
5  Medical Center.  Do you know how the jail came into
6  possession of the Dixie Regional Medical Center
7  records?
8       A.  Probably requested them.
9       Q.  Okay.  Is that something as a nurse you
10  do or is that someone else's job to request records?
11      A.  We will request records at time if
12  there's a need.  Sometimes we get them, sometimes we
13  don't.  Sometimes they're delayed in getting to us.
14      Q.  Have you ever had an opportunity to look
15  at what records were downloaded?
16      A.  No.  I believe he was released on the
17  2nd; is that right?  From our custody?
18      Q.  From your custody, yes.
19      A.  And then we received these on the 3rd,
20  so I wouldn't have looked at them.
21      Q.  Okay.
22          (Discussion off the record.)
23      Q.  On July 30th there was an x-ray done to
24  rule out pneumonia is what the record states.
25      MR. MYLAR:  July 30th?

108

1       MR. SCHRIEVER:  Excuse me.  June 30th.
2  You've got to watch me with June and July
3  apparently.
4       Q.  On June 30, 2014 the records indicate
5  there was an x-ray ordered by Dr. Larrowe and the
6  note said it was to rule out pneumonia.  Do you have
7  a memory of that?
8       A.  No.
9       Q.  Okay.  That's in the records.
10      A.  So which day are we talking about?
11      Q.  July 30th -- or June 30th.
12      MR. MYLAR:  Do you have the Bates
13  number?
14      MR. SCHRIEVER:  501.
15      Q.  Were you off that day?
16      A.  On the 30th?
17      Q.  Yes.
18      A.  Yes.  I believe on the 30th Ryan and I
19  were both working that day but he had booking and I
20  had general population, so I wouldn't have seen it.
21      Q.  On the 30th.
22      A.  Yes, I believe that's correct.  So, no,
23  I didn't see any of that.
24      Q.  499 appointment set by Michael Johnson
25  and then the appointment no longer needed.  Let's go

109

1  back a page.  So on page 498 does this indicate that
2  you met with Mr. Crowson on the 30th?
3       A.  No.  He wasn't in my care.  Like I said,
4  Ryan and I were both on that day.  Ryan had booking.
5  I had general population.
6       Q.  When somebody exhibits those symptoms,
7  is it important to take vital signs regularly?
8       A.  At least once a shift, yeah.  Check on
9  him twice a day.
10      Q.  If vital signs are taken, it should be
11  recorded in CorEMR every time?
12      A.  Should.
13      Q.  Who is Trevor Benson?
14      A.  Right now he's a lieutenant over
15  housing.
16      Q.  Who was he in June of 2014?
17      A.  I'm not sure what his assignment was.
18      Q.  How about Harry Lambert?
19      A.  He was a lieutenant.
20      Q.  513, this note is dated 8-11-14 and it
21  recites down here that Crowson was transported on
22  July 14th and then it gives a description.  Have you
23  ever seen this report before?
24      A.  No.
25      Q.  Were you ever asked by Trevor Benson or

110

1  Harry Lambert about this incident?
2       A.  No.
3       Q.  Are they in the medical department?
4       A.  No.
5       Q.  You may not know because you don't use
6  Spillman very much.  Up here at the top there is an
7  incident number given.  Do you know what that number
8  means in Spillman?
9       A.  No.
10          MR. SCHRIEVER:  Those are all the
11  questions I have for you.
12          MR. WIGHT:  I'm going to have just a
13  few.  Shall we do that now?
14          MR. MYLAR:  Yes.
15              EXAMINATION
16  BY MR. WIGHT:
17       Q.  Sir, I'm Gary Wight.  I represent
18  Dr. Larrowe.  I'm going to jump around a little bit
19  just to ask you a few followup questions.
20       A.  Okay.
21       Q.  You testified that you received some
22  training from Dr. Larrowe on what to do with
23  patients who are suffering alcohol withdrawal.  I
24  believe that's what you testified.  Did I get that
25  right?

111

1       A.  We've had staff trainings in the past
2  where he's come out and attended I think once or
3  twice.
4       Q.  What do you remember about those staff
5  trainings?
6       A.  Basically just watch out for vital
7  signs, orientation, cognitive, neurological
8  deficits, delirium tremens with the shakes or any of
9  those things that would seem abnormal.
10       Q.  And that's what Dr. Larrowe told the
11  staff regarding alcohol or drug withdrawals?
12       A.  Just withdrawals in general.
13       Q.  Withdrawals in general.
14       A.  Yeah.
15       Q.  Did he give you any other instructions
16  that you can remember?
17       A.  No.
18       Q.  And you think that's been two times that
19  he's --
20       A.  I don't remember.  I know he's come out
21  to a staff meeting at least once where we've talked
22  to Dr. Larrowe a little bit about detoxing, what to
23  watch out for, what was emergent, what might be
24  observed for a few days.
25       Q.  Do you know when it was that he did that

112

1  training?
2       A.  Not exactly, no.
3       Q.  Was it after this June of 2014 or
4  before?  Any way to tell me that?
5       A.  I don't know.
6       Q.  I want to go back to 501.  Specifically
7  I want to start with the June 25th entry.  It's my
8  understanding that the June 25, 2014 entry at 7:13
9  a.m., this is something that you entered, correct?
10       A.  Yes.
11       Q.  I don't see anywhere in this entry that
12  it states that you contacted Dr. Larrowe.  Am I
13  missing it somehow?
14       A.  No.  Not at that point I didn't get
15  ahold of him.
16       Q.  So you don't believe you contacted him
17  on June 25th?
18       A.  I don't believe so.
19       Q.  All right.  You do know that you
20  referred Mr. Crowson to Jon Worlton, though.
21       A.  Yes.
22       Q.  But I think, and I just want to make
23  sure your testimony is you're not sure what happened
24  with that referral.
25       A.  No.

113

1       Q.  You already told us that you weren't at
2  the facility on the 26th or the 27th.  Do you know
3  what nurses were at the facility those days?
4       A.  Not specifically.
5       Q.  If the nurses that were there the 26th
6  and the 27th had entered notes in CorEMR, would you
7  expect that we would see those here on 501?
8       A.  Should be there.
9       Q.  And you've never become aware of any
10  notes that were entered those days?
11       A.  No.
12       Q.  So the first note I see of a contact
13  with Dr. Larrowe was June 28, 2014, 4:22 p.m.  Does
14  that look accurate to you?
15       A.  June 28 what time?
16       Q.  4:22 p.m.  It says, "Patient status,
17  staffed with M.D."
18       A.  I reported to the doctor at 2:00, 2:07
19  on the 28th.
20       Q.  Oh, I see.  You're right.  That was the
21  first time you contacted Dr. Larrowe?
22       A.  Yes.
23       Q.  Okay.  Do you have any actual memory of
24  the conversations you had with Dr. Larrowe on the
25  28th of June?

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

114

1     A.   Not actual, no.
2     Q.   As you sit here, you can't remember
3  words or things you described to him?
4     A.   Only what I documented.
5     Q.   All right.  And you can't remember
6  things he might have asked you or said to you other
7  than what you've documented?
8     A.   No.
9     Q.   On the 28th when you came back to the
10  facility after being gone for a few days, would you
11  have had a handoff discussion with the nurse who had
12  been observing Mr. Crowson?
13     A.   Yes.
14     Q.   Do you know when that handoff discussion
15  took place?
16     A.   It would have been at shift change.
17  Normally we pass off to each other so that would
18  have been first thing in the morning.
19     Q.   And that's not always documented, the
20  handoff discussion?
21     A.   No.
22     Q.   Is it something that's ever documented?
23     A.   I don't know.
24     Q.   It sounds like you don't always document
25  handoff discussions.

115

1     A.   No.  It's a face-to-face report and then
2  we just go from there and then go do our rounds and
3  check on the patients that need to be checked on.
4     Q.   Do you have any recollection what you
5  were told about Mr. Crowson when you came back the
6  morning of June 28th?
7     A.   No.
8     Q.   And we don't have a document here on
9  501, correct?
10     A.   Not that I can see, no.
11     Q.   Do you have any recollection of hearing
12  anything from prison staff, whether that's
13  correctional officers or other nurses, regarding
14  Mr. Crowson potentially using homemade alcohol or
15  having access to drugs prior to June 25th?
16     A.   Not that I recall, no.
17     Q.   When you were treating Mr. Crowson
18  around the June 25th to the June 29th timeframe were
19  you aware that he had had problems with drug abuse
20  in the past?
21     A.   He had been in our jail on a frequent
22  basis.  I believe there were entries prior to this
23  that he was documented as intoxicated when he came
24  in on his intake and was kept in booking for a
25  certain period of time to make sure he was all

116

1  right.
2     Q.   And you were aware of that at the time,
3  in the June 25th timeframe?
4     A.   Yeah.  He had been out there before and
5  we knew he was a user, was a drug user and had
6  problems.
7     Q.   You testified earlier that when you
8  tried to take his blood you had trouble and one of
9  the reasons is because of scarring?
10     A.   Yes.
11     Q.   Can you help us understand that
12  scarring?
13     A.   I wasn't able to get any vein
14  penetration because of the scarring on his veins.
15     Q.   Did you have an understanding of how
16  Mr. Crowson developed those scars?
17        MR. SCHRIEVER:  Objection.  Speculation.
18     A.   I don't know.
19     Q.   Did you believe it was from heroin use,
20  intravenous drug use?
21     A.   That's normally what we see when someone
22  has been using.
23     Q.   Okay.  Do you have any recollection
24  whether those scars appeared to be fresh or older?
25     A.   No, I don't recall.

117

1     Q.   I want to go to the note on 501, June
2  29, 2014, 3:36 p.m.  This chronicles a conversation
3  you had with Mr. Crowson after you had administered
4  the Ativan earlier that day.  Do I have the timeline
5  right?
6     A.   Yes.
7     Q.   Did it appear to you that Mr. Crowson's
8  condition had improved after you administered the
9  Ativan?
10     A.   Yes.
11     Q.   In fact, Mr. Crowson was able to
12  verbalize more than just one-word answers after you
13  administered the medication?
14     A.   Yes.
15     Q.   And he was more alert and attentive; is
16  that correct?
17     A.   Yes.
18     Q.   At the bottom there you explained to him
19  that he would continue to be receiving meds twice a
20  day orally.  That's correct.
21     A.   Yes.
22     Q.   Then it states, "Patient verbal
23  understanding and contracts to take meds as
24  ordered."  Did I decipher that correctly?
25     A.   "Patient verbalized understanding."

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

118

1    Q.  Verbalized.  Thank you.  Did you explain
2  to Mr. Crowson at that time that he was receiving
3  medications for alcohol or drug withdrawal?
4    A.  For withdrawals.  I didn't know if it
5  was alcohol or what it was but the doctor ordered
6  that and it was for detoxing on some substance,
7  yeah.
8    Q.  And I just want to make sure but you
9  explained to Mr. Crowson that's why he was receiving
10  the medication.
11    A.  Yes.
12    Q.  Did he ever push back on that and say,
13  "Hey, I don't have anything to withdraw from"?
14    A.  No.
15    Q.  In fact, your note indicates that he
16  actually contracted to take the medication as
17  ordered by Dr. Larrowe.
18    A.  Yes.
19    MR. WIGHT:  That's all the questions I
20  have.  Thank you, sir.
21    MR. MYLAR:  I don't have any questions.
22    FURTHER EXAMINATION
23  BY MR. SCHRIEVER:
24    Q.  I just wanted to confirm that the first
25  time Dr. Larrowe was called was on June 28th at 2:07

119

1  p.m.; is that correct?
2    MR. MYLAR:  By this witness you're
3  asking.
4    MR. SCHRIEVER:  By anyone in the record.
5    MR. MYLAR:  Well, I'm going to object.
6  Lack of foundation as to anyone in the record.
7    Q.  Anyone on those entries on 501.
8    MR. SCHRIEVER:  Again I'll object based
9  on lack of personal information.
10    A.  I have no idea.
11    Q.  First time you called him on June 28,
12  2014 was at 7 p.m.?
13    A.  Yes.
14    Q.  Why wasn't Ativan prescribed on 6-25?
15    MR. MYLAR:  Objection.  Calls for
16  speculation.  Lack of foundation.
17    Q.  Well, actually it couldn't have been
18  because you hadn't called Dr. Larrowe, right?
19    MR. MYLAR:  Objection.  Calls for
20  speculation.
21    Q.  It would take a call to Dr. Larrowe to
22  get that prescription, right?
23    A.  It would be a doctor's order.
24    Q.  When you refer to he'd been put into
25  detox on booking, you were referring to prior

120

1  incarcerations, not this incarceration, correct?
2    A.  Yes.
3    Q.  Because on the intake for this
4  particular booking there was no alcohol.
5    A.  That's what the record, yeah.
6    Q.  He actually said that he had taken
7  heroin about two days before that, do you recall
8  that?
9    A.  You showed me that in the record
10  earlier, right.
11    Q.  Okay.  So at that point, if you had
12  received that information, would you have any reason
13  to believe that he was being untruthful about the
14  substances that he had used?
15    A.  I wouldn't really know if he would be
16  truthful or not.  We have inmates that aren't.
17    Q.  Okay.
18    A.  We listen to what they say but we have
19  to verify.
20    Q.  If he told you that he'd had heroin but
21  denied alcohol, any reason to think that that was
22  somehow inaccurate?
23    MR. MYLAR:  Objection.  Calls for
24  speculation and also calls for mental impression of
25  the plaintiff.

121

1    MR. WIGHT:  Let me add it lacks
2  foundation.  Go ahead.
3    A.  I wouldn't try to assume anything.
4    Q.  Are you familiar with the class of drugs
5  called benzodiazepines?
6    MR. MYLAR:  Objection.  Lack of
7  foundation.
8    A.  Am I familiar with it?
9    Q.  Yes.
10    A.  Somewhat, yes.
11    Q.  Is it your understanding it's a more
12  slow-acting form of drugs that people use to get
13  high?
14    A.  No.
15    Q.  What's your understanding of that?
16    A.  I don't -- ask the question again,
17  please.
18    Q.  What's your understanding of how
19  benzodiazepines work?
20    MR. MYLAR:  Objection.  Lack of
21  foundation.
22    A.  You indicated more slow acting that
23  people use to get high?  I'm not sure which question
24  you're asking.
25    Q.  I'm just opening it up to your

CROWSON vs WASHINGTON COUNTY
April 17, 2018                                            Michael T. Johnson

---

122

1  knowledge.  So what is your understanding of how
2  benzodiazepines work?
3      A.  When we use Ativan or librium, those are
4  the only benzodiazepines I have any knowledge about
5  really because we use them in our practice.  We use
6  them to help a patient detox either from alcohol or
7  sometimes meth, heroin.  A lot of times use Xanax.
8      Q.  Do you know how they work in the body?
9      A.  Not exactly, no.
10         MR. SCHRIEVER:  We're done.
11         MR. WIGHT:  I have nothing further.
12  Thank you, sir.
13         MR. MYLAR:  We'll read and sign the
14  deposition.
15     (Whereupon the taking of this deposition was
16  concluded at 11:50 a.m.)
17            * * *
18     Reading copy submitted to the witness at
19  Washington County Sheriff's Office, 750 South 5600
20  West, Hurricane, Utah  84737.
21     Original transcript submitted to
22  Mr. Schriever.
23
24
25

---

123

1                    C E R T I F I C A T E
2    STATE OF UTAH    )
                      )
3    COUNTY OF        )
4        I HEREBY CERTIFY that I have read the
5    foregoing testimony consisting of 120 pages,
6    numbered from 3 through 122 inclusive, and the same
7    is a true and correct transcription of said
8    testimony except as I have indicated changes on the
9    enclosed errata sheet.
10
11
12                        MICHAEL T. JOHNSON
13
14
15
16    Subscribed and sworn to at
17   this       day of            , 2018.
18
19
20                        Notary Public
21
     My Commission Expires:
22
23
24
25                            * * *

---

124

1                    C E R T I F I C A T E
2    STATE OF UTAH        )
                          )
3    COUNTY OF SALT LAKE  )
4        THIS IS TO CERTIFY that the deposition of
5    MICHAEL T. JOHNSON was taken before me, Linda
6    Van Tassell, Registered Diplomate Reporter and
7    Notary Public in and for the State of Utah.
8        That the said witness was by me, before
9    examination, duly sworn to testify the truth, the
10   whole truth, and nothing but the truth in said
11   cause.
12       That the testimony was reported by me and that
13   a full, true, and correct transcription is set
14   forth in the foregoing pages, numbered 3 through
15   122 inclusive.
16       I further certify that I am not of kin or
17   otherwise associated with any of the parties to
18   said cause of action, and that I am not interested
19   in the event thereof.
20       WITNESS MY HAND at Salt Lake City, Utah, this
21   18th day of April, 2018.
22
23
                         Linda Van Tassell
24                       RDR/RMR/CRR
25

---

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

**0**

**02** 78:13

**1**

**1** 49:4,7,14
**100** 60:9 61:19
**11** 100:1,3 102:16
**11:50** 122:16
**12** 12:8,14,19 21:21 23:12 106:11
**12-28** 48:7
**125/78** 61:3
**131/86** 60:5
**136931** 44:14
**14** 6:2,24 7:6 12:8 38:7 77:14
**140** 95:11
**14th** 109:22
**150** 79:2 106:3,7
**153/140** 60:11
**17** 7:21
**1997** 6:10
**1s** 49:11
**1st** 49:19 77:18 94:24 105:10

**2**

**2** 95:2,19
**20** 3:18 11:9 12:14,19 21:21 78:6 82:11 96:1
**2005** 77:21
**2011** 48:7
**2014** 16:16 44:15 45:10 48:16 54:25 59:21 77:14, 18,22 82:11 95:2 107:2 108:4 109:16 112:3,8 113:13 117:2 119:12
**23** 89:2
**24** 42:5 68:24 69:2 89:2 97:6
**24-7** 39:16
**24/7** 15:9
**25** 8:6 44:15 45:9 48:16 54:25 59:21 77:18,21,22 112:8
**25th** 49:24 65:25 81:7 112:7,17 115:15,18 116:3
**26th** 50:2,12 51:15 80:20 113:2,5

**27th** 50:2,13,14 51:15 80:20 113:2,6
**28** 113:13,15 119:11
**28th** 49:24 80:25 88:20 113:19,25 114:9 115:6 118:25
**29** 117:2
**29th** 49:24 96:25 101:5 115:18
**2:00** 113:18
**2:07** 113:18 118:25
**2nd** 107:17

**3**

**3** 107:2
**30** 46:18,19,21,25 66:8 97:7 108:4
**30th** 49:25 107:23,25 108:1,11,16,18,21 109:2
**31st** 50:4,5,7,11
**36** 42:5
**3:23** 80:3
**3:36** 117:2
**3rd** 107:19

**4**

**40-hour** 12:9
**475** 43:10
**478** 75:2
**479** 75:2
**48** 41:23 69:5
**481** 44:13
**483** 48:6
**487** 48:23
**492** 105:20
**497** 49:17
**498** 109:1
**499** 108:24
**4:22** 113:13,16
**4:24** 82:11

**5**

**5** 49:4,9
**500** 49:17
**501** 77:16 108:14 112:6 113:7 115:9 117:1 119:7
**502** 107:1
**503** 60:4

**504** 61:1
**513** 109:20
**533** 77:6
**55** 60:7
**5600** 122:19
**58** 61:6

**6**

**6-11-14** 75:4
**6-25** 61:1,11,13 98:12 119:14
**6-25-14** 73:24 74:1 75:6
**6-26** 49:19
**6-27** 49:19
**6-28** 49:18 60:11
**6-29** 49:18 95:8 98:12 103:25
**6-29-14** 60:5
**6-30** 49:18
**60** 60:9 61:18

**7**

**7** 119:12
**7-31** 49:19
**70** 78:25 79:2
**72** 41:23 69:5 95:24
**73** 78:19,24
**75** 106:6
**750** 122:19
**7:00** 95:23
**7:13** 80:2 112:8
**7:15** 44:15

**8**

**8-11-14** 109:20
**84737** 122:20
**86** 69:5

**9**

**98** 95:24
**99** 78:13
**9:00** 95:23

**A**

**A&o** 104:12
**a-n-d** 46:2

**a.m.** 44:15 80:3 112:9 122:16
**ability** 91:10,13,19
**abnormal** 53:12 80:15 111:9
**abnormalities** 56:1,13,16
**abuse** 115:19
**access** 15:5 19:18,19 20:1 29:20 31:10,17 39:16 67:24 72:4,5 92:13,16 97:5 100:2 102:20 115:15
**accident** 3:21,23
**account** 71:15
**accurate** 8:17 113:14
**acting** 32:7 44:23 46:10 70:17,19 71:9 72:16 121:22
**activities** 24:9
**actual** 19:24 113:23 114:1
**add** 64:2 71:5 121:1
**addition** 7:3,8 12:15
**address** 24:1 27:20
**administer** 95:3
**administered** 106:17 117:3,8,13
**administers** 106:20
**administration** 12:1
**admitted** 55:12 85:9
**Afebrile** 78:10
**affect** 35:14,15 44:17 45:6, 13 79:12
**afternoon** 80:1,5
**agencies** 6:14
**agitated** 28:4 35:19
**agree** 53:19 87:17 99:8
**agreed** 72:17,19 104:23
**ahead** 33:7 36:15 73:20 75:4 76:11 84:7 121:2
**ahold** 73:3 112:15
**aides** 8:7
**alarm** 61:12 75:9 85:6
**alcohol** 33:25 40:13,16 41:2,22,24 42:4 52:12 53:1,6 96:4,13 100:8,20,25 102:22 110:23 111:11 115:14 118:3,5 120:4,21 122:6
**alcoholics** 40:21
**alert** 57:23 80:8 104:13 117:15
**allergies** 17:7
**altercations** 23:21

**ambulate** 40:18 41:15

**amount** 12:18 101:9

**answering** 98:6

**answers** 45:10 71:11 81:3, 9,10 104:15 117:12

**anticipate** 5:9

**anxiety** 27:14

**anxious** 28:4

**apparently** 108:3

**appeared** 116:24

**appointment** 18:14 49:17 77:14 108:24,25

**appointments** 18:3,7,8,16 24:13 49:21 77:9

**appropriately** 19:1

**area** 11:11 16:24,25 21:4,6 23:2,23 27:17 31:22 36:4 51:10 58:5 97:6

**Argumentative** 84:6 87:13

**arms** 81:20

**arrange** 18:22

**arrested** 59:8 79:9

**arresting** 17:1

**aspect** 20:7 22:15 96:21

**aspects** 9:16 22:8

**assault** 15:15

**assess** 11:12 21:10 40:10, 15 66:5 76:6

**assessed** 65:17

**assessing** 54:3 55:18,24 56:1,11,12 58:25 62:9 63:14 72:2

**assessment** 32:18,22 33:3 34:12 53:8 56:15 57:17 64:17 74:16 76:1

**assessments** 38:4 54:1

**assigned** 21:15

**assignment** 109:17

**Associate** 6:6

**associate's** 6:9 8:19

**Association** 9:22 52:16

**assume** 14:12 51:9 121:3

**assumed** 96:15

**Assumes** 87:7

**assuming** 69:4 73:4 86:10,13

**assumption** 86:8 96:17

**Ativan** 95:3,6,19 102:10,13 117:4,9 119:14 122:3

**attack** 15:16 33:15

**attempt** 67:5

**attempted** 81:19

**attended** 52:18 111:2

**attention** 29:10 54:24 93:12 94:13

**attentive** 117:15

**average** 11:9

**Aw** 30:25

**aware** 11:14 26:9 38:6,21 44:12 51:12 61:25 62:16 69:12 88:25 92:6,9,12,15 96:22,25 100:3 113:9 115:19 116:2

---

**B**

**B-U-R-N-H-A-M** 13:15

**b.i.d** 105:23

**b.i.d.** 105:22

**bachelor's** 8:16,20

**back** 15:22 28:6,9 32:24 37:21 39:10 42:10 54:4 58:8 63:12 74:5,11,17 80:25 81:16 82:4 91:10 96:10 109:1 112:6 114:9 115:5 118:12

**background** 5:15 6:5

**based** 45:10 58:10 70:18 76:20 84:18 119:8

**basically** 19:21 111:6

**basis** 11:6 21:23 28:11 56:21 68:1 74:12 115:22

**Bates** 80:2 108:12

**begin** 41:23

**behalf** 3:3

**bells** 85:6

**belong** 9:20

**Benson** 109:13,25

**benzodiazepines** 121:5, 19 122:2,4

**big** 20:20 35:19

**Billings** 16:5

**binder** 20:24,25

**bit** 12:25 15:22 19:3 27:7 28:12 40:13 45:17 46:10 59:5 60:18,20 61:8,20 77:4 101:3 110:18 111:22

**blanket** 20:10

**bleeding** 67:3,10

**block** 32:3,5 88:11 98:9

**blocks** 17:23 18:2 24:10 31:24 64:22

**blood** 22:6 37:6,18 41:18, 20 59:24 60:5,11 61:2,11,

17,21 65:21 78:5 81:11,17, 19 82:7 91:20,23 116:8

**body** 122:8

**booked** 12:16 17:17

**booking** 11:11 16:23,24 17:20 22:15 23:3,9 31:3 43:13 44:14 46:15,18,22, 24 47:8 50:19,23 51:3 57:7,10 58:5 59:1 97:3,6 98:3 104:9,20 108:19 109:4 115:24 119:25 120:4

**bookings** 23:12,14

**booklet** 20:19,22

**Borrowman** 16:5 52:9 89:13 94:22 105:15

**Borrowman's** 77:19

**bottom** 20:9 60:13,15,25 77:11 117:18

**box** 48:25 49:3,5

**brain** 32:12,16 33:5,9,13 34:5,6,8 35:25 36:25 37:2, 25 38:9,10,16,23 39:20 40:1,3 53:18,20 55:7,15,24 56:2,12 62:10,14,23 63:5, 20 64:20 65:5,10,13 104:5

**break** 5:6 30:22 62:6

**breakfast** 58:7 70:14 77:24 79:14

**breath** 81:5

**breathe** 82:16

**breathing** 66:18 68:8 82:5

**breaths** 82:6

**Brett** 25:10,11

**bring** 21:10 31:21 96:17

**broad** 15:14 17:10 64:18

**brought** 12:20,22 17:1 47:9 54:24 58:1,15 75:10 96:16,19

**bunch** 12:1

**bunk** 20:9 77:11

**Burnham** 13:11 14:9

**busy** 11:22 23:11 28:1 29:14 30:2

---

**C**

**call** 3:11 13:1 14:11 15:5,7, 10 18:15 23:5,24 24:3,8 28:25 29:3 36:6,19 38:5 39:1,4,15,17,18,21,23 67:7,16,20 68:7,11,14,19, 22 69:2,22 72:22,25 73:5 91:2,3,19 119:21

**called** 3:3 20:22 69:11 71:1,8 72:15 95:16 107:1 118:25 119:11,18 121:5

**calling** 68:25

**calls** 24:15 25:20,22 26:4,5 58:18 67:16 70:13 83:6,13 84:15 87:23,24 89:6 90:6, 11,12 97:14,20 98:14 99:11,13,19,20 100:15 119:15,19 120:23,24

**calm** 35:23

**capsule** 106:2

**capsules** 105:22

**cardiac** 64:21

**care** 7:13 8:6,12 11:10,18 12:2 21:10 23:17,18 27:17 28:13 51:24 54:6,23 55:3 66:20 68:6,9 83:18,19 84:4,13,20,21 88:6 93:7,8, 10,23 94:3,5,8 100:5 109:3

**cared** 84:12

**carefully** 40:22

**carried** 35:20

**carts** 21:6

**case** 14:12 54:18 58:13 65:18 72:14 73:20 74:24 76:5 94:21 101:15

**cases** 100:23

**CAT** 37:13

**category** 75:23 107:1

**caused** 61:12 95:6 98:13

**cell** 15:6,8 18:1 31:16,18, 24 32:2,5 46:21,23,24 47:2 89:1 97:6

**cells** 50:23

**Center** 73:8 107:5,6

**Central** 3:25

**certified** 25:2

**chance** 4:5 17:9 103:23

**change** 43:23 44:6,11 64:10 114:16

**changed** 62:13,21 63:19 94:24 98:12

**Charge** 8:6

**charged** 86:11

**chart** 29:21 39:6 60:1 106:18

**charted** 39:11 57:22 59:9 85:23 86:5 89:17 95:10

**charting** 18:5 19:5,9 23:16,19 88:8

**charts** 19:11

**check** 20:11 32:18,22,24 36:21 39:1 46:24 47:10 49:9 53:9 76:8 80:9,11,12 101:24,25 109:8 115:3

**checked** 66:7 78:19 115:3

checking 22:6 66:8 79:25 97:8

checks 18:1 32:17 36:5 46:21 49:2 65:3

chest 81:14,18

child 93:6 94:6

children 92:20,23 93:1,23 94:3

choice 48:10 75:14

choosing 54:7

chronicles 117:2

circumstance 39:19

circumstances 17:4

CIWA-AR 52:11,25

clarify 4:15 37:5 38:17 45:7

class 121:4

classes 10:6

clearance 20:8

clearances 77:10

cleared 56:9

client 90:13

clientele 10:21,22

Cliffs 6:16 8:2,5,9

clinic 15:8

clinical 11:2 14:1,19

clinics 11:5

close 81:21 82:25

closely 80:18 81:18 88:10, 16 93:21 94:16 95:21

closet 24:19,25

clothes 58:15 59:13 69:25 70:21

coal 3:20,24

cognitive 32:19 40:17 41:15 53:11 56:18 57:23 59:5 65:20 66:13 67:4 76:7 95:13 111:7

cognitively 98:7

cold 15:15

colds 22:7

Collaboration 47:17

College 6:7

Coma 38:25

combative 105:6

comfortable 48:4

common 57:6 74:4

communicate 72:13

comparable 74:18

complaints 26:10

complete 30:14

completely 4:24

compliant 30:23 105:4

computer 28:23

computers 21:9

concern 12:25

concerned 70:16

concerns 11:8 22:7

concluded 122:16

concussions 38:11

condition 72:23 75:9 117:8

conference 9:10

confident 20:5

confirm 118:24

confused 44:17 45:16 55:1 59:4 65:19 68:12,18, 24 69:10 72:16 77:23 81:2, 22 83:10,16 85:4,15,24 86:14 87:5,20 88:4,17 101:8

confusion 64:1

conjunction 6:17

connection 55:2

considered 9:8 98:22

consistently 7:5 27:22 86:8

constantly 24:20 28:1,13

contact 35:5 113:12

contacted 69:17 112:12, 16 113:21

contacting 24:12

contained 103:14

continually 81:22

continue 81:17 95:21 117:19

continued 93:20

continuing 9:8 82:9 83:7 96:10

contract 13:6

contracted 118:16

contracts 105:2 117:23

contraindications 102:4, 9,13

conversation 117:2

conversations 89:19 113:24

convey 55:9 67:17 71:20 72:20

coordinate 11:15 13:3,8 18:2,3,9,13,25 19:24 27:6 28:6

coordinator 18:17

copy 122:18

Coremr 19:6,17 29:4,19,24 30:5 31:7,8,10,13,17 39:5, 7,11 42:14 43:11,16,21 48:25 52:2 77:1 92:7,10,13 106:18 109:11 113:6

correct 16:18 23:15 48:18 50:17 53:22 55:10 59:25 69:17 77:25 82:12 89:14, 25 108:22 112:9 115:9 117:16,20 119:1 120:1

correctional 9:11,21 10:16 21:12,16 25:2,8 52:15 115:13

corrections 9:20

correctly 91:1 105:22 117:24

corridor 32:2

corridors 31:23

counts 4:7

county 4:2 11:3 13:7 14:3, 6,8,13 122:19

couple 23:12 28:25 77:2 88:18

court 4:4,7

cover 10:2 17:9 24:14

covered 23:24

covers 15:16

coworkers 10:9

CPR 68:5

crisis 68:3

criteria 36:1 38:15 62:22

critical 99:4

Crowson 5:19 14:12 42:8, 20 43:11,18 45:1,14,20 46:12 50:17 51:14 54:18 56:4 57:7,14 62:1 71:23 73:4 77:14 94:4,12 95:3 103:23 105:18 109:2,21 112:20 114:12 115:5,14,17 116:16 117:3,11 118:2,9

Crowson's 52:3,6 117:7

custody 107:17,18

**D**

daily 11:6 21:22 28:11 49:2,8 74:12 105:24 106:3, 6,7

damage 64:20

date 43:15 44:10,11,15 79:21 80:3

dated 48:7 82:10 109:20

dates 77:18

day 11:10,24,25 12:7,9,15, 21 13:24 14:23 17:13 22:2, 16,17 23:12,17,18 29:7 30:1 34:16 37:22 45:16 47:11,12,14,15 49:10 50:16,20 56:20 61:5,10,21, 22 65:24 66:2,6,8 69:7,9, 10 70:25 71:1 72:7 85:11 88:7 89:2 97:6 105:12 106:4 108:10,15,19 109:4, 9 117:4,20

day-to-day 56:21

days 12:11 17:14,16 23:13 49:21,23 62:2 80:23 82:15 83:10,16 85:4,8,23,25 86:1,3,14 87:5,21 88:3,14, 18 90:15 94:18 95:17 96:11 97:2,23 100:1,4,6, 19,24 102:16 104:1,8 105:13 106:11 111:24 113:3,10 114:10 120:7

dazed 45:17 55:1 59:4 65:19 68:12,18,24 69:9 83:10,15 85:3,15,23 86:14 87:5,20 88:4,17

de-escalate 35:23

deal 15:12,18 20:6 56:20

dealing 7:12 64:15 71:17

dealt 47:25

decided 94:25

decipher 117:24

decision 56:25 95:2

decline 66:13

Decrease 41:20

decreased 62:12 63:19

deep 82:6,16 85:5

deficits 76:11 111:8

degree 6:6,9 8:16,19

delayed 105:10 107:13

delirium 41:3,5,8,12 53:10 95:15 101:4,16 102:1 111:8

denied 120:21

dental 21:7

dentist 19:1

denying 54:19

department 21:17 26:25 110:3

departments 7:16

depending 12:9,24 15:1 17:3 37:22 40:8 56:19 61:22 77:3

depends 5:12 14:21 22:10 27:25 30:1 36:13 38:2 42:2 69:1 80:16 101:2

deposition 3:14 4:3 5:9 43:8 63:11 122:14,15

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

**depression** 27:14

**deputies** 19:25 44:22 45:12,17 46:11 50:25 56:19 57:25 59:12 66:8 67:25 68:4 71:7 72:5,13

**deputy** 10:25 25:13 26:3 32:6 35:22 58:6 69:24 70:13,15,18,20 79:11

**describe** 25:15

**description** 34:5 109:22

**designated** 13:6

**designates** 15:9 39:17

**designation** 8:14

**determination** 90:23 91:8

**determine** 3:23 30:10 36:2,19 38:3 45:11 62:22 66:12 91:18,23

**determining** 38:16

**detox** 46:23 47:2 48:8,11, 17 56:7 119:25 122:6

**detoxes** 100:25

**detoxing** 17:4 64:21,23 88:10,18,21,22 96:18,20 111:22 118:6

**developed** 116:16

**diabetic** 19:22 49:9 78:22

**diagnose** 40:9 53:25 54:1 91:15,16 99:3,6,16

**diagnosed** 38:12 65:17

**diagnoses** 40:10

**diagnosing** 53:20 55:17 62:9 63:13 99:14

**diagnosis** 68:17 98:25 99:1

**diastolic** 60:15,16

**diet** 19:22

**dietary** 19:21 77:12

**difference** 10:15

**differences** 10:20 11:23

**differentiating** 64:14

**differently** 44:7 70:17 71:9 72:16

**difficult** 68:11,14

**dilated** 32:25 35:1 79:21 80:14

**direct** 91:11

**directly** 14:11 15:5,6 39:18 73:5

**director** 13:6,8

**disagree** 99:17,22

**disciplined** 8:21

**discomfort** 96:3

**discussed** 52:15 94:21

**discussion** 62:9,25 63:13 107:22 114:11,14,20

**discussions** 114:25

**disease** 33:19

**dislike** 45:20

**disorientation** 81:23

**disoriented** 81:3

**displayed** 44:18

**distress** 96:3

**Dixie** 6:19 7:15,18 73:7 107:4,6

**doc** 39:1 81:16 84:23

**doctor** 11:3,4 13:1,9,18,19 14:15 16:19 30:16 36:6,13, 21,22 37:16 38:5,13 39:4 40:10 67:7,8,17,18,20 68:17,20,23,25 69:2,10,17, 23 71:1 81:13 85:15,20 86:6 88:8 97:24 99:7,9,12, 15,25 113:18 118:5

**doctor's** 15:4 36:8 38:13 39:10 82:3 94:15 119:23

**doctors** 10:5 11:15 13:4 24:12

**document** 29:23 114:24 115:8

**documentation** 42:11,12 56:3

**documented** 114:4,7,19, 22 115:23

**documents** 43:7 107:2,3

**Dolgnar** 25:13 26:3 72:14 79:12

**dose** 106:9

**doses** 106:8,12,13,16,20

**downloaded** 107:3,15

**downtime** 24:16

**dozen** 11:9 17:3,16 64:1 98:23

**draw** 37:6 81:17,19 91:20, 23

**dressed** 58:16 59:13,16 69:16,22 70:1

**dressing** 23:10

**drift** 35:5

**drinking** 97:11

**drops** 106:9

**drug** 34:2 100:9 102:22 111:11 115:19 116:5,20 118:3

**drugs** 115:15 121:4,12

**DT** 95:14

**DTS** 41:2 95:11 101:4

**due** 81:20

**duly** 3:4

**duties** 8:8 17:25

**E**

**earlier** 26:12 45:3 48:6 58:6 92:22 116:7 117:4 120:10

**easier** 27:21 75:3

**Eastern** 6:7

**easy** 68:7

**eat** 40:18 41:15 79:16

**eating** 97:10

**edited** 44:2,4

**education** 5:15 9:5,8

**educational** 6:5

**elevated** 40:25 41:8,18 60:17 81:12 82:8 95:10

**Elizabeth** 18:20,24 107:3

**else's** 107:10

**emergencies** 23:20

**emergency** 7:17 10:8 14:8 28:18 36:20 38:9 66:22,24 67:3,21 68:1,6 73:12 82:2, 19 91:12 103:2

**emergent** 54:11 73:14 111:23

**Emery** 4:2

**employed** 7:5 16:8,11,13

**employment** 8:22

**EMT** 3:20

**Encephalitis** 34:10

**encephalopathy** 34:4 65:9,13

**encouraged** 79:16

**end** 29:16 30:15 82:13,24, 25

**end-of-life** 7:13

**entailed** 68:6

**entails** 19:21

**enter** 29:18 76:25

**entered** 29:22 44:11 112:9 113:6,10

**entire** 13:24

**entries** 19:19,25 20:2,12 52:4 72:9 77:22 80:22 115:22 119:7

**entry** 43:21 44:1,8 48:6,25 49:1 77:8 79:20,24 82:10 112:7,8,11

**episode** 32:21

**equal** 76:15,16

**equals** 49:4

**equipped** 37:1

**ER** 85:17

**escorted** 10:23

**essence** 38:1 40:4

**essentially** 97:2

**estimate** 23:5

**eval** 46:3 47:20

**evaluated** 36:16

**evaluating** 53:17 63:14

**evaluation** 79:18

**evaluations** 62:14

**events** 4:9

**evidence** 55:13 59:18 87:8

**exam** 21:5,8 31:9 48:22

**EXAMINATION** 3:6 110:15 118:22

**examined** 3:4

**excuse** 77:21 86:25 108:1

**exhibiting** 35:25 37:24 103:5

**exhibits** 109:6

**expect** 113:7

**experience** 10:15 32:14

**explain** 10:19 118:1

**explained** 92:24 104:8,19 117:18 118:9

**explanation** 49:20

**expressly** 103:6

**extra** 20:10

**extreme** 35:21 65:15 67:15

**extremities** 78:16

**eye** 35:4 81:21

**eyes** 32:18,25 33:1 34:22

**F**

**face-to-face** 115:1

**facilities** 18:23 27:17

**facility** 8:10,11 10:16 18:14 65:17 113:2,3 114:10

**fact** 43:24 77:24 84:3 85:3 93:2 117:11 118:15

**facts** 4:9 55:12 70:11 71:2 73:19 87:7

**fair** 23:4,7 54:2

**familiar** 8:9 11:21 42:21

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

52:11 77:7 121:4,8
**family** 24:15 34:21
**fast** 32:20 66:17
**faster** 66:18
**fed** 97:9
**feedback** 36:14
**feeding** 17:25
**feel** 4:23 30:19
**feelings** 45:19
**field** 40:9
**figure** 98:1 99:5
**files** 19:13
**fill** 19:4
**filled** 75:17
**fills** 12:10
**find** 4:5 29:13 53:21 67:15
**fine** 3:13
**finger** 35:3
**fingers** 76:10
**fingertip** 101:22
**fit** 63:15
**five-day** 10:6
**fixed** 35:2
**flashlight** 35:1
**flip** 44:13
**focus** 65:1
**focusing** 105:16
**follow** 29:12,17 35:3 38:15
52:25 53:2 58:2,11,22,25
59:15 69:15 70:14 85:4
96:11 100:13,17,18,20
**followup** 103:8 110:19
**form** 43:14 44:17 75:17,19,
22 121:12
**format** 4:8
**foundation** 25:21 26:7
33:7 51:20 53:24 58:19
59:18 71:6 73:18 83:12
85:8 86:17 89:6 90:6,13
97:21 98:16 99:3,12,21
100:15,22 102:7 119:6,16
121:2,7,21
**Frank** 50:9
**frequent** 115:21
**frequently** 66:7
**fresh** 116:24
**Friday** 15:25
**front** 71:17
**full** 3:8 6:17 7:4,11 9:7
**full-fledged** 98:24
**full-time** 7:9

**function** 53:15,16

**G**

**Gary** 110:17
**gateway** 55:21
**gave** 59:12 70:21 81:3 83:1
93:17
**general** 51:2 56:10,14 97:4
102:20 108:20 109:5
111:12,13
**generally** 5:14
**give** 11:24 18:15 20:14
36:14 38:22 67:8 68:16
70:10 90:22 91:17,22 95:5,
19 99:6,15 103:13 111:15
**giving** 99:14
**Glasgow** 38:25
**Glucose** 78:19
**good** 25:7,17 29:25 53:20
72:6 82:5 88:6 93:10 103:2
**greater** 12:3
**grip** 76:9
**grips** 32:22 76:15
**group** 9:21
**guard** 97:7
**guards** 100:2
**guess** 85:19
**guideline** 89:8
**guidelines** 88:25 94:17
**guides** 38:19
**guy** 32:7 54:13 90:25 91:5
99:24
**guys** 37:1 38:15

**H**

**half** 17:2 22:1 64:1 98:22
**hallway** 58:4
**handle** 28:6
**handoff** 114:11,14,20,25
**happen** 54:10 64:22 88:19
98:9
**happened** 28:18 112:23
**happening** 34:6 46:7,8
67:7 101:15
**hard** 38:10 79:1 87:11,14
**Harry** 109:18 110:1
**he'll** 29:15 36:14 39:1
**head** 4:14 15:15 22:7
32:23 53:21 58:16 59:14
70:1,7,22 71:16 72:1

**headache** 53:21 57:15
**heading** 43:14
**health** 6:14,22 11:19 26:14
27:2,4,9,11 29:22 46:7
48:12,21 57:8,10
**healthcare** 6:13,15,20
86:12
**hear** 24:18 59:19
**heard** 52:17
**hearing** 115:11
**heart** 15:16 33:15 40:19,23
41:9 61:12,18,20,21 66:3
82:8 95:10,24,25 96:9
**helps** 18:18
**heroin** 100:25 116:19
120:7,20 122:7
**Hey** 32:7 62:11 90:25 91:4,
25 118:13
**high** 49:4 60:18,21 65:14
74:13 121:13,23
**HIPAA** 31:22
**history** 30:20 73:9,14,15
87:18 98:1,4 102:15,17,19
**hold** 81:21
**home** 6:13,22 8:1,11
**homemade** 115:14
**honestly** 4:24
**hospice** 6:14,23 7:9,12
**hospital** 6:14,20 8:10 9:15
10:17 17:8 83:4,11 89:3,
10,13,16 90:2,10,20,22
91:1,5 93:2 94:25
**hospitalized** 36:2
**hospitals** 11:24 24:19
**hour** 18:1
**hours** 5:10 12:9 14:1,21
22:2,9,12,13 23:13 41:23
42:5 54:11 68:25 69:2 89:2
95:23 97:6
**house** 9:2
**housed** 104:9,20
**housing** 45:23 109:15
**how's** 33:11
**HSA** 47:18
**Hurricane** 5:22 122:20
**hurting** 57:18
**hypoglycemic** 78:22
**hypothetical** 55:12 73:18,
19 83:6,13 84:15 87:24
89:6 90:6 100:15
**hypothetically** 68:2 69:24
73:12

**I**

**ICU** 7:17
**idea** 17:10 21:20 53:20
66:17 76:23 88:15,22
97:16 103:2 119:10
**identify** 32:16
**ill** 27:18
**IM** 95:19,22
**imaging** 37:11
**immediately** 23:20 27:15
36:16 38:5 65:4,16
**important** 24:3 30:13,19
40:17,19,20 55:8 73:8
86:13,21,22 87:4,6,12,18,
21 88:4,6 97:17 101:14
109:7
**impression** 25:21 26:5
90:12 99:12,20 120:24
**impressions** 98:15
**improved** 96:1 117:8
**improving** 89:4
**inaccurate** 120:22
**incarcerated** 78:3 93:4
**incarceration** 48:7 120:1
**incarcerations** 120:1
**incident** 110:1,7
**include** 9:14
**included** 21:7 31:6 56:21
**incoming** 75:25
**incomplete** 55:11 73:18
83:5,13 84:14 87:24 89:5
90:5 100:14
**independently** 45:12
**indicating** 47:13
**indication** 51:14 54:18
**individual** 46:22 101:2
**infection** 33:23 64:8,19
**influences** 99:9
**informal** 4:4
**information** 30:4,9 40:11
55:8 67:17 68:16 71:20,22,
23 72:20 75:6 77:1 89:23
91:7,18,22 93:18 95:5
97:23 99:6,10,15 103:13,
17 104:6 119:9 120:12
**ingested** 63:24 64:21
88:11
**initial** 53:8
**injection** 95:20,22
**injuries** 23:25 32:12 36:25
37:2 40:1,3 53:18 62:10

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

**injury** 32:16 33:5,9,13 34:5
36:1 37:25 38:9,11,16,23
39:20 53:20 55:7,15,25
56:3,12 62:15,23 63:5,20
65:5 104:5

**inmate** 10:24 14:8,13
23:22 29:10,13 31:9,17
32:2 75:25 89:21 90:2
91:12,21 100:20

**inmate's** 75:9

**inmates** 12:15 14:2,3
17:18,19 18:22 19:25
23:21 25:19 28:20 38:1
50:23 54:5,16 64:23 76:4
84:4,20 92:6 102:20
120:16

**input** 15:4

**instance** 93:16

**instruction** 58:11 59:1,15
85:5

**instructions** 58:3,23
69:16 70:14 111:15

**intake** 56:8 73:22,25 74:5,
6,11 75:10,15,20,22 76:14,
21,24 77:1 115:24 120:3

**intakes** 30:21

**interact** 10:9 28:10

**interaction** 10:24 32:5

**interactions** 5:18 26:6

**interactive** 46:13

**Intermountain** 6:13,15,20

**interpretation** 4:14

**interview** 43:15 44:10

**interviewer** 43:15,20
44:16 105:16

**interviews** 22:20

**intoxicated** 115:23

**intramuscular** 95:20

**intravenous** 37:15 116:20

**involved** 16:9 19:2 22:5,25
24:1 28:15 57:11

**involving** 10:7

**issue** 15:17 28:14 30:12
31:21 35:20 37:25 46:7,8
47:24 48:3 57:8,11,12,13
67:4 74:6 76:13 85:14

**issues** 11:8,13,19 15:12,
23 17:6,19 22:7 27:21 31:1
33:21 41:17 53:11 56:18
64:21 66:16 67:14 74:18
81:15,19 95:12

**item** 43:14 44:16

**J**

**jail** 5:16 6:1,12,17,18 7:11,
25 9:9 12:4 15:7,15 16:8
20:13 23:20 27:18,21 28:3,
5 37:1 42:22 45:2 51:15
53:3,6,15 64:18 65:16 70:3
71:13 73:21 83:18,20,21,
24 84:21 89:21 93:8,13
94:13 98:8 100:23 107:5
115:21

**jibe** 71:11

**Jimenez** 18:20 107:3

**job** 6:16 7:9,22,24,25 17:20
34:19 99:22 107:10

**jobs** 7:1

**Johnson** 3:2,10,11 108:24

**joke** 70:2,4

**Jon** 26:16 27:25 30:17 46:9
56:23 57:4,9 79:19 103:22
112:20

**Josh** 16:5,17

**judgment** 67:16 100:19

**July** 49:19 50:6 77:18
94:24 105:10 107:2,23,25
108:2,11 109:22

**jump** 110:18

**June** 16:16 44:15 45:9
48:16 50:5,7 51:15 54:25
59:21 65:25 77:14,18,21
81:7 82:11 95:2 96:25
108:1,2,4,11 109:16 112:3,
7,8,17 113:13,15,25 115:6,
15,18 116:3 117:1 118:25
119:11

**justify** 68:25

**K**

**key** 89:2

**kid** 83:3,9

**Kidney** 33:19

**kind** 7:15 10:9 18:2 22:9
27:12,14 28:14,18 30:11
32:21,23 34:19 46:8 56:13
60:9 63:24 64:2 66:17
71:12 72:23 76:10 78:21
79:2,8 96:8,12 97:11
102:21

**kitchen** 19:24

**knew** 44:21 58:10 77:24
78:2 84:11 116:5

**knowing** 88:14

**knowledge** 26:6 43:25
65:12 85:8 122:1,4

**L**

**lack** 25:21 33:6 51:19
53:23 58:19 59:18 71:5
73:17 85:7 86:16 89:6
90:6,13 97:21 98:15 99:2,
12,21 100:15,21 102:6
119:6,9,16 121:6,20

**lacks** 26:5 121:1

**Lambert** 109:18 110:1

**lapsed** 9:24

**Larrowe** 13:5 14:4,10,11,
15,18 15:3 16:19 39:13,21,
24 53:3 54:12 55:9 56:24
57:3 62:20,25 71:20 72:20,
21,25 73:3,5 82:19 89:15,
17,20 90:3,9,12,19,21,25
91:3,8,11,20,25 92:2,5,9,
12,15 93:18 95:6,16,18
96:15 98:13,15,17 99:18,
20,23 100:9 102:12,15
108:5 110:18,22 111:10,22
112:12 113:13,21,24
118:17,25 119:18,21

**Larrowe's** 89:18

**law** 27:19 31:25

**lawyers** 3:22

**learned** 52:14

**leave** 30:25

**led** 3:23

**left** 50:23

**levels** 28:2

**librium** 95:20 102:5,13
105:21 122:3

**license** 8:24 9:3,18

**licensed** 11:18,19,20
26:14,22

**lieutenant** 109:14,19

**light** 34:25 79:22 80:16,17

**Linda** 4:14

**lines** 9:22 99:1

**list** 11:6 28:22 29:4 32:15
33:10 49:12 62:14 64:9

**listed** 44:16 45:22

**listen** 120:18

**literally** 5:3

**live** 5:21 34:21

**Liver** 33:21

**Liz** 24:13

**lock** 89:2

**lockdown** 62:1 96:23,24
97:2,3 100:1,3

**locked** 21:7

**long** 3:17 4:11 5:23,25 6:8,
22 13:20 14:20 19:17
22:16,19 36:11 37:21
39:13 65:10 76:25

**long-term** 8:12

**longer** 27:4 62:4 77:5
101:1 108:25

**looked** 52:1,7 107:20

**lose** 35:7 105:17

**loss** 104:3

**lot** 9:9 10:4 11:2,23 17:14,
15 18:18,19 20:21 27:16,
18 28:14 30:8,16 39:2
40:20 54:16 67:2 70:3 98:6
122:7

**low** 49:4 60:8,10 61:7,8,18,
20 65:14 66:3

**lump** 85:24

**lung** 81:15,18 82:4

**Lyman** 25:10,11,16,19
26:10 58:7 72:14 79:11

**M**

**M.D.** 47:18 113:17

**made** 44:1 52:4 66:10
69:12 91:9 95:2

**main** 17:22 41:3

**make** 4:9,14 5:4 8:7 10:25
11:13 17:22,24 18:5 19:3
23:24 27:8,20 28:1 35:4,10
36:18 38:6 39:2 56:24
57:6,10 59:3 63:14 65:7
67:16,18 68:17 70:25 76:7,
19,22 80:13 84:23 91:8,10
93:11 105:21 112:22
115:25 118:8

**makes** 30:14 43:21 90:23
100:12

**making** 4:12 24:10,11
33:10 35:4 54:21,25 66:9
81:9 86:7

**males** 64:3

**manage** 27:21

**manic** 32:21 35:13,17

**manifested** 101:5 102:2

**manual** 20:13,16 62:11
101:25

**manufactures** 3:22

**mark** 75:2

**marked** 77:16

**married** 92:18

**Martin** 14:12 43:11

**matter** 84:3 86:2 100:11

**meals** 51:1

CROWSON vs WASHINGTON COUNTY

April 17, 2018

Michael T. Johnson

**meaning** 95:14

**means** 46:19 47:6 78:11 110:8

**meant** 93:5

**med** 56:15 58:1

**Med/surge** 7:17

**medical** 10:8 11:8,13 13:5, 8,9 15:12,17 17:5,19 18:3, 7,8 19:15 20:7 21:4,6,16 23:2,24 24:4,21 26:25 29:20,21 30:12,19 31:21 36:3 45:23 47:4,10 50:19, 24 54:6 55:3,21 56:20 70:16 71:14 72:18,23 73:2, 8,9 74:6 77:9,10,13 82:14 83:18 87:18 89:1 93:7,12, 23 94:3,5,7,12 97:1,8 104:21 106:19 107:4,5,6 110:3

**medically** 23:25

**medicating** 97:18

**medication** 21:6 37:15 105:20 117:13 118:10,16

**medications** 11:14 17:6,7 27:13,22,23 104:23 118:3

**meds** 105:2 106:21,24 117:19,23

**meet** 31:9 32:1 103:23

**meeting** 29:24 111:21

**meetings** 10:12

**members** 24:15 34:21

**membership** 9:23

**memory** 4:8 16:10 42:8 104:3 108:7 113:23

**mental** 11:18 25:21 26:5, 14 27:2,4,9,11 29:22 46:7 48:12,21 57:8,10 62:12,13, 21 63:19 64:11 90:12 98:14 99:11,20 120:24

**mentally** 27:17

**mentation** 63:19

**mentioned** 21:21 26:12 34:13 36:6 38:4 93:3

**met** 29:13 109:2

**meth** 122:7

**methamphetamine** 101:1

**Michael** 3:2,10,11 108:24

**middle** 23:9 48:24,25 49:3

**Mike** 3:12,14

**Mike's** 3:13

**mild** 101:21

**milligrams** 95:19 105:25 106:3,6,7

**mind** 10:20 43:2 63:21,23

64:10 86:24

**Mine** 4:2

**mines** 3:20,24

**minute** 78:8

**minutes** 12:23 21:24 22:21 23:4,8 46:18,20,21, 25 66:9 77:2,3 84:19 97:7

**Mischaracterizes** 58:12 59:17

**missing** 112:13

**Misstates** 71:2

**misunderstanding** 8:15

**Monday** 15:21,24

**monitor** 41:14 68:16 81:17 82:9 83:7 93:20 94:16,18 95:21

**monitoring** 85:13

**mood** 35:13,15

**morning** 12:22 95:9,23 114:18 115:6

**mouth** 105:22

**move** 32:9 33:1 35:3

**moved** 7:23 23:23 71:14

**movement** 32:19 105:10

**moving** 96:10

**MRI** 37:11

**multiple** 33:8 34:20 75:14

**MYLAR** 25:20,24 26:4 33:6 50:5,8 51:19 53:23 55:11 58:12,18 59:17 62:4 63:10 64:5 71:2,5 73:17 82:21 83:5,12 84:6,9,14 85:7 86:16,25 87:7,13,23 89:5 90:5,11 92:8 93:24 97:14, 20 98:14 99:2,11,19 100:14,21 102:6 107:25 108:12 110:14 118:21 119:2,5,15,19 120:23 121:6,20 122:13

───────────

**N**

**national** 9:10,20,21 52:15

**necessarily** 27:25 67:1 69:18 70:15

**needed** 47:24 91:6,24 108:25

**neuro** 32:17 36:5 65:3 80:11,12 101:24

**neurological** 32:17,22 34:12 40:17 75:12,20,23 76:1,3,8 111:7

**neuros** 53:9 80:13

**nod** 4:13

**normal** 20:10 22:8 44:21 59:24 60:5,7,23 61:3,4,17 65:22 66:2 78:17,18,24 80:14 95:25

**note** 46:10 76:14 79:11 95:7 101:10 103:14 105:11 108:6 109:20 113:12 117:1 118:15

**noted** 16:4 65:21 77:23 78:5 81:2,22 95:11 96:3 97:10,12 101:4 103:25 105:15

**notes** 29:21 42:13,14,16, 18 44:25 45:15 51:24 92:6, 10 113:6,10

**notice** 17:24 44:6 66:14

**noticed** 57:25

**notified** 88:8 89:17

**number** 43:13 44:14 49:7, 11,14 60:13,15 106:8,12 108:13 110:7

**numerical** 38:22

**nurse** 6:3,6,11,23 7:9,12 8:6,14,22 15:10 16:1 51:15 53:15 63:3,8,16 73:9 83:1 86:11 87:17 88:5 93:8 106:21,23 107:9 114:11

**nurses** 10:5 12:1 15:19,25 16:4,8,13 113:3,5 115:13

**nurses'** 51:24

**nursing** 8:1,11 9:11,21 10:16,17 20:17,18 21:1,3 30:19 52:15

───────────

**O**

**oath** 4:4

**object** 82:21 84:9 87:1 98:15 119:5,8

**objection** 25:20 26:4 33:6 51:19 53:23 55:11 58:12, 18 59:17 63:10 71:2,6 73:17 83:5,12 84:6,14 85:7 86:16 87:7,13,23 89:5 90:5,11 93:24 97:14,20 98:14 99:2,11,19 100:14, 21 102:6 116:17 119:15,19 120:23 121:6,20

**objective** 30:10,15

**objectively** 30:7

**observation** 36:4,17,23 48:8,11,12,18,21 50:19,24 56:15 58:1 65:11 69:13 71:14 80:17 82:15 88:9 89:1 94:14 97:1 102:18

**observations** 93:17

**observe** 36:9 65:2 68:15, 21 70:4,17 84:23 88:16

**observed** 71:14 105:18 111:24

**observing** 71:8 88:23 90:22 91:17 95:17 114:12

**occasion** 32:4,10 64:23 76:2

**occur** 3:21 98:8

**occurring** 95:11

**office** 15:7 21:5,7,9 23:2 122:19

**officer** 21:12,16 25:3

**officers** 17:1,24 25:8 115:13

**older** 116:24

**one-word** 70:24 81:3,10 104:15 117:12

**ongoing** 9:15 15:23

**onsite** 37:19

**open** 51:10

**opening** 121:25

**opportunity** 107:14

**option** 54:6,15 55:5

**options** 81:24,25

**orally** 117:20

**order** 19:21 36:8,22 38:13 67:8 81:18 82:3 85:20 89:18 94:16 96:12 100:17 119:23

**ordered** 37:8,9,16,23 85:16 95:19 104:23 105:3 108:5 117:24 118:5,17

**orders** 38:13 39:10 84:23 97:24

**orientation** 111:7

**oriented** 57:24 80:8 104:13

**Original** 122:21

**outgoing** 45:15 46:12,13

**overlapping** 14:5

**Oversee** 8:7

**oxygen** 78:14,16 95:24

───────────

**P**

**p.m.** 20:9 80:3 82:11 113:13,16 117:2 119:1,12

**pad** 31:20

**pages** 49:16

**pain** 17:8 30:11 53:22 57:18

**panel** 37:18

**paper** 19:11,13,15

CROWSON vs WASHINGTON COUNTY

April 17, 2018

Michael T. Johnson

**paperwork** 19:4

**parameter** 61:19 79:1

**parameters** 60:6

**Pardon** 42:17

**part** 7:4,10 8:4 20:17 49:7 64:13 72:6 74:16 80:12

**part-time** 6:16 7:1

**parts** 71:11

**pass** 30:2 40:10 114:17

**passing** 106:21

**password** 19:20

**past** 100:23 111:1 115:20

**patient** 10:24 12:24 29:21 35:24 41:1 45:24 46:3 62:21 65:6 72:23 73:9,13, 15 77:23 79:3 81:19 84:23 86:12 89:1 90:19 91:16 92:4 93:9,10,21 95:21,22 102:16 103:20,25 104:11, 25 105:15 113:16 117:22, 25 122:6

**patient's** 73:22 79:21

**patients** 8:7 10:9 11:9,12, 24,25 12:14 14:22 19:3 21:21 22:6 27:3 28:14 49:7 110:23 115:3

**pattern** 93:2

**peak** 42:4

**penetration** 116:14

**people** 18:10 21:10 24:22 26:13 28:3 29:22 30:20 37:2 47:9 57:1 61:19 83:21 84:4 93:4 97:5 100:2 121:12,23

**percent** 78:13 95:25

**percentage** 74:13

**perform** 26:14

**period** 9:12 10:6 16:3 52:4 60:3 65:6 88:13 101:1 106:10,22 115:25

**periodically** 49:10 97:9

**person** 41:24 42:2 43:20 53:21 61:23 68:18 87:20 88:3 94:18 100:24 101:17

**person's** 87:18

**personal** 26:6 119:9

**personally** 28:23

**phone** 15:6,8 24:14 29:1

**photographs** 103:19

**Physical** 105:10

**physiological** 57:8

**picture** 43:1 65:2

**pinpoints** 32:25

**place** 8:10 15:23 18:6 20:16 99:25 100:8 114:15

**plaintiff** 3:3 120:25

**play** 35:15

**pneumonia** 107:24 108:6

**point** 35:1 46:6 47:23 55:2 56:17 61:25 82:2,14,20 86:7,15 88:20 89:3,9,11,12 91:6 96:14,22 112:14 120:11

**policies** 20:14,15,21 38:20

**policy** 62:10,17

**population** 51:2 56:10,11, 14 97:4 102:21 108:20 109:5

**possession** 107:6

**possibilities** 88:24

**possibility** 63:21 67:14 88:12

**POST** 25:5

**potential** 53:17

**potentially** 115:14

**practice** 29:25 31:13 39:23 57:6 74:4 122:5

**practitioners** 15:10

**prebooking** 16:24,25 27:16

**pregnant** 17:9 20:9

**preparation** 43:8

**prescribe** 95:6 102:8

**prescribed** 119:14

**prescription** 119:22

**presents** 63:18

**pressure** 41:18,20 59:24 60:5,11 61:2,11,17,22 65:21 78:5 81:12 82:7

**pressures** 22:6

**pretty** 18:6 23:17 30:23 39:15 45:15 49:15

**previously** 63:11

**Price** 4:1

**prior** 7:10 45:10 56:4 58:13 71:13 73:16,23 79:9 115:15,22 119:25

**priority** 49:4,10,15

**prison** 12:4 13:4 54:5 92:16 100:2 115:12

**private** 13:3 31:22

**privy** 71:4,7

**problem** 99:9

**problems** 27:19 32:8 40:19 41:16 75:12,21,23 76:3 115:19 116:6

**procedure** 20:10

**procedures** 5:17 20:14, 15,21 62:10

**proceeding** 4:4

**process** 31:3 56:9,17,18 76:21

**processed** 37:19

**processes** 5:17

**processing** 32:20 35:6

**progressed** 81:8

**proper** 26:23

**protocol** 95:21 99:24 100:11,13,20

**provide** 54:7 94:14

**providers** 18:11

**psychological** 57:12,13

**psychologists** 10:5 11:20

**pull** 52:2,3

**pulled** 32:4 35:22 52:6

**pulse** 60:7,8,20 61:6 101:25

**pupils** 79:21 80:14

**Purgatory** 6:1,12 7:3,6,24 37:1

**purpose** 49:5

**push** 118:12

**put** 11:7 14:2,22 19:19,24 20:2,8 21:6,22 22:11 27:10 30:4 31:2 45:24 47:1 48:11,17,20 58:16 59:13 70:6,21,23 72:8 76:23 77:3,4,9 89:1 99:24 119:24

**puts** 70:1,20

**putting** 56:14 71:16 72:1

## Q

**question** 4:7,22 26:3 35:7 46:16 52:25 75:5,14 84:8 87:10,11,14 88:2 94:9 103:7 121:16,23

**questionnaire** 75:18

**questions** 5:13,15,18 17:3 33:2 34:13 53:14,17 57:21 70:23 74:11 75:24 81:4,10 85:22 98:7 103:9 110:11, 19 118:19,21

**quick** 39:15

**quicker** 22:3 41:25 42:1

**quiet** 45:16 46:12

**quietly** 96:2

## R

**raised** 74:6 76:13

**range** 15:14 59:25 60:23 66:3 78:18

**rate** 40:19,23 41:9 53:5 60:7,20 61:6,12,18,20,21 66:3 82:8 95:10,24,25 96:9

**rating** 53:1

**Rationale** 45:23

**reactive** 34:24 79:22

**reacts** 80:17

**read** 106:5 122:13

**Reading** 122:18

**real** 83:21

**reason** 30:21 49:8 69:16 72:12 80:4,6,7 96:24 120:12,21

**reasons** 4:19 67:2 116:9

**reassess** 65:7

**recall** 42:20 50:3 52:20 57:16 60:1 74:3,7,25 75:6, 7 90:24 102:3 103:18 115:16 116:25 120:7

**receive** 6:8

**received** 102:21 106:12,14 107:19 110:21 120:12

**receives** 99:9

**receiving** 94:4 117:19 118:2,9

**recently** 17:7

**Recess** 62:7

**rechecking** 80:12

**recites** 109:21

**recognize** 43:12,16 48:2, 24 49:1 55:20 63:4 71:19

**recognized** 46:6 47:24

**recognizing** 32:12

**recollection** 115:4,11 116:23

**recommend** 82:18,22 91:20

**recommendation** 91:9,11

**recommended** 46:9 89:15

**recommending** 64:14

**record** 3:9 4:12 30:9,14 57:2 58:13 62:8 64:5 71:3 76:14 106:19 107:22,24 119:4,6 120:5,9

**recorded** 39:4,6 44:7 106:18 109:11

CROWSON vs WASHINGTON COUNTY

April 17, 2018

Michael T. Johnson

**records** 16:3,4 19:15
31:10,14,18 43:5,16 51:13,
18 52:1 59:12 72:5,8,9
77:13 92:6,10 107:4,7,10,
11,15 108:4,9

**Red** 6:16 8:2,5,9

**refer** 18:18 27:15 28:9,13,
20 29:15 47:20 119:24

**reference** 75:3

**referral** 112:24

**referred** 14:10 18:11 30:16
57:1,2,4 79:17 112:20

**referring** 35:13 46:23
56:23 119:25

**reflects** 88:8

**refused** 105:8

**refusing** 54:19

**regard** 32:11

**Regional** 6:16,19 7:15,19
73:7 107:4,6

**register** 78:15

**registered** 6:6 8:14

**regularly** 74:21 109:7

**regulation** 31:24

**regulations** 31:22

**rehab** 8:11

**related** 63:25

**relation** 3:19 26:24

**relationship** 25:15,17
73:19

**relationships** 25:7

**released** 107:16

**rely** 54:7 73:15

**remember** 45:14 46:11
52:18 56:3 57:22 59:10
71:12 79:8 101:5 102:1
104:1,7 111:4,16,20 114:2,
5

**reminder** 4:3

**remote** 92:13

**removing** 23:9

**renew** 9:2

**repeat** 50:21 103:7

**rephrase** 4:25

**report** 44:22 83:1 109:23
115:1

**reported** 45:18 81:12 82:4
86:5 113:18

**represent** 16:2 44:25
59:11 70:11 77:6 110:17

**request** 12:21 21:22 31:2
107:10,11

**requested** 107:8

**requests** 11:7 14:2 22:4

**required** 9:18 29:23,25
99:4

**requirement** 9:6

**requires** 4:14 8:16 68:8,19

**reserved** 46:13

**residents** 24:18

**Respiration** 78:7

**respirations** 78:8 96:1

**respiratory** 66:16

**respond** 10:8 23:20 39:14
57:20 66:15 67:5,22

**responded** 81:16

**responding** 70:22

**response** 43:15 44:17
75:13

**responsibilities** 16:22
17:20 30:18

**responsible** 50:17

**responsive** 66:9,10,15
67:4,20 68:8

**rest** 24:8

**restate** 92:8

**resting** 66:3

**restrained** 23:23

**review** 16:3 51:13,17,24
52:7 72:9

**reviewed** 43:4,7

**reviewing** 45:15

**revoked** 8:25

**Richard** 43:11

**risk** 41:9,10,11

**RN** 32:13 99:4

**role** 28:5

**roll** 68:5

**room** 7:17 31:10 38:9
66:22,24 67:3,21 73:13
82:2,19 91:12 99:17 103:3

**rooms** 21:5,8

**rotating** 12:12

**rounds** 17:23 24:10,11
115:2

**route** 55:5

**routine** 49:8

**rude** 4:18,19

**rule** 78:21 81:14,18 107:24
108:6

**run** 27:19 61:20

**running** 78:11

**runs** 60:9

**Ryan** 16:5,17 77:19 89:12
94:21 108:18 109:4

**S**

**safety** 45:24 46:3

**salad** 35:9

**sat** 78:13

**satisfied** 84:12

**saturation** 78:14 95:24

**Saturday** 15:25

**Scale** 38:25

**scan** 37:13

**scanned** 107:1

**scarring** 81:20 116:9,12,
14

**scars** 116:16,24

**schedule** 12:12 15:1 49:7
50:20,22,25

**scheduled** 19:1 49:18,21

**scheduling** 18:4

**school** 8:18 32:14

**Schriever** 3:7 50:6,9 85:10
108:1,14 110:1 116:17
118:23 119:4,8 122:10,22

**scope** 48:3 63:15

**score** 38:22

**scores** 38:24

**screening** 27:16

**seconds** 23:1

**security** 10:25

**seek** 54:6

**seizure** 41:2,4,9

**send** 36:8,15 37:20 38:14
39:2 67:2,6,8 82:19 83:10
89:3,9 90:19,21 91:4,11
93:1 94:25 103:2

**sending** 67:21

**sends** 70:16 90:9

**sense** 4:9 5:4 25:18 35:10
54:21,25 67:18 70:25 76:8,
19,22 81:9 100:12

**separate** 28:24 44:8 48:14
79:20,24

**served** 42:10

**serving** 77:23

**set** 21:5 108:24

**setting** 10:18 73:22 84:21,
22

**severe** 101:19

**severity** 38:2,3,16,23 53:6

**shakes** 40:20,21 41:6
53:11 101:7,19 111:8

**shaking** 95:12 101:22

**Shave** 51:8

**sheriff's** 67:25 122:19

**shift** 12:7 15:19,20 17:15
21:21 24:8 30:3 47:4,5,13
80:19 82:13,25 85:12,13
97:9 109:8 114:16

**shifts** 12:6,8 47:14 86:1

**Short-term** 104:3

**showed** 120:9

**shower** 51:6

**side** 35:4 77:17

**sign** 49:2 80:9 122:13

**signs** 30:6 35:25 36:5,18
37:24 40:19 41:14 53:9,10
59:22 60:2 63:4 65:3,14
68:15 69:14 82:6 88:17
96:2 101:8,25 104:18
109:7,10 111:7

**similar** 93:2

**similarity** 93:24,25 94:2

**simple** 58:2,22 59:15
69:15 85:4

**sir** 110:17 118:20 122:12

**sit** 44:20 65:10 114:2

**site** 15:4

**sitting** 60:20

**situation** 32:1 55:22 68:19
69:12 73:13,14 83:17,23
90:1 92:1 93:22 94:7

**situations** 94:19

**skip** 46:14

**sleep** 24:19

**sleeping** 24:25 96:2

**slow** 32:20 35:11 121:22

**slow-acting** 121:12

**slower** 66:19

**slurred** 35:11

**smuggled** 98:9 102:22

**snack** 20:10

**Social** 47:22

**socialize** 51:11

**solid** 86:14

**sort** 67:15

**sounds** 16:12 82:5 114:24

**South** 122:19

**space** 21:9

**span** 100:5

**speak** 33:2 54:22 90:15

**speaking** 49:13 65:25

**specific** 5:18 14:23 19:23
38:10,15 64:25 65:1

**specifically** 14:3 21:15 26:21 47:1 53:17 56:12 101:6 102:11 112:6 113:4

**spectrum** 17:10 64:18

**speculate** 86:19,20

**speculating** 86:23

**speculation** 25:22 26:5 58:19 83:6,13 84:15 87:25 89:7 90:7,13 97:15,21 99:13,21 100:16 116:17 119:16,20 120:24

**speech** 32:19 35:11

**spell** 13:14 79:6 81:11

**spend** 12:19,22 72:6

**spent** 21:20

**Spillman** 19:18,25 20:3,11 31:6 72:5,8,9 77:7,8,10 92:16 110:6,8

**split** 27:6

**stable** 104:17,18

**stack** 69:25

**staff** 26:9 46:15,18 47:4,10 97:8 111:1,4,11,21 115:12

**staffed** 113:17

**staffing** 15:23

**stamp** 80:2,3

**stand** 46:1,15

**standard** 75:17,18

**standards** 52:12,25

**standing** 24:21

**stands** 46:17

**start** 57:4 68:5 95:20 97:17 98:5 112:7

**starts** 44:14

**state** 3:8 9:19 11:4 13:8 14:1,6 30:8 35:21 67:13

**stated** 82:24

**statement** 70:11

**states** 59:12 103:25 107:24 112:12 117:22

**station** 20:18 21:1,3

**status** 62:12,13,21 63:19 64:11 113:16

**stay** 13:24 17:23 35:2 36:23 67:12

**stays** 12:12 13:25

**stick** 32:23

**stories** 24:18

**strength** 106:1

**stress** 28:2

**stressed** 61:24

**stroke** 33:17 63:24 64:20

**struggles** 105:16

**stuff** 11:2 15:2 19:23 56:7

**subjective** 30:9 104:6

**submit** 12:21 28:22 97:24

**submitted** 122:18,21

**substance** 17:5 63:24 96:9,13 97:13,19 98:2 118:6

**substances** 98:8 120:14

**suffering** 40:16 110:23

**Sunday** 15:25

**supervisor** 27:1 28:17 57:5

**supplies** 37:17

**supposed** 106:4

**surprise** 58:6,17,21 59:14

**surprised** 58:9

**suspect** 39:20

**suspecting** 104:4

**suspended** 8:24

**suspicion** 76:10

**SW** 47:20,21

**sweating** 101:7

**sweaty** 101:10

**swelling** 34:8 65:10,13

**switch** 40:12

**sworn** 3:4

**symptom** 101:14

**symptomatic** 41:1 97:22

**symptoms** 35:25 40:21 41:12 42:4 52:12 53:1,6,10 54:11 63:4 64:2 67:13 70:25 84:18 96:2 98:18,21 103:6 109:6

**system** 70:21

**Systolic** 60:18

**T**

**takes** 23:1,17,18 69:24

**taking** 28:13 56:14 93:8 122:15

**talk** 28:4,23 30:25 31:23 35:22 40:18 76:7,18 90:16

**talked** 35:6 71:10 72:6,17 111:21

**talking** 16:13 27:9 31:4 36:12 71:22 76:6 87:2 92:22 108:10

**tapered** 106:9

**task** 11:6 28:22 29:4 49:12

**tasks** 9:16 22:9 49:6

**teaching** 9:5

**temperature** 78:11

**ten** 12:23 21:24 23:4,8

**term** 27:9

**terminology** 26:23

**terms** 63:15

**testified** 3:4 53:24 110:21, 24 116:7

**testify** 4:6,7

**testimony** 5:3 58:13 80:10 112:23

**therapist** 26:22 27:6

**therapist's** 28:5

**therapists** 11:16,17

**thing** 10:10 27:10 34:25 41:3 64:25 65:1 94:5 98:10 114:18

**things** 10:2,4 11:7 12:2 16:9 19:21 27:14 28:2 32:15 33:8 48:14 49:6 63:20,22 64:2,9,15 67:13 68:5 73:8 88:12 96:7,20 97:11 98:23 113:9 114:3,6

**thinking** 56:2 98:25 99:5

**thought** 35:8 48:16 56:16 91:6 98:17 103:1 105:17

**Thursday** 15:1,21,24

**time** 5:6 6:17 7:4,11 8:4,7 9:7,12,23 10:11 12:18 16:3,8,11,15,19 17:8,17 19:16,17 21:20 22:8,25 23:5,13 26:15 27:2 30:22 31:20 34:17 36:24 40:4 41:2 42:6 43:4 47:7 52:4 55:14 60:3 65:6 71:18 74:12,13 75:10 78:12 80:1 81:11,23 83:8 85:14,17 86:20 89:22 90:14,15 93:20 95:16,18 96:2 97:3 98:7 100:4 101:9 106:22 107:11 109:11 113:15,21 115:25 116:2 118:2,25 119:11

**timeframe** 115:18 116:3

**timeline** 117:4

**times** 7:8 9:11 18:4 23:21, 22 24:20,24 28:3 29:6 30:8,16 36:16 38:8 39:2 40:20 41:7 42:23 45:2 47:8 70:3,6 76:9 98:8 111:18 122:7

**timing** 37:25

**Tiny** 61:8

**Todd** 3:10

**toe** 32:23

**told** 58:7 59:13 70:18 78:1 79:12 82:15 111:10 113:1

115:5 120:20

**tolerated** 95:22

**ton** 18:5

**tongue** 32:24

**tools** 33:3

**top** 43:10,13 49:10 110:6

**total** 106:7

**totally** 57:23 100:25

**touch** 17:23 101:22 106:24

**town** 15:11

**track** 33:1 35:8 83:8

**tracking** 35:2

**tract** 64:8,19

**train** 35:8 105:17

**trained** 53:2,7 63:4,8 66:12,14

**training** 9:9,15,17 24:4 25:5 26:13,20 32:11 52:18 62:20 63:3 64:13 110:22 112:1

**trainings** 9:14,25 10:3 111:1,5

**transcript** 122:21

**transport** 18:22

**transported** 109:21

**trauma** 33:8,13

**tray** 79:14

**treat** 37:1

**treated** 54:14 89:18

**treating** 40:4 115:17

**treatment** 36:25 37:3 54:19 55:21 96:5 105:8

**tremens** 41:3,5,8,13 53:10 95:15 101:4,16 102:2 111:8

**trespassed** 27:19

**Trevor** 109:13,25

**trick** 5:2

**triggers** 27:23

**trouble** 116:8

**trust** 83:18

**truthful** 120:16

**Tuesday** 15:1

**turned** 58:8

**twenties** 3:21

**Twenty** 78:8

**Twenty-five** 105:25

**type** 8:10 10:22 30:4 48:24 49:1 77:8,11

**types** 10:2,6 15:12 57:21

CROWSON vs WASHINGTON COUNTY
April 17, 2018
Michael T. Johnson

**typical**  12:6,18 17:13 21:20 22:16 57:17 61:19

**typically**  14:20 22:19 29:14,17 39:14 41:23 42:4 57:9

**U**

**uh-huh**  4:10,11,13 13:13 24:5 34:14 42:15 61:9 78:4,9 81:5

**uh-uh**  4:13

**umbrella**  27:10

**unable**  56:18 59:15 69:15 79:8

**unconscious**  66:21 67:19

**understand**  4:23 8:13 73:21 76:4 87:9,14 93:9,25 94:1 116:11

**understanding**  8:15 41:22 42:3 76:20 91:1 105:1,2,21 112:8 116:15 117:23,25 121:11,15,18 122:1

**underwear**  58:16 59:14 70:1,7,22 71:16 72:1

**unit**  18:17

**unresponsive**  66:23

**untruthful**  120:13

**upset**  28:4 35:19

**upstairs**  58:8

**upwards**  17:16

**urinary**  64:8,19

**user**  116:5

**usual**  60:8 106:9

**Utah**  3:25 5:22 6:7 9:7,19 122:20

**UTI**  63:25 64:6

**UTIS**  64:3

**V**

**vagueness**  82:22 84:9 87:1

**variation**  5:14

**varied**  6:24 15:22 65:23,24

**varies**  12:5 17:14 22:18 28:21 61:21 67:1

**vary**  22:10 61:22

**vegetarian**  19:23

**vein**  116:13

**veins**  116:14

**verbal**  117:22

**verbalize**  79:3 104:14 117:12

**verbalized**  104:25 105:1 117:25 118:1

**verbally**  29:9 30:3 66:15

**verify**  120:19

**versus**  10:16

**video**  103:19

**view**  73:22 99:8

**visit**  31:16 105:17

**visited**  51:14

**visiting**  17:19

**visits**  14:1

**vital**  30:6 36:5,17 40:19 41:14 49:2 53:9 59:22 60:2 65:3,14 68:15 69:14 80:9 82:6 88:16 101:7,25 104:18 109:7,10 111:6

**vitals**  78:15 80:4

**VU**  105:1

**W**

**wait**  36:7 65:5 86:25

**waiting**  24:21

**walk**  22:22 58:4

**walked**  58:8

**wanted**  46:19 72:11 81:17 118:24

**warrant**  56:13

**Washington**  122:19

**watch**  10:7 28:8 40:22 59:3 88:13,16 108:2 111:6, 23

**watched**  88:9

**watching**  80:18

**ways**  28:24 64:14

**WCSO**  43:11

**week**  11:4 13:9,12,21 14:19,23 18:18 19:2 43:6 54:12 96:23

**weeks**  56:4 73:16,23 78:3

**West**  122:20

**whack**  60:14

**Whichever**  106:21

**wife**  83:15,22

**wiggle**  32:24

**Wight**  13:14 84:7 110:12, 16,17 118:19 121:1 122:11

**Wilberg**  4:2

**wise**  98:7

**withdraw**  118:13

**withdrawal**  33:25 34:2 40:13,16 42:4 52:12 53:1,6 96:4 98:18,20 99:24 100:9, 20 110:23 118:3

**withdrawals**  41:23 97:18 98:13 111:11,12,13 118:4

**woken**  24:20

**word**  35:9 68:14

**words**  54:3 99:23 114:3

**work**  3:24 6:17,19,22 7:18 12:7 27:6 33:10 51:16 59:8,10 71:12 79:9 121:19 122:2,8

**worked**  3:21 5:25 6:11 7:16,21 49:24

**worker**  47:22

**working**  8:2 9:7 11:25 25:17 34:20 49:22,23 50:1 51:23 73:7 108:19

**workload**  12:3 14:22 27:7

**works**  27:5 76:21

**workweek**  12:9

**Worlton**  26:16 28:11 46:4, 9 56:23 57:4,9 79:17,19 103:22 112:20

**Worlton's**  26:19

**worry**  41:3 50:11

**worst**  52:24

**write**  31:19 76:16,19

**written**  38:19 52:8

**X**

**x-ray**  81:14,18 107:23 108:5

**x-rays**  18:10

**Xanax**  122:7

**Y**

**year**  9:4,10 10:13

**years**  3:18 5:24 6:2,24 7:6, 21,22 10:14 13:22 38:7