IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| MARTIN CROWSON,<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>WASHINGTON COUNTY, UTAH, CORY C. PULSIPHER, acting Sheriff of Washington County, JUDD LAROWE, and MICHAEL JOHNSON,<br><br>　　　　　　　　Defendants. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 2:15-cv-00880-TC |

　　　　While an inmate at the Washington County Purgatory Correctional Facility, Plaintiff Martin Crowson began suffering from symptoms of toxic metabolic encephalopathy, a degenerative neurologic disorder caused by exposure to toxic substances. Rather give him medical care, medical staff wrongly assumed that he was withdrawing from drugs or alcohol and placed him in an observation cell for seven days without treatment. Mr. Crowson brings claims under 42 U.S.C. § 1983, alleging that the lack of medical care violated the Eight Amendment's ban on cruel and unusual punishment, as applied to him as a pre-hearing detainee by the Fourteenth Amendment. The remaining Defendants in the case—Michael Johnson (a nurse), Dr.

Judd LaRowe, and Washington County—have moved for summary judgment. For the reasons below, the court denies their motions in most respects.

## BACKGROUND FACTS

This case arises from Mr. Crowson's stay in the Washington County Purgatory Correctional Facility (the Jail) from June 11, 2014, when he was booked for a parole violation, until July 1, 2014, when he was taken to the hospital for what would be diagnosed as metabolic encephalopathy.

On June 17, 2014, Mr. Crowson was placed in solitary confinement, known as the "A Block," because of a disciplinary charge. On the morning of June 25, while still in solitary confinement, Jail Deputy Brett Lyman noticed that Mr. Crowson was acting slow and lethargic. The deputy alerted Defendant Michael Johnson. As a registered nurse, Nurse Johnson could not formally diagnose and treat Mr. Crowson. His role was to assess inmates and communicate with medical staff who could make diagnoses—in this case, Jon Worlton, a physician assistant (PA), and Judd LaRowe, the Jail's physician.

Nurse Johnson evaluated Mr. Crowson that morning. He noted normal vital signs, but also memory loss: Mr. Crowson could not remember the kind of work he did before his arrest. Nurse Johnson instructed jail deputies to move Mr. Crowson to a medical observation cell, and entered a request in the medical recordkeeping system for PA Worlton to conduct a psychological evaluation.

While being moved to the medical observation cell, another deputy, Fred Keil, noticed that Mr. Crowson appeared unusually confused. Deputy Keil performed a body cavity search on

Mr. Crowson; when ordered to re-dress himself, Mr. Crowson first put on his pants, then put his underwear on over his pants.

Nurse Johnson checked Mr. Crowson again that afternoon. He observed that Mr. Crowson's pupils were dilated but reactive to light, and that Mr. Crowson appeared alert and oriented. He left the Jail at the end of his shift without conducting further physical or mental assessments, and without contacting Dr. LaRowe. PA Worlton never received Nurse Johnson's request for a psychological examination and, according to the Jail's medical recordkeeping system, no medical personnel checked on Mr. Crowson for the next two days.

Nurse Johnson returned to work on June 28 and visited Mr. Crowson in the early afternoon. Mr. Crowson seemed confused and disoriented and had elevated blood pressure. He gave one-word answers to Nurse Johnson's questions, and understood, but could not follow, an instruction to take a deep breath. After his visit, Nurse Johnson relayed his observations to Dr. LaRowe by telephone. Dr. LaRowe ordered that Mr. Crowson undergo a chest x-ray and a blood test. The blood test, known as a complete blood count, could have detected an acid-base imbalance in Mr. Crowson's blood, a symptom of encephalopathy.

Mr. Crowson never received the x-ray or the blood test. Nurse Johnson tried to draw Mr. Crowson's blood on June 28, but couldn't because of scarring on Mr. Crowson's veins and because Mr. Crowson would not hold still. Nurse Johnson reported his unsuccessful attempt to Dr. LaRowe, who made no further attempts to diagnose Mr. Crowson.

On the morning of June 29, Nurse Johnson again took Mr. Crowson's vital signs and noted an elevated heart rate. He also observed noted in the medical recordkeeping system that Mr. Crowson was still acting dazed and confused, and was experiencing delirium tremens, a

symptom of alcohol withdrawal. He again reported his observations to Dr. LaRowe, who prescribed Librium and Ativan—medicines used to treat substance withdrawal—and instructed Nurse Johnson to administer a dose of Ativan. An hour later, Nurse Johnson checked on Mr. Crowson, who was sleeping, and noted that his vital signs had returned to normal.

Nurse Johnson visited Mr. Crowson again that afternoon. He noted that Mr. Crowson was better able to verbalize his thoughts and that his vital signs remained stable. But Mr. Crowson again reported memory loss, telling Nurse Johnson that he could not remember the last five days. Nurse Johnson, who still assumed that that Mr. Crowson was suffering from substance withdrawal, told Mr. Crowson that he was in a medical observation cell, and that he would begin taking medication to help his condition.

The following day, Nurse Ryan Borrowman was assigned to the medical holding area. Nurse Borrowman first saw Mr. Crowson on July 1 and noted that his physical movements were delayed and that he struggled to focus and would lose his train of thought. As Nurse Borrowman recounted in his declaration, "[d]ue to the severity of [Mr. Crowson's] symptoms and the length of time he had been in a medical holding cell, I immediately called Dr. LaRowe for immediate medical care." (Decl. of Ryan Borrowman ¶ 9 (ECF No. 67).) Dr. LaRowe ordered Nurse Borrowman to send Mr. Crowson to the hospital, and Mr. Crowson was transported to the Dixie Regional Medical Center.

The parties' summary judgment briefs allude to, but do not explain, Mr. Crowson's circumstances before and after his incarceration at the Jail. The amended complaint refers to a hospitalization at Dixie Regional Medical Center "a few weeks before being arrested and detained" at the Jail, and states cryptically that medical history "would have revealed to Facility

4

staff that Crowson should not have been given any drug categorized as a benzodiazepine" (such as Librium). (Am. Compl. ¶ 37 (ECF No. 7).) The hospitalization appears to have been the result of a heroin overdose. (Dep. of Martin Crowson at 5:15–6:19, 49:19–22 (ECF No. 66-2) [hereinafter "Crowson Dep."].)

The parties also do not discuss the after-effects of Mr. Crowson's encephalopathy. According to the amended complaint, Mr. Crowson remained in the hospital until July 7, 2014, and continued to suffer from "residual effects of encephalopathy, liver disease, and other problems." (Am. Compl. ¶ 43.) He testified in his deposition that he spent months recovering at his mother's house in Hooper, Utah before returning to the Jail on September 7, 2014:

> And then I really don't have a memory for like the next two-and-a-half months until my brain—it's like my brain checked out sometime. Because I guess—I guess I was still eating food and I was still doing stuff because—and my mom and my girl was changing my diaper, and my little brother. They were changing my diaper the whole time I was in Hooper until like—I don't even—I don't even—I can't even say necessarily a certain time that I checked back in to my brain locker.

(Crowson Dep. at 19:7–15.)

## PROCEDURAL BACKGROUND

Mr. Crowson filed this case against Washington County, the Jail and Jail personnel (including Sheriff Pulsipher in his individual and official capacities), alleging negligence under state law, violations of the Utah Constitution, and violations of the Eighth and Fourteenth Amendments. A number of parties and claims have already been dismissed, both by court order and stipulation of the parties. Most recently, the court, at the December 19, 2019 hearing on the present motions, dismissed PA Worlton from the case because of Mr. Crowson's failure to serve

5

him. Mr. Crowson's only remaining claims are his § 1983 claims against Washington County (including Sheriff Pulsipher in his official capacity), Nurse Johnson, and Dr. LaRowe.

These remaining Defendants have moved for summary judgment. Nurse Johnson and Dr. LaRowe argue that their care did not violate constitutional standards, and that they are, consequently, entitled to qualified immunity. Washington County[1] seeks summary judgment on the grounds that none of its employees committed an underlying constitutional violation, and that Mr. Crowson cannot show that a County policy or custom caused Mr. Crowson's injuries.

The Defendants also argue that Mr. Crowson's claims should be dismissed because he failed to comply with the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), which requires that prisoners exhaust all available administrative remedies before filing suit under § 1983.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Judgment as a matter of law is appropriate when the nonmoving party has failed to make a sufficient showing on an essential element of his or her case with respect to which he or she has the burden of proof." Koch v. City of Del City, 660 F.3d 1228, 1238 (10th Cir. 2011) (quoting Shero v. City of Grove, Okl., 510 F.3d 1196, 1200 (10th Cir.2007)). When

---

[1] Sheriff Pulsipher only remains in this case in his official capacity, and "an official-capacity suit brought under § 1983 . . . is, in all respects other than name, to be treated as a suit against the entity." Moss v. Kopp, 559 F.3d 1155, 1168 n.13 (10th Cir. 2009). Accordingly, and to avoid confusion about the manner in which he is being sued, the court will omit reference to Sheriff Pulsipher when discussing the liability of Washington County.

evaluating a motion for summary judgment, the court must draw all reasonable inferences in favor of the non-moving party.  Id.

Nurse Johnson and Dr. LaRowe both raise the defense of qualified immunity, so the burden on summary judgment shifts somewhat.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  It provides "immunity from suit rather than a mere defense to liability." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis omitted).  Though the court must still view the evidence in a light most favorable to Mr. Crowson, he bears the two-part burden of demonstrating (1) that Nurse Johnson and Dr. LaRowe violated his constitutional rights, and (2) that the law supporting the violations was clearly established when the alleged violations occurred.  Tenorio v. Pitzer, 802 F.3d 1160, 1164 (10th Cir. 2015).

## ANALYSIS

### Individual Defendants

The Eight Amendment imposes an obligation on the government "to provide medical care for those whom it is punishing by incarceration."  Estelle v. Gamble, 429 U.S. 97, 103 (1976).  "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met."  Id.  And sufficiently egregious failures—those reflecting "deliberate indifference to serious medical needs of prisoners"—violate the Eight Amendment and are actionable under § 1983.  Id.  This constitutional protection "applies to

pretrial detainees through the due process clause of the Fourteenth Amendment." Howard v. Dickerson, 34 F.3d 978, 980 (10th Cir. 1994).

The deliberate indifference test has two parts—one objective, the other subjective. First, "the deprivation alleged must be, objectively, 'sufficiently serious.'" Farmer v. Brennan, 511 U.S. 825, 834 (1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). "[A] medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir.1980)).

The subjective component requires that a prison official "knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. That is, "the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference"—a standard equivalent to criminal-law recklessness. Id.

## I. Sufficiently Serious

Nurse Johnson and Dr. LaRowe argue that Mr. Crowson cannot show that his medical need was sufficiently serious because he "was not known to be suffering from a serious medical ailment by anybody," and "nobody noticed [that he] had a serious injury after being examined by multiple medical personnel." (Cnty. Defs.' Mot. Summ. J. at 12 (ECF No. 66).) Their argument misses the mark.

The determination of whether a medical need is sufficiently serious should not "be made exclusively by the symptoms presented at the time the prison employee has contact with the

8

prisoner." Mata v. Saiz, 427 F.3d 745, 753 (10th Cir. 2005). Rather, the court must consider "the ultimate harm" as alleged by the plaintiff. Id. at 754.

In this case, Mr. Crowson suffered from metabolic encephalopathy, an undisputedly serious condition warranting immediate care. He suffered from debilitating aftereffects for months. A reasonable jury could find that his medical needs were sufficiently serious to satisfy the objective prong of the deliberate indifference test, even absent obvious symptoms or an accurate diagnosis.

**II.    Deliberate Indifference**

The subjective prong of the deliberate indifference test asks whether Nurse Johnson and Dr. LaRowe were aware of a substantial risk of serious harm. "Whether a prison official has the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Farmer, 511 U.S. at 842. While actual knowledge would certainly suffice, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id.

   A. Nurse Johnson

The Tenth Circuit recognizes two ways in which healthcare providers may be deliberately indifferent. "First, a medical professional may fail to treat a serious medical condition properly." Sealock v. Colorado, 218 F.3d 1205, 1211 (10th Cir. 2000). Second, a prison official may "prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." Id. In the Jail's healthcare scheme, Nurse Johnson acted as a "gatekeeper" for further medical care, implicating the second theory of liability.

Nurse Johnson did not know that Mr. Crowson was suffering from encephalopathy. Still, there is evidence that he was aware of the need for prompt medical care. The two deputies who interacted with Mr. Crowson on the morning of June 25 noticed alarming symptoms. Deputy Lyman, who summoned Nurse Johnson, observed Mr. Crowson acting with uncharacteristic lethargy. Deputy Keil recalled that Mr. Crowson was disoriented to the point that he could not properly dress himself.

Nurse Johnson himself noted that Mr. Crowson was "dazed and confused," and "unable to remember what kind of work he did prior to being arrested." (Medical Records at 28 (ECF No. 71) [hereinafter "Medical Records"].) He admitted in his declaration that, despite recording normal vital signs, he "was concerned [Mr. Crowson] may be suffering from some medical problem." (Decl. of Michael Johnson ¶ 11 (ECF No. 68).) But, despite his gatekeeper role, Nurse Johnson placed Mr. Crowson in an observation cell and left his shift without ensuring that Mr. Crowson would receive further care. He did not alert Dr. LaRowe, and PA Worlton never received Nurse Johnson's request for a mental health evaluation. According to medical records, Mr. Crowson did not receive any follow-up evaluation or care from medical staff for the next two days.

When Nurse Johnson returned to work on June 28, Mr. Crowson's symptoms had persisted beyond the expected timeframe for substance withdrawal. Though Nurse Johnson did then alert Dr. LaRowe to Mr. Crowson's condition, he failed to tell Dr. LaRowe that Mr. Crowson had already been in a medical observation cell for three days and in solitary confinement for nine days before that. (See Dep. of Judd LaRowe at 44:1–17 (ECF No. 91-2).) Mr. Crowson is entitled to the inference that Nurse Johnson, by failing to provide even this basic

10

patient history, again prevented Mr. Crowson from receiving an accurate diagnosis or appropriate treatment.

This is not to say that all of Nurse Johnson's conduct suggests deliberate indifference. When Nurse Johnson tried and failed to take Mr. Crowson's blood, he informed Dr. LaRowe—shifting the impetus to the doctor to order Mr. Crowson to the hospital for a blood draw. Under a theory of gatekeeper liability, Nurse Johnson satisfied his obligation to pass on key information to the treating physician. Nonetheless, a reasonable jury could conclude that Nurse Johnson's earlier inactions—the failures to seek medical care and provide Dr. LaRowe with a full accounting of Mr. Crowson's symptoms—amounted to deliberate indifference.

B. Dr. LaRowe

Dr. LaRowe never visited the Jail during Mr. Crowson's stay in the medical observation cell. Still, as Mr. Crowson's treating physician, he may be liable for his "fail[ure] to treat a medical condition properly." Sealock, 218 F.3d at 1211. While Dr. LaRowe "has available the defense that he was merely negligent in diagnosing or treating the medical condition," id., there is sufficient evidence in the record from which a jury could conclude that he instead acted with deliberate indifference.

Nurse Johnson alerted Dr. LaRowe to Mr. Crowson's condition on June 28; according to that day's medical records, Mr. Crowson continued to appear confused and disoriented, gave one-word answers to questions, and had elevated blood pressure. Despite knowing of these symptoms, Dr. LaRowe made only minimal efforts to diagnose Mr. Crowson's condition. He ordered a blood test, an effective diagnostic tool. Yet after learning that Nurse Johnson could not perform the blood draw, he ended his inquiry and wrongly assumed that Mr. Crowson was

11

experiencing drug withdrawals. Without an accurate diagnosis in hand, he prescribed a benzodiazepine drug that worsened Mr. Crowson's encephalopathy.

Dr. LaRowe argues that there is no evidence that he "was aware, drew any inferences, or strongly suspected that Plaintiff could be suffering from encephalopathy or any other serious condition." (LaRowe Reply in Supp. of Mot. Summ. J. at 13 (ECF No. 86).) Instead, he argues that "the undisputed facts show that [he] understood that Mr. Crowson exhibited nonspecific—or vague—symptoms, which could have been characterized any number of diagnoses, one of which being substance withdrawal—a common occurrence in the jail." (LaRowe Mot. Summ. J. at 7 (ECF No. 73).)

In support, Dr. LaRowe cites to Mata v. Saiz, a case in which an inmate suffered a heart attack. A nurse in that case, Donna Quintana, performed an EKG test on the inmate after the inmate reported chest pain, but the test produced normal results. Trusting the test results, she released the inmate from the infirmary with instructions to return if the pain worsened. The panel found that Nurse Quintana had not acted with deliberate indifference because she subjectively believed that the inmate was not suffering a heart attack, and "made a good faith effort to diagnose to diagnose and treat [the plaintiff's] medical condition." Mata, 427 F.3d at 760–61.

Unlike Nurse Quintana, Dr. LaRowe failed to assess, diagnose, or even visit Mr. Crowson. Though he saw reason to order a blood test, he did not follow up to ensure the test occurred after Nurse Johnson's unsuccessful attempt to draw Mr. Crowson's blood. Instead, and despite vague and nonspecific symptoms, he prescribed medication based on his unverified suspicion that Mr. Crowson was suffering from withdrawals. He did not misdiagnose Mr.

12

Crowson, but rather failed to conduct diagnostic tests that would have informed him of Mr. Crowson's medical needs. A reasonable jury could find that Dr. LaRowe's failure to seek an accurate diagnosis amounted to deliberate indifference.

### III.     Qualified Immunity

As discussed above, Mr. Crowson has presented sufficient evidence from which a reasonable jury could find that Nurse Johnson and Dr. LaRowe acted with deliberate indifference. But because Nurse Johnson and Dr. LaRowe raise the defense of qualified immunity, the court must consider whether the alleged constitutional violations were clearly established at the time they occurred—that is, "whether 'the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Estate of Booker v. Gomez, 745 F.3d 405, 411 (10th Cir. 2014) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Id. at 427 (quoting Fogarty v. Gallegos, 523 F.3d 1147, 1161 (10th Cir. 2008)).

As the Tenth Circuit has recognized, "there is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." Mata, 427 F.3d at 749. Further, Tenth Circuit law makes clear that the particular conduct in this case could amount to a constitutional violation. Nurse Johnson is a "medical professional [who] knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition," but who, a reasonable jury could find, "delay[ed] or refuse[d] to fulfill that gatekeeper role due to deliberate indifference." Sealock, 218 F.3d at 1211. Dr.

13

LaRowe "did not simply misdiagnose" Mr. Crowson, he "refused to assess or diagnose [his] condition at all" and simply assumed he was experiencing substance withdrawals. Mata, 427 F.3d at 758. Neither Nurse Johnson nor Dr. LaRowe are entitled to qualified immunity.

**Washington County**

Mr. Crowson also seeks to hold Washington County liable under § 1983. Local governments can be held liable for constitutional violations, but not simply for the unconstitutional acts of their employees. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978). Rather, a plaintiff "must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged." Bryson v. City of Oklahoma City, 627 F.3d 784, 788 (10th Cir. 2010) (quoting Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir.1993)). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick v. Thompson, 563 U.S. 51, 61 (2011).

A plaintiff must also "demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 407 (1997). Importantly, the deliberate indifference standard used to determine municipal liability differs from the deliberate indifference standard used to determine individual liability. With individual liability, "deliberate indifference is a subjective standard requiring actual knowledge of a risk by the official." Barney v. Pulsipher, 143 F.3d 1299, 1308 n.5 (10th Cir. 1998). But here, "[i]n the municipal liability context, deliberate

14

indifference is an objective standard which is satisfied if the risk is so obvious that the official should have known of it." Id.

Mr. Crowson alleges that Washington County is liable for its failure to train Jail nurses—specifically, for its failure to promulgate written policies for Jail nurses to follow. To prevail on such a failure-to-train theory, a plaintiff must typically show "a pattern of tortious conduct by inadequately trained employees." Brown, 520 U.S. at 407–08. The "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." Id. at 407 (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 390 n.10 (1989)).

Mr. Crowson has not alleged—or proffered evidence to show—a pattern of constitutional violations. But "in a narrow range of circumstances," a pattern of violations may not be necessary to establish liability. Id. at 409. Instead, a single violation "may be a highly predictable consequence of a failure to equip [municipal employees] with specific tools to handle recurring situations." Id. "The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." Id. at 409–10.

Based on the evidence submitted by the parties, the County's healthcare policies at the time of Mr. Crowson's incarceration seem severely lacking. There are no written policies in the record. Instead, the County describes the Jail's general customs and practices for providing

medical care to inmates using the deposition testimony of various medical personnel.[2] Dr. LaRowe was responsible for diagnosing and treating inmates, but only visited the Jail one or two day a week, for two to three hours at a time. He relied heavily on the Jail's deputies and nurses. When an inmate was placed in a medical observation cell, Jail deputies observed inmates at least once every thirty minutes, and would notify a Jail nurse when "this guy is not acting right or this guy is having problems." (Dep. of Michael Johnson at 32:4–10 (ECF No. 76-7).) Jail nurses—who, by law, could not diagnose inmates—generally spent five to ten minutes with the inmate once every twelve-hour shift, to take the inmate's vital signs and conduct follow-up checks. If an inmate exhibited symptoms of a cognitive problem (as did Mr. Crowson), the nurse would inform Dr. LaRowe and PA Worlton, who, in addition to his role as the Jail's health services administrator, handles mental health care.

Within this framework, nurses were left largely to their own devices. Nurse Johnson testified that the Jail has no guidelines or written policies for assessing brain injuries, such as the type suffered by Mr. Crowson. He testified that Dr. LaRowe provided training for alcohol withdrawal, but that he could not remember a protocol or standards for assessing withdrawal symptoms (the parties have not cited to a written policy in the record). PA Worlton testified that the Jail does not have a written policy or procedure for nurses to follow when placing an inmate in an observation cell to detox, or a written protocol for evaluating inmates once in detox. Additionally, Dr. LaRowe testified that the Jail had no set policy to determine when an inmate should be transported to the hospital. Such a decision was usually based on a discussion between

---

[2] After the hearing on the present motions, Nurse Johnson and Washington County filed a motion (ECF No. 91) to supplement the record with additional pages of deposition testimony. Mr. Crowson has not filed an opposition, and court will grant the motion.

Dr. LaRowe and the nurses. Remarkably, it appears from the record that Washington County failed to promulgate written policies pertaining to the Jail's core healthcare functions.

A reasonable factfinder could conclude that these policy deficiencies caused Mr. Crowson's injury. Mr. Crowson required immediate hospitalization on June 25, but instead spent days in a medical observation cell with only intermittent medical attention. Later, the Jail's medical staff treated Mr. Crowson as if he were withdrawing from drugs or alcohol, and without a diagnosis in hand. The drug protocol for withdrawal may have worsened Mr. Crowson's actual condition. This maltreatment can be seen as an obvious consequence of the County's reliance on a largely absentee physician, and an attendant failure to promulgate written protocols for monitoring, diagnosing, and treating inmates.[3] In light of these policy deficiencies, the County is not entitled to summary judgment.

**Prison Litigation Reform Act**

As a final matter, the Defendants contend that Mr. Crowson has not complied with the Prison Litigation Reform Act (PLRA), which states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). But the court cannot resolve this issue based on the present record.

---

[3] As an additional basis for county liability, Mr. Crowson challenges County's failure to provide access to medical treatment to inmates in solitary confinement. But Mr. Crowson has not presented any evidence that he suffered symptoms of encephalopathy before June 25, when Deputy Lyman observed him acting strangely and summoned Nurse Johnson. Without such evidence, a factfinder cannot infer that a County policy or custom concerning solitary confinement actually caused Mr. Crowson's injury. Washington County is entitled to summary judgment on this theory of liability.

Though the PLRA requires exhaustion, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones v. Bock, 549 U.S. 199, 218 (2007). The court must evaluate the precise grievance procedures in place at the time of the inmate's detention, see Cantwell v. Sterling, 788 F.3d 507, 509 (5th Cir. 2015), and consider whether the procedures were available to the inmate—that is, "'capable of use' to obtain 'some relief for the action complained of.'" Ross v. Blake, 136 S. Ct. 1850, 1859 (2016) (quoting Booth v. Churner, 532 U.S. 731, 738 (2001)).

Washington County has not provided its actual grievance procedures to the court. Instead, it cites to Sheriff Pulsipher's declaration, in which he gives a general overview of "a comprehensive grievance system" available to inmates:

> Any grievances or complaints are handled by the first line supervisor, and any appeals are handled by the next line supervisor (e.g. a complaint against a deputy would be handled by a sergeant and the appeal would be handled by a lieutenant), after two levels of appeals, an inmate has exhausted their administrative remedies and the issue would be ripe for a lawsuit. I would only receive an appeal for a grievance or complaint if it was made against a chief or undersheriff. Any policy issues related to prisoners, jail staff, or any other issues related to the jail are appealed to me. If an inmate appellant disagrees with my decision, he or she can file a lawsuit.
>
> The grievance policy was always available for inmates to file grievances and complaints to address any type of harm.

(Decl. of Cory Pulsipher ¶¶ 10–11 (ECF No. 69).)

From this bare description, the court cannot determine the process an inmate would use to lodge a grievance, or whether Mr. Crowson could have effectively used the procedure during his incarceration. The Defendants have not met their burden of showing that Mr. Crowson failed to exhaust his available remedies.

**ORDER**

For the foregoing reasons, the court orders as follows:

1. Nurse Johnson's and Washington County's Motion to Supplement the Record (ECF No. 91) is GRANTED;

2. Nurse Johnson's and Washington County's Motion for Summary Judgment (ECF No. 66) is GRANTED IN PART AND DENIED IN PART—Washington County is entitled to summary judgment on Mr. Crowson's § 1983 claim based on its solitary confinement policy (see note 3, supra), but the Motion is otherwise denied;

3. Dr. LaRowe's Motion for Summary Judgment (ECF No. 73) is DENIED; and

4. Defendant Jon Worlton is hereby DISMISSED from this case for Mr. Crowson's failure to effect timely service.

DATED this 19th day of July, 2019.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge