Robert D. Jones, MD
2806 N. 11th Ave
Phoenix, AZ 85007

October 26, 2021

Ryan J. Schriever, JD
The Schriever Law Firm
174 South Main Street
Spanish Fork, Utah 84660

Dear Mr. Schriever:

Re:   Martin Crowson v. Washington County, State of Utah and James
      **District Court** Case No. 2:15-CV-00880-TC

## MEDICAL EXPERT OPINION OF
## ROBERT D. JONES, M.D.

I, **ROBERT D. JONES, M.D.**, the undersigned, declare as follows:

### I.   QUALIFICATIONS

I am currently licensed to practice medicine in Arizona and Utah. I have an inactive license in Montana. I have been certified by the American Board of Family Practice since 1977 (re-certifications in 1983, 1989, 1995, 2001 and 2008) and certified by the National Board of Physicians and Surgeons in 2017 in Family Medicine current until November 20, 2023. From 1990 to 1997, I was the Clinical Director at the Utah Department of Corrections. In this position, I was responsible for overseeing mental health, medical, dental services, substance abuse, and sex offender treatment for adult offenders. From 1997 to 2001, I was the Medical/Mental Health Director for the Montana Department of Corrections. In this capacity, I was responsible for medical and mental health programs for adult and juvenile offenders. From 2001 to January 2004, I served as the Deputy Director over Health Services for the Arizona Department of Corrections. Thereafter, I worked for the Maricopa County Public Health Department and as a regional medical director of occupational medicine clinics in Utah and Arizona. From 2008 to June 2020, I was the Medical Director for the Arizona Department of Juvenile Corrections. I continue to participate in my retirement in national correctional and public health organizations.

I further based my opinions on my knowledge and training as a medical doctor combined with extensive correctional health care experience in jails, prisons, and juvenile correctional facilities. My experiences involve not only providing direct health services to

1

inmates and detainees, but also in administration of correctional health care. My knowledge of national standards and my experience surveying jails, prisons and juvenile facilities for their compliance with those standards further supports my opinions. I have served on the Board of Governors for the American Correctional Association and currently as a member of the Health Care, Substance Abuse, Mental Health and Juvenile Committees of the American Correctional Association. In addition, I am a Certified Correctional Healthcare Provider of the National Commission on Correctional Health Care (NCCHC) and a Past President of the American Correctional Health Services Association. I have assisted with the revision and drafting of health care standards by both the NCCHC and also those of the American Correctional Association (ACA). I am an associate clinical professor in the Dept. of Family Medicine for the University of Arizona Medical School—Phoenix Campus. For more information regarding my qualifications and experience, please see my Curriculum Vitae.

I have been asked to render opinions limited to Mr. Crowson treatment while detained in the Purgatory Jail, Washington County, State of Utah.

**II. I have reviewed the following documents and information:**

    A. Mr. Crowson Complaint;
    B. Mr. Crowson's Medical Records while in the jail;
    C. Mr. Crowson's Medical Records at the Dixie Medical Center, St. George, Utah;
    D. Mr. Crowson's neurological evaluation in July 2014;
    E. Utah State Prison medical records;
    F. Deposition of Jon Worlton, LCSW;
    G. Deposition of Brett A. Lyman;
    H. Deposition of Ryan T. Borrowman, RN;
    I. Deposition of Judd LaRowe, MD
    J. Deposition of Michael T. Jonson, RN
    K. Deposition of Martin R. Crowson, plaintiff;
    L. Jail logs; and
    M. Appeal Ruling from the United States Court of Appeals for the Tenth Circuit.

**III. Based upon my review of the foregoing records and documents, the following is a summary of the pertinent facts and data that relate to my opinions set forth herein:**

- On 09/09/2013 Mr. Crowson underwent an intake screening by RN Joshua Billings.

- On 06/11/2014 Mr. Martin Crowson was booked into the Washington County Purgatory Correctional Facility in Hurricane, Utah due to a parole violation. He underwent an intake screening by Ryan Borrowman.

- On 06/17/2014 Due to a disciplinary violation, Mr. Crowson was placed in solitary confinement.

- On 06/25/2014 Jail Deputy Brett Lyman noticed the Mr. Crowson was acting slow and lethargic and Deputy Dolgner escorted him to booking due to not coming out to eat.  Due to Mr. Crowson's vitals were normal, he was returned to the housing unit.  Officers requested that he be checked by Registered Nurse Michael Johnson.  The nursing assessment by RN Johnson revealed that "Mr. Crowson was "confused" and had a "different affect than is normally displayed," and he was "unable to remember what kind of work he did prior to being arrested."   Mr. Crowson was assessed as having normal vital signs and some memory loss.  RN Johnson was concerned that Mr. Crowson may be suffering from some medical problem."   RN Johnson ordered that Mr. Crowson be moved to a medical observation cell.  Justification for the transfer was "patient safety and further evaluation with J. Worlton" and stabilization.  He was to be checked every 30 mins by booking staff and medical staff each shift.  Under the list of items required to justify his transfer, item "collaboration with MD and HSA (health services administrator) RN Johnson listed "referred for further evaluation with SW." (Presumably Social Work)

- Later that day, 06/25/2014 Jail Deputy Fred Keil moved Mr. Crowson to a medical observation cell but noted that Mr. Crowson appeared "usually confused."  He observed that after a visual body cavity search that Mr. Crowson put on his pants and then his underwear over his pants when instructed to re-dress.  A recheck by RN Johnson later that day revealed that Mr. Crowson had dilated but reactive pupils and that he appeared alert and oriented.  RN Johnson had no further contact with Mr. Crowson nor did he contact Dr. LaRowe about the transfer of Mr. Crowson to the medical observation cell.

- On 06/26-27/2014 Mr. Crowson remained in the medical observation cell but there is no documentation that any medical personnel saw Mr. Crowson who had been placed in medical observation.

- On 06/28/2014 RN Johnson returned to work and saw Mr. Crowson in the afternoon, but had ordered high priority daily vital signs be completed at 08:27AM.  His nursing assessment documented that "Mr. Crowson seemed confused and disoriented and had elevated blood pressure."  At 06:05PM Mr. Crowson apparently refused his "high priority vital signs."  No action was taken and given his mental state such a refusal could not be interpreted as a rational refusal.  Mr. Crowson gave one-word answers to the nurse's questions and understood, but could not follow an instruction to take a deep breath."  RN Johnson believed that Mr. Crowson's symptoms had persisted beyond the expected timeframe for substance withdrawal."  RN Johnson then called Dr. LaRowe and informed him of some of his observations.  He neglected to inform Dr. LaRowe that Mr. Crowson had been in a medical observation cell for three days and that prior to that he had been in solitary confinement for two weeks.   Based on the information provided, Dr. LaRowe ordered a complete blood count, comprehensive medical panel and a chest x-ray to rule out any lung problems.  After one unsuccessful attempt and due to scarring of

Mr. Crowson's veins and Mr. Crowson's "unwillingness to hold still," RN Johnson notified Dr. LaRowe that he could not complete the blood draw. Mr. Crowson "continued to be confused, disoriented and had an elevated blood pressure. Vital signs taken by RN Johnson at 04:24PM revealed a BP of 139/87 and while Mr. Crowson was afebrile, he had a pulse of 188! No further evaluation or response was made to this very significant tachycardia by RN Johnson. None of the ordered tests were completed. Dr. LaRowe did not make any further attempts to establish a definitive diagnosis for Mr. Crowson.

- On 06/29/2014 RN Johnson took Mr. Crowson's vital signs at 07:48AM and noted that his heart rate was 140 which is still a significant tachycardia. RN Johnson recorded, "noted dt's occurring, staffed patient status with MD. (Delirium tremens is a diagnosis not a "symptom" and is life threatening if it is occurring.) Dr. LaRowe order Ativan 2 mg now and then started Mr. Crowson's on a "Librium protocol" and instructed nursing to continue to monitor patient closely. Mr. Crowson was given 2 mg of Ativan. He recorded at 09:43AM that "Mr. Crowson was sleeping with heart rate of 72 and no symptoms of distress/discomfort." Based on the information provided by RN Johnson, Dr. LaRowe prescribed Librium 75 mg twice a day which was to be tapered. An additional visit at 03:36PM by RN Johnson reported that Mr. Crowson was more alert and oriented and able to verbalize more than one-word answers and that his vital signs were stable. Mr. Crowson reported to RN Johnson that he could not remember the last five days. RN Johnson informed Mr. Crowson that he had been in booking during that time due to elevated vital signs, confusion and disorientation. RN Johnson further informed Mr. Crowson that had been given medication earlier and that he would continue to be receiving medication twice a day. Mr. Crowson contracted to take medications as ordered.

- On 06/30/2014 Nurse Ryan Borrowman was assigned to the medical observation area. He apparently was not briefed by RN Johnson as to Mr. Crowson's reason for being there and what had transpired not that as ordered by Dr. LaRowe to "be followed closely."

- On 07/01/2014 at 02:50PM Nurse Borrowman finally assessed Mr. Crowson and recorded that Mr. Crowson "could verbalize in more than just one-word answers but that physical movements were delayed" and that he "still struggles with focusing on the interviewer and will lose his train of thought." Due to the severity of Mr. Crowson's symptoms and length of time Mr. Crowson had been in a medical holding cell Nurse Borrowman, immediately called Dr. LaRowe and Dr. LaRowe ordered that Mr. Crowson be transferred to the Dixie Regional Medical Center in St. George, Utah for more in-depth evaluation." At that hospital, Mr. Borrowman was finally correctly diagnosed. Mr. Crowson had been in a medical observation cell for a week during which three of those days (June 26th, 27th and 30th) he was not seen by any medical personnel nor during that week did Dr. LaRowe ever see Mr. Crowson or examine him. Significantly abnormal vital signs were ignored or not responded to

    appropriately and a nurse's observation of "dt's" would require an immediate transfer to an inpatient setting.

- On 07/07/2014 Mr. Crowson was released from the hospital and spent the next two months recovering at his mother's home where he experienced severe memory loss and inability to focus on problems.

- On 09/07/2014 Mr. Crowson was returned to the Jail. He could not afford to undergo the neuropsychological testing that was recommended while he was at Dixie Regional Medical Center nor could he afford to pay for other recommended treatment. Mr. Crowson underwent an intake screen by RN Borrowman on this date. Even though the jail staff knew that they had sent Mr. Crowson to the hospital, there was no release of information signed to obtain records to understand what had happened to Mr. Crowson while he had been previously detained in the jail.

IV.    **Expert Opinions.**

My opinions in this case are held to a reasonable degree of medical certainty and are based on my education, training, and professional experience, coupled with actual knowledge of the applicable standards of care, as that standard exist for health care providers and municipalities who establish and incarcerate/detain individuals.

    **Opinion 1: During his incarceration at the Purgatory Correctional Facility in Washington County, Utah, Mr. Crowson developed a life-threatening medical condition of toxic encephalopathy. He did not receive medical care that met the standard of care for a jail housing inmate and pretrial detainees or the community.**

    **Basis:** After a review of documents and based on the information provided, it is clear that Mr. Crowson did not undergo an adequate intake history that should have included any recent hospitalizations and other medical conditions. He did not undergo a physical exam by a qualified medical provider at any time during his time in the jail. A completed medical history review and physical examination by day fourteen is usual the standard of care. Mr. Crowson was not provided access to medical care while he was placed in separation and largely any need for medical care rested on non-medical jail deputies. While Mr. Crowson was eventually noted

5

to be disoriented and demonstrating bizarre behavior such as putting on his pants and then his underwear, Mr. Crowson could not perform the simplest of tasks or respond in any way that could be considered to be a rational mind.   At the request of jail deputies and due to their concerns, Mr. Crowson was placed in "medical observation" which by practice and not informed by any policy provided that non-medical correctional officers check on him "every 30 minutes and medical staff once a shift."   There is nothing in policy, procedure or practice that provided parameters for nurses that mandated when to notify the on-call medical provider, Dr. LaRowe.  While the justification guideline for transfer to medical observation listed "notification of MD and HSA," Dr. LaRowe was not notified of the transfer until several days later and the referral to LCSW Worlton was never accomplished during the week that Mr. Crowson was in medical observation.   Even when Mr. Crowson's vital signs were clearly critically abnormal with a heart rate of 188, RN Johnson never contacted Dr. LaRowe.  The following morning when Mr. Crowson heart rate was still rapid at 140 and there were signs of "dt's" (delirium tremors) occurring," Mr. Crowson was not referred to the hospital and given 2 mgs of Ativan.   This persistent tachycardia and symptoms should have required an actual assessment by a physician but apparently were no guidelines or set requirements as to when notification of the provider was required.    Nursing assessments have little value if they do not evoke an appropriate response and the physician is not informed in a timely manner.

> **Opinion 2:**  The Sheriff and other governmental officials hired the nursing staff and contracted with a local physician, Judd LaRowe, MD.  These officials utilized the services of a licensed clinical social worker to administrate the medical and mental health care provided at the Purgatory Correctional Facility.
>
> **Basis:**  Relationship determined from the records.

**Opinion 3:** The Sheriff and governmental officials of Washington County failed to establish and monitor that a system that would ensure that the health and safety of individuals who were incarcerated/detained at the jail was provided.

**Basis:** The inability of the county correctional facility to produce any meaningful policies and procedures that would ensure that an individual had access to a qualified health care provider who could render a correct diagnosis and provider appropriate treatment. These administrative county officials either knew or should have known that failure to provide an adequate system could and did endanger the life of Mr. Crowson and others. The lack of such guidelines outlined in policy and procedure and documented by actual practice is unacceptable and frankly shocking! Given the number of national organizations and their recommended standards to guide county officials in creating and maintaining a functional and effective health care system this was not done. This lack of policy, procedure and actual practices led to a situation where adequate care and evaluation was not provided. Even worse, because of an accepted practice of belief in inaccurate and hearsay information by RN Johnson, the tentative diagnosis made by Dr. LaRowe further endangered Mr. Crowson's life. The treatment ordered based on a "lithium protocol" did not established formal process to be utilized to serially assess Mr. Crowson, had he actually been withdrawing from alcohol and experiencing delirium tremens and having a very significant tachycardia that should have been assessed by an EKG. To accomplish a detoxification process which is a frequent occurrence in jails, there must be close monitoring and documentation, strict criteria for a timely referral to an inpatient setting based on frequent serial monitoring. The lack of a well-established, formalized process should shock the conscience of anyone aware of occurrence of deaths from drugs and alcohol withdrawal. The meager health care system that was in place at the Purgatory Correctional

Facility failed to accomplish the mental health evaluation by Jon Worlton who was the health care administrator and clinical provider for the facility.  Obviously, Mr. Crowson's condition required a prompt evaluation given his observed behavior and serial findings.   Mr. Crowson was never seen by anyone that could provide him with a diagnosis while at the jail.  This clearly demonstrates a situation devoid of the necessary checks and balances to provide and ensure that timely care that is ordered, would occur.    Had the evaluation by Mr. Worlton of Mr. Crowson taken place, it might have led to a timelier referral and recognition of his organic, metabolically caused observed signs and symptoms.   Mr. Crowson was not at liberty just leave the jail to seek care and worse yet it was clear that due to his mental confusion he was incapable of making such a rational decision and the system failed to intervene on his behalf.  There was no effective system in place to deal with Mr. Crowson serious medical condition and to protect his life and to keep him safe.

> **Opinion 4:**  The Sheriff and municipality officials failed in their duty to protect and provide care to Mr. Crowson and they either knew or should have known how horribly lacking the health care system for which they held ultimate responsibility was.   They did not create a functional system nor did they demonstrate sufficient oversight to protect inmates and detainees.   This willful disregard led to the endangerment and actual harm that required hospitalization Mr. Crowson to be hospitalized and for Mr. Crowson's family to provide two months of supportive and rehabilitative care.

**Basis:**  Mr. Crowson never underwent a more extensive medical history and review nor did he ever have a physical examination by a qualified healthcare professional.  The referral by RN Johnson for a psychological evaluation never occurred.   He was denied mental health care even though the nurse felt that it was indicated.  Mr. Worlton in his capacity as health care administrator failed to review the care of Mr. Crowson's care during the week he was in medical observation.  Mr. Crowson while in a medical observation cell was never seen by a

physician.  While nurses are supposed to be limited to conducting nursing assessments, RN Johnson was the sole medical person that provided care for a critically ill patient, Mr. Crowson. RN Johnson failed to recognized the seriousness and failed to take action when on two days Mr. Crowson experienced tachycardia, a very rapid heartbeat.   An electrocardiogram was never done while at the jail.  There was no call to the physician alerting him of a heart rate of 188. RN Johnson recorded in his note that Mr. Crowson was experiencing "dt's" which is most likely stands for delirium tremens which is beyond the scope of a nursing assessment and even with appropriate in hospital treatment would carry a 5 to 15 percent chance of death.   Dr. LaRowe relied upon the information provided by the nurse but although he referenced a withdrawal protocol, it is clear that that it did not occur nor did the nurse believe it required nothing anything more than medications twice a day which he explained to Mr. Crowson.  The medications were ordered in a tapering dose however, given the timeline of Mr. Crowson's detainment, a diagnosis of alcohol withdrawal was highly unlikely.   There is nothing in the record that supports that Dr. LaRowe was aware of that timeline and the doctor failed to determine when Mr. Crowson's last drink occurred or even if it could have occurred.  Failing to care enough to obtain an accurate history is indicative of an indifferent attitude to the treatment of alcohol withdrawal and the critical need to determine if outpatient management was appropriate.   Quite plainly, the facility did not have essential processes to manage outpatient alcohol withdrawal and certainly they failed to recognize the need for immediate transfer to an inpatient setting.  While the diagnosis that was made was incorrect and the treatment provided contraindicated for Mr. Crowson's actual medical problem; there was systemic indifference to the seriousness of the symptoms clearly observed in Mr. Crowson.

The system failed to identify when an evaluation did not occur and to alert staff that it had not happened.   On three of the days that Mr. Crowson was supposed to be being medically check on each shift, he was not seen by medical personnel.   This failure would be critical to know and should have been immediately corrected during the medical observation.    There were no specific guidelines in place and though placement apparently required that the MD and HSA were notified, this was not done by RN Johnson demonstrating his continued indifference to Mr. Crowson's serious medical condition when he placed Mr. Crowson in medical observation. The system relied on non-medical jail deputies to recognize serious medical conditions and relied only nursing assessments to determine the seriousness medical conditions.   There were no clear guidelines as to when notification or referral to an outside urgent /emergent level of care was mandatory.  As the responsible physician, Dr. LaRowe failed to provided nurses with specific guidance as to what he expected and required from them.   It is shocking and a clear demonstration of indifference when a seriously ill individual can be "observed" for a week in the Purgatory Correctional Facility and never be examined by the doctor and not even seen by nursing personnel for three of the days he was allegedly being "observed."   The nurses and officers clearly knew Mr. Crowson was ill and their observations and findings established the seriousness of Mr. Crowson's condition but the system failed miserably in protecting Mr. Crowson.  It seriously doubtful that any competent physician if presented with a patient who is confused, lethargic and tachycardic at a rate of 188, had he been informed of the situation and in which they did not have baseline laboratory results, would not have immediately referred Mr. Crowson to the emergency room.   The nurse demonstrated multiple times his indifference to the actual serious findings that by license and training he should have clearly recognized and

dealt with in a timely manner.  Leaving a patient with a pulse of 188 the prior evening and finding that it was still elevated at a rate of 140 the following morning and then not taking immediate action is not merely malpractice it is just not caring and demonstrates willful disregard.  There is a pattern of incompetence demonstrated by a dysfunctional system which lacked basic policies, procedures and practices to care for Mr. Crowson's serious medical condition and provide him with access to care, an accurate diagnosis and appropriate not contraindicated treatment.  The Sheriff and County Officials either knew or should have known how lacking the system in the Purgatory Correctional Facility was.  There is no evidence of that a response to this sentinel event involving Mr. Crowson was undertaken and corrective action taken based on the findings.  It should have resulted in the creation and implementation of policy, procedures and practices that would likely prevent such events in the future.  The is the very essence of not caring and being indifferent by those ultimately responsible parties for which inmates/detainees had to rely for their health care and safety.

I reserve the right to add to or amend the opinions expressed herein and expressly reserve the right to do so as additional information becomes available through discovery in this case.

**V. Exhibits that will be used to summarize or support the opinions.**

Records as listed above (as needed).

**VI. List of all other cases in which the witness has testified in deposition or trial within the last four years.**

- Tina Drake, PR vs. Salvatore Bianco, MD. (deposition)

- Kent Richard Ellis v. Corizon, et al. (deposition)

- Stephen Hammonds vs. Dr. Robert Theakston, MD (deposition)

- Timothy Harlan vs. Corizon Health, Inc, et al. (deposition)

- Marinay v. Corizon, LLC et al. (deposition)

I have testified once in trial within the past 4 years—Hammers, et al. v. Dennis Sale, DO, et al. Case No. 2:15-cv-07994-CM-KGG, U.S. District Court for the District of Kansas.

### VII. Publications past 10 years:

- The Challenges of Providing Health Care and Mental Health Services to Juveniles published in *Corrections Today*, June/July 2012.
- Strongyloidiasis in the Lost Boys of the Sudan—CDC, multiple authors.
- Substance Abuse 101 for correctional officer as coauthor in Corrections Today.

### VIII. Hourly rate:

My fees are as follows:

$ 450.00 per hour for records review and preparation of documents

$ 550.00 per hour for depositions in Phoenix

$ 4,500.00 per day for court appearance with reimbursement of any expenses incurred for an appearance/deposition out of town.

_____
Robert D. Jones, MD