THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| MARTIN CROWSON,<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON COUNTY; CORY C. PULSIPHER, acting Sheriff of Washington County; JUDD LAROWE; and MICHAEL JOHNSON,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING [143] DEFENDANT WASHINGTON COUNTY'S THIRD MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:15-cv-00880-DBB<br><br>District Judge David Barlow |

Before the court is Defendant Washington County's (the "County") Third Motion for Summary Judgment[1] on Plaintiff Martin Crowson's ("Mr. Crowson") claims under 42 U.S.C. § 1983. For the reasons below, the court grants the County's motion.[2]

## BACKGROUND[3]

*Mr. Crowson's Medical History*

Mr. Crowson was incarcerated at Washington County Jail (the "Jail") from June 11 to July 1, 2014.[4] On June 25, a Jail officer saw Mr. Crowson in the dining area and noted that he "appeared to . . . be lethargic or slow."[5] Medical staff described Mr. Crowson as looking "dazed and confused" and remarked that he was "███████████

---

[1] Third Mot. Summ. J., ECF No. 143, filed May 5, 2023.
[2] Having reviewed the parties' briefing and relevant law, the court concludes the motion may be resolved without oral argument. *See* DUCivR 7-1(g).
[3] The court views the evidence "in the light most favorable to the non-moving party[.]" *Klein v. Roe*, 76 F.3d 1020, 1028 (10th Cir. 2023) (citation omitted).
[4] Am. Compl. ¶ 14, ECF No. 7.
[5] Dep. of Brett Lyman ("Lyman Dep.") 75:18–22, ECF No. 136-6; Jail Log, ECF No. 76-8, at 4.

1

▮▮▮▮."[6] Concerned, staff transferred him to a medical holding cell for observation.[7] No record exists as to whether medical staff checked on Mr. Crowson June 26 or 27.[8]

On June 28, a nurse reported that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[9] The nurse notified the Jail's doctor of Mr. Crowson's symptoms and the doctor ordered a chest x-ray and a blood test.[10] The nurse could not draw blood and medical staff never completed the test.[11] The next day, the nurse noted that Mr. Crowson "▮▮▮▮▮▮▮▮▮▮"[12] Medical staff "concluded that [he] was experiencing drug or alcohol withdrawal."[13] As a result, the doctor prescribed Librium and Ativan to treat the suspected withdrawal symptoms.[14] Though Mr. Crowson's vitals "▮▮▮▮▮▮▮▮" he told a nurse "▮▮▮▮▮▮▮▮▮▮▮▮."[15] The nurse informed Mr. Crowson "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[16] On July 1, the nurse documented that Mr. Crowson's "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



---

[6] *Crowson v. Washington County*, 983 F.3d 1166, 1175 (10th Cir. 2020) (citation omitted); *see* Jail Med. Records (sealed), ECF No. 71, at 8, 28 (noting Mr. Crowson was "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").
[7] *Crowson*, 983 F.3d at 1175.
[8] *Id.*; Dep. of Dr. Judd Larowe ("Larowe Dep.") 24:2–25:23, ECF No. 91-2.
[9] *Crowson*, 983 F.3d at 1175; Jail Med. Records (sealed) 24–25.
[10] *Crowson*, 983 F.3d at 1175.
[11] *Id.*
[12] *Id.* at 1176; Jail Med. Records (sealed) 25.
[13] *Crowson*, 983 F.3d at 1173.
[14] *Id.* at 1176; Larowe Dep. 41:6–43:25; Jail Med. Records (sealed) 18–19. Ativan (lorazepam) and Librium (chlordiazepoxide) "are both popular treatments for alcohol-withdrawal syndrome." Channaveerachari Naveen Kumar, Chittaranjan Andrade & Pratima Murthy, *A Randomized, Double-blind Comparison of Lorazepam and Chlordiazepoxide in Patients with Uncomplicated Alcohol Withdrawal*, 70 J. Stud. on Alcohol & Drugs 467 (May 2009).
[15] *Crowson*, 983 F.3d at 1176; Jail Med. Records (sealed) 28 (noting on the June 29 morning check that Mr. Crowson ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[16] Jail Med. Records (sealed) 28.

2

▆▆▆▆."[17] After the nurse informed the doctor of the latest symptoms, the doctor ordered Mr. Crowson transported to Dixie Regional Medical Center (the "Hospital") for further evaluation.[18]

Hospital staff accurately diagnosed Mr. Crowson with toxic-metabolic encephalopathy.[19] He received treatment for the "residual effects of encephalopathy, liver disease, and other problems" over the next six days.[20] After his discharge, Mr. Crowson spent two months convalescing at his mother's home.[21] He continued to experience "severe memory and focus problems" during his recovery.[22] On September 7, 2014, he returned to the Jail.[23]

*Jail Grievance Policy*

The Jail "has a comprehensive grievance system where an inmate can grieve any aspect of their incarceration."[24] The grievance policy (the "Policy") is "always available for inmates to

---

[17] *Crowson*, 983 F.3d at 1176; Jail Med. Records (sealed) 28.
[18] *Crowson*, 983 F.3d at 1176; Jail Med. Records (sealed) 28.
[19] Larowe Dep. 32:4–16. "[T]oxic metabolic encephalopathy is a condition in which brain function is disturbed either temporarily or permanently due to different diseases or toxins in the body. Metabolic encephalopathies may be reversible if the preexisting disorders are treated. If left untreated, they may result in brain damage." Andrea Craig Armstrong, *Prison Medical Deaths and Qualified Immunity*, 112 J. Crim. L. & Criminology 79, 104 (2022) (quoting Karthik Kumar, *What is Metabolic Encephalopathy?*, MedicineNet (Oct. 1, 2020), https://www.medicinenet.com/what_is_metabolic_encephalopathy/article.htm [https://perma.cc/5JXD-2TCN]).
[20] *Crowson*, 983 F.3d at 1176.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] Decl. of John Zwahlen ("Zwahlen Decl.") ¶ 7, ECF No. 144; Decl. of Sheriff Cory Pulsipher in Support of Def.'s Mot. for Summ. J. ("Pulsipher Decl.") ¶ 10, ECF No. 69; *see* Jail Grievance Policy, ECF No. 128-2.
    Mr. Crowson objects to the Zwahlen Declaration because Mr. Zwahlen and the grievances were not disclosed in the County's "initial disclosures as required by Federal Rule of Civil Procedure 26." Mem. in Opp'n to Washington County's Third Mot. for Summ. J. ("Opp'n") 8, ECF No. 150. Mr. Crowson also invokes Rule 37(c)(1), stating, "If a party fails to provide information or identify a witness by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial . . . ." *Id.*
    The County rejoins that Mr. Crowson left off the following from Rule 37(c)(1): "[U]nless the failure [to disclose] was substantially justified or is harmless." The County further cites Tenth Circuit precedent: "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002) (quoting *Woodworker's Supply, Inc. v. Principal Mut. Life Ins*, 170 F.3d 985, 993 (10th Cir. 1999)). *Jacobsen* identified four factors a court should consider for justification or harmlessness: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Woodworker's Supply*, 170 F.3d at 993.

file grievances and complaints to address any type of harm."[25] Inmates are "encouraged to resolve grievances at the lowest level, when possible and appropriate."[26] The Policy allows inmates to appeal answered grievances.[27] "[A]fter two levels of appeals, an inmate has exhausted their administrative remedies and the issue [is] ripe for a lawsuit."[28] Grievances "should be filed within seven days of the event being grieved."[29] The Jail "should" answer within seven days and an extension "beyond seven days require[s] notification to the inmate."[30] "[I]nmates can [also] file requests, which are . . . more informal ways an inmate can ask for something at the Jail, like a change in classification or . . . getting a particular item from the commissary."[31]

For inmates lacking "the skills necessary to submit a grievance form on their own[,]" they "may seek help from other inmates or [Jail] employees when preparing a grievance."[32]

---

The County argues that its need to expand the exhaustion arguments justifies the declaration. *See* ECF No. 141 (ordering additional briefing on the failure-to-exhaust argument); Washington County's Reply Mem. in Support of its Third Mot. for Summ. J. ("Reply") 7–8, ECF No. 153. Because the original declarant on grievance issues—Sheriff Pulsipher—died, the County enlisted a new declarant—Mr. Zwahlen. *Id.* at 7–8. The information in Mr. Zwahlen's declaration is similar to what Sheriff Pulsipher could have been provided. Based on their positions, each declarant had access or would have had access to the County's grievance policy and records. This particular information was not dependent on the individual experiences of the declarant but on each declarant's access to policy and records. If Sheriff Pulsipher had lived long enough to amend his declaration to include the more detailed information, he would have had access to and provided the same information as Mr. Zwahlen. This fact supports the lack of harm or prejudice to Mr. Crowson, who would have faced the same evidence on grievances. In essence, this means there was also no prejudice to cure and no potential to disrupt a trial. *See Woodworker's Supply*, 170 F.3d at 993. As the County highlights, "if this case proceeds to trial, any PLRA affirmative defense will have been lost, so [Mr. Zwahlen's] testimony will not be necessary[.]" Reply 8. And there appears to be no "bad faith or willfulness" shown by the County, which was reacting to a declarant's death. *Woodworker's Supply*, 170 F.3d at 993.

Crucially, Mr. Crowson has not argued or analyzed these points. He instead simply identifies Rule 37(c)(1)'s language prohibiting use of evidence not previously disclosed under Rule 26, without even acknowledging the exceptions, let alone suggesting why the exceptions would not apply here. Thus, the court allows the use of Mr. Zwahlen's declaration for the instant Memorandum Decision and Order.

[25] Pulsipher Decl. ¶ 11; Jail Grievance Policy 2 ("In general, all inmate complaints should be grievable.").
[26] Jail Grievance Policy 2.
[27] *Id.* at 3.
[28] Zwhalen Decl. ¶ 7.
[29] Jail Grievance Policy 3.
[30] *Id.*
[31] Zwhalen Decl. ¶ 10.
[32] Jail Grievance Policy 2.

"[D]isabled . . . inmates shall receive special assistance when necessary."[33] "For grievances of an emergency nature (e.g., medical, safety, etc.), information may be taken and forwarded verbally in order to expedite possible resolution."[34] All Jail employees are "trained in how to expedite emergency grievances" and document them in the Jail's computer system.[35]

*Mr. Crowson's Grievances and Requests*

On October 11, November 11, and November 19, 2013, Mr. Crowson filed grievances for various non-medical issues.[36] Jail officials responded promptly. For the November 19 submission, a Jail official informed Mr. Crowson that his grievance had been "submitted more than seven days from the incident date . . . . Being timely in when you turn in your grievances helps in us taking care of an issue before it becomes a big problem. Also I have already answered another grievance about the same subject . . . in October."[37]

After his return to the Jail in September 2014, Mr. Crowson filed eight other requests or grievances.[38] He submitted a request on November 8 asking for his Jail medical history.[39] Ten days later, the Jail responded: "Medical does not release medical records while you are still incarcerated. If you have a specific question, Medical will discuss it with you. You may request your records after you are released."[40] Mr. Crowson entered a request on November 18. He complained that someone tampered with his mail and that "[he] know[s] this should have its own

---

[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *See* Zwahlen Decl. ¶ 16 & Exs. 11–13, ECF Nos. 144-2, 144-3, 144-4. For example, on October 11, Mr. Crowson filed a request about how a Jail officer allegedly "ha[d] something against [him]." ECF No. 144-2, at 3.
[37] ECF No. 144-4, at 3.
[38] Zwahlen Decl. ¶ 16.
[39] ECF No. 144-7, at 2.
[40] *Id.*

greivance [sic], however [a] deputy . . . has been telling people . . . that [he] was a faker & just trying to get [ ] mental health court after [he] was sent to the hospital after th[e] [J]ail overdosed [him] on [L]ibrium[.]"[41] Even though the seven days during which a grievance "should" be filed had passed, the Jail said he "should submit a formal grievance on this if [he] fell [sic] strongly about it. Include specific facts, dates[,] etc."[42]

It is undisputed that Mr. Crowson never filed a grievance about the Jail's actions (or lack thereof) that form the basis of this lawsuit.[43]

*Procedural History*

On December 15, 2015, Mr. Crowson sued the County, the County Sheriff, and the Sheriff's office for claims of deliberate indifference under the Eighth Amendment, violations of the Utah Constitution, and commission of state-law torts.[44] He amended his complaint in March 2016.[45] Several parties and claims were subsequently dismissed by court order or stipulation.[46] The remaining defendants moved for summary judgment in August and September 2018.[47] The court granted in part and denied in part the motions in July 2019.[48] Mr. Crowson filed an interlocutory appeal the next month.[49] On January 20, 2021, the Tenth Circuit reversed the denial of summary judgment to the County on the failure-to-train claim; dismissed Mr. Crowson's claims against the Jail doctor and nurse on the grounds of qualified immunity;[50] and dismissed

---

[41] ECF No. 144-1, at 2.
[42] *Id.*
[43] Pulsipher Decl. ¶ 12; Zwahlen Decl. ¶ 15.
[44] *See* Compl., ECF No. 2; Zwahlen Decl. ¶ 12.
[45] *See* Am. Compl.
[46] *See* ECF Nos. 49, 63, 93.
[47] ECF Nos. 66, 73.
[48] ECF No. 93.
[49] ECF Nos. 94–96.
[50] Order on Remand, ECF No. 114 (Defendants Michael Johnson and Judd LaRowe).

the County's appeal as to the "systemic failure claim," stating that it lacked jurisdiction to consider the issue.[51] The court remanded.[52]

In February 2022, the County filed a second motion for summary judgment addressing the "systemic failure" claim and arguing that Mr. Crowson had failed to administratively exhaust his claim.[53] After review, the court ordered the parties to refile their briefings to address in greater detail the administrative-exhaustion issue as well as the "systemic failure" issue.[54] On May 5, 2023, the County filed its Third Motion for Summary Judgment.[55] Mr. Crowson filed a response on June 20.[56] The County replied on July 12.[57]

## STANDARD

Courts grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[58] The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material*

---

[51] *Crowson*, 983 F.3d at 1192. The court defined the "systemic failure" claim as "the broader claim that the County's policy of failing to properly train nurses and guards, combined with its policy of relying on a largely absentee physician, evidenced deliberate indifference to Mr. Crowson's serious medical condition." *Id.* at 1193.
[52] ECF No. 109.
[53] *See* ECF No. 128.
[54] ECF No. 141. The County argued failure to exhaust as a ground for dismissal in its first and second motions for summary judgment. *See* ECF Nos. 66, 128. Because the court found additional briefing necessary for the court to properly consider both issues, ECF No. 141, it granted leave for the County "to re-file [its] motion so that Plaintiff and Defendant c[ould] thoroughly and adequately address both issues": the "failure to exhaust administrative remedies" issue and the "systemic failure" issue, *id.* (quoting ECF No. 120, at 2).
[55] *See* Third Mot. for Summ. J. The action involves Defendant Cory C. Pulsipher ("Sheriff Pulsipher"), who remains in this case only in his official capacity. *See* Am. Compl. ¶ 11; ECF No. 49, at 5–7 (dismissing claims against Sheriff Pulsipher in his individual capacity). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Brown v. Buhman*, 822 F.3d 1151, 1162 n.10 (10th Cir. 2016) (citation omitted). To avoid confusion, the court therefore omits reference to Sheriff Pulsipher when discussing the County's liability.
[56] *See* Opp'n.
[57] *See* Reply.
[58] Fed. R. Civ. P. 56(a).

fact."[59] "To determine whether a 'genuine issue' as to a material fact exists, [the court] consider[s] 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"[60] "Mere allegations unsupported by further evidence . . . are insufficient to survive a motion for summary judgment."[61] "A fact is material if it can 'have an impact on the outcome of the lawsuit[.]'"[62]

"After the moving party has identified a lack of a genuine issue of material fact, the nonmoving party has the burden to cite to specific facts showing that there is a genuine issue for trial."[63] It may do so by "'citing to particular parts of materials in the record' or by showing that the moving party has relied on insufficient or inadmissible evidence."[64] "[T]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[65] "Unsubstantiated allegations carry no probative weight in summary judgment proceedings."[66] The court "look[s] at the factual record and the reasonable inferences to be drawn from the record in the light most favorable to the non-moving party."[67]

---

[59] *Klein*, 76 F.3d at 1028 (emphases in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1171 (10th Cir. 2021) ("To survive a motion for summary judgment, the nonmoving party must show more than '[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position . . . [;] there must be evidence on which the jury could reasonably find for the [nonmoving party].'" (alterations in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986))).
[60] *Klein*, 76 F.3d at 1028 (quoting *Anderson*, 477 U.S. at 251–52).
[61] *James v. Wadas*, 724 F.3d 1312, 1319–20 (10th Cir. 2013) (citation omitted); *see Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings." (citation omitted)).
[62] *N.M. Oncology*, 994 F.3d at 1171 (quoting *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1216 (10th Cir. 2000)).
[63] *Ezell v. BNSF Ry. Co.*, 949 F.3d 1274, 1278 (10th Cir. 2020) (cleaned up).
[64] *Id.* (quoting Fed. R. Civ. P. 56(c)(1)(A)–(B)).
[65] *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. 2022) (citation omitted).
[66] *Id.* (quoting *Hasan*, 935 F.3d at 1098).
[67] *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (citing *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

## DISCUSSION

Before the court can reach the merits, it must analyze whether the County has demonstrated Mr. Crowson failed to exhaust his administrative remedies. If the County presents a prima facie case, the court next determines whether Mr. Crowson can show the remedies were "unavailable" under the Prison Litigation Reform Act ("PLRA").

### I. Mr. Crowson Did Not Exhaust his Administrative Remedies and Does Not Show that Remedies Were Unavailable.

In passing the PLRA, Congress "impos[ed] a strict administrative-exhaustion requirement . . . [on] civil-rights claims filed by prisoners."[68] "No action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies *as are available are exhausted*."[69] Exhaustion serves two important goals. First, it gives agencies "opportunit[ies] to correct [their] own mistakes with respect to the programs [they] administer before [they are] haled into federal court" such that it discourages "disregard of [agency] procedures[,] and *second*, it promotes efficiency[.]"[70] "[A] court may not excuse a failure to exhaust, even to take [special] circumstances into account . . . . Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to. . . . [M]andatory exhaustion statutes like the PLRA . . . foreclos[e] judicial discretion."[71]

---

[68] *Pakdel v. City and Cnty. of San Francisco*, 141 S. Ct. 2226, 2231 (2021) (per curiam) (citing 42 U.S.C. § 1997e(a)).
[69] § 1997e(a) (emphasis added).
[70] *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (emphasis added) (citations omitted).
[71] *Ross*, 578 U.S. at 639 (citations omitted); *see id.* ("'[Courts] are not free to rewrite the statutory text' when Congress has strictly 'bar[red] claimants from bringing suit in federal court until they have exhausted their administrative remedies.'" (alteration in original) (quoting *McNeil v. United States,* 508 U.S. 106, 111, 113 (1993))).

The exhaustion doctrine demands "'proper exhaustion'—that is, 'compliance with an agency's deadlines and other critical procedural rules.'"[72] "Otherwise, parties who would 'prefer to proceed directly to federal court' might fail to raise their grievances in a timely fashion and thus deprive 'the agency [of] a fair and full opportunity to adjudicate their claims.'"[73] "Proper exhaustion" intends use of "all steps the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)."[74] "[R]ules are defined not by PLRA, but by the prison grievance process itself."[75] The Supreme Court notes that this requirement will stymie some prisoner cases, but observes that a "centerpiece of the PLRA's effort 'to reduce the quantity . . . of prisoner suits' is an 'invigorated' exhaustion provision[.]"[76]

Failure to exhaust administrative remedies is an affirmative defense.[77] The burden is on the defendant to make out a prima facie case of exhaustion.[78] But when "a defendant has established that an inmate did not exhaust his or her administrative remedies, the burden shifts to the plaintiff to establish the grievance process was unavailable."[79] "[W]hether a remedy is

---

[72] *Pakdel*, 141 S. Ct. at 2230 (citation omitted).
[73] *Id.* (citations omitted); *see Woodford*, 548 U.S. at 95 ("A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction[.]").
[74] *Woodford*, 548 U.S. at 90 (citation omitted).
[75] *Jones v. Bock*, 549 U.S. 199, 218 (2007).
[76] *Woodford*, 548 U.S. at 84 (quoting *Porter*, 534 U.S. at 524); *see also id.* at 103 (responding to argument "that requiring proper exhaustion is harsh for prisoners, who generally are untrained in the law and are often poorly educated," the Court notes "that prisoners who litigate in federal court generally proceed *pro se* and are forced to comply with numerous unforgiving deadlines and other procedural requirements").
[77] *Jones*, 549 U.S. at 216.
[78] *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007).
[79] *Sanchez v. Corizon Health, Inc.*, No. 21-8069, 2022 WL 4857122, at *4 (10th Cir. Oct. 4, 2022) (not selected for publication) (citing *May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019)).

available to exhaust is a fact-specific inquiry."[80] The court first examines whether the County meets its burden to show a failure to exhaust administrative remedies.[81]

### A. The County Makes Out a Prima Facie Case That Mr. Crowson Did Not Exhaust His Administrative Remedies.

The threshold question is whether Mr. Crowson exhausted his administrative remedies. The Jail's formal grievance system lets inmates raise complaints and other concerns.[82] Except for situations not applicable here, "all inmate complaints should be grievable[.]"[83] Mr. Crowson was familiar with the Policy. He filed at least twelve requests or grievances.[84] Yet none directly address Mr. Crowson's § 1983 claim for the Jail's alleged denial of medical care between June 25 and July 1, 2014.[85] Mr. Crowson offers no evidence to the contrary. For these reasons, there is no genuine dispute of material fact that the County satisfies its burden to show a failure to exhaust administrative remedies. The burden shifts to Mr. Crowson to demonstrate the Policy's unavailability.

---

[80] *Smallwood v. Williams*, 59 F.4th 306, 314 (7th Cir. 2023); *accord Sedillo v. N.M. Dep't of Corr.*, No. 1:20-cv-01019, 2021 WL 2894745, at *4 (D.N.M. July 9, 2021) (citing *Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010)).
[81] *See, e.g.*, *Bateast v. Orunsolu*, No. 22-3093, 2023 WL 3072669, at *5 (D. Kan. Apr. 25, 2023) ("The issue of Plaintiff's failure to exhaust his available administrative remedies before filing his lawsuit must be determined before reaching the merits of his lawsuit.").
[82] *See* Jail Grievance Policy.
[83] *Id.* at 2.
[84] Zwahlen Decl. ¶ 16.
[85] *Id.* at ¶ 11; Pulsipher Decl. ¶ 12. The closest Mr. Crowson comes to addressing an alleged constitutional violation was his November 18, 2014 request. While complaining about mail tampering and a Jail deputy telling "people in [F] block that [he] was a faker[,]" Mr. Crowson says he was "sent to the hospital after th[e] jail overdosed [him] on [L]ibrium[.]" ECF No. 144-1, at 2. But this bare-bones assertion is not enough. In fact, Mr. Crowson declined to submit a formal grievance after the Jail's invitation to do so. *Id.* ("You should submit a formal grievance on this if you fell [sic] strongly about it.").

      **B.**    **Mr. Crowson Does Not Meet His Burden to Show That the Jail Grievance Process Was "Unavailable."**

Mr. Crowson contends the grievance process was unavailable because he "was mentally incompetent and locked in a cell without access to the communal area['s]" kiosks during the relevant time frame.[86] The County contends Mr. Crowson did not ever file a grievance despite the process's availability and his familiarity with the process.[87]

"The PLRA does not impose an exhaustion requirement unless administrative remedies are 'available.'"[88] The Supreme Court in *Ross v. Blake* noted that "the ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose, and that which is accessible or may be obtained.'"[89] The Court identified three non-exhaustive situations "in which an administrative remedy, although officially on the books, is not capable of use to obtain relief."[90] These are: (1) "[W]hen [the procedure] operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates";[91] (2) "[A]n administrative scheme might be so opaque that it becomes, practically speaking, incapable of use"—i.e., "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it";[92] and (3) "[W]hen prison administrators thwart inmates from taking advantage of a

---

[86] Opp'n 37. Mr. Crowson asserts he could only file a grievance within seven days of the event at issue. *Id.* at 38. According to Mr. Crowson, the relevant period spanned June 25, 2014 to July 1, 2014—when he was in the Jail's medical observation cell. *Id.* at 39.
[87] Third Mot. for Summ. J. 30–33.
[88] *May*, 929 F.3d at 1234.
[89] *Ross*, 578 U.S. at 642 (internal quotation marks omitted) (quoting *Booth v. Churner*, 532 U.S. 731, 737–38 (2001)); *see id.* ("[A]n inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" (quoting *Booth*, 532 U.S. at 738)).
[90] *Id.* at 643.
[91] *Id.*
[92] *Id.* at 644 (stating that because the "administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion").

grievance process through machination, misrepresentation, or intimidation."[93] If the process has "multiple reasonable interpretations, . . . the inmate should err on the side of exhaustion."[94]

To support his contention that the process was unavailable, Mr. Crowson makes two arguments. He first argues he could not file a grievance during the mandatory seven-day period because he had no access to a kiosk[95]—in his words, "there was never a time when he was competent or capable of filing a grievance during the required period."[96] And he argues that the Jail prevented him from filing a grievance when it denied his November 2014 request for medical records.[97] The court addresses each argument in order.

### 1. The Undisputed Evidence Shows That the Grievance Policy Was Available for Mr. Crowson to Grieve the Alleged Denial of Medical Care.

Mr. Crowson first argues the Policy was unavailable because he was incoherent and without access to a kiosk during the relevant seven-day period. He contends that "[u]nder the policy, [he] had seven days to file a grievance," which he calculates to be June 25 to July 1, 2014.[98] But he claims that while confined to the medical holding cell, he "had neither access to the grievance kiosk nor the mental coherence to file a grievance[.]"[99] Accordingly, he argues that the Policy was "so opaque that it bec[ame], practically speaking, incapable of use . . . ."[100]

---

[93] *Id.*
[94] *Id.*
[95] Opp'n 40.
[96] *Id.* at 39. The Jail's grievance process specified that to grieve, an inmate must complete and submit an electronic grievance form via an inmate kiosk. Jail Grievance Policy 3.
[97] Opp'n 41.
[98] *Id.* at 39. During this time, Jail staff placed Mr. Crowson in a medical observation cell after he exhibited symptoms of confusion and memory loss. *See Crowson*, 983 F.3d at 1175–76. Mr. Crowson does not explain why he believes the seven-day period would begin to run the first day he was observed to be symptomatic as opposed to the day when the Jail doctor allegedly failed to order a head or brain examination, the last day before the jail took him to the Hospital, or the date on which he was accurately diagnosed or informed of that diagnosis.
[99] Opp'n 39.
[100] *Id.* (quoting *Ross*, 578 U.S. at 644).

To start, Mr. Crowson does not demonstrate that the Policy bars inmates from filing late grievances. The Policy states that "[g]rievances *should* be filed within seven days of the event being grieved."[101] The use of "should" when referring to timeliness is unlike the Policy's repeated use of "shall,"[102] and differs from a jail's policy where an inmate is instructed that he "must" submit grievances within seven days.[103] Black's Law Dictionary defines "should" as "ordinarily impl[ying] duty or obligation*; although usually no more than an obligation of propriety or expediency*."[104] To be sure, some courts "do not always interpret 'should' as permissive."[105] But other courts conclude that "the term 'should' often connotes a strong *suggestion*, not a requirement."[106] As such, the Policy should not be read as categorically excluding grievances filed seven days after the relevant event. The use of "should" for inmate grievances and jail responses, contrasted with the mandatory "shall" used elsewhere, together with the breadth of the ordinary meaning of "should" to encompass things of propriety, expectation, or expedience, do not show that the seven-day period operates as a complete bar to later grievances.

---

[101] Jail Grievance Policy 3 (emphasis added).
[102] *See id.* (thirteen instances of "shall").
[103] *Crocco v. Van Wickler*, 596 F. Supp. 3d 325, 328 (D.N.H. 2022).
[104] *Should*, Black's Law Dictionary (6th ed. 1990); *see Should*, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/should (last visited Sept. 5, 2023) ("used in auxiliary function to express condition" or "to express futurity from a point of view in the past"); *Should*, Oxford English Dictionary (Oxford Univ. Press, July 2023), https://doi.org/10.1093/OED/6856792294 ("In statements of duty, obligation, or propriety . . . . Also, in statements of expectation, likelihood, prediction, etc.").
[105] *United States v. Montgomery*, 462 F.3d 1067, 1069 (9th Cir. 2006) (citing *United States v. Smith*, 282 F.3d 1045, 1047–48 (8th Cir. 2002); *United States v. Paladino,* 401 F.3d 471, 484 (7th Cir. 2005)).
[106] *Montgomery*, 462 F.3d at 1069 (emphasis added); *accord Edakunni v. Mayorkas*, No. 2:21-cv-00393, 2022 WL 2439864, at *6 (W.D. Wash. July 5, 2022); *see United States v. Maria*, 186 F.3d 65, 70 (2d Cir. 1999) ("[T]he common meaning of 'should' suggests or recommends a course of action[.]"); *Schoen v. Bank of Am., N.A.*, No. 2:17-cv-648, 2019 WL 590882, at *15 (S.D. Ohio Feb. 13, 2019) ("[T]he Court reads the word 'should' . . . as merely a suggestion or a best practice, not a mandatory requirement.").

In any event, the undisputed evidence shows Mr. Crowson knew about the Policy and his ability to file grievances outside of the seven-day window. He submitted three grievances before the June–July 2014 incident. On November 19, 2013, he complained about an earlier incident where a Jail deputy allegedly "h[ad] something against him."[107] The Jail responded: "[T]his . . . grievance was submitted more than seven days from the incident date, . . . almost two months from when it happened. Being timely . . . helps in us taking care of an issue before it becomes a big problem. Also I have already answered another grievance about the same subject . . . . [T]he answer stands . . . ."[108] Jail officials did not deny the grievance for its untimeliness. They did not ignore it. And they did not tell Mr. Crowson he could never file a late grievance. Instead, they said timely grievances were merely *helpful*. In addition, officials resolved his grievance by directing Mr. Crowson to an earlier response.

Contrary to Mr. Crowson's assertion,[109] the Policy also allowed for alternative filing methods. Inmates could seek help from other inmates or Jail employees. Disabled inmates could "receive special assistance when necessary."[110] Plus, for emergency grievances such as medical issues, "information [could] be taken and forwarded verbally . . . to expedite possible resolution."[111] Mr. Crowson points to no evidence that he ever asked other inmates or Jail employees to help him grieve, and he does not explain why he could not do so.[112] At a minimum,

---

[107] ECF No. 144-4, at 3.
[108] *Id.*
[109] Opp'n 40 ("At that time, the policy did not provide an alternative method to file a grievance.").
[110] Jail Grievance Policy 2.
[111] *Id.*
[112] *Cf. Lanaghan v. Koch*, 902 F.3d 683, 688–89 (7th Cir. 2018) (finding that a remedy was unavailable when an inmate tried to file a grievance but jail officials denied him the means to fill out the required paperwork).

Mr. Crowson could have used a kiosk upon his return to Jail in September 2014.[113] But he did not do so.

Mr. Crowson's November 18, 2014, administrative request shows that the Jail would not have prevented him from filing a late grievance. In this request, Mr. Crowson's chief complaint was that some of his mail "was opened when [he] received it" and he asked the Jail to address the matter.[114] He also said that a Jail "deputy . . . [was] telling people . . . that [he] was a faker & just trying to get [ ] mental health court after [he] was sent to the hospital after th[e] [J]ail overdosed [him] on [L]ibrium[.]"[115] Tellingly, he said that "[he] know[s] this should have its own greivance [sic][.]"[116] The Jail did not tell Mr. Crowson he was barred from grieving the five-month-old incident. A Jail official instead responded: "You should submit a formal grievance . . . if you fell [sic] strongly about it. Include specific facts, dates[,] etc."[117] Rather than rejection, the Jail *invited* Mr. Crowson to file a grievance over something that happened many months earlier. That he did not accept the Jail's invitation is of no moment. The Jail's response is strong evidence that remedies were available even outside of the seven-day window. Simply put, without even trying to submit a delayed grievance, Plaintiff impermissibly speculates that the Jail would not have accepted such a grievance.[118] His own experience with the grievance process showed otherwise.

---

[113] *See* ECF No. 144, at ¶ 16 & Exs. 14–22 (listing Mr. Crowson's grievances filed post-September 2014).
[114] ECF No. 144-1, at 2.
[115] *Id.*
[116] *Id.*
[117] *Id.*
[118] *See Woodford*, 548 U.S. at 102 ("Respondent contends that requiring proper exhaustion will lead prison administrators to devise procedural requirements that are designed to trap unwary prisoners and thus to defeat their claims. Respondent does not contend, however, that anything like this occurred in his case, and it is speculative that this will occur in the future.").

It is undisputed Mr. Crowson never tried to file a grievance for the Jail's purportedly unconstitutional acts. He alleges he could only grieve between June 25 and July 1, 2014, when he "had neither access to the grievance kiosk nor the [requisite] mental coherence[.]"[119] Yet while required to do so, Mr. Crowson does not support with admissible evidence his allegations of grievance-process "unavailability"—that "he was mentally incompetent"; "locked in a cell without access to the communal area"; or "there was never a time when he was competent or capable of filing a grievance during the required period."[120] And he does not offer evidence, let alone explanation, as to why he never tried to grieve after July 1. Mr. Crowson simply asserts that "[i]t was impossible for him to file a grievance[.]"[121] His cursory conclusions are insufficient.

After the defendant shows a failure to exhaust, "the onus falls on the plaintiff to show that remedies were unavailable to him."[122] The County has made out a prima facie case. Because Mr. Crowson presents no evidence to support his assertions, he fails to carry his burden. In sum, the Policy is neither "so opaque that it becomes . . . incapable of use" nor is it "a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."[123]

---

[119] Opp'n 39.
[120] *Id.* at 37, 39. It might well be the case that Mr. Crowson was sufficiently mentally diminished for some or even all of the time period in question. But he bears the burden on unavailability and does not carry that burden.
[121] Opp'n 40.
[122] *May*, 929 F.3d at 1234 (quoting *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011)).
[123] *Ross*, 578 U.S. at 643.

### 2. The Undisputed Evidence Shows That the County Did not Thwart Mr. Crowson's Efforts to File a Grievance.

Mr. Crowson next argues that the Jail, and by extension the County, "affirmatively prevented [him] from learning the information necessary to know of his need to file a grievance."[124] On November 8, 2014, Mr. Crowson made a "grama [sic] request for all [his] medical history from [the Jail]."[125] The Jail replied that "Medical does not release medical records while you are still incarcerated. If you have a specific question, Medical will discuss it with you. You may request your records after you are released."[126] Mr. Crowson asserts that because the Jail rejected his request for medical records, he did not learn information "necessary to know of his need to file a grievance."[127]

The Supreme Court recognizes an exception to the PLRA's exhaustion requirement "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."[128] The Court reasons that "officials might devise procedural systems (including the blind alleys and quagmires . . . ) in order to 'trip[] up all but the most skillful prisoners.'"[129] As the Court explains, "such interference with an inmate's pursuit of relief renders the administrative process unavailable."[130]

Mr. Crowson does not show how the Jail thwarted his attempt to grieve. It appears he argues he had no idea the Jail's medical staff misdiagnosed him or gave him inadequate medical

---

[124] Opp'n 41.
[125] ECF No. 144-7, at 1; *see generally* Utah Code Ann. §§ 63G-2-101 to -901 (West 2023) ("Government Records Access and Management Act").
[126] ECF No. 144-7, at 2.
[127] Opp'n 41.
[128] *Ross*, 578 U.S. at 644.
[129] *Id.* (alteration in original) (quoting *Woodford*, 548 U.S. at 102).
[130] *Id.* (collecting cases that show prison officials preventing inmates' access to the grievance process with threats, intimidation, or trickery).

treatment until after he sued the Jail and received discovery.[131] This is circular reasoning. Under this theory, Mr. Crowson would not have known to file the action until he obtained discovery evidence—evidence that he could not get without filing the action. Besides, the November 18, 2014 request shows that Mr. Crowson had at least some idea the Jail may have wronged him[132]—for allegedly "overdos[ing] [him] on [L]ibrium"[133]—even without the benefit of his Jail medical records. Yet he did not try to submit a grievance even after the Jail invited him to do so.[134] Further, when Mr. Crowson requested his medical records, the Jail directed him to ask the medical department for information.[135] But Mr. Crowson produces no evidence that he ever tried to contact the Jail's medical staff. He also fails to assert, much less provide any evidence, that the Hospital did not inform him of his diagnosis, nor does he contend that he requested but did not receive his medical records from the Hospital.

In short, Mr. Crowson is left with his bare assertion that the County "thwarted and prevented [him] from filing a grievance for administrative relief prior to filing his lawsuit."[136] But Plaintiff offers no evidence that he did not know that he had been misdiagnosed or inadequately treated at the Jail, then was properly diagnosed and treated at the Hospital. Aside from the lack of evidence, it defies reason that Mr. Crowson did not know to grieve that he had been very sick and worsened under the Jail's care, only to improve and eventually obtain a discharge under the Hospital's care.

---

[131] Opp'n 41.
[132] ECF No. 144-1, at 2 ("[I] think im [sic] going to sue [the Jail] for medical malpractice.").
[133] *Id.*
[134] *Id.* ("You should submit a formal grievance on this if you fell [sic] strongly about it.").
[135] ECF No. 144-7, at 2 ("Medical will discuss it with you.").
[136] Opp'n 41.

Mr. Crowson failed to ever file a grievance on the subject underlying his lawsuit. Having failed to do so, he bears the burden of showing the process was unavailable to him. He has not done so. The County thus prevails on summary judgment due to Mr. Crowson's failure to exhaust his administrative remedies.

**II. The Court Does Not Reach the "Systemic Failure" Claim as There is No Genuine Dispute of Material Fact That Mr. Crowson Failed to Exhaust His Remedies.**

As explained above, Mr. Crowson did not exhaust his administrative remedies under the PLRA. The court therefore does not reach the issue of whether Mr. Crowson could prevail on a "systemic failure" theory.[137]

## ORDER

For the foregoing reasons, the court GRANTS Defendant Washington County's Third Motion for Summary Judgment.[138] Plaintiff's claims against Defendant Washington County are DISMISSED without prejudice for failure to exhaust administrative remedies under the Prison Litigation Reform Act.[139]

Signed September 20, 2023.

BY THE COURT

David Barlow
United States District Judge

---

[137] *See, e.g.*, *Huggins v. Reilly*, 679 F. App'x 679, 682 (10th Cir. 2017) (unpublished) ("Because we affirm based on failure to exhaust administrative remedies, we need not consider the parties' arguments about the merits of the underlying § 1983 claims.").
[138] ECF No. 143.
[139] The court also DISMISSES without prejudice Plaintiff's claims against Defendant Cory C. Pulsipher in his official capacity.